# EXHIBIT S

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| WSOU INVESTMENTS, LLC d/b/a BRAZOS LICENSING AND DEVELOPMENT, | §<br>§<br>§<br>§ | CIVIL ACTION NO. 6:20-cv-571 |
| Plaintiff, | §<br>§ | **JURY TRIAL DEMANDED** |
| v. | §<br>§ | |
| GOOGLE LLC, | §<br>§ | |
| Defendant. | §<br>§<br>§ | |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff WSOU Investments, LLC d/b/a Brazos Licensing and Development ("Brazos" or "Plaintiff"), by and through its attorneys, files this Complaint for Patent Infringement against Google LLC ("Google") and alleges:

**NATURE OF THE ACTION**

1.      This is a civil action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 1, *et seq.*, including §§ 271, 281, 284, and 285.

**THE PARTIES**

2.      Brazos is a limited liability corporation organized and existing under the laws of Delaware, with its principal place of business at 605 Austin Avenue, Suite 6, Waco, Texas 76701.

3.      On information and belief, Google is a Delaware corporation with a physical address at 500 West 2nd Street, Austin, Texas 78701.

**JURISDICTION AND VENUE**

4.      This is an action for patent infringement which arises under the Patent Laws of the United States, in particular, 35 U.S.C. §§ 271, 281, 284, and 285.

1

5.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C.
§§ 1331 and 1338(a).

6.      This Court has specific and general personal jurisdiction over the defendant
pursuant to due process and/or the Texas Long Arm Statute, because the defendant has committed
acts giving rise to this action within Texas and within this judicial district. The Court's exercise of
jurisdiction over the defendant would not offend traditional notions of fair play and substantial
justice because the defendant has established minimum contacts with the forum. For example, on
information and belief, the defendant has committed acts of infringement in this judicial district,
by among other things, selling and offering for sale products that infringe the asserted patent,
directly or through intermediaries, as alleged herein.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b). Google
is registered to do business in Texas. Google has offices in this District, has transacted business in
this District, and has committed acts of direct and indirect infringement in this District. Google
also has a regular and established place of business in this District, as set forth below.

8.      Since 2007, Google has employed "hundreds" of employees in this District in
Austin, Texas.[1]  As of August 2018, Google had more than 800 employees in Austin.[2]  By June of
2019, Google had more than 1,100 employees in Austin.[3]  In January 2019, it was reported that
Google "signed a lease for an entire 35-story tower that has started construction just east of the

---

[1] According to Gerardo Interiano, Google's public affairs and government relations manager, in a statement.  *See* http://www.statesman.com/business/google-lease-200-000-square-feet-new-downtown-austin-tower/SANZSa3du8QQ4k8ytOC2rJ/
[2] *See* https://www.statesman.com/news/20190131/source-google-to-occupy-35-story-office-tower-in-downtown-austin
[3]   *See*   https://www.bizjournals.com/austin/news/2019/06/14/google-confirms-austin-expansion-will-begin-moving.html

Central Library in downtown Austin."[4] Google's 35-story tower in Austin "will have 790,000 square feet of space, enough to potentially house about 5,000 people."[5]



Source:  https://www.statesman.com/news/20190131/source-google-to-occupy-35-story-office-tower-in-downtown-austin

9.      Articles report that Google's office in Austin would "would certainly be one of its most expansive offices in North America."[6]

10.     Google has 300,000 square feet of office space in Austin, Texas, at 500 West 2nd Street.[7] Google also has offices on North MoPac Expressway,[8] University Park, and Austin's Children Museum.[9]

---

[4] *Id.*
[5] *Id.*
[6] *See* https://9to5google.com/2019/01/31/google-signs-lease-austin-campus/
[7] *See* https://www.bizjournals.com/austin/news/2020/02/27/google-to-invest-10b-in-offices-and-data-centers.html
[8] *See* https://www.google.com/intl/en/about/locations/?region=north-america
[9] *See* http://www.statesman.com/business/google-lease-200-000-square-feet-new-downtown-austin-tower/SANZSa3du8QQ4k8ytOC2rJ/



Source: https://www.youtube.com/watch?v=RKA1RJYGOYQ



Source: https://www.bizjournals.com/austin/news/2019/10/28/inside-austins-coolest-offices.html#g/419929/15

4

11.    Google has, as of June 2020, fifty (50) job postings for Austin, TX.[10]

12.    Google's taxed appraised property values in Travis County (Austin) are approximately $1 billion.[11] Google's taxed appraised property values in in McLennan County (Waco) are approximately $75,000.[12] Google's taxed appraised property values in Bexar County (San Antonio) are approximately $50 million.[13] Google's taxed appraised property values in in El Paso are approximately $258,000.[14]

13.    Operationally, Google is a multinational technology company that collects, stores, organizes, and distributes data.  In addition to its service model for distribution of data (e.g., movies, search results, maps, music, etc.), Google has an expansive regime that gathers data on residents of this District through the hardware devices it sells (e.g., phones, tablets, and home audio devices) and, also, through the operating systems and apps it provides. As an example, Google gathers data when a resident runs its operating systems and apps (e.g., location services).[15] As another example, Google gathers data when a resident interacts with Google's plethora of services such as search, email, and music and movie streaming. *See* https://safety.google/privacy/data/ (indicating that Google gathers data from "things you search for," "Videos you watch," "Ads you view or click," "Your location," "Websites you visit," and "Apps, browsers, and devices you use to access Google services").  As yet another example, Google gathers data by listening and recording everything a resident says within proximity of one of its products, such as Google

---

[10]
https://careers.google.com/jobs/results/?company=Google&company=YouTube&hl=en&jlo=en-US&location=Austin,%20TX,%20USA
[11] *See* http://propaccess.traviscad.org
[12] *See* https://propaccess.trueautomation.com/clientdb/Property.aspx?cid=20&prop_id=378970
[13] *See* https://bexar.acttax.com/act_webdev/bexar/showdetail2.jsp?can=000001265355,
[14] *See* http://www.epcad.org/Search?Keywords=GOOGLE+INC&Year=2019
[15] *See* e.g., "AP Exclusive: Google tracks your movements, like it or not,"
https://apnews.com/828aefab64d4411bac257a07c1af0ecb/AP-Exclusive:-Google-tracks-your-movements,-like-it-or-not

Home.[16]  Others have reported that Google gathers "where you've been," "everything you've ever

searched – and deleted," "all the apps you use," "all of your YouTube history," "which events you

attended, and when," "information you deleted [on your computer]," "your workout routine,"

"years' worth of photos," and  "every email you ever sent."[17]

14.     Google takes these massive amounts of gathered data on residents of this District

and monetizes them, for example, through targeted advertising.  Some have reported that "creepy"

advertisements for items never searched for, but only spoken out loud, appeared. *See* e.g.,

https://www.youtube.com/watch?v=zBnDWSvaQ1I (conducting test on the term "dog toys"

spoken out loud, but never searched; tester claims targeted "dog toy" advertisements only appeared

after speaking the phrase out loud).

15.     In addition to extensive data gathering of information on residents of this District,

Google has a substantial presence in the District directly through the products and services Google

provides residents of this District (some of which also gather data).[18] One of Google's main

businesses in this District is delivering information, including digital content such as movies,

music, apps, and advertising.

---

[16] *See* https://www.unilad.co.uk/technology/google-is-listening-to-everything-we-say-and-you-can-hear-it-back/ ("Tech giant and the font of all pub quiz knowledge, Google, can quietly record many of the conversations that people have in close proximity to its products.").

[17] *See* https://www.theguardian.com/commentisfree/2018/mar/28/all-the-data-facebook-google-has-on-you-privacy.

[18] Non-limiting examples include Google Search, Maps, Translate, Chrome Browser, YouTube, YouTube TV, Google Play Music, Chromecast, Google Play Movies and TV, Android Phones, Android Wear, Chromebooks, Android Auto, Gmail, Google Allo, Google Duo, Google+, Google Photos, Google Contacts, Google Calendar, Google Keep, Google Docs, Google Sheets, Google Slides, Google Drive, Google Voice, Google Assistant, Android operating system, Project Fi Wireless phone systems,  Google Pixel, Google Home, Google Wifi, Daydream View, Chromecast Ultra.

16.     Google describes itself as an "information company."[19] Its vision is "to provide access to the world's information in one click," and its mission is "to organize the world's information and make it universally accessible and useful."[20] Making information available to people wherever they are and as quickly as possible is critical to Google's business.

*Google Global Cache (GGC)*

17.     As Google's CEO, Sundar Pichai, explains, "We want to make sure that no matter who you are or where you are or how advanced the device you are using—Google works for you."[21] To meet this goal, Google developed a content delivery network that it calls the Edge Network.

18.     One non-limiting example of physical presence in this District is Google's Edge Network. Google provides web-based services, such as YouTube, YouTube TV, and Google Play, to users throughout the world. These services are in high demand. Google reports that Google Play reaches more than 1 billion Android users and that YouTube serves over 1.8 billion users per month.[22] Studies show that YouTube alone is responsible for approximately 20% of all internet traffic.[23] YouTube TV, which has been described as an "add-on to YouTube" allows Google to essentially become the local TV provider for residents of this District. For example, residents in this District obtain local Waco-Temple-Bryan area channels such as KXXV, ABC (Channel 25); KBTX, CBS (Channel 3) or KWTX, CBS (Channel 10); KCEN NBC (Channel 5); and KCEN,

---

[19] *See* "This Year's Founder's Letter" by Alphabet CEO, Sundar Pichai, https://blog.google/inside-google/alphabet/this-years-founders-letter/.

[20] *See* http://panmore.com/google-vision-statement-mission-statement.

[21] *See* e.g., http://time.com/4311233/google-ceo-sundar-pichai-letter/.

[22] *See* https://www.theverge.com/2018/5/3/17317274/youtube-1-8-billion-logged-in-monthly-users-brandcast-2018

[23] *See* https://www.sandvine.com/hubfs/downloads/archive/2016-global-internet-phenomena-report-latin-america-and-north-america.pdf and http://testinternetspeed.org/blog/half-of-all-internet-traffic-goes-to-netflix-and-youtube/

Fox (Channel 6).[24]   To verify a resident should receive such local channels, Google verifies a location of such resident.

19.    Google's Edge Network, itself, has three elements: Core Data Centers, Edge Points of Presence, and Edge Nodes. The Core Data Centers (there are eight in the United States) are used for computation and backend storage. Edge Points of Presence are the middle tier of the Edge Network and connect the Data Centers to the internet. Edge Nodes are the layer of the network closest to users. Popular content, including YouTube TV, YouTube, video advertising, music, mobile apps, and other digital content from the Google Play store, is cached on the Edge Nodes, which Google refers to as Google Global Cache or "GGC."

20.    Google Global Cache is recognized as "one of Google's most important pieces of infrastructure,"[25] and Google uses it to conduct the business of providing access to the world's information. GGC servers in the Edge Nodes function as local data warehouses, much like a shoe manufacturer might have warehouses around the country.  Instead of requiring people to obtain information from distant Core Data Centers, which would introduce delay, Google stores information in the local GGC servers to provide quick access to the data.

21.    Caching and localization are vital for Google's optimization of network resources. Because hosting all content everywhere is inefficient, it makes sense to cache popular content and serve it locally. Doing so brings delivery costs down for Google, network operators, and internet service providers. Storing content locally also allows it to be delivered more quickly, which improves user experience. Serving content from the edge of the network closer to the user improves performance and user happiness. To achieve these benefits, Google has placed Edge Nodes

---

[24] *See*, e.g. https://thestreamable.com/markets/waco-temple-bryan-tx.
[25] *See* http://blog.speedchecker.xyz/2015/11/30/demystifying-google-global-cache/.

throughout the United States, including in this District. Google describes these nodes as the workhorses of video delivery.

22.     Just like brick-and-mortar stores, Google's GGC servers independently determine what content to cache based on local requests. The GGC servers in Google's Edge Nodes include software that Google refers to as "μstreamer." μstreamer is responsible for serving video content from YouTube and other Google services, along with other large content such as Google Play applications and Chrome downloads. It operates on a content-delivery platform at the edge of Google's network called "bandaid"; it does not run in the core (except for some internal testing purposes), unlike the majority of the Google services, such as search or gmail.

23.     Using μstreamer and bandaid, a GGC server handles requests directly from its clients, predominantly YouTube's video players. When such a request is received, if the content is stored in the node's local cache, the node will serve it to the end user, improving the user experience and saving bandwidth. If cache-eligible content is not already stored on the node, and the content is cache-eligible, the node will retrieve it from Google, serve it to the user, and store it for future requests.

24.     μstreamer is largely autonomous, in the sense that almost all decisions related to serving a particular request are made locally, without coordinating with other servers. Like a brick-and-mortar store sells directly to customers from inventory and stocks that inventory based on local customer demand, μstreamer in each GGC node decides—independently from other nodes in Google's Edge Network— whether to serve requested content, whether to cache content, and whether to send requests to other servers.

25.     Google's GGC servers are housed in spaces in the District leased by Google. Google's GGC servers are housed in spaces leased by Google from Internet Service Providers

(ISPs) whose networks have substantial traffic to Google and are interested in saving bandwidth. Hosting Google servers allows ISPs to save both bandwidth and costs, as they do not incur the expense of carrying traffic across their peering and/or transit links.

26.     When an ISP agrees to host a GGC server, the parties enter into a Global Cache Service Agreement, under which Google provides:

- hardware and software— including GGC servers and software—to be housed in the host's facilities;

- technical support; service management of the hardware and software; and

- content distribution services, including content caching and video streaming.

In exchange, the host provides, among other things, a physical building, rack space where Google's computer hardware is mounted, power, and network interfaces. All ownership rights, title, and intellectual property rights in and to the equipment (i.e., the hardware and software provided by Google) remain with Google and/or its licensors.

27.     Multiple ISP hosted GGC servers are in this District. Google's website identifies Midland, El Paso, Austin, and San Antonio as GGC server locations. Each of these cities is located in this District.



Source: https://peering.google.com/#/infrastructure

28.     The Office of Telecommunications Services for the University of Texas, for example, is an ISP that hosts two GGC servers in Austin, Texas.[26]

29.     Google caches content on the GGC servers located in this District.

30.     Google's GGC servers located in this District cache content that includes, among other things: (i) video advertising; (ii) apps; and (iii) digital content from the Google Play store.

31.     Google's GGC servers located in this District deliver cached content for the items in the preceding paragraph to residents in this District.

32.     Google generates revenue (i) by delivering video advertising, (ii) from apps, and (iii) from digital content in the Google Play store.

---

[26] See https://it.utexas.edu/ots-caching-and-peering



33.     Google treats its GGC servers in this District the same as it treats all of its other GGC servers in the United States.

34.     The photograph below shows an "illustrative picture" of a Google GGC server.



Source:  https://www.wired.com/2010/03/google-traffic/

35.     Google not only exercises exclusive control over the digital aspects of the GGC, Google, but also exercises exclusive control over the physical server and the physical space within which the server is located and maintained.

*Google's Communication Services*

36.     Google provides both data and television services to both San Antonio and Austin.[27]

---

[27] https://fiber.google.com/ourcities/



*Google's Cell Phone Service (aka Google Fi)*

37.     Google also provides phone, messaging, and data services in this District from its wireless phone services called Google Fi.  Via the Google Fi service, Google provides its customers voice and high-speed data coverage (4G LTE) for cities such as Waco.



Source: https://fi.google.com/coverage?q=Waco,%20tx

38.     The cell towers used for Google's services are fixed geographical locations.  They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google has contractual and/or property rights to use the cell towers to operate its business.  Google also ratifies the service locations through its coverage lookup service.

39.     With this coverage lookup service, Google advertises its ability to provide cell coverage in this District and its selected cell towers in and near this District to provide the

advertised coverage (e.g., 2G, 3G, or 4GLTE) depending on the location in the District. See https://fi.google.com/coverage?. Google is not indifferent to the location of its cell towers. It "established" and "ratified" their geographic placement to achieve specific business purposes.

40.     Residents of this District also directly contract with and are billed by Google for these services as their telecommunications provider.



Source:  https://fi.google.com/about/plan

41.     Google also determines which cell tower a particular Google Fi customer will use while within the District.

> ⌄  **What determines when Project Fi moves me between cellular networks?**
>
> When multiple carriers are available, Project Fi will move you to the network that our analysis shows will be fastest in your current location, whether that is 4G LTE, 3G, or 2G. We're constantly learning and improving, to account for factors such as newly-built towers or newly-available radio frequencies. And if your current network is providing weak or no coverage, we'll adjust in real time to find you a stronger connection.

Source:  https://fi.google.com/about/faq/#network-and-coverage-4

## COUNT ONE - INFRINGEMENT OF U.S. PATENT NO. 7,817,858

42.     Brazos re-alleges and incorporates by reference the preceding paragraphs of this Complaint.

43.     On October 19, 2010, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,817,858 ("the '858 Patent"), entitled "Communication Terminal." A true and correct copy of the '858 Patent is attached as Exhibit A to this Complaint.

44.     Brazos is the owner of all rights, title, and interest in and to the '858 Patent, including the right to assert all causes of action arising under the '858 Patent and the right to any remedies for the infringement of the '858 Patent.

45.     Google makes, uses, sells, offers for sale, imports, and/or distributes in the United States, including within this judicial district, products such as, but not limited to, Gboard and associated Google devices that utilize Gboard (collectively, the "Accused Products").

46.     The Accused Products include, but are not limited to, devices that utilize Gboard – including those on the iOS and Android platforms.  According to Google, on the Android platform alone, Gboard has been installed on more than one billion devices.

47.     Amongst the Accused products are Google's own brand of device referred to under the brand name "Pixel." Google Pixel is a brand of consumer electronic devices developed by Google that runs either Chrome OS or the Android operating system having a controller and a memory storing executable instructions. The Pixel brand was introduced in February 2013 with the first-generation Chromebook Pixel. The Pixel line includes laptops, tablets, and smartphones,

as well as several accessories.  One non-limiting example Google Pixel device is a Pixel 3, which came pre-installed with the Gboard.



Source: https://store.google.com/US/product/pixel_3,

48.     Gboard is a virtual keyboard that provides a feature of Glide typing in the Accused Instrumentalities.  Users can type by gliding the fingers on the display of the device in which Gboard is installed.



Source: https://play.google.com/store/apps/details?id=com.google.android.inputmethod.latin&hl=en_US,

17



Source: https://apps.apple.com/us/app/gboard-the-google-keyboard/id1091700242

     49.    As an example, the display of a device installed with Gboard has a touch-sensitive display. The device is capable of detecting the first touch on the display when the user glides on the screen on the Gboard application.



Source: https://www.youtube.com/watch?v=KAW0iTFnv5A&t=213s

50.     Gboard addresses the error of "fat finger typing" or tracing spatially similar words in glide typing with the help of Neural Spatial Models. The below example shows the average glide trails for two spatially similar words: "Vampire" and "Value."



https://ai.googleblog.com/2017/05/the-machine-intelligence-behind-gboard.html

51.     As another example, the diagram shows the trajectory for the word "Cloud" on Gboard. The trajectory is shown as the normalized sampled trajectory with a pre-sample variance (image in the right). The pre-sample variance highlights the area (i.e. candidate area) considered during different touchpoints as the user glides on the display. As the user glides for the word "Cloud" the area considered for the words is dependent on the trajectory of the glide (i.e. between the first point in the trajectory for the alphabet "C" and the second position in the trajectory for the alphabet "L" for the word "Cloud").



Source: https://ai.googleblog.com/2017/05/the-machine-intelligence-behind-gboard.html

52.     As an example, the trajectory followed for the word "Cloud," a plurality of candidate characters are disposed within the area for the trajectory. These candidate characters

falling under the area (image in the right) are considered as the alphabets (i.e. candidate characters) while gliding on the display of the device.



Source: https://ai.googleblog.com/2017/05/the-machine-intelligence-behind-gboard.html

    53.    Gboard creates robust spatial models that map fuzzy sequences of raw touchpoints to keys on the keyboard. It then builds a powerful core decoding engine based on finite-state transducers (FST) to determine the likeliest word sequence given an input touch sequence from the area (i.e. candidate area) for the trajectory of a word.

With the realization that the way a mobile keyboard translates touch inputs into text is similar to how a speech recognition system translates voice inputs into text, we leveraged our experience in Speech Recognition to pursue our vision. First, we created robust spatial models that map fuzzy sequences of raw touch points to keys on the keyboard, just like acoustic models map sequences of sound bites to phonetic units. Second, we built a powerful core decoding engine based on finite state transducers (FST) to determine the likeliest word sequence given an input touch sequence. With its mathematical formalism and broad success in speech applications, we knew that an FST decoder would offer the flexibility needed to support a variety of complex keyboard input behaviors as well as language features. In this post, we will detail what went into the development of both of these systems.

Source: https://ai.googleblog.com/2017/05/the-machine-intelligence-behind-gboard.html,

    54.    While the Neural spatial models use spatial information to help determine what was tapped or swiped, there are additional constraints — lexical and grammatical — that can be brought

to bear. A lexicon tells the Gboard what words occur in a language and a probabilistic grammar tells the Gboard what words are likely to follow other words. To encode this information Gboard uses finite-state transducers.



Source: https://ai.googleblog.com/2017/05/the-machine-intelligence-behind-gboard.html

55. A probabilistic n-gram transducer is used to represent the language model for the keyboard. A state in the model represents an (up to) n-1-word context and an arc leaving that state is labeled with a successor word together with its probability of following that context (estimated

from textual data). These, together with the spatial model, gives the likelihoods of sequences of key touches (discrete tap entries or continuous gestures in glide typing).

> A probabilistic n-gram transducer is used to represent the language model for the keyboard. A state in the model represents an (up to) n-1 word context and an arc leaving that state is labeled with a successor word together with its probability of following that context (estimated from textual data). These, together with the spatial model that gives the likelihoods of sequences of key touches (discrete tap entries or continuous gestures in glide typing), are combined and explored with a beam search.
>
> Generic FST principles, such as streaming, support for dynamic models, etc took us a long way towards building a new keyboard decoder, but several new functionalities also had to be added. When you speak, you don't need the decoder to complete your words or guess what you will say next to save you a few syllables; but when you type, you appreciate the help of word completions and predictions. Also, we wanted the keyboard to provide seamless multilingual support, as shown below.

Source: https://ai.googleblog.com/2017/05/the-machine-intelligence-behind-gboard.html

56.     In view of preceding paragraphs, each and every element of at least claim 16 of the '858 Patent is found in the Accused Products.

57.     Google continues to directly infringe at least one claim of the '858 Patent, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, importing, and/or distributing the Accused Products in the United States, including within this judicial district, without the authority of Brazos.

58.     Google has received notice and actual or constructive knowledge of the '858 Patent since at least the date of service of this Complaint.

59.     Since at least the date of service of this Complaint, through its actions, Google has actively induced product makers, distributors, retailers, and/or end users of the Accused Products to infringe the '858 Patent throughout the United States, including within this judicial district, by, among other things, advertising and promoting the use of the Accused Products in various websites, including providing and disseminating product descriptions, operating manuals, and

other instructions on how to implement and configure the Accused Products. Examples of such advertising, promoting, and/or instructing include the documents at:

- https://store.google.com/US/product/pixel_3
- https://www.youtube.com/watch?v=KAW0iTFnv5A
- https://play.google.com/store/apps/details?id=com.google.android.inputmethod.latin&hl=en_US
- https://ai.googleblog.com/2017/05/the-machine-intelligence-behind-gboard.html

60. Since at least the date of service of this Complaint, through its actions, Google has contributed to the infringement of the '858 Patent by having others sell, offer for sale, or use the Accused Products throughout the United States, including within this judicial district, with knowledge that the Accused Products infringe the '858 Patent. The Accused Products are especially made or adapted for infringing the '858 Patent and have no substantial non-infringing use. For example, in view of the preceding paragraphs, the Accused Products contain functionality which is material to at least one claim of the '858 Patent.

## JURY DEMAND

Brazos hereby demands a jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Brazos respectfully requests that the Court:

(A)     Enter judgment that Google infringes one or more claims of the '858 Patent literally and/or under the doctrine of equivalents;

(B)     Enter judgment that Google has induced infringement and continues to induce infringement of one or more claims of the '858 Patent;

(C)     Enter judgment that Google has contributed to and continues to contribute to the infringement of one or more claims of the '858 Patent;

(D)  Award Brazos damages, to be paid by Google in an amount adequate to compensate Brazos for such damages, together with pre-judgment and post-judgment interest for the infringement by Google of the '858 Patent through the date such judgment is entered in accordance with 35 U.S.C. § 284, and increase such award by up to three times the amount found or assessed in accordance with 35 U.S.C. § 284;

(E)  Declare this case exceptional pursuant to 35 U.S.C. § 285; and

(F)  Award Brazos its costs, disbursements, attorneys' fees, and such further and additional relief as is deemed appropriate by this Court.

Dated: June 29, 2020                    Respectfully submitted,

                                        /s/ James L. Etheridge
                                        James L. Etheridge
                                        Texas State Bar No. 24059147
                                        Ryan S. Loveless
                                        Texas State Bar No. 24036997
                                        Travis L. Richins
                                        Texas State Bar No. 24061296

                                        ETHERIDGE LAW GROUP, PLLC
                                        2600 E. Southlake Blvd., Suite 120 / 324
                                        Southlake, Texas 76092
                                        Telephone: (817) 470-7249
                                        Facsimile: (817) 887-5950
                                        Jim@EtheridgeLaw.com
                                        Ryan@EtheridgeLaw.com
                                        Travis@EtheridgeLaw.com

                                        **COUNSEL FOR PLAINTIFF**

# EXHIBIT T

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC D/B/A<br>BRAZOS LICENSING AND DEVELOPMENT, | No. 6:20-cv-00725 |
|       Plaintiff, | **JURY TRIAL DEMANDED** |
|   v. | |
| HEWLETT PACKARD ENTERPRISE COMPANY, | |
|       Defendant. | |

**BRAZOS'S COMPLAINT AGAINST HPE FOR**
**INFRINGEMENT OF U.S. PATENT NO. 7,280,534**

Plaintiff WSOU Investments, LLC d/b/a Brazos Licensing and Development ("Brazos"), by and through its attorneys, files this Complaint for Patent Infringement against defendant Hewlett Packard Enterprise Company ("HPE") and alleges:

**NATURE OF THE ACTION**

1.    This is a civil action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 1 *et seq.*, including §§ 271, 281, 284, and 285.

**THE PARTIES**

2.    Brazos is a limited liability corporation organized and existing under the laws of Delaware, with its principal place of business at 606 Austin Avenue, Suite 6, Waco, Texas 76701.

3.    On information and belief, HPE is a corporation organized and existing under the laws of Delaware, with a regular and established place of business located at 14231 Tandem Boulevard, Austin, Texas 78728. HPE may be served through its designated agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas, 75201.

## JURISDICTION AND VENUE

4.       This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

5.       This Court has specific and general personal jurisdiction over HPE pursuant to due process and/or the Texas Long Arm Statute because HPE has committed and continues to commit acts of patent infringement, including acts giving rise to this action, within the State of Texas and this Judicial District. The Court's exercise of jurisdiction over HPE would not offend traditional notions of fair play and substantial justice because HPE has established minimum contacts with the forum. For example, on information and belief, HPE has committed acts of infringement in this Judicial District, directly and/or through intermediaries, by, among other things, making, using, offering to sell, selling, and/or importing products and/or services that infringe the Asserted Patent, as alleged herein.

6.       Upon information and belief, HPE has continuous and systematic business contacts with the State of Texas. HPE is registered to do business in the State of Texas, has offices and facilities in the State of Texas, and actively directs its activities to customers located in the State of Texas. HPE, directly and/or through affiliates and/or intermediaries, conducts its business extensively throughout Texas, by shipping, importing, manufacturing, distributing, offering for sale, selling, and/or advertising its products and services in the State of Texas and this Judicial District.

7.       Venue is proper in this Court pursuant to 28 U.S.C. § 1400(b). HPE is registered to do business in Texas, and, upon information and belief, HPE has transacted business in this Judicial District, and has committed acts of direct and indirect infringement in this Judicial District by, among other things, importing, offering to sell, and selling products that infringe the

Asserted Patent. HPE has regular and established places of business in this Judicial District, as
set forth below.

      8.      HPE maintains a regular and established place of business in this Judicial District,
located at least at 14231 Tandem Boulevard, Austin, Texas 78728:[1,2]



      9.      Upon information and belief, HPE conducts business and serves customers from
its regular and established place of business in Austin, Texas, in this District. Upon information
and belief, HPE's Austin office is located on a 52-acre campus.[3]

      10.     In October 2019, it was reported that HPE signed a lease for a 27,326-square-
foot-space in a 164,714-square-foot office building in North Austin at Paloma Ridge, located at
13620 FM 620 Austin, Texas, 78717.[4]

---

[1] *See* https://www.hpe.com/us/en/contact-hpe.html.

[2] *See* https://goo.gl/maps/mojArn1WxaHcHU8v8; *see also* https://goo.gl/maps/
cBjm1De4gVPFMeam9.

[3] *See* https://www2.colliers.com/en/properties/austin-continuum/USA-14231-tandem-boulevard-
austin-tx-78728/usa1046778.

[4] *See* https://communityimpact.com/local-news/austin/leander-cedar-park/coming-soon/2019/10/
23/hewlett-packard-signs-lease-at-paloma-ridge-on-fm-620/.

11.     Upon information and belief, HPE owns at least two properties in Austin, Texas, in this District.[5]

12.     HPE maintains additional regular and established places of business in the State of Texas, nearby to this District, including at 11445 Compaq Center West Drive, Houston, Texas, 77070, and 6080 Tennyson Parkway, Suite 400, Plano, Texas 75024.[6]

13.     HPE's website states that HPE is "a global edge-to-cloud Platform-as-a-Service company . . . that helps customers connect, protect, analyze, and act on all [of the customer's] data and applications wherever they live . . . ."[7] Upon information and belief, HPE designs, manufactures, uses, imports into the United States, sells, and/or offers for sale in the United States products that infringe the Asserted Patent, directly and or through intermediaries, as alleged herein. HPE markets, sells, and/or offers to sell its products and services, including those accused herein of infringement, to actual and potential customers and end-users located in Texas and in this District, as alleged herein.

14.     HPE's website permits customers to configure and customize HPE products, including the HPE FlexNetwork 5510 HI Switch Series, the HPE FlexFabric 5940 Switch Series and the HPE FlexFabric 5940 Switch Series, and request price quotes from HPE on the configured products.[8] HPE's website also permits users to purchase HPE products directly from HPE's website.[9]

---

[5] *See* http://propaccess.traviscad.org/clientdb/SearchResults.aspx (printout attached as Exhibit B).

[6] *See* https://www.hpe.com/us/en/contact-hpe.html.

[7] *See* https://www.hpe.com/us/en/about.html.

[8] *See, e.g.*, https://h22174.www2.hpe.com/SimplifiedConfig/Welcome (printout attached as Exhibit C).

[9] *See, e.g.*, https://buy.hpe.com/us/en/networking/networking-switches/hpe-flexfabric-5940-switch-series/p/1009148840.

15.     Upon information and belief, HPE offers trainings and/or certifications to HPE partners, customers, and HPE employees including, *inter alia*, trainings and certifications regarding the sales and/or service of HPE products. For example, HPE offers an HPE Certification to HPE employees, customers, and partners that teaches how to "design, implement, and configure complex data center solutions based on the HPE FlexNetwork Architecture."[10]

16.     As of August 2020, HPE advertised at least fifteen public job postings for positions at HPE's Austin, Texas office.[11]

## COUNT I
## Infringement of U.S. Patent No. 7,280,534

17.     Brazos re-alleges and incorporates by reference the preceding paragraphs 1–16 of this Complaint.

18.     On October 9, 2007, the U.S. Patent & Trademark Office duly and legally issued U.S. Patent No. 7,280,534 (the "'534 Patent"), entitled "Managed IP Routing Services For L2 Overlay IP Virtual Private Network (VPN) Services." A true and correct copy of the '534 Patent is attached as Exhibit A to this Complaint.

19.     Brazos is the owner of all rights, title, and interest in and to the '534 Patent, including the right to assert all causes of action arising under the '534 Patent and the right to any remedies for the infringement of the '534 Patent.

20.     HPE makes, uses, sells, offers for sale, imports, and/or distributes in the United States, including within this Judicial District, switches with support for multiprotocol label switching ("MPLS") Layer 3 virtual private network ("VPN"). These switches include the HPE

---

[10] *See* https://certification-learning.hpe.com/TR/datacard/Course/00908176.

[11] *See* https://www.linkedin.com/jobs/search?keywords=Hewlett%20Packard%20Enterprise&location=Austin%2C%20Texas%2C%20United%20States (printout attached as Exhibit D).

FlexNetwork 5510 HI Switch Series,[12] the HPE FlexFabric 5930 Switch Series,[13] and the HPE

FlexFabric 5940 Switch Series[14] (collectively, the "Accused Products").

21.     The Accused Products practice a method of providing Internet Protocol (IP)

Virtual Private Network (VPN) services, comprising: exchanging unique loop-back addresses of

customer edges (CE) between said CEs via a respective data virtual circuit therebetween;

sending IP addresses of customer networks associated with each CE to an associated IP service

controller (IPSC); broadcasting from said associated IPSC, said IP addresses of said associated

customer networks to other IPSCs; sending, from each CE to an associated IPSC, a list of

received loop-back addresses; sending, from each IPSC to an associated CE, customer network

addresses received from other IPSCs; and, populating, at each CE, a local routing table with

information mapping said customer networks with a data virtual circuit.

22.     According to HPE, "MPLS L3VPN is a L3VPN technology used to interconnect

geographically dispersed VPN sites. MPLS L3VPN uses [Border Gateway Protocol ("BGP")] to

advertise VPN routes and uses MPLS to forward VPN packets over a service provider backbone.

MPLS L3VPN provides flexible networking modes, excellent scalability, and convenient support

for MPLS [Traffic Engineering ("TE")]."[15]

23.     The Accused Products include "Gigabit Ethernet switches that deliver resiliency,

security, and multiservice support capabilities at the edge layer of data center, large campus, and

---

[12] *See* https://buy.hpe.com/us/en/networking/networking-switches/hpe-flexnetwork-5510-hi-
switch-series/p/1008652960; *see also* https://techhub.hpe.com/eginfolib/networking/docs/
switches/5510hi/cr/5200-3843_hi-avail_cr/content/index.htm.

[13] *See* https://buy.hpe.com/us/en/networking/networking-switches/hpe-flexfabric-5940-switch-
series/p/1009148840; *see also* https://techhub.hpe.com/eginfolib/networking/docs/switches/
5940-5930/5200-4864_hi-avail_cg/content/bk01-toc.htm.

[14] *Id.*

[15] *See* https://support.hpe.com/hpesc/public/docDisplay?docId=a00041116en_us at 184.

metro Ethernet networks. . . . With complete IPv4/IPv6, OpenFlow, and MPLS/VPLS features, the series provides investment protection with an easy transition from IPv4 to IPv6 networks."[16]

24.     The Accused Products practice a method providing Internet Protocol (IP) Virtual Private Network (VPN) services, comprising: exchanging unique loop-back addresses of customer edges (CE) between said CEs via a respective data virtual circuit therebetween; sending IP addresses of customer networks associated with each CE to an associated IP service controller (IPSC); broadcasting from said associated IPSC, said IP addresses of said associated customer networks to other IPSCs; sending, from each CE to an associated IPSC, a list of received loop-back addresses; sending, from each IPSC to an associated CE, customer network addresses received from other IPSCs; and, populating, at each CE, a local routing table with information mapping said customer networks with a data virtual circuit.

25.     The Accused Products practice a method of providing IP-VPN services for customers and service providers utilizing layer-2 point-to-point connectivity.[17] *See* Figure A below.

---

[16] *See* https://h20195.www2.hpe.com/v2/GetPDF.aspx/c04843027.pdf.

[17] *See* https://techhub.hpe.com/eginfolib/networking/docs/switches/5510hi/5200-0081b_mpls_cg/content/index.htm; *see also* https://support.hpe.com/hpesc/public/docDisplay?docId=a00041116en_us at 296.



Figure A

26.     The Accused Products practice a method of exchanging unique loop-back addresses of customer edge nodes ("CE") between the CEs via a respective data virtual circuit therebetween, and sending IP addresses of customer networks associated with each CE to an associated IP service controller ("IPSC").[18] A loopback interface address is configured for the Customer Edge 1 ("CE1") as shown in Figure A above and Figure B below.

| Device | Interface | IP address | Device | Interface | IP address |
|--------|-----------|------------|--------|-----------|------------|
| CE 1 | Loop0 | 100.1.1.1/32 | CE 3 | Loop0 | 200.1.1.1/32 |
| | Vlan-int2 | 10.1.1.1/24 | | Vlan-int7 | 10.3.1.1/24 |
| CE 2 | Vlan-int2 | 10.2.1.1/24 | PE 2 | Loop0 | 2.2.2.9/32 |
| PE 1 | Loop0 | 1.1.1.9/32 | | Vlan-int2 | 10.2.1.2/24 |
| | Vlan-int2 | 10.1.1.2/24 | | Vlan-int4 | 40.1.1.2/24 |
| | Vlan-int3 | 30.1.1.1/24 | | Vlan-int5 | 50.1.1.1/24 |
| | Vlan-int4 | 40.1.1.1/24 | P | Loop0 | 3.3.3.9/32 |
| PE 3 | Loop0 | 4.4.4.9/32 | | Vlan-int3 | 30.1.1.2/24 |
| | Vlan-int6 | 60.1.1.2/24 | | Vlan-int5 | 50.1.1.2/24 |
| | Vlan-int7 | 10.3.1.2/24 | | Vlan-int6 | 60.1.1.1/24 |

Figure B[19]

The Accused Products provide a feature of operation in MPLS L3VPN.[20] CE2 learns the loopback interface address from CE1. *See* Figures A and B above. The loopback addresses are communicated between the CEs. *See* Figure C below.[21]

---

[18] *See*, *e.g*., https://support.hpe.com/hpesc/public/docDisplay?docId=a00041116en_us.

[19] *See* https://support.hpe.com/hpesc/public/docDisplay?docId=a00041116en_us at 296.

27. The associated IPSC of the Accused Products broadcasts the IP addresses of the associated customer networks to other IPSCs, and each CE sends to an associated IPSC, a list of received loop back addresses.[22]

Redistributing the loopback interface address

| Step | | Command | Remarks |
|------|--|---------|---------|
| 1. | Enter system view. | **system-view** | N/A |
| 2. | Enter BGP instance view. | **bgp** *as-number* [ **instance** *instance-name* ] [ **multi-session-thread** ] | N/A |
| 3. | Enter BGP-VPN instance view. | **ip vpn-instance** *vpn-instance-name* | N/A |
| 4. | Enter BGP-VPN IPv4 unicast address family view. | **address-family ipv4** [ **unicast** ] | N/A |
| 5. | Redistribute direct routes into BGP (including the loopback interface route). | **import-route direct** | By default, no direct routes are redistributed into BGP. |

Figure C

28. Each IPSC then sends to an associated CE the customer network addresses received from other IPSCs, and each CE populates a local routing table with information mapping the customer networks with a data virtual circuit.[23] As shown in Figure D (network diagram) and Figure E below (Interface and IP address assignment), the routes learned by CE2 from PE2 are populated in a routing table in CE2.[24] When the routing information that CE2 has received is checked it has a routing table, which includes the route of the VPN behind CE1, *i.e.*, the customer network associated with CE1.

---

[20] https://support.hpe.com/hpesc/public/docDisplay?docId=a00041116en_us at 184–298.

[21] https://support.hpe.com/hpesc/public/docDisplay?docId=a00041116en_us at 220.

[22] *Id.*

[23] *See* https://support.hpe.com/hpesc/public/docDisplay?docId=a00041116en_us at 292.

[24] *Id.*



Figure D

| Device | Interface | IP address | Device | Interface | IP address |
|---|---|---|---|---|---|
| CE 1 | Vlan-int11 | 10:1::2/96 | P | Loop0 | 2.2.2.9/32 |
| | Vlan-int12 | 100::1/96 | | Vlan-int11 | 30.1.1.1/24 |
| PE 1 | Loop0 | 10.1.1.1/32 | | Vlan-int12 | 20.1.1.2/24 |
| | Vlan-int11 | 10:1::1/96 | PE 2 | Loop0 | 10.1.1.2/32 |
| | Vlan-int12 | 20.1.1.1/24 | | Vlan-int11 | 30.1.1.2/96 |
| CE 2 | Vlan-int12 | 10:2::2/96 | | Vlan-int12 | 10:2::1/24 |
| | Vlan-int13 | 200::1/96 | | | |

Figure E

29.     In view of the preceding paragraphs 21–28, each and every element of at least

claim 1 of the '534 Patent is found in the Accused Products.

30.     HPE continues to directly infringe at least one claim of the '534 Patent, literally

or under the doctrine of equivalents, by making, using, selling, offering for sale, importing,

and/or distributing the Accused Products in the United States, including within this judicial

district, without the authority of Brazos.

31.     HPE has received notice and actual or constructive knowledge of the '534 Patent

since at least the date of service of this Complaint.

32.     Since at least the date of service of this Complaint, through its actions, HPE has

actively induced product makers, distributors, retailers, and/or end users of the Accused Products

10

to infringe the '534 Patent throughout the United States, including within this Judicial District, by, among other things, advertising and promoting the use of the Accused Products in various websites, including providing and disseminating product descriptions, operating manuals, and other instructions on how to implement and configure the Accused Products. Examples of such advertising, promoting, and/or instructing include the documents at:

- https://support.hpe.com/hpesc/public/docDisplay?docId=c05218883;

- https://support.hpe.com/hpesc/public/docDisplay?docId=a00077571en_us;

- https://support.hpe.com/hpesc/public/docDisplay?docId=a00077564en_us; and

- https://support.hpe.com/hpesc/public/docDisplay?docId=a00041116en_us.

HPE was and is aware that the normal and customary use by end users of the Accused Products infringes the '534 patent. HPE's inducement is ongoing.

33. Since at least the date of service of this Complaint, through its actions, HPE has contributed to the infringement of the '534 Patent by having others sell, offer for sale, or use the Accused Products throughout the United States, including within this judicial district, with knowledge that the Accused Products infringe the '534 Patent. The Accused Products have special features that are especially made or adapted for infringing the '534 Patent and have no substantial non-infringing use. For example, in view of the preceding paragraphs, the Accused Products contain functionality which is material to at least claim 1 of the '534 Patent. HPE's infringing use of the Accused Products includes its internal use and testing of the Accused Products.

34. The special features include providing MPLS L3VPN and implementing IP-VPN services for customers and service providers utilizing layer-2 point-to-point connectivity, which is used in a manner that infringes the '534 Patent.

35.     The special features constitute a material part of the invention of one or more claims of the '534 Patent and are not staple articles of commerce suitable for substantial non-infringing uses.

36.     Brazos has suffered damages as a result of HPE's direct and indirect infringement of the '534 Patent in an amount adequate to compensate for HPE's infringement, but in no event less than a reasonable royalty for the use made of the invention by HPE, together with interest and costs as fixed by the Court.

### JURY DEMAND

Brazos hereby demands a jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Brazos respectfully requests that the Court:

(a)     enter judgment that HPE infringes one or more claims of the '534 Patent literally and/or under the doctrine of equivalents;

(b)     enter judgment that HPE has inducted infringement and continues to induce infringement of one or more claims of the '534 Patent;

(c)     enter judgment that HPE has contributed to and continues to contribute to the infringement of one or more claims of the '534 Patent;

(d)     award Brazos damages, to be paid by HPE in an amount adequate to compensate Brazos for such damages, together with pre-judgment and post-judgment interest for the infringement by HPE of the '534 Patent through the date such judgment is entered in accordance with 35 U.S.C. § 284, and increase such award by up to three times the amount found or assessed in accordance with 35 U.S.C. § 284;

(e)     declare this case exceptional pursuant to 35 U.S.C. § 285; and

(f)     award Brazos its costs, disbursements, attorneys' fees, and such further and

additional relief as is deemed appropriate by this Court.

                                        Respectfully submitted,

Dated: August 12, 2020                  /s/ Raymond W. Mort, III
                                        Raymond W. Mort, III
Edward J. Naughton                      Texas State Bar No. 00791308
(*pro hac vice* to be filed)            raymort@austinlaw.com
enaughton@brownrudnick.com              THE MORT LAW FIRM, PLLC
Rebecca MacDowell Lecaroz               100 Congress Avenue, Suite 2000
(*pro hac vice* to be filed)            Austin, Texas 78701
rlecaroz@brownrudnick.com               Tel/Fax: 512-865-7950
BROWN RUDNICK LLP
One Financial Center
Boston, Massachusetts 02111
telephone:   (617) 856-8200
facsimile:   (617) 856-8201

Alessandra C. Messing
(*pro hac vice* to be filed)
amessing@brownrudnick.com
Timothy J. Rousseau
(*pro hac vice* to be filed)
trousseau@brownrudnick.com
Yarelyn Mena
(*pro hac vice* to be filed)
ymena@brownrudnick.com
BROWN RUDNICK LLP
7 Times Square
New York, New York 10036
telephone:   (212) 209-4800
facsimile:   (212) 209-4801

Sarah G. Hartman
(*pro hac vice* to be filed)
shartman@brownrudnick.com
BROWN RUDNICK LLP
2211 Michelson Drive, 7th Floor
Irvine, California 92612
telephone:   (949) 752-7100
facsimile:   (949) 252-1514

                                        *Counsel for Plaintiff*
                                        *WSOU Investments, LLC d/b/a*
                                        *Brazos Licensing and Development*

# EXHIBIT U

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

WSOU INVESTMENTS, LLC D/B/A
BRAZOS LICENSING AND DEVELOPMENT,

        Plaintiff,

    v.

JUNIPER NETWORKS, INC.,

        Defendant.

No. 6:20-cv-00812

**JURY TRIAL DEMANDED**

### BRAZOS'S COMPLAINT AGAINST JUNIPER FOR
### INFRINGEMENT OF U.S. PATENT NO. 7,382,781

Plaintiff WSOU Investments, LLC d/b/a Brazos Licensing and Development ("Brazos"),

by and through its attorneys, files this Complaint for Patent Infringement against defendant

Juniper Networks, Inc. ("Juniper") and alleges:

### NATURE OF THE ACTION

1.    This is a civil action for patent infringement arising under the Patent Laws of the

United States, 35 U.S.C. §§ 1 *et seq.*, including §§ 271, 281, 284, and 285.

### THE PARTIES

2.    Brazos is a limited liability corporation organized and existing under the laws of

Delaware, with its principal place of business at 605 Austin Avenue, Suite 6, Waco, Texas

76701.

3.    On information and belief, Juniper is a corporation organized and existing under

the laws of Delaware, with a regular and established place of business located at 1120 South

Capital of Texas Highway, Suite 120, First Floor, Building 2, Austin, Texas 78746. Juniper may

be served through its designated agent for service of process, CT Corporation System, 1999

Bryan Street, Suite 900, Dallas, Texas, 75201. On information and belief, Juniper is registered to

do business in the State of Texas and has been since at least April 27, 2017.

**JURISDICTION AND VENUE**

4.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

§§ 1331 and 1338(a).

5.     This Court has specific and general personal jurisdiction over Juniper pursuant to

due process and/or the Texas Long Arm Statute because Juniper has committed and continues to

commit acts of patent infringement, including acts giving rise to this action, within the State of

Texas and this Judicial District. The Court's exercise of jurisdiction over Juniper would not

offend traditional notions of fair play and substantial justice because Juniper has established

minimum contacts with the forum. For example, on information and belief, Juniper has

committed acts of infringement in this Judicial District, directly and/or through intermediaries,

by, among other things, making, using, offering to sell, selling, and/or importing products and/or

services that infringe the Asserted Patent, as alleged herein.

6.     Upon information and belief, Juniper has continuous and systematic business

contacts with the State of Texas. Juniper is registered to do business in the State of Texas, has

offices and facilities in the State of Texas, and actively directs its activities to customers located

in the State of Texas. Juniper, directly and/or through affiliates and/or intermediaries, conducts

its business extensively throughout the State of Texas, by shipping, importing, manufacturing,

distributing, offering for sale, selling, and/or advertising its products and services in the State of

Texas and this Judicial District.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1400(b). Juniper is

registered to do business in the State of Texas, and, upon information and belief, Juniper has

transacted business in this Judicial District, and has committed acts of direct and indirect

infringement in this Judicial District by, among other things, importing, offering to sell, and selling products that infringe the Asserted Patent. Juniper has regular and established places of business in this Judicial District, as set forth below.

8.      Juniper maintains a regular and established place of business in this Judicial District, at least at 1120 South Capital of Texas Highway, Suite 120, First Floor, Building 2, Austin, Texas 78746. Upon information and belief, Juniper conducts business, serves customers, and markets and/or sells its products from its regular and established place of business in Austin, Texas, in this Judicial District.

9.      Upon information and belief, Juniper maintains additional regular and established places of business in the State of Texas, nearby to this Judicial District, including at Granite Park V, 5830 Granite Pkwy #850, Plano, Texas 75024.

10.     Juniper's Form 10-K for the fiscal year ended December 31, 2019 states, in part:

> Juniper Networks designs, develops, and sells products and services for high-performance networks to enable customers to build scalable, reliable, secure and cost-effective networks for their businesses . . . . We organize and manage our business by major functional departments on a consolidated basis as one operating segment. We sell our high-performance network products and service offerings across routing, switching, and security technologies. In addition to our products, we offer our customers services, including maintenance and support, professional services, and education and training programs.[1]

11.     Upon information and belief, Juniper designs, manufactures, uses, imports into the United States, sells, and/or offers for sale in the United States products that infringe the Asserted Patent, directly and or through intermediaries, as alleged herein. Juniper markets, sells, and/or offers to sell its products and services, including those accused herein of infringement, to actual and potential customers and end-users located in the State of Texas and in this Judicial District, as alleged herein.

---

[1] *See* https://s1.q4cdn.com/608738804/files/doc_financials/2019/q4/2019-10-K-Final.pdf at 3.

12.    Juniper's website advertises and promotes its products and services to customers nationwide, and permits customers to request a quote or buy directly from Juniper by requesting a direct call or email from a Juniper representative.[2]

## COUNT I
## Infringement of U.S. Patent No. 7,382,781

13.    Brazos re-alleges and incorporates by reference the preceding paragraphs 1–12 of this Complaint.

14.    On June 3, 2008, the U.S. Patent & Trademark Office duly and legally issued U.S. Patent No. 7,382,781 (the "'781 Patent"), entitled "Multicast Architecture for a Virtual Private Local Area Network Service in a Metro Ethernet Network." A true and correct copy of the '781 Patent is attached as Exhibit A to this Complaint.

15.    Brazos is the owner of all rights, title, and interest in and to the '781 Patent, including the right to assert all causes of action arising under the '781 Patent and the right to any remedies for the infringement of the '781 Patent.

16.    Juniper makes, uses, sells, offers for sale, imports, and/or distributes in the United States, including within this Judicial District, products running Juniper's Junos OS operating system and supporting IS-IS and multicast,[3] including, but not limited to, Juniper's QFX Series Switches,[4] EX Series Switches,[5] MX Series 5G Universal Routing Platform,[6] NFX Series

---

[2] *See* https://www.juniper.net/us/en/how-to-buy/.

[3] *See* https://www.juniper.net/us/en/products-services/nos/junos/.

[4] *See* https://www.juniper.net/us/en/products-services/switching/qfx-series/;
https://www.juniper.net/us/en/products-services/switching/qfx-series/datasheets/1000480.page.

[5] *See* https://www.juniper.net/us/en/products-services/switching/ex-series/;
https://www.juniper.net/documentation/en_US/junos/topics/reference/configuration-statement/
interface-edit-protocols-isis.html.

Network Services Platform,[7] and SRX Series Services Gateways[8] (collectively, the "Accused Products").

17.     Junos OS is the operating system that runs on the physical, virtual networking and security products offered by Juniper:[9]

> Innovatively designed for simplicity, Junos OS is the single operating system that powers Juniper's broad portfolio of physical and virtual networking and security products. Built for reliability, security, and flexibility, it runs some of the world's most sophisticated network deployments, giving operators a competitive advantage over those who run other network operating systems.
>
> Junos OS automates network operations with streamlined precision, furthers operational efficiency, and frees up valuable time and resources for top-line growth opportunities.

18.     The Accused Products practice a method of operating a computer network along which network traffic flows between a plurality of nodes in the form of packets.

19.     Specifically, the Accused Products run and maintain the operation of devices in a network along which traffic flows between a plurality of nodes in the form of packets. The Accused Products implement the "IS-IS protocol," which is "an interior gateway protocol (IGP) that uses link state information to make routing decisions." "IS-IS uses hello packets that allow network convergence to occur quickly when network changes are detected." "An IS-IS network is a single autonomous system (AS), also called a *routing domain*, that consists of *end systems*

---

[6] *See* https://www.juniper.net/us/en/products-services/routing/mx-series/; https://www.juniper.net/documentation/en_US/junos/topics/reference/configuration-statement/interface-edit-protocols-isis.html.

[7] *See* https://www.juniper.net/us/en/products-services/sdn/nfx-series/; https://www.juniper.net/documentation/en_US/junos/information-products/pathway-pages/nfx-series/nfx150-getting-started.pdf.

[8] *See* https://www.juniper.net/us/en/products-services/security/srx-series/; https://www.juniper.net/documentation/en_US/junos/information-products/pathway-pages/config-guide-routing/config-guide-routing-is-is.pdf.

[9] *See supra* note 3.

and *intermediate systems*. End systems are network entities that send and receive packets. Intermediate systems send and receive packets and relay (forward) packets."[10]

20. The Accused Products communicate unicast packet traffic along the network according to a first traffic configuration along the network.

21. The Accused Products route unicast packet traffic according to unicast metrics and unicast routing tables, which are a first traffic configuration.

22. The Accused Products communicate multicast packet traffic along the network according to a second traffic configuration along the network, wherein the second traffic configuration differs from the first traffic configuration. "In certain instances, the unicast routing table used for the [reverse path forwarding (RPF)] check is also the table used for forwarding unicast data packets."[11]

23. Juniper's documentation for the Accused Products describes the address configuration of unicast data traffic that is used to communicate unicast data traffic based on the first configuration:[12]

> A unicast address identifies a single interface. When a network device sends a packet to a unicast address, the packet goes only to the specific interface identified by that address. Unicast addresses support a global address scope and two types of local address scopes.

> A unicast address consists of $n$ bits for the prefix and 128 - $n$ bits for the interface ID.

> In the IPv6 implementation for a subscriber access network, the following types of unicast addresses can be used:

---

[10] *See* https://www.juniper.net/documentation/en_US/junos/information-products/pathway-pages/config-guide-routing/config-guide-routing-is-is.pdf at 3.

[11] *See supra* note 10 at 179.

[12] *See* https://www.juniper.net/documentation/en_US/junos/topics/concept/subscriber-management-dual-stack-ipv6-address-types.html.

- Global unicast address—A unique IPv6 address assigned to a host interface. These addresses have a global scope and essentially the same purposes as IPv4 public addresses. Global unicast addresses are routable on the Internet.

- Link-local IPv6 address—An IPv6 address that allows communication between neighboring hosts that reside on the same link. Link-local addresses have a local scope, and cannot be used outside the link. They always have the prefix FE80::/10.

- Loopback IPv6 address—An IPv6 address used on a loopback interfaces. The IPv6 loopback address is 0:0:0:0:0:0:0:1, which can be notated as ::1/128.

- Unspecified address—An IPv6 unspecified address is 0:0:0:0:0:0:0:0, which can be notated at ::/128.

24.     The Accused Products communicate routing information representing at least a portion of the second traffic configuration to each node in the plurality of nodes, wherein each node in the plurality of nodes routes multicast traffic in response to at least a portion of the second traffic configuration.

25.     The Accused Products are configured to calculate an alternate multicast topology, in addition to the unicast topology and adds corresponding routes to inet.2 (*i.e.*, an alternate unicast routing table). Additionally, the information related to the second configuration (*i.e.*, the multicast topology and the corresponding routes) present in inet.2 is also advertised as shown below:[13]

> Most multicast routing protocols perform a reverse-path forwarding (RPF) check on the source of multicast packets. If a packet comes in on the interface that is used to send data to the source, the packet is accepted and forwarded to one or more downstream interfaces. Otherwise, the packet is discarded and a notification is sent to the multicast routing protocol running on the interface.
>
> In certain instances, the unicast routing table used for the RPF check is also the table used for forwarding unicast data packets. Thus, unicast and multicast routing are congruent. In other cases, where it is preferred that multicast routing be independent of unicast routing, the multicast routing protocols are configured to perform the RPF check using an alternate unicast routing table inet.2.
>
> You can configure IS-IS to calculate an alternate IPv4 multicast topology, in addition to the normal IPv4 unicast topology, and add the corresponding routes to

---

[13] *See supra* note 10 at 179–80.

> inet.2. The IS-IS interface metrics for the multicast topology can be configure independently of the unicast metrics. You can also selectively disable interfaces from participating in the multicast topology while continuing to participate in the regular unicast topology. This enables you to exercise control over the paths that multicast data takes through a network so that it is independent of unicast data paths. You can also configure IS-IS to calculate an alternate IPv6 multicast topology, in addition of the normal IPv6 unicast topology.

> NOTE: IS-IS only starts advertising the routes when the interface routes are in inet.2.

Thus, the routing information (*i.e.*, the corresponding routes of the multicast topology) that is a portion of the second configuration is also advertised (*i.e.*, communicated) to the nodes in the network. Based on the communicated second configuration, the nodes are configured to control which path the multicast data must take in the network.

26.    "The IS-IS protocol is an interior gateway protocol (IGP) that uses link-state information to make routing decisions."[14] In a link-state based IGP, the routes determined by the link-state based interior gateway IS-IS protocol are communicated to all routers (*i.e.*, each node) in the area/network (*i.e.*, routes added into inet.2 are advertised by IS-IS to each node):[15]

> The propagation of link-state updates is determined by the level boundaries. All routers within a level maintain a complete link-state database of all other routers in the same level. Each router then uses the Dijkstra algorithm to determine the shortest path from the local router to other routers in the link-state database.

27.    In view of the preceding paragraphs 18–26, each and every element of at least claim 18 of the '781 Patent is found in the Accused Products.

28.    Juniper continues to directly infringe at least one claim of the '781 Patent, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, importing, and/or distributing the Accused Products in the United States, including within this Judicial

---

[14] *See supra* note 10 at 3.

[15] *See supra* note 10 at 21.

District, without the authority of Brazos. Juniper's infringing use of the Accused Products includes its internal use and testing of the Accused Products.

29.     Juniper has received notice and actual or constructive knowledge of the '781 Patent since at least the date of service of this Complaint.

30.     Since at least the date of service of this Complaint, through its actions, Juniper has actively induced product makers, distributors, retailers, and/or end users of the Accused Products to infringe the '781 Patent throughout the United States, including within this Judicial District, by, among other things, advertising and promoting the use of the Accused Products in various websites, including providing and disseminating product descriptions, operating manuals, and other instructions on how to implement and configure the Accused Products. Examples of such advertising, promoting, and/or instructing include the documents at:

- http://www.juniper.net/assets/us/en/local/pdf/datasheets/1000616-en.pdf; and

- https://www.juniper.net/documentation/en_US/junos/information-products/pathway-pages/config-guide-multicast/config-guide-multicast.pdf.

31.     Juniper was and is aware that the normal and customary use by end users of the Accused Products infringes the '781 Patent. Juniper's inducement is ongoing.

32.     Since at least the date of service of this Complaint, through its actions, Juniper has contributed to the infringement of the '781 Patent by having others sell, offer for sale, or use the Accused Products throughout the United States, including within this Judicial District, with knowledge that the Accused Products infringe the '781 Patent. The Accused Products have special features that are especially made or adapted for infringing the '781 Patent and have no substantial non-infringing use. For example, in view of the preceding paragraphs, the Accused Products contain functionality which is material to at least claim 18 of the '781 Patent.

33.     The special features include using the IS-IS protocol to control the routing of multicast packet traffic according to a multicast traffic configuration that differs from a traffic configuration used for unicast packet traffic in a manner that infringes the '781 Patent.

34.     The special features constitute a material part of the invention of one or more claims of the '781 Patent and are not staple articles of commerce suitable for substantial non-infringing uses.

35.     Brazos has suffered damages as a result of Juniper's direct and indirect infringement of the '781 Patent in an amount adequate to compensate for Juniper's infringement, but in no event less than a reasonable royalty for the use made of the invention by Juniper, together with interest and costs as fixed by the Court.

**JURY DEMAND**

Brazos hereby demands a jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Brazos respectfully requests that the Court:

(a)     enter judgment that Juniper infringes one or more claims of the '781 Patent literally and/or under the doctrine of equivalents;

(b)     enter judgment that Juniper has induced infringement and continues to induce infringement of one or more claims of the '781 Patent;

(c)     enter judgment that Juniper has contributed to and continues to contribute to the infringement of one or more claims of the '781 Patent;

(d)     award Brazos damages, to be paid by Juniper in an amount adequate to compensate Brazos for such damages, together with pre-judgment and post-judgment interest for the infringement by Juniper of the '781 Patent through the date such judgment is entered in

accordance with 35 U.S.C. § 284, and increase such award by up to three times the amount found or assessed in accordance with 35 U.S.C. § 284;

(e)     declare this case exceptional pursuant to 35 U.S.C. § 285; and

(f)     award Brazos its costs, disbursements, attorneys' fees, and such further and additional relief as is deemed appropriate by this Court.

Respectfully submitted,

Dated: September 4, 2020

Edward J. Naughton
(*pro hac vice* to be filed)
enaughton@brownrudnick.com
Rebecca MacDowell Lecaroz
(*pro hac vice* to be filed)
rlecaroz@brownrudnick.com
BROWN RUDNICK LLP
One Financial Center
Boston, Massachusetts 02111
telephone:  (617) 856-8200
facsimile:   (617) 856-8201

Alessandra C. Messing
(*pro hac vice* to be filed)
amessing@brownrudnick.com
Timothy J. Rousseau
(*pro hac vice* to be filed)
trousseau@brownrudnick.com
Yarelyn Mena
(*pro hac vice* to be filed)
ymena@brownrudnick.com
BROWN RUDNICK LLP
7 Times Square
New York, New York 10036
telephone:  (212) 209-4800
facsimile:   (212) 209-4801

David M. Stein
dstein@brownrudnick.com
(*pro hac vice* to be filed)
Sarah G. Hartman
(*pro hac vice* to be filed)
shartman@brownrudnick.com
BROWN RUDNICK LLP
2211 Michelson Drive, 7th Floor
Irvine, California 92612
telephone:  (949) 752-7100
facsimile:   (949) 252-1514

/s/ Raymond W. Mort, III
Raymond W. Mort, III
Texas State Bar No. 00791308
raymort@austinlaw.com
THE MORT LAW FIRM, PLLC
100 Congress Avenue, Suite 2000
Austin, Texas 78701
tel/fax:    (512) 677-6825

*Counsel for Plaintiff*
*WSOU Investments, LLC d/b/a*
*Brazos Licensing and Development*

12

# EXHIBIT V

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

|  |  |
|---|---|
| WSOU INVESTMENTS, LLC D/B/A BRAZOS LICENSING AND DEVELOPMENT, | |
| Plaintiff, | CIVIL ACTION NO. 6:20-cv-1083 |
| v. | |
| ARISTA NETWORKS, INC. | |
| Defendant. | JURY TRIAL DEMANDED |

**BRAZOS COMPLAINT FOR
PATENT INFRINGEMENT AND JURY DEMAND**

Plaintiff WSOU Investments, LLC d/b/a Brazos Licensing and Development ("Brazos"), by and through its attorneys, files this Complaint for Patent Infringement against defendant Arista Networks, Inc. ("Arista") and alleges as follows:

1.     This Complaint arises from Arista's unlawful infringement of the following United States patents owned by Brazos: United States Patent Nos. 7,409,715 ("'715 Patent"); 8,472,447 ("'447 Patent"); and 9,450,884 ("'884 Patent") (collectively, the "Asserted Patents").

**Parties**

2.     Plaintiff Brazos is a limited liability corporation organized and existing under the laws of Delaware, with its principal place of business at 605 Austin Avenue, Suite 6, Waco, Texas 76701.

3.     Defendant Arista Networks, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 5453 Great America Parkway, Santa Clara, California 95054. Arista is doing business, either directly or through its agents, on an ongoing basis in this judicial district and elsewhere in the United States, and has a regular and

established place of business in this judicial district. Arista may be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

### Jurisdiction & Venue

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

5.     This Court has personal jurisdiction over Arista in this action because Arista has committed acts of infringement of the Asserted Patents within this District giving rise to this action, and has established minimum contacts with this forum such that the exercise of jurisdiction over Arista would not offend traditional notions of fair play and substantial justice. Arista, directly and through subsidiaries or intermediaries, has committed and continues to commit acts of infringement in this District by, among other things, making, using, importing, offering to sell, and selling products that infringe the Asserted Patents. Notably, Arista has repeatedly admitted or failed to dispute that this Court has personal jurisdiction over Arista in patent actions. *See, e.g.*, Answer ¶ 8, *Proven Networks, LLC v. Arista Networks, Inc.*, 6:20-cv-00281 (W.D. Tex. Jun. 22, 2020), ECF No. 13; Answer ¶ 5, *Intellectual Ventures I LLC et al v. Arista Networks, Inc.*, 6:20-cv-00749 (W.D. Tex. November 5, 2020), ECF No. 9. Notably *Proven Networks* involves many of the same accused products that are at issue here.

6.     Venue is proper in this District under 28 U.S.C. § 1400(b). Arista is registered to do business in Texas, and upon information and belief, Defendant has transacted business in this District and has committed acts of direct and indirect infringement in this District by, among other things, importing, offering to sell, and selling products that infringe the Asserted Patents. Arista

has a regular and established place of business in the District, including corporate offices at The

Terrace, Building II, Suite 420, 2700 Via Fortuna, Austin, Texas 78746.[1]

7.       In a recent case, Arista admitted that this federal judicial district is a proper venue

for patent infringement actions against it. *See, e.g.*, Answer ¶ 9, *Proven Networks, LLC v. Arista*

*Networks, Inc.*, 6:20-cv-00281 (W.D. Tex. Jun. 22, 2020), ECF No. 13 (admitting venue is proper

in this district). Notably, *Proven Networks* involves many of the same accused products that are at

issue here. Arista also admitted it has transacted business in this district. *See, e.g.*, Answer ¶ 9,

*Proven Networks, LLC v. Arista Networks, Inc.*, 6:20-cv-00281 (W.D. Tex. Jun. 22, 2020), ECF

No. 13.

## Count 1
(Infringement of the '715 Patent)

8.       Brazos repeats and re-alleges the allegations in the preceding paragraphs as if fully

set forth herein.

9.       On August 5, 2008, the U.S. Patent & Trademark Office duly and legally issued the

'715 Patent entitled "Mechanism for detection of attacks based on impersonation in a wireless

network." A true and correct copy of the '715 Patent is attached as Exhibit A to this Complaint.

10.       Brazos is the owner of all rights, title, and interest in and to the '715 Patent,

including the right to assert all causes of action arising under the '715 Patent and the right to any

remedies for the infringement of the '715 Patent.

11.       Claim 1 of the '715 Patent recites:

   1. A method for detecting impersonation based attacks at a wireless node of
   a wireless communication network, comprising the steps of:

---

[1]   *See*, *e.g.*, https://www.arista.com/en/company/contact-us, last visited November 25, 2020
(showing Austin office address).

a) operatively connecting the wireless node with an intrusion detection module and providing the intrusion detection module with a copy of original data frames transmitted by the wireless node over a wireless interface;

b) detecting at the intrusion detection module incoming data frames received over the wireless interface;

c) comparing at the intrusion detection module the information in the copy with the information in the incoming data frames; and

d) recognizing an impersonating attack when the intrusion detection module determines that the information in the copy differs from the information in the incoming data frames.

12.     Arista has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 1, of the '715 Patent in violation of 35 U.S.C. § 271(a) because Arista makes, uses, offers for sale, sells, and/or imports certain products ("'715 Accused Products"), including within this Judicial District, such as the Arista Wireless Intrusion Prevention System (WIPS) with Marker Packet auto-classification technology implemented on including but not limited to the C–120, C-110. C–100, C-230, C-260, C-230E, C-130, C-130E, W–118, O-235, O-235E, O-105, O-105E Access Points ("AP"). Arista's infringing use of the '715 Accused Products includes its internal use and testing of the '715 Accused Products.

13.     The '715 Accused Products satisfy all claim limitations of one or more of the claims of the '715 Patent, including at least claim 1.

14.     For example, the '715 Accused Products implement a method for detecting impersonation based attacks at a wireless node of a wireless communication network. The Arista Wireless Intrusion Prevention System (WIPS) is used to provide various threat detection, classification and prevention techniques while minimizing the number of false alarms raised. Arista WIPS implements a Marker Packet technology which performs network connectivity-based

AP autoclassification to automatically enforce network security.[2]  The WIPS classification systems classify the visible APs that are part of the network and marks them as "Authorized", "External" and "Rogue" APs.[3] Rogue APs are unauthorized APs that may be installed in the enterprise wired network without administrator knowledge. One of the most common types of threats that occur in a wireless network are caused by these Rogue APs since they allow unauthorized access to private networks (*i.e.*, impersonation based attacks).[4] The WIPS system classifies the rogue and external APs.[5] Thus it detects impersonation based attacks at a wireless node of a wireless communication network.

15.     The '715 Accused Products also comprise operatively connecting the wireless node with an intrusion detection module and providing the intrusion detection module with a copy of original data frames transmitted by the wireless node over a wireless interface. A WIPS sensor (an intrusion detection module) is connected with an authorized AP and Rogue AP (a wireless node) through the enterprise wired network.[6] The WIPS sensor (or the intrusion detection module) injects the Marker packets or those with a unique identifier (or original data frames) into the wired network. The packets (or data frames) are relayed to the wireless side (or wireless interface) of the WIPS sensor (or intrusion detection module) by the APs (or wireless node) present in the network. They (data frames) are detected over the air by the wireless side (or wireless interface) of WIPS

---

[2] https://www.arista.com/assets/data/pdf/Whitepapers/Arista-Marker-Packet-Whitepaper.pdf,
Page 1, Last accessed on July 26, 2020.
[3] *Id.* at Page 2.
[4]https://d2cpnw0u24fjm4.cloudfront.net/wp-content/uploads/Arista-Review-of-Detection-Classification-and-Prevention-Techniques-in-WIPS.pdf, Page 2, Last accessed on July 26, 2020.
[5] https://wifihelp.arista.com/post/rogue-aps-and-marker-packets/?pdf=445, Page 4, Last accessed on July 26, 2020.
[6] https://www.arista.com/assets/data/pdf/Whitepapers/Arista-Marker-Packet-Whitepaper.pdf,
Page 4, Last accessed on July 26, 2020.

sensor (or intrusion detection module).[7] The WIPS sensor can also inject the marker packets from the wireless-side (or wireless interface) of the sensor.[8]

16.     The '715 Accused Products also comprise detecting at the intrusion detection module incoming data frames received over the wireless interface. The marker packets (or incoming data frames) relayed by the AP are detected at the wireless side (or wireless interface) of the WIPS sensor (or intrusion detection module).[9] Likewise, the '715 Accused Products compare at the intrusion detection module the information in the copy with the information in the incoming data frames. As per the WIPS Marker-packet auto classification technology, marker packets (or data frames) are injected through the wire-side (or the wire interface) of the WIPS sensor (or intrusion detection module), which are then relayed by the AP and are detected at the wireless side (or the wireless interface) of the WIPS sensor (or the intrusion detection module).[10]

17.     The '715 Accused Products also comprise recognizing an impersonating attack when the intrusion detection module determines that the information in the copy differs from the information in the incoming data frames. The AP auto-classification segregates APs into three categories: authorized (managed APs in the enterprise wired network which the administrator is aware of), external (unmanaged APs in the wireless network which are not connected to the monitored enterprise wired network), and rogue (unauthorized APs installed in the enterprise wired network which is the administrator is not aware of).[11] As per the WIPS Marker-packet auto

---

[7]     https://d2cpnw0u24fjm4.cloudfront.net/wp-content/uploads/Arista-Review-of-Detection-Classification-and-Prevention-Techniques-in-WIPS.pdf, Page 3, Last accessed on July 26, 2020.
[8]     https://www.arista.com/assets/data/pdf/Whitepapers/Arista-Marker-Packet-Whitepaper.pdf, Page 4, Last accessed on July 26, 2020.
[9]     https://d2cpnw0u24fjm4.cloudfront.net/wp-content/uploads/Arista-Review-of-Detection-Classification-and-Prevention-Techniques-in-WIPS.pdf, Page 3, Last accessed on July 26, 2020.
[10] *Id.*
[11]    https://www.arista.com/assets/data/pdf/Whitepapers/Arista-Marker-Packet-Whitepaper.pdf, Page 2, Last accessed on November 18, 2020.

classification technology, marker packets (or data frames) are injected through the wire-side of the WIPS sensor (or intrusion detection module), which are then relayed by the AP and are detected at the wireless side of the WIPS sensor.[12] This technique avoids false alarms in that it never marks rogue APs (recognizing they are an impersonating attack) when the WIPS Marker-packet is not received at the target host (determining that the information in the copy differs from the information in the incoming data frames).[13]

18.     Arista has received notice and actual or constructive knowledge of the '715 Patent and the infringing nature of the accused product since at least the date of service of this Complaint.

19.     Since at least the date of service of this Complaint, through its actions, Arista has indirectly infringed and continues to indirectly infringe the '715 Patent in violation of 35 U.S.C. § 271(b). Arista has actively induced product makers, distributors, retailers, and/or end users of the Accused Products to directly infringe the '715 Patent throughout the United States, including within this Judicial District, by, among other things, advertising and promoting the use of the Accused Products in various websites, including providing and disseminating product descriptions, operating manuals, and other instructions on how to implement and configure the '715 Accused Products. Examples of such advertising, promoting, and/or instructing include the documents at:

- https://d2cpnw0u24fjm4.cloudfront.net/wp-content/uploads/Arista-Review-of-Detection-Classification-and-Prevention-Techniques-in-WIPS.pdf

- https://www.arista.com/assets/data/pdf/Whitepapers/Arista-Marker-Packet-Whitepaper.pdf

---

[12] *Id*. at Page 4.
[13] *Id*.

- https://wifihelp.arista.com/post/rogue-aps-and-marker-packets/?pdf=445

- https://www.arista.com/assets/data/pdf/Whitepapers/Arista-WIPS-Whitepaper.pdf

20.     Arista does so knowing and intending that its customers and end users will commit these infringing acts. Arista also continues to make, use, offer for sale, sell, and/or import the '715 Accused Products, despite its knowledge of the '715 Patent, thereby specifically intending for and inducing its customers to infringe the '715 Patent through the customers' normal and customary use of the '715 Accused Products.

21.     In addition, Arista has indirectly infringed and continues to indirectly infringe the '715 Patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the '715 Accused Products with knowledge that they are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use.

22.     For example, Arista is aware that the Arista Wireless Intrusion Prevention System (WIPS) with Marker Packet auto-classification technology included in the '715 Accused Products enables such products to operate as described above and that such functionality infringes the '715 Patent, including claim 1. Arista continues to sell and offer to sell such products in the United States after receiving notice of the '715 Patent and how the products' functionality infringes that patent.

23.     The infringing aspects of the '715 Accused Products can be used only in a manner that infringes the '715 Patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

24.     Brazos has suffered damages as a result of Arista's direct and indirect infringement of the '715 Patent in an amount adequate to compensate for Arista's infringement, but in no event less than a reasonable royalty for the use made of the invention by Arista, together with interest and costs as fixed by the Court.

### Count 2
(Infringement of the '447 Patent)

25.     Brazos repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

26.     On June 25, 2013, the U.S. Patent & Trademark Office duly and legally issued the '447 Patent entitled "IP multicast snooping and routing with multi-chassis link aggregation." A true and correct copy of the '447 Patent is attached as Exhibit B to this Complaint.

27.     Brazos is the owner of all rights, title, and interest in and to the '447 Patent, including the right to assert all causes of action arising under the '447 Patent and the right to any remedies for the infringement of the '447 Patent.

28.     Claim 15 of the ''447 Patent recites:

15. A method for performing Internet Protocol (IP) multicast snooping on an aggregation switch in a multi-chassis system, comprising:

receiving snooping information via at least external ports coupled to at least one edge node and at least one network node;

storing the snooping information within a database;

sharing the snooping information substantially in real-time with a remote aggregation switch via a virtual fabric link (VFL) therebetween, wherein the remote aggregation switch is active and in a separate physical chassis

building respective forwarding vectors for multicast traffic flows received from the at least one network node based on the snooping information; and

determining a multicast index for a received multicast traffic flow to set-up hardware paths for forwarding the received multicast traffic flow to the external ports in a virtual local area network (VLAN) that requested the received multicast

traffic flow via the at least one edge node, the multicast index being used globally between the aggregation switch and the remote aggregation switch.

29.     Arista has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 15, of the '447 Patent in violation of 35 U.S.C. § 271(a) because Arista makes, uses, offers for sale, sells, and/or imports certain products ("'447 Accused Products"), including within this Judicial District, such as Arista's switches that support Internet Group Management Protocol (IGMP) snooping + Multi-chassis Link Aggregation (MLAG) including but not limited to Arista 7260X, 7280R, 7250X, 7280R2, 7260X3, 7280R3, 7280E, 720XP 7020R, 7050X, 7050X2, 7060X, 7060X2, 7050X3, 7050, 7160, 7170, 7150, 7010, 7500R2, 7500R, 7500E, 7300X, 7320X, 7300X3, 7368, and 7500R3 Series switches. Arista's infringing use of the '447 Accused Products includes its internal use and testing of the '447 Accused Products.

30.     The '447 Accused Products satisfy all claim limitations of the one or more claims of the '447 Patent, including at least claim 15.

31.     By way of example, the Arista 7500R Series modular switches are high-performance universal spine switches. They combine 100G density with Internet scale table sizes and comprehensive L2 and L3 features. These switches can do internet protocol (IP) multicast snooping when the switches are operating in multi-chassis link aggregation mode (to interconnect two switches and use them as one logical switch), as described in claim 15.[14] The other '447 Accused Products support the same accused features.[15]

---

[14]   https://www.arista.com/assets/data/pdf/Datasheets/7500RDataSheet.pdf, Page 2-7, Last accessed November 18, 2020.

[15]   https://www.arista.com/en/support/product-documentation/supported-features, Last accessed April 23, 2020.

32.     The '447 Accused Products practice a method for performing Internet Protocol (IP) multicast snooping on an aggregation switch in a multi-chassis system. The '447 Accused Products support multicast transmissions through IGMP, IGMP Snooping (*i.e.*, IP multicast snooping), and PIM-SM.[16] The '447 Accused Products also support Multi-Chassis Link Aggregation (MLAG) feature, which allows interconnection of two Arista 7000 Family switches (*i.e.*, an aggregation switch in a multi-chassis system) and for use as one logical switch. They further support MLAG to work in conjunction with IGMP snooping.[17]

33.     Further, the method practiced by the '447 Accused Products comprises of receiving snooping information via at least external ports coupled to at least one edge node and at least one network node. The '447 Accused Products support multicast transmissions.[18] IP Multicasting works by forming multicast groups. The host nodes (*i.e.*, network nodes) send IGMP packets to a multicast router to join or leave a multicast group. The '447 Accused Products examine these IGMP packets to extract information about hosts that want to join a multicast group.[19] The '447 Accused Products in MLAG configuration are deployed at various places in the network wherein the network node is connected to the accused product via an edge node.[20]

---

[16] *Id.*

[17]  *Id.*; https://www.arista.com/en/products/multi-chassis-link-aggregation-mlag, Page 1, Last accessed April 23, 2020.

[18]  https://www.arista.com/en/um-eos/eos-section-38-1-overview#ww1151209, Last accessed November 24, 2020.

[19]  https://www.arista.com/en/support/product-documentation/supported-features, Last accessed April 23, 2020; https://www.arista.com/en/assets/data/pdf/user-manual/um-books/EOS-4.23.2F-Manual.pdf, Page 2676, Last accessed April 23, 2020.

[20] https://www.arista.com/en/products/multi-chassis-link-aggregation-mlag, Page 2, Last accessed April 23, 2020.

34.     The snooping information is stored within a database in the on-chip memory on the switch.[21]

35.     When the '447 Accused Products are in MLAG configuration, the MLAG peer switches (*i.e.*, aggregation switches) are connected by a peer link (*i.e.*, virtual fabric link (VFL)). This peer link acts as an interface for the two switches to communicate with each other, and the snooping information is synchronized over this peer link (*i.e.*, sharing the snooping information substantially in real-time with a remote aggregation switch).[22] In this configuration, the remote aggregation switch is both active and in a separate physical chassis.[23]

36.     The '447 Accused Products examine the IGMP join or leave packets to extract snooping information about hosts (*i.e.,* network nodes) that want to join multicast group. This extracted snooping information is used to build the group multicast list (*i.e.*, the forwarding vector), which is stored in the switch. This multicast list includes information of various multicast groups, the network nodes that are part of the group and the port to which these nodes are connected. The MLAG peers use this multicast list to forward multicast packets to the external ports that are connected to the nodes of the multicast group.[24]

---

[21] https://www.arista.com/assets/data/pdf/user-manual/um-books/EOS-4.23.2F-Manual.pdf, Page 2676, Last accessed April 23, 2020; https://www.arista.com/assets/data/pdf/Whitepapers/Arista7500RSwitchArchitectureWP.pdf, Page 1, Last accessed April 23, 2020.

[22] https://www.arista.com/assets/data/pdf/user-manual/um-books/EOS-4.23.2F-Manual.pdf, Page 739, Last accessed April 23, 2020; https://eos.arista.com/forum/igmpsnooping-in-mlag/, Page 1, Last accessed April 23, 2020.

[23] https://www.arista.com/en/products/multi-chassis-link-aggregation-mlag, Page 2, Last accessed April 23, 2020; https://www.arista.com/assets/data/pdf/user-manual/um-books/EOS-4.23.2F-Manual.pdf, Pages 748, 766, Last accessed April 23, 2020.

[24] https://www.arista.com/assets/data/pdf/user-manual/um-books/EOS-4.23.2F-Manual.pdf, Page 2676, Last accessed April 23, 2020.

37.     The method practiced by the '447 Accused Products comprises determining a multicast index for a received multicast traffic flow to set-up hardware paths for forwarding the received multicast traffic flow to the external ports in a virtual local area network (VLAN) that requested the received multicast traffic flow via the at least one edge node, the multicast index being used globally between the aggregation switch and the remote aggregation switch. The '447 Accused Products store the snooping information that is extracted from IGMP packets to the group multicast list. The switch uses this multicast list to forward multicast packets to nodes that joined the group and to prune multicast traffic from links that are not in the group.[25] The '447 Accused Products support the IEEE 802.1Q standard. When a multicast frame from a network node which is part of a virtual local area network (VLAN) arrives at a port, the multicast frame is tagged with a VLAN tag (*i.e.*, multicast index) based at least on the VLAN that it came from. This frame enables the switch to set up a hardware path for forwarding the frame to a VLAN that the frame belongs to (*i.e.*, set-up hardware paths for forwarding the received multicast traffic).[26] The ports on the switch use this VLAN tag to determine whether to forward the frame or not. If the frame is tagged for a VLAN that is connected to that port, the port forwards the frame. If the frame is tagged for a VLAN that is not connected to that port, the port drops the frame. Ports on both the switches can use this tag to make forwarding decisions (*i.e.*, being used globally between the aggregation switch and the remote aggregation switch) and this tag is removed once the frame reaches the egress port of either of the two switches.[27]

---

[25] *Id.*

[26] https://www.arista.com/en/support/product-documentation/supported-features, Last accessed April 23, 2020.

[27] https://www.arista.com/assets/data/pdf/user-manual/um-books/EOS-4.23.2F-Manual.pdf, Page 1127, Last accessed April 23, 2020.

38.    Arista has received notice and actual or constructive knowledge of the '447 Patent and the infringing nature of the accused product since at least the date of service of this Complaint.

39.    Since at least the date of service of this Complaint, through its actions, Arista has indirectly infringed and continues to indirectly infringe the '447 Patent in violation of 35 U.S.C. § 271(b). Arista has actively induced product makers, distributors, retailers, and/or end users of the Accused Products to directly infringe the '447 Patent throughout the United States, including within this Judicial District, by, among other things, advertising and promoting the use of the Accused Products in various websites, including providing and disseminating product descriptions, operating manuals, and other instructions on how to implement and configure the Accused Products. Examples of such advertising, promoting, and/or instructing include the documents at:

- https://www.arista.com/assets/data/pdf/Whitepapers/Arista7500RSwitchArchitectureWP.pdf

- https://www.arista.com/en/support/product-documentation/supported-features

- https://www.arista.com/assets/data/pdf/user-manual/um-books/EOS-4.23.2F-Manual.pdf

- https://www.arista.com/en/products/multi-chassis-link-aggregation-mlag

- https://eos.arista.com/forum/igmpsnooping-in-mlag/

40.    Arista does so knowing and intending that its customers and end users will commit these infringing acts. Defendant also continues to make, use, offer for sale, sell, and/or import the '447 Accused Products, despite its knowledge of the '447 Patent, thereby specifically intending for and inducing its customers to infringe the '447 Patent through the customers' normal and customary use of the '447 Accused Products.

41.     In addition, Arista has indirectly infringed and continues to indirectly infringe the '447 Patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the '447 Accused Products with knowledge that they are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use.

42.     For example, Arista is aware that the Internet Group Management Protocol (IGMP) snooping and Multi-chassis Link Aggregation (MLAG) technology included in the '447 Accused Products enables such products to operate as described above and that such functionality infringes the '447 Patent, including claim 15. Arista continues to sell and offer to sell such products in the United States after receiving notice of the '447 Patent and how the products' functionality infringes that patent.

43.     The infringing aspects of the '447 Accused Products can be used only in a manner that infringes the '447 Patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

44.     Brazos has suffered damages as a result of Arista's direct and indirect infringement of the '447 Patent in an amount adequate to compensate for Arista's infringement, but in no event less than a reasonable royalty for the use made of the invention by Arista, together with interest and costs as fixed by the Court.

## Count 3
### (Infringement of the '884 Patent)

45.     Brazos repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

46.     On September 20, 2016, the U.S. Patent & Trademark Office duly and legally issued the '884 Patent entitled "Software defined networking based congestion control." A true and correct copy of the '884 Patent is attached as Exhibit C to this Complaint.

47.     Brazos is the owner of all rights, title, and interest in and to the '884 Patent, including the right to assert all causes of action arising under the '884 Patent and the right to any remedies for the infringement of the '884 Patent.

48.     Claim 1 of the '884 Patent recites:

1. A method of adjusting bandwidth allocation by a network switching element in a communications network, the network switching element including a target port, the method comprising:

monitoring, by the network switching element, a data flow traversing the target port of the network switching element;

determining, by the network switching element, a bandwidth allocation for the target port, the bandwidth allocation for the target port being a bandwidth that is currently allocated for the data flow;

determining, by the network switching element, a fair-share bandwidth allocation for the target port, the fair-share bandwidth allocation being a proportional allocation of a total bandwidth of the network switching element; and

adjusting, by the network switching element, the bandwidth allocation for the target port based on the fair-share bandwidth allocation.

49.     Arista has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 1, of the '884 Patent in violation of 35 U.S.C. § 271(a) because Arista makes, uses, offers for sale, sells, and/or imports certain products ("'884 Accused Products"), including within this Judicial District, such as Arista's switches including but not limited to Arista 7500R Series, 7500R3 Series, 7800R3 Series, 7280R3 Series, 7280R Series, and 7020R Series switches. Arista's infringing use of the '884 Accused Products includes its internal use and testing of the '884 Accused Products.

50.     The '884 Accused Products satisfy all claim limitations of at least one or more of the claims of the '884 Patent, including at least claim 1.

51.     By way of example, The Arista 7500R series switches are designed for large virtualized and cloud networks. Arista 7500R series switches use Advanced EOS features for network monitoring, precision timing, VXLAN network virtualization, and EVPN, etc. Arista 7500R series switches use deep buffer virtual output queue (VOQ) architecture to ensure fair allocation of bandwidth among all traffic classes across ports as described in Claim 1. The other accused switches also have infringing functionality.

52.     The '884 Accused Products practice a method of adjusting bandwidth allocation by a network switching element in a communications network, the network switching element including a target port. The '884 Accused Products are switches designed for large virtualized and cloud networks. The '884 Accused Products use Advanced EOS features for network monitoring, precision timing, VXLAN network virtualization, and EVPN. The '884 Accused Products also use deep buffer virtual output queue (VOQ) architecture to ensure fair allocation of bandwidth among all virtual output queues of ports.[28]

53.     The '884 Accused Products provide an architecture of deep buffer virtual output queue (VOQ) for congested network scenarios. The '884 Accused Products also provide an advanced traffic scheduler to fairly allocate bandwidth (*i.e.*, a method of adjusting bandwidth allocation) between all virtual output queues of ports. The VOQ bandwidth allocation is per traffic class and per port.[29]

---

[28] https://www.arista.com/en/products/7500r-series, Page 1, Last accessed on May 28, 2020.
[29] https://www.arista.com/assets/data/pdf/Datasheets/7500RDataSheet.pdf, Page 4, Last accessed on May 28, 2020; https://inog.net/files/iNOG8-Arista-Deep-Buffers.pdf, Page 1, Last accessed on May 28, 2020.

54.     The method practiced by the '884 Accused Products comprises monitoring, by the network switching element, a data flow traversing the target port of the network switching element. The '884 Accused Products provide a system for managing big data workloads with the help of deep buffer, advanced VOQ architecture, and analysis tools. The analysis tools monitor and analyze the data flow across the switch (*i.e.*, ports of the switch).[30] The '884 Accused Products provide an architecture of deep buffer virtual output queue (VOQ) for congested network scenarios. The '884 Accused Products also provide an advanced traffic scheduler to fairly allocate bandwidth between all virtual output queues of ports. Based on monitoring and analyzing, the VOQ architecture enables fair bandwidth allocation across traffic classes (*i.e.*, flows with different traffic classes) across the ports.[31]

55.     The method practiced by the '884 Accused Products comprise determining, by the network switching element, a bandwidth allocation for the target port, the bandwidth allocation for the target port being a bandwidth that is currently allocated for the data flow. The '884 Accused Products provide a virtual output queuing architecture (VOQ) that fairly allocates bandwidth across traffic classes (*i.e.*, flows with different traffic classes) across the ports. Packets enqueued for transmission in the VOQ are monitored within the software for the '884 Accused Products via per-port interface counters (*i.e.*, a bandwidth allocation for the target port).[32]  For example, when a new traffic Class (*e.g.*, traffic flow with Class-A) enters a port, the accused product monitors the

---

[30]   https://www.youtube.com/watch?v=KaEFvEib7WY&feature=emb_logo, Timestamp [5:34], Last accessed on May 28, 2020.
[31]   https://www.arista.com/assets/data/pdf/Datasheets/7500RDataSheet.pdf, Page 4, Last accessed on May 28, 2020; https://www.arista.com/assets/data/pdf/Whitepapers/BigDataBigBuffers-WP.pdf, Page 4, Last accessed on May 28, 2020; https://inog.net/files/iNOG8-Arista-Deep-Buffers.pdf, Page 4, Last accessed on May 28, 2020.
[32]   https://eos.arista.com/troubleshooting-egress-queue-drops-on-7280-7500-devices, Last accessed November 18, 2020.

flow and provides bandwidth to the port as per the bandwidth of incoming data flow (*i.e.*, bandwidth that is currently allocated for the data flow).[33]

56.     The method practiced by the '884 Accused Products comprises determining, by the network switching element, a fair-share bandwidth allocation for the target port, the fair-share bandwidth allocation being a proportional allocation of a total bandwidth of the network switching element.  The '884 Accused Products provide an architecture of deep buffer virtual output queue (VOQ) for congested network scenarios. The '884 Accused Products also provide an advanced traffic scheduler to allocate bandwidth fairly (*i.e.*, fair-share bandwidth) between all virtual output queues of ports through at least weighted fair queueing, fixed priority queueing, and hybrid queuing schemes.[34] The VOQ architecture also enables fair bandwidth allocation across traffic classes (*i.e.*, flows with different traffic classes) across the ports.[35] The '884 Accused Products also provide a fair allocation of bandwidth per port and the bandwidth allocation among the shared ports is proportionate to the data flow.[36]

57.     The method practiced by the '884 Accused Products comprises adjusting, by the network switching element, the bandwidth allocation for the target port based on the fair-share bandwidth allocation. The deep buffer VOQ architecture allocates a fair distribution of bandwidth

[33] https://www.arista.com/assets/data/pdf/Datasheets/7500RDataSheet.pdf, Page 4, Last accessed on May 28, 2020; https://inog.net/files/iNOG8-Arista-Deep-Buffers.pdf, Page 1, Last accessed on May 28, 2020.

[34] https://www.arista.com/assets/data/pdf/Datasheets/7500RDataSheet.pdf, Page 4, Last accessed on November 18, 2020.

[35] https://www.arista.com/assets/data/pdf/Datasheets/7500RDataSheet.pdf, Page 4, Last accessed on May 28, 2020; https://www.arista.com/assets/data/pdf/Whitepapers/BigDataBigBuffers-WP.pdf, Page 4, Last accessed on May 28, 2020; https://inog.net/files/iNOG8-Arista-Deep-Buffers.pdf, Page 4, Last accessed on May 28, 2020.

[36] https://inog.net/files/iNOG8-Arista-Deep-Buffers.pdf, Page 6, Last accessed on May 28, 2020.

based on monitoring tools. The bandwidth of the flow is adjusted based on fair-share bandwidth allocation.[37]

58.     Arista has received notice and actual or constructive knowledge of the '884 Patent and the infringing nature of the accused product since at least the date of service of this Complaint.

59.     Since at least the date of service of this Complaint, through its actions, Arista has indirectly infringed and continues to indirectly infringe the '884 Patent in violation of 35 U.S.C. § 271(b). Arista has actively induced product makers, distributors, retailers, and/or end users of the Accused Products to directly infringe the '884 Patent throughout the United States, including within this Judicial District, by, among other things, advertising and promoting the use of the Accused Products in various websites, including providing and disseminating product descriptions, operating manuals, and other instructions on how to implement and configure the Accused Products. Examples of such advertising, promoting, and/or instructing include the documents at:

- https://www.arista.com/en/products/7500r-series

- https://www.arista.com/assets/data/pdf/Datasheets/7500RDataSheet.pdf

- https://www.arista.com/assets/data/pdf/Whitepapers/BigDataBigBuffers-WP.pdf

60.     Arista does so knowing and intending that its customers and end users will commit these infringing acts. Arista also continues to make, use, offer for sale, sell, and/or import the '884 Accused Products, despite its knowledge of the '884 Patent, thereby specifically intending for and inducing its customers to infringe the '884 Patent through the customers' normal and customary use of the '884 Accused Products.

---

[37] https://www.arista.com/en/products/7500r-series, Page  4, Last accessed on May 28, 2020; https://inog.net/files/iNOG8-Arista-Deep-Buffers.pdf, Page  6, Last accessed on May 28, 2020.

61.     In addition, Arista has indirectly infringed and continues to indirectly infringe the '884 Patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the '884 Accused Products with knowledge that they are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use.

62.     For example, Arista is aware that the technology described above included in the '884 Accused Products enables such products to operate as described above and that such functionality infringes the '884 Patent, including claim 1. Arista continues to sell and offer to sell such products in the United States after receiving notice of the '884 Patent and how the products' functionality infringes that patent.

63.     The infringing aspects of the '884 Accused Products can be used only in a manner that infringes the '884 Patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

64.     Brazos has suffered damages as a result of Arista's direct and indirect infringement of the '884 Patent in an amount adequate to compensate for Arista's infringement, but in no event less than a reasonable royalty for the use made of the invention by Arista, together with interest and costs as fixed by the Court.

<u>**Demand for Jury Trial**</u>

65.     Brazos hereby demands a jury trial for all issues so triable.

<u>**Prayer for Relief**</u>

WHEREFORE, Brazos requests the that the Court:

(a)      enter judgment that Arista infringes one or more claims of the Asserted Patents literally and/or under the doctrine of equivalents;

(b)      enter judgment that Arista has induced and/or contributed to infringement literally and/or under the doctrine of equivalents and continues to induce and/or contributed to infringement of one or more claims of the Asserted Patents;

(c)      award Brazos damages, to be paid by Arista in an amount adequate to compensate Brazos for such damages, together with pre-judgment and post-judgment interest for the infringement by Arista of the Asserted Patents through the date such judgment is entered in accordance with 35 U.S.C. § 284;

(d)      declare this case exceptional pursuant to 35 U.S.C. § 285; and

(e)      award Brazos its costs, disbursements, attorneys' fees, and such further and additional relief as is deemed appropriate by this Court.

Dated: November 25, 2020                 Respectfully submitted,

By: */s/ Max L. Tribble, Jr.*
    Max L. Tribble, Jr.
    State Bar No. 2021395
    Shawn Blackburn *(pro hac vice)*
    State Bar No. 24089989
    Bryce T. Barcelo *(pro hac vice)*
    State Bar No. 24092081
    SUSMAN GODFREY L.L.P.
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002-5096
    Telephone: (713) 651-9366
    Fax: (713) 654-6666
    mtribble@susmangodfrey.com
    sblackburn@susmangodfrey.com
    bbarcelo@susmangodfrey.com

    Kalpana Srinivasan *(pro hac vice)*
    State Bar No. 237460
    SUSMAN GODFREY L.L.P.

1900 Avenue of the Stars, 14th Floor
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Fax: (310) 789-3150
ksrinivasan@susmangodfrey.com

**COUNSEL FOR PLAINTIFF WSOU
INVESTMENTS, LLC D/B/A BRAZOS
LICENSING AND DEVELOPMENT**

# EXHIBIT W

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| WSOU INVESTMENTS, LLC d/b/a BRAZOS LICENSING AND DEVELOPMENT, | § § § § | |
| **Plaintiff,** | § § | |
| v. | § § | CIVIL ACTION NO. 6:20-cv-1172 |
| SALESFORCE.COM, INC., | § § | JURY TRIAL DEMANDED |
| **Defendant.** | § § | |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff WSOU Investments, LLC d/b/a Brazos Licensing and Development ("Brazos" or "Plaintiff"), by and through its attorneys, files this Complaint for Patent Infringement against Defendant Salesforce.com, Inc. ("Salesforce") and alleges:

**NATURE OF THE ACTION**

1.      This is a civil action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 1, et seq., including §§ 271, 281, 284, and 285.

**THE PARTIES**

1.      Brazos is a limited liability corporation organized and existing under the laws of Delaware, with its principal place of business at 606 Austin Avenue, Suite 6, Waco, Texas 76701.

2.      Defendant Salesforce is a corporation organized and existing under the laws of Delaware that maintains an established place of business at 415 Mission Street, 3rd Floor, San Francisco, California 94105.

## JURISDICTION AND VENUE

3.      This is an action for patent infringement which arises under the Patent Laws of the United States, in particular, 35 U.S.C. §§271, 281, 284, and 285.

4.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has specific and general personal jurisdiction over Defendant pursuant to due process and/or the Texas Long Arm Statute because Defendant has committed acts giving rise to this action within Texas and within this judicial district. The Court's exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice because Salesforce has established minimum contacts with the forum. For example, on information and belief, Defendant has committed acts of infringement in this judicial district, by among other things, selling and offering for sale products that infringe the asserted patent, directly or through intermediaries, as alleged herein.

6.      Venue in the Western District of Texas is proper pursuant to 28 U.S.C. §§1391 and 1400(b) because Defendant has committed acts of infringement in this judicial district and has regular and established places of business in this judicial district and in Texas. As non-limiting examples, on information and belief, Defendant uses office space in Austin for client meetings. Salesforce has more than 300 employees that work in this judicial district, including employees working in the cities of Waco, Austin, and San Antonio.  The titles of said employees include "Vice President," "Principal Architect," and "Senior Director."

7.      Upon information and belief, the majority of Salesforce's nationwide workforce is working from home and will continue to be allowed to do so until at least August of 2021. Upon information and belief, some of the Salesforce employees working in the Western District utilize

their home as a principal place of business for Salesforce.  Additionally, such employees are allowed to advertise that they are, for example, an Austin Salesforce employee.  Because of such representations, local magazines advertise Salesforce as having a place of busines in Austin.



Source: https://www.builtinaustin.com/company/salesforce

**<u>COUNT ONE - INFRINGEMENT OF U.S. PATENT NO. 9,336,320</u>**

1.      Brazos re-alleges and incorporates by reference the preceding paragraphs of this Complaint.

2.      On May 10, 2016, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,336,320 ("the '320 Patent"), entitled "Method and apparat for navigating services." A true and correct copy of the '320 Patent is attached as Exhibit A to this Complaint.

3.      Brazos is the owner of all rights, title, and interest in and to the '320 Patent, including the right to assert all causes of action arising under the '320 Patent and the right to any

remedies for the infringement of the '320 Patent.

     4.    Salesforce makes, uses, sells, offers for sale, imports, and/or distributes in the United States, including within this judicial district, products such as, but not limited to, Salesforce Communities (collectively, the "Accused Products").

     5.    Salesforce Communities are branded spaces for employees, customers, and partners to connect. An admin can customize and create communities to meet their business needs, then transition seamlessly between them.



Source: https://help.salesforce.com/articleView?id=networks_overview.htm&type=5, Page 1

     6.    Salesforce Communities provide customizable Navigation menu components. These navigation menu items can include Salesforce objects, topics, URL to external sites, and menu labels.

SALESFORCE HELP > DOCS > SET UP AND MANAGE SALESFORCE COMMUNITIES

## Navigation Menu

The navigation menu component extends your community's navigation beyond navigational topics. Navigation menu items can include Salesforce objects, topics, pages in your community, URLs to external sites, and menu labels. Menu labels are parent headings under which you can nest other menu items. You can also enable the App Launcher to make it easy for members to switch between their communities and their Salesforce org.

Source:https://help.salesforce.com/articleView?id=rss_setup_nav_menu.htm&type=5#rss_setup_nav_menu, Page 1

7.    While accessing the Salesforce Communities by a user, Salesforce Community admin can enable detection of the location of the user devices of the user. As an example, an admin can use 'navigation.geolocation' object to detect location. To improve the location, an admin can use 'sforce' Javascript object to detect the location of a user device while accessing the Salesforce communities. (i.e., receiving location information associated with a device)

Device browsers and webview equivalents do have the ability to find a user's location using the `navigator.geolocation` object, but the reliability and accuracy leaves something to be desired. Its implementation and inner workings is also a complete black box with very little information on how it actually works. The native Location APIs appear to be much more robust and accurate. The native OS Location APIs use not only GPS, but also Wifi, cellular, and Bluetooth signals to improve location accuracy. I am almost certain `navigator.geolocation` does not do this, but again, it is a black box and there appears to be no public documentation on the implementation per OS.

This Idea is to propose extending the Salesforce `sforce` JavaScript object to support native device location APIs. The API implementation and response object would be the exact same as `navigator.geolocation`.

It would look something like this:

```
sforce.geolocation.getCurrentPosition(function(position) {

 do_something(position.coords.latitude, position.coords.longitude);

});
```

I understand this behavior would vary based on the container it is being called form. In a device Browser (Safari,Chrome) it would simply be a proxy for the normal `navigator.geolocation`. If running inside the Salesforce1 application it would access the native device Location APIs. Both iOS and Android have all the necessary methods to rebuild the `position.coords` object.

Source: https://success.salesforce.com/ideaView?id=0873A000000Tr2oQAC,

8.    The method practiced by the accused product comprises selecting, via a processor, menu items associated with two or more different services based on the location information.

9.    An admin of a Salesforce community can add menu items to a menu. The menu

items include Community pages, External URL, Global Action, Menu Label, Navigation Topic, and Salesforce Object, each representing different services.



Source: https://help.salesforce.com/articleView?id=rss_setup_nav_menu.htm&type=5#rss_setup_nav_menu, Page 1

10.     Salesforce customization allows users to add different types of menu items using toolbars. Each menu item provides a different service to the user.



Source: https://www.youtube.com/watch?v=eMoC2xeG5Ms, Timestamp:0:27.

11.    Salesforce Communities provides a platform to customize menu items that can be added based on the requirements of the user. For the same webpage, Salesforce provides options to have different menu items.



Set Up Navigation Menu Variations and Tile Menu for Salesforce Community

Source: https://www.youtube.com/watch?v=eMoC2xeG5Ms, Timestamp:0:5

12.    One such example of the Salesforce Community is "community.logitech.com". Salesforce community has built the Logitech community.



Source: https://www.youtube.com/watch?v=mwdgueihnXA, Time Stamp 8:51

13.    The website community.logitech supports different menu items based on the location. Six menu items are shown in the below figure and include "Business Support Home" and "Register a Product."



Source: https://support.logi.com/hc/en-us/community/topics, Page 1

     14.    All the menu items are presented together to the user in a user interface that acts as a bridge. These menu items correspond to one or more services.

     15.    The Salesforce Navigation Menu acts as a bridge between the menu items of a website and a mobile application.



Source:
https://help.salesforce.com/articleView?id=rss_setup_nav_menu.htm&type=5#rss_setup_nav_menu, Page 2

16.      Salesforce community has built the Logitech community.



Source: https://www.youtube.com/watch?v=mwdgueihnXA, Page 1

17.      For example, the Salesforce Logitech support menu bar acts as a bridge for different menu items.



Source: https://support.logi.com/hc/en-us/community/topics, Page 1

18.    In Salesforce Community, admin can use 'sforce' Javascript object to detect the location of a user device while accessing the Salesforce communities. These functions extract the location information.



Source: https://success.salesforce.com/ideaView?id=0873A000000Tr2oQAC, Page 1

19.    Each Salesforce Community has one associated "Site.com." "Site.com" enables Salesforce community users to add custom branded pages to the community. "Site.com" allows users to customize the community interface.



Source:
https://help.salesforce.com/articleView?id=siteforce_communities_overview.htm&type=5,
Page 1.

Source:    https://help.salesforce.com/articleView?id=siteforce_communities_using.htm&type=5,
Page 1

20.    Salesforce Community builder provides an option to create a multilingual community with "Site.com."

21.    Translated content for each language can be added, and community visitors can choose their preferred language. Also, the language of the menu items can be presented in different languages.

## Create a Multilingual Community

Creating a multilingual community involves a few main steps. Define the languages that you want your community to support. Add translated content for each language. And enable community visitors to choose their preferred language.

REQUIRED EDITIONS AND USER PERMISSIONS

Available in: Lightning communities accessed through Lightning Experience, Salesforce Classic, and mobile devices, and is available in **Essentials**, **Enterprise**, **Performance**, **Unlimited**, and **Developer** editions.

| USER PERMISSIONS NEEDED | |
|---|---|
| To create, customize, or publish a community: | Create and Set Up Communities AND View Setup and Configuration |

Source: https://help.salesforce.com/articleView?id=customize_wbench.htm&type=5, Page 1

22.    Salesforce Community uses a translation workbench to translate the menu items. A

five-character locale code is used to identify languages according to the geographic location.

## Translations

This metadata type allows you to work with translations for various supported languages. The ability to translate component labels is part of the Translation Workbench. For more information, see "Enable and Disable the Translation Workbench" in the Salesforce online help.

This type extends the Metadata metadata type and inherits its `fullName` field.

## Language

A two-character language code identifies each language, such as `en`. A five-character locale code is used for languages that differ depending on the location. For example, en_AU.

 Setting a default language is different from setting a default locale. See Select Your Language, Locale, and Currency in Salesforce Help for more information.

Salesforce offers full support for the following languages.

- Chinese (Simplified): `zh_CN`
- Chinese (Traditional): `zh_TW`

Source: https://developer.salesforce.com/docs/atlas.en-us.api_meta.meta/api_meta/meta_translations.htm

23.    Salesforce Community Builder builds the website to be accessed across multiple

regions in different languages. A user can also select the language for website surfing using a drop

down list in the Logitech Community.



Source: https://support.logi.com/hc/en-us/community/topics, Page 1,

24.     A user can also manually change the region and select a different language in which to surf the Salesforce-based community.  As a non-limiting example, the top right icon in the below figure can change the location. In the first figure below, the United States has been selected as the country.  When the country is changed to France, as demonstrated in the second figure, the menu items appear in the French language. The Logitech website menu items are also changed as the location is changed.



Source: https://support.logi.com/hc/en-us/community/topics



Source: https://support.logi.com/hc/fr-be/community/topics, Page 1

25.    Salesforce Community build website "community.logitech" supports different menu items based on the location. As an example, six menu items are shown in the below figure in a different language based on location information.



Source: https://support.logi.com/hc/fr-be/community/topics, Page 1

26.    A non-limiting example can be seen in the Salesforce Community built Logitech

Community. In the USA, users can choose "Orders/Returns/Refunds," while in France, users can only select from "Retours/Remboursements" ("Returns/Refunds"). Certain menu items may not be available based on the location of the user.



Source: https://support.logi.com/hc/fr-be/community/topics, Page 1.

27.    In view of preceding paragraphs, each and every element of at least claim 1 of the '320 Patent is found in the Accused Products.

28.    Salesforce continues to directly infringe at least one claim of the '320 Patent, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, importing, and/or distributing the Accused Products in the United States, including within this judicial district, without the authority of Brazos.

29.    Salesforce has received notice and actual or constructive knowledge of the '320 Patent since at least the date of service of this Complaint.

30.    Since at least the date of service of this Complaint, through its actions, Salesforce has actively induced product makers, distributors, retailers, and/or end users of the Accused Products to infringe the '320 Patent throughout the United States, including within this judicial

district, by, among other things, advertising and promoting the use of the Accused Products in various websites, including providing and disseminating product descriptions, operating manuals, and other instructions on how to implement and configure the Accused Products. Examples of such advertising, promoting, and/or instructing include the documents at:

- https://help.salesforce.com/articleView?id=networks_overview.htm&type=5

- https://help.salesforce.com/articleView?id=rss_setup_nav_menu.htm&type=5#rss_setup_nav_menu

- https://success.salesforce.com/ideaView?id=0873A000000Tr2oQAC

- https://www.youtube.com/watch?v=eMoC2xeG5Ms

- https://www.youtube.com/watch?v=eMoC2xeG5Ms

- https://www.youtube.com/watch?v=mwdgueihnXA

- https://support.logi.com/hc/en-us/community/topicshttps://help.salesforce.com/articleView?id=siteforce_communities_overview.htm&type=5

- https://help.salesforce.com/articleView?id=siteforce_communities_using.htm&type=5

- https://help.salesforce.com/articleView?id=customize_wbench.htm&type=5

- https://developer.salesforce.com/docs/atlas.en-us.api_meta.meta/api_meta/meta_translations.htm

- https://support.logi.com/hc/fr/community/topics

31.     Since at least the date of service of this Complaint, through its actions, Salesforce has contributed to the infringement of the '320 Patent by having others sell, offer for sale, or use the Accused Products throughout the United States, including within this judicial district, with knowledge that the Accused Products infringe the '320 Patent. The Accused Products are

especially made or adapted for infringing the '320 Patent and have no substantial non-infringing use. For example, in view of the preceding paragraphs, the Accused Products contain functionality which is material to at least one claim of the '320 Patent.

## JURY DEMAND

Brazos hereby demands a jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Brazos respectfully requests that the Court:

(A)     Enter judgment that Salesforce infringes one or more claims of the '320 Patent literally and/or under the doctrine of equivalents;

(B)     Enter judgment that Salesforce has induced infringement and continues to induce infringement of one or more claims of the '320 Patent;

(C)     Enter judgment that Salesforce has contributed to and continues to contribute to the infringement of one or more claims of the '320 Patent;

(D)     Award Brazos damages, to be paid by Salesforce in an amount adequate to compensate Brazos for such damages, together with pre-judgment and post-judgment interest for the infringement by Salesforce of the '320 Patent through the date such judgment is entered in accordance with 35 U.S.C. § 284, and increase such award by up to three times the amount found or assessed in accordance with 35 U.S.C. § 284;

(E)     Declare this case exceptional pursuant to 35 U.S.C. § 285; and

(F)     Award Brazos its costs, disbursements, attorneys' fees, and such further and additional relief as is deemed appropriate by this Court.

Dated: December 18, 2020                Respectfully submitted,

*/s/ James L. Etheridge*
James L. Etheridge
Texas State Bar No. 24059147
Ryan S. Loveless
Texas State Bar No. 24036997
Travis L. Richins
Texas State Bar No. 24061296
ETHERIDGE LAW GROUP, PLLC
2600 E. Southlake Blvd., Suite 120 / 324
Southlake, Texas 76092
Telephone: (817) 470-7249
Facsimile: (817) 887-5950
Jim@EtheridgeLaw.com
Ryan@EtheridgeLaw.com
Travis@EtheridgeLaw.com

**COUNSEL FOR PLAINTIFF**