# EXHIBIT H

03-19-02

A

# IN THE UNITED STATES
# PATENT AND TRADEMARK OFFICE

**PATENT APPLICATION**

| | |
|---|---|
| **APPLICANT:** | Jeffrey H. Sinsky |
| **CASE NAME:** | Sinsky 4 |
| **TITLE:** | Correcting Misalignment Between Data and a Carrier Signal in Transmitters |

**22186**

PATENT TRADEMARK OFFICE

**ASSISTANT COMMISSIONER FOR PATENTS**
**WASHINGTON, D.C. 20231**

**SIR:**

Enclosed are the following papers relating to the above-named application for patent:

1. Check in the amount of $924.00;
2. Transmittal Letter (1 page);
3. Declaration and Power of Attorney (4 pages);
4. Assignment Recordation Form Cover Sheet (1 page);
5. Assignment (2 pages); and
6. Patent Application with Informal Drawings (1 Cover Page; 8 Pages of Specification; 4 Pages of Claims; 1 Page of Abstract; 9 Sheet(s) of Drawings).

| CLAIMS AS FILED | | | | |
|---|---|---|---|---|
| | NO. FILED | NO. EXTRA | RATE | CALCULATIONS |
| Total Claims | 28 - 20= | 0 | x $18 = | $144 |
| Independent Claims | 2 - 3= | 0 | x $84 = | $ |
| Multiple Dependent Claim(s), if applicable | | | $280 = | $ |
| Basic Fee | | | | $740 |
| | | | TOTAL FEE: | $884 |

**METHOD OF PAYMENT OF FEES:**

A check in the amount of $924.00 to cover the filing fee and the assignment fee is enclosed.

The Commissioner for Patents is hereby authorized to charge payment of any filing fees for presentation of extra claims under 37 CFR 1.16 and any patent application processing fees under 37 CFR 1.17 during the pendency of this application or credit any overpayment to **Mendelsohn & Associates, P.C. Deposit Account No. 50-0782.**

Please address all correspondence to **Steve Mendelsohn, Mendelsohn & Associates, P.C., 1515 Market Street, Suite 715, Philadelphia, Pennsylvania 19102.** Telephone calls should be made to me at Area Code (215) 557-6657.

Respectfully submitted,

Date: **3/18/02**

Customer No. 22186
Mendelsohn & Associates, P.C.
1515 Market Street, Suite 715
Philadelphia, Pennsylvania 19102

Yuri Gruzdkov
Registration No. 50,762
Agent for Applicant
(215) 557-8544

990.0388

Sinsky 4

990.0388

# KINDLY SCAN OUR CUSTOMER NUMBER

  

22186

PATENT TRADEMARK OFFICE

# FOR OUR CORRESPONDENCE ADDRESS.

# THANK YOU. 

IDS#124057 (990.0388)                                    Attorney Docket No. Sinsky 4


APPLICATION FOR UNITED STATES LETTERS PATENT


FOR


**CORRECTING MISALIGNMENT BETWEEN DATA**
**AND A CARRIER SIGNAL IN TRANSMITTERS**


Inventors:        Jeffrey H. Sinsky


Prepared by:      Mendelsohn & Associates, P.C.
                  1515 Market Street, Suite 715
                  Philadelphia, Pennsylvania  19102
                  (215) 557-6657
                  Customer No. 22186


\*          \*          \*          \*          \*

Certification Under 37 CFR 1.10


"Express Mail" Mailing Label No. EL942946386US       Date of Deposit  3-18-2002

         I hereby certify that this document is being deposited with the United States Postal
Service's "Express Mail Post Office To Addressee" service under 37 CFR 1.10 on the date indicated
above and is addressed to the Assistant Commissioner for Patents, Washington, D.C.  20231.

Amy Laudenslager
(Name of person mailing)                     (Signature of person mailing)

## CORRECTING MISALIGNMENT BETWEEN DATA AND A CARRIER SIGNAL IN TRANSMITTERS

### BACKGROUND OF THE INVENTION

5   Field of the Invention

The present invention relates to communication equipment.

Description of the Related Art

Transmission of optical signals through fiber-optic networks is widely used in modern

10   communication systems.  In particular, long-haul, high data-rate wavelength division multiplexed

(WDM) optical transmission is an important component of optical networking.  One known way to

accomplish long-haul transmission is by using soliton optical pulses.  Due to special non-linear

optical characteristics, a soliton pulse is less susceptible to chromatic and polarization mode

dispersion than, e.g., a rectangular pulse.  As such, soliton pulses can provide relatively low bit

15   error rates and therefore high reliability for optical transmission.

Fig. 1 shows a typical prior art system **100** for transmitting data using soliton pulses.

System **100** is configured to convert an electronic data stream **102** into an optical signal **104**.

System **100** comprises a laser **106** that generates a continuous wave (CW) beam of light.  This

beam is fed into an optical fiber and delivered to a first electro-optic (E/O) modulator **108**.

20   Modulator **108**, also called a pulse carver, is configured to generate an optical pulse train of soliton

pulses based on control signals from a modulator driver **114** receiving an electrical input signal

**112**.  Signal **112** may be a sine wave at a reference clock frequency.  The output of modulator **108**

is a soliton pulse train **118**.  Depending on the type of E/O modulator, the frequency of pulse train

**118** may be equal the frequency of signal **112** or harmonically related to it.  Pulse train **118**, also

25   called an optical carrier signal, is fed into a second E/O modulator **110** configured to modulate said

pulse train based on control signals from a second modulator driver **116** receiving data stream **102**.

The output of modulator **110** is optical signal **104**.  In different types of transmitters not using

soliton pulses, an optical carrier signal analogous to carrier signal **118** may be a different

periodically modulated optical signal.

30   One problem with system **100** is that it requires synchronizing *optical* carrier signal **118**

and *electronic* data stream **102**.  Such synchronization is difficult to maintain due to often

occurring and, in general, poorly controllable phase drifts in E/O modulators.  As a result of phase

drift, carrier signal **118** and data stream **102** may become misaligned causing inaccuracies in signal

**104**.

35   Figs. 2A-B illustrate the effect of misalignment of signals **102** and **118** on signal **104**.  As

shown in Fig. 2A, when signal **102** is properly aligned with signal **118**, modulator **110** transmits or

blocks a carrier-signal pulse depending on the logical input to driver **116**. However, as shown in Fig. 2B, when signals **102** and **118** are misaligned, the shape of a transmitted pulse is distorted and/or a pulse is not properly blocked. Distorted pulses do not have the correct soliton waveform required for propagation through a long-haul optical fiber. In addition, misalignment may result in

5    the transmission of portions of carrier-signal pulses that ideally should not be transmitted. Both of these effects may result in increased bit error rates at a receiver.

### SUMMARY OF THE INVENTION

In a preferred embodiment, the present invention is a device and technique for aligning an

10    optical carrier signal (e.g., a soliton pulse train) with data in an optical transmitter. The device is configured to analyze the radio frequency (RF) spectrum of the transmitter's output. In one implementation, the device evaluates the amount of energy in a certain frequency band located near a selected null of the RF spectrum. In another implementation, the device examines the shape of the RF spectrum within that frequency band. In either case, based on the analysis, the device

15    adjusts the phase of the clock signal driving an electro-optic (E/O) modulator in the transmitter. Such adjustment reduces misalignment between the optical carrier signal and the data resulting, e.g., from thermal effects in the E/O modulator. The device may be used, e.g., in long-haul optical transmission systems operating at 10 GBit/s.

According to one embodiment, the present invention is an apparatus for reducing

20    misalignment between a carrier signal and a data signal, the apparatus comprising: (a) an analyzer configured (i) to analyze an input signal corresponding to the carrier and data signals, and (ii) to generate a control signal based on the analysis; and (b) a phase shifter configured to introduce a phase shift between the data signal and a clock signal using the control signal, wherein the carrier signal is based on the clock signal.

25    According to another embodiment, the present invention is a method of reducing misalignment between a carrier signal and a data signal, comprising the steps of: (i) analyzing a data-modulated signal corresponding to the carrier and data signals; and (ii) introducing a phase shift between the data signal and a clock signal based on the analysis, wherein the carrier signal is based on the clock signal.

30

### BRIEF DESCRIPTION OF THE DRAWINGS

Other aspects, features, and advantages of the present invention will become more fully apparent from the following detailed description, the appended claims, and the accompanying drawings in which:

35    Fig. 1 shows a prior art system for transmitting data using an optical train of soliton pulses;

Figs. 2A-B illustrate the effect of alignment between the carrier and data signals on the output signal in the system of Fig. 1;

Figs. 3A-B show representative spectra of a data-modulated signal produced using an optical pulse train and a pseudo-random data signal having a bit rate of about 10 GBit/s;

5          Fig. 4 shows a system for transmitting data according to one embodiment of the present invention;

Fig. 5 shows a block diagram of a power analyzer that can be used in the system of Fig. 4 according to one embodiment of the present invention;

Fig. 6 illustrates the operation of the power analyzer of Fig. 5;

10         Fig. 7 shows a block diagram of a spectrum analyzer that can be used in the system of Fig. 4 according to another embodiment of the present invention;

Figs. 8A-B illustrate one type of analysis that can be implemented in the spectrum analyzer of Fig. 7 according to one embodiment of the present invention; and

Fig. 9 illustrates the results of the analysis illustrated in Fig. 8.

15

DETAILED DESCRIPTION

Reference herein to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of the phrase "in one embodiment" in various

20       places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. Although the invention is particularly suitable for use with communications equipment, those skilled in the art can appreciate that the invention can be equally applied to other types of electrical and/or optical equipment.

25         Before embodiments of the present invention are described in detail, spectral properties of modulated optical signals, such as signal **104** of system **100**, are briefly characterized.

Figs. 3A and 3B show two representative spectra of a data-modulated optical signal produced using an optical pulse train of soliton pulses and a pseudo-random non-return-to-zero (NRZ) data signal having a bit rate of about 10 GBit/s. Fig. 3A shows a spectrum of a data-

30       modulated signal (e.g., signal **104** of system **100**) when the carrier signal (e.g., signal **118**) and the data signal (e.g., signal **102**) are properly aligned. The spectrum exhibits a generally flat background with a sharp peak **302** corresponding to the modulation frequency, i.e., about 10 GHz.

Fig. 3B shows a typical spectrum of a data-modulated signal when the carrier and data signals are misaligned. As can be seen in Fig. 3B, the spectral background is no longer flat, but

35       rather, exhibits spectral nulls, e.g., nulls **304** and **306** at about 6 and 17 GHz, respectively. The presence of one or more nulls in the spectrum is indicative of misalignment and may be used to

detect and correct the same. The position, shape, and number of nulls depends on certain characteristics of the system, such as modulation frequency, pulse shape, data format, etc. For example, an optical pulse train of soliton pulses modulated with pseudo-random NRZ data having a bit rate of $X$ GBit/s will have a spectral null at about $0.6X$ GHz.

5          Fig. 4 shows a transmission system **400** according to one embodiment of the present invention. System **400** comprises system **100** of Fig. 1 (already described above) and an alignment device **402**. Device **402** is configured to generate feedback to modulator **108** of system **100** based on signal **104** to maintain carrier signal **118** in alignment with the input data signal (i.e., signal **102**).

10          In one embodiment, device **402** comprises a photodetector **404**, an analyzer circuit **406**, and a voltage-controlled phase shifter **408**. Phase shifter **408** may be, for example, PS-1401 available from Communication Techniques, Inc. of Wippany, New Jersey. A small fraction of the optical output of system **100** is delivered to photodetector **404** (e.g., a photodiode) using an optical tap. Photodetector **404** is configured to convert an optical tap signal **410** into an electrical signal

15   **414** corresponding to optical signal **104**. Analyzer **406** processes signal **414** and, based on the processing, generates a control signal **416** applied to phase shifter **408**. Based on signal **416**, phase shifter **408** adjusts the phase of clock signal **112** to generate a phase-shifted clock signal **412** applied to driver **114** of modulator **108**. Using signal **412** instead of signal **112**, e.g., helps to compensate for phase drifts of modulator **108** and maintain signals **118** and **102** in better alignment

20   with each other.

          Fig. 5 shows a block diagram of a power analyzer **500** that can be used as analyzer **406** of system **400** according to one embodiment of the present invention. Power analyzer **500** is configured to generate control signal **416** based on the amount of energy in a certain band located near a spectral null. In one implementation, the band may be centered on null **304** (see Fig. 3B)

25   and have a bandwidth of, e.g., 2 GHz. In a different implementation, a different bandwidth and/or a different null or combination of nulls may be used. In general, control signal **416** causes phase shifter **408** to introduce such phase difference between clock signals **112** and **412** as to maintain the amount of energy in the chosen band/combination of bands at a specific (e.g., maximum) level.

          In one embodiment, power analyzer **500** comprises a bandpass filter (BPF) **502**, an

30   envelope detector (ED) **504**, a low-pass filter (LPF) **506**, and a control signal generating circuit **508**. BPF **502** is configured to pass a portion of signal **414** corresponding to the pass band of the BPF. In one embodiment of the present invention, the pass band of BPF **502** is from about 5 GHz to about 7 GHz. In other embodiments, the pass band of BPF **502** may be configured differently depending, e.g., on the particular spectral null to be used.

35          ED **504** is configured to detect the radio frequency (RF) power in the pass band of BPF **502**. In one embodiment, detector **504** may be a Schottky diode whose output voltage is

proportional to the RF power in the pass band of BPF **502**. The output signal of ED **504** is a relatively slow changing signal corresponding to the relatively slow phase drift (mostly thermal in nature) of modulator **108** of system **400**. This signal is processed by LPF **506** and applied to circuit **508**.

5        In one embodiment, circuit **508** may be an analog circuit. In another embodiment, circuit **508** may include digital circuitry. For example, as shown in Fig. 5, circuit **508** comprises an analog-to-digital converter (ADC) **510**, a digital processor **512**, and a digital-to-analog converter (DAC) **514**. ADC **510** can be a relatively low speed ADC configured to measure the amplitude of the output of LPF **506**. Based on the measured amplitude, processor **512** generates a digital control

10      signal that is then converted by DAC **514** to analog control signal **416** applied to phase shifter **408**.

        Fig. 6 further illustrates the operation of power analyzer **500** in a 10-GHz system. More specifically, Fig. 6 shows the dependence of the average power of signal **414** in the 2-GHz band centered on spectral null **304** on the relative delay between signals **102** and **112**. Delaying clock signal **112** causes signal **118** to go in or out of alignment with signal **102**. For example, at a delay

15      of about 220 or 320 picoseconds (ps), signals **102** and **118** are properly aligned. As seen in Fig. 6, proper alignment corresponds to a relatively high power level (i.e., −80.5 dBm) in the 2-GHz band. Similarly, when clock signal **112** is delayed by about 270 or 370 ps, the power level is relatively low (i.e., −88.5 dBm) indicating that signals **102** and **118** are misaligned. Therefore, to maintain signals **102** and **118** in alignment, power analyzer **500** may configure phase shifter **408** by way of

20      control signal **416** to apply a time delay, e.g., of about 220 ps to clock signal **112**.

        Fig. 7 shows a block diagram of a spectrum analyzer **700** that can be used as analyzer **406** of system **400** according to another embodiment of the present invention. Spectrum analyzer **700** is configured to generate control signal **416** based on the spectral shape of signal **414** within a selected frequency range near a spectral null. In one implementation, the frequency range may be

25      centered on null **304** (see Fig. 3B) and be within, e.g., ±3 GHz from the position of said null. In a different implementation, a different frequency range and/or a different null or combination of nulls may be used. In one embodiment, control signal **416** causes phase shifter **408** to introduce such phase difference between clock signals **112** and **412** so as to flatten the shape of the spectrum within the selected frequency range. In different embodiments, different shape criteria for the

30      spectrum may be applied.

        In one embodiment, spectrum analyzer **700** comprises a BPF **702**, a mixer **704**, an LPF **706**, a control signal generating circuit **708**, a sawtooth generator **716**, and a voltage-controlled oscillator (VCO) **718**. BPF **702** is configured to pass a portion of signal **414** corresponding to the pass band of the BPF. In one embodiment of the present invention employed in a 10-GHz system,

35      the pass band of BPF **702** is from about 3 GHz to about 9 GHz. In other embodiments, the pass

band of BPF **702** may be configured differently depending, e.g., on the particular frequency range
and/or the spectral null to be used.

VCO **718** is configured to sweep across a selected frequency range, e.g., the pass band of
BPF **702**, using a sawtooth waveform from generator **716**. Generator **716** also applies that
5   waveform to circuit **708**. Mixer **704** multiplies the outputs of BPF **702** and VCO **718** to place at
DC a portion of the power spectrum of signal **414** corresponding to the instant frequency of VCO
**718**. That portion is passed onto circuit **708** via LPF **706** which filters out the relatively high-
frequency components also present in the multiplied signal.

In one embodiment, circuit **708** comprises an envelope detector **720**, an ADC **710**, a digital
10  processor **712**, and a DAC **714**. Detector **720** may be a detecting log amplifier configured to
generate an output voltage proportional to the logarithm of in-band power of LPF **706**. In one
implementation, detector **720** may have a bandwidth and log-linear range of about 0-500 MHz and
90 dB, respectively. In other implementations, a different suitable detector may be used.

ADC **710** is configured to measure the amplitude of the output of detector **720**. ADC **710**
15  is further configured to measure the output voltage of generator **716**. Based on these
measurements, ADC **710** outputs, e.g., a pair of values corresponding to a frequency within the
frequency range swept by VCO **718** and a power level of signal **414** at that frequency. Therefore
in each frequency sweep, a power spectrum of signal **414** is measured and output to processor **712**
which is configured to analyze the shape of that power spectrum using a set of selected criteria.
20  Based on the analysis, processor **712** generates a digital control signal that is then converted by
DAC **714** to analog control signal **416** applied to phase shifter **408**.

Figs. 8A and 8B illustrate one type of analysis that can be implemented in processor **712**
according to one embodiment of the present invention. Fig. 8A shows a representative set of
power spectra received by processor **712** from ADC **710**. Each spectrum, $S(f)$, is approximated
25  with a second order polynomial, e.g., using Equation (1) as follows:

$$S(f) = a_2 f^2 + a_1 f + a_0 \qquad (1)$$

A representative result of such approximations is shown in Fig. 8B. Processor **712** evaluates the
concavity of a recent spectrum, e.g., using the value of $a_2$ corresponding to that spectrum. Based
on that value, the processor derives a phase shift that needs to be applied to clock signal **112** by
30  phase shifter **408** to flatten out the spectrum (i.e., to minimize $a_2$). Processor **712** then generates a
digital control signal corresponding to the derived phase shift. That digital control signal is then
converted to control signal **416** by DAC **714** and used by phase shifter **408** to generate phase-
shifted clock signal **412**.

Fig. 9 shows a set of $a_2$ values derived from the spectra of Fig. 8B as a function of time
35  delay introduced by phase shifter **408** between clock signals **112** and **412**. As explained earlier in
the context of Fig. 6, delaying clock signal **112** causes signal **118** to go in or out of alignment with

signal **102**. For example in a 10-GHz system, at the delay of about 220 ps, signals **102** and **118** are properly aligned, while at the delay of about 270 ps, those signals are misaligned. Fig. 9 shows that proper alignment corresponds to low concavity of the spectrum (i.e., near zero) whereas misalignment results in relatively high concavity (i.e., about $6\times10^{-19}$ dBm/Hz$^2$). Therefore similar

5  to the results of Fig. 6, to maintain signals **102** and **118** in alignment, spectrum analyzer **700** may configure phase shifter **408** by way of control signal **416** to apply a time delay, e.g., of about 220 ps to clock signal **112**.

Spectrum analyzer **700** has the advantage of being less susceptible to gradual laser power fluctuations (e.g., that of laser **106** of system **100**) than power analyzer **500**, whereas power

10  analyzer **500** can be implemented using fewer and/or less expensive components than spectrum analyzer **700**. Therefore depending on the particular application, power analyzer **500** or spectrum analyzer **700** may be used. For example, it may be preferable to use power analyzer **500** with optical transmitters having relatively stable optical power levels. Likewise, spectrum analyzer **700** may be preferred in situations where laser power is relatively unstable.

15  Analyzer **406** of system **400** may be implemented using any suitable technology, e.g., as an ASIC or as discrete circuit elements. Alignment device **402** may be adapted to align signals having different data rates (e.g., 10, 20, or 40 GBit/s) and to accept clock signals represented by different waveforms. Furthermore, alignment device **402** may be configured for use with pure electronic circuits, in which situation photodetector **404** may be excluded. In different embodiments,

20  photodetector **404** may be based on any suitable light-sensitive device, such as, for example, a photodiode, a phototransistor, a photogate, photo-conductor, a charge-coupled device, a charge-transfer device, or a charge-injection device. Similarly, as used in this specification, the term "light" refers to any suitable electromagnetic radiation in any wavelength that may be used in an optical transmission system, such as system **100**. Modulators employed in system **100** may be, for

25  example, lithium niobate Mach-Zhender type modulators operating at, e.g., 1550 nm. In various embodiments, digital processors **512** and **712** may be specialized processors designed for their respective circuits **508** and **708** or be part of a different circuit or device connected to analyzer **406**. Furthermore, said digital processors may be configured to use look-up tables for generating their respective digital control signals. In some embodiments, a delay may be applied to the data signal

30  (e.g., signal **102**) instead of the clock signal (e.g., signal **112**).

While this invention has been described with reference to illustrative embodiments, this description is not intended to be construed in a limiting sense. Various modifications of the described embodiments, as well as other embodiments of the invention, which are apparent to persons skilled in the art to which the invention pertains are deemed to lie within the principle and

35  scope of the invention as expressed in the following claims.

Although the steps in the following method claims, if any, are recited in a particular sequence with corresponding labeling, unless the claim recitations otherwise imply a particular sequence for implementing some or all of those steps, those steps are not necessarily intended to be limited to being implemented in that particular sequence.

CLAIMS

What is claimed is:

1.      An apparatus for reducing misalignment between a carrier signal and a data signal, the apparatus comprising:

5      (a)     an analyzer configured (i) to analyze an input signal corresponding to the carrier and data signals, and (ii) to generate a control signal based on the analysis; and

(b)     a phase shifter configured to introduce a phase shift between the data signal and a clock signal using the control signal, wherein the carrier signal is based on the clock signal.

10     2.      The invention of claim 1, wherein the analysis implemented in the analyzer is based on spectral power of the input signal.

3.      The invention of claim 2, wherein the analyzer comprises:

(1)     a bandpass filter characterized by a pass band, wherein the input signal is applied to the

15    bandpass filter;

(2)     an envelope detector configured to measure power of the input signal in the pass band;

(3)     a low pass filter configured to filter the output of the envelope detector; and

(4)     a circuit configured to generate the control signal based on said filtered output.

20     4.      The invention of claim 3, wherein the pass band corresponds to a spectral null in the input signal.

5.      The invention of claim 3, wherein the circuit comprises:

an analog-to-digital converter (ADC) configured to digitize the filtered output of the envelope

25    detector;

a digital processor configured to generate a digital control signal based on the digitized signal from the ADC; and

a digital-to-analog converter configured to generate the control signal based on the digital control signal.

30

6.      The invention of claim 1, wherein the analysis implemented in the analyzer is based on spectral shape of the input signal.

7.      The invention of claim 6, wherein the control signal is generated based on the

35    concavity of the spectral shape of the input signal corresponding to a spectral null in the input signal.

8.      The invention of claim 6, wherein the analyzer comprises:

(1)     a bandpass filter configured to filter the input signal;

(2)     a voltage-controlled oscillator (VCO) configured to generate a variable frequency

5       signal;

(3)     a mixer configured to multiply the output of the bandpass filter and the variable
frequency signal;

(4)     a low pass filter configured to filter the output of the mixer to produce a filtered signal
corresponding to the spectral shape of the input signal; and

10      (5)     a circuit configured to generate the control signal based on said filtered signal.

9.      The invention of claim 8, wherein the analyzer further comprises a sawtooth generator
configured to drive the VCO and provide a reference signal to the circuit, wherein the reference
signal corresponds to the frequency of the variable frequency signal and the circuit uses the
15      reference signal to generate the control signal.

10.     The invention of claim 8, wherein the circuit comprises:

an amplifier, configured to generate an output voltage corresponding to the power of the
filtered signal;

20      an analog-to-digital converter configured to digitize the output of the amplifier;

a digital processor configured to generate a digital control signal based on the digitized output
of the amplifier; and

a digital-to-analog converter configured to generate the control signal based on the digital
control signal.

25

11.     The invention of claim 1, further comprising a photodetector configured to (i) receive a
data-modulated optical signal corresponding to the carrier and data signals and (ii) generate the
input signal.

30      12.     The invention of claim 11, further comprising an optical transmitter configured to
generate the data-modulated optical signal based on the data signal and the clock signal.

13.     The invention of claim 12, wherein the optical transmitter comprises:

a first driver configured to generate a first driving signal based on the clock signal;

35      a first electro-optic (E/O) modulator configured to receive an optical input from a laser and to
modulate said optical input based on the first driving signal to produce the carrier signal;

a second driver configured to generate a second driving signal based on the data signal; and

a second E/O modulator configured to receive the carrier signal and to modulate said carrier signal based on the second driving signal to produce the data-modulated optical signal.

5    14    The invention of claim 13, wherein:

the optical input is a continuous wave (CW) signal; and

the apparatus further comprises the laser.

15.    The invention of claim 11, wherein the phase shifter is configured to shift the phase of

10    the clock signal and apply the shifted clock signal to the optical transmitter.

16.    The invention of claim 1, wherein the carrier signal comprises an optical train of soliton pulses.

15    17.    A method of reducing misalignment between a carrier signal and a data signal, comprising the steps of:

(i)    analyzing a data-modulated signal corresponding to the carrier and data signals; and

(ii)    introducing a phase shift between the data signal and a clock signal based on the analysis, wherein the carrier signal is based on the clock signal.

20    18.    The invention of claim 17, wherein step (i) comprises the step of analyzing spectral power of the data-modulated signal.

19.    The invention of claim 18, wherein step (i) comprises the step of analyzing spectral

25    power in a spectral band corresponding to a spectral null of the data-modulated signal.

20.    The invention of claim 18, wherein step (i) comprises the steps of:

(1)    applying the data-modulated signal to a bandpass filter characterized by a pass band;

(2)    measuring power of the data-modulated signal in the pass band using an envelope

30    detector;

(3)    filtering the output of the envelope detector using a low pass filter; and

(4)    generating a control signal based on said filtered output.

21.    The invention of claim 17, wherein step (i) comprises the step of generating a control

35    signal based on the analysis; and step (ii) comprises the step of introducing the phase shift between the data signal and the clock signal based on the control signal.

22.     The invention of claim 17, wherein step (i) comprises the step of analyzing spectral shape of the data-modulated signal.

5       23.     The invention of claim 22, wherein step (i) comprises the step of analyzing the concavity of a spectral null in the data-modulated signal.

24.     The invention of claim 23, wherein step (ii) comprises the step of minimizing said concavity.

10

25.     The invention of claim 22, wherein step (i) comprises the steps of:

(1)     filtering the data-modulated signal using a bandpass filter;

(2)     generating a variable frequency signal;

(3)     multiplying the output of the bandpass filter and the variable frequency signal;

15      (4)     filtering the result of multiplication to produce a filtered signal corresponding to the spectral shape of the data-modulated signal; and

(5)     generating a control signal based on said filtered signal.

26.     The invention of claim 17, further comprising the step of:

20      (iii)    generating the carrier signal using the clock signal.

27.     The invention of claim 26, wherein step (iii) comprises the steps of generating a phase-shifted clock signal and using the phase-shifted clock signal to generate the carrier signal.

25      28.     The invention of claim 17, wherein the carrier signal comprises an optical train of soliton pulses.

# CORRECTING MISALIGNMENT BETWEEN DATA AND A CARRIER SIGNAL IN TRANSMITTERS

## ABSTRACT OF THE DISCLOSURE

5

A device and technique for aligning an optical carrier signal (e.g., a soliton pulse train) with a data signal in a transmitter. According to the invention, the device is configured to analyze the radio frequency (RF) spectrum of the transmitter's output. In one implementation, the device evaluates the amount of energy in a certain frequency band located near a selected null of the RF

10  spectrum. In another implementation, the device examines the shape of the RF spectrum within that frequency band. In either case, based on the analysis, the device adjusts the phase of the clock signal driving an electro-optic (E/O) modulator in the transmitter. Such adjustment reduces misalignment between the optical carrier signal and data resulting, e.g., from thermal effects in the E/O modulator. The device may be used, e.g., in long-haul optical transmission systems operating

15  at 10 GBit/s.



FIG. 1

(Prior Art)



FIG. 2



FIG. 3A



FIG. 3B



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8A                           FIG. 8B



FIG. 9

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/100,521 | 03/18/2002 | Jeffrey H. Sinsky | Sinsky 4 | 5080 |

46850          7590          03/10/2005

STEVE MENDELSOHN
MENDELSOHN & ASSOCIATES, P.C.
1515 MARKET STREET
SUITE 715
PHILADELPHIA, PA  19102

| EXAMINER |
|---|
| WANG, LEMING |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2633 | |

DATE MAILED: 03/10/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| ***Office Action Summary*** | Application No. | Applicant(s) |
| | 10/100,521 | SINSKY, JEFFREY H. |
| | Examiner | Art Unit | |
| | Leming Wang | 2633 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>18 March 2002</u>.

2a)☐ This action is **FINAL**.   2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>28</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☐ Claim(s) <u>1-28</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☒ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☒ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08) Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application (PTO-152)

6)☐ Other: _____ .

Application/Control Number: 10/100,521                                    Page 2

Art Unit: 2633

## DETAILED ACTION

1.      The following is a quotation of the appropriate paragraphs of 35

U.S.C. 102 that form the basis for the rejections under this section made in this

Office action:

> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

2.      Claims 1, 2, 6, 11, 12, 15, 17, 18, 21, 22, 25, and 26 are rejected under

U.S.C. 102(e) as being anticipated by *Notargiacomo et al.* (US 2002/0191261).

        Regarding claim 1, *Notargiacomo et al.* teach that an apparatus for

reducing misalignment between a carrier signal ($b_1$, Fig.4) and a data signal ($s_2$,

Fig.4), the apparatus comprising: (a) an analyzer (200, Fig.6) configured (i) to

analyze (13-17, Fig.4, [0042], Page 2; [0099], Page 4) an input signal

corresponding to the carrier and data signals ($s_r$, Fig.4), and (ii) to generate a

control signal based on the analysis ($s_t$, $s_p$, Fig.4; [0059], Page 3); and (b) a

phase shifter (4, 6, Fig.4; Abstract, line 11) configured to introduce a phase shift

([0042], Page 2) between the data signal ($s_2$, Fig.4) and a clock signal ($s_1$ - 2- 4,

Fig.4) using the control signal ($s_t$, $s_p$, Fig.4), wherein the carrier signal is based

on the clock signal ($b_1 - b_2$, Fig.4; $s_1$, Fig.7, [0281],Page 11;  [0301], Page 12]).

Application/Control Number: 10/100,521                                    Page 3
Art Unit: 2633

   Regarding claims 2 and 6, *Notargiacomo et al.* further teach that the
analysis implemented in the analyzer is based on spectral power of the input
signal (For examples, [0031], [0041], [0042], [0046], Page 2).

   Regarding claim 11, *Notargiacomo et al.* further teach that a photodetector
(12 Fig.4) configured to (i) receive a data-modulated optical signal ($s_r$, Fig.4)
corresponding to the carrier ($b_1$ Fig.4) and data signals ($s_2$, Fig.4) and (ii)
generate the input signal ($s_r$, Fig.4).

   Regarding claim 12, *Notargiacomo et al.* further teach that an optical
transmitter (100, Fig.4) configured to generate the data-modulated optical signal
($b_2$ and $b_{2f}$, Fig.4) based on the data signal ($s_2$, Fig.4) and the clock signal ($s_1$ - 2-
4, Fig.7, [0281] Page 11; [0301], Page 12).

   Regarding claim 15, *Notargiacomo et al.* further teach the phase shifter
(4,6 Fig.4) is configured to shift the phase of the clock signal ($s_1$ - 2- 4, Fig.4; $s_1$,
Fig.7, [0281], [0301], Page 2) and apply the shifted clock signal ($b_p + b_t + b_c$,
Fig.4) to the optical transmitter (919, 100, Fig.4).

   Regarding claim 17, *Notargiacomo et al.* further teach that a method of
reducing misalignment between a carrier signal and a data signal, comprising the
steps of (i) analyzing a data-modulated signal (200, Fig.6,) corresponding to the
carrier and data signals ($s_r$, Fig.4); and (ii) introducing a phase shift (Abstract, line

Application/Control Number: 10/100,521                                    Page 4
Art Unit: 2633

11; [0042], Page 2) between the data signal ($s_2$, Fig.4) and a clock ($s_1$ - 2- 4,

Fig.4; $s_1$, Fig.7; [0281], Page 11;  [0301], Page 12) signal based on the analysis

(13-17, Fig.4; [0042], Page 2; [0099), wherein the carrier signal is based on the

clock signal ($b_1$, $s_1$, Fig.7; $s_2$ - 2- 4, Fig.4; [0281], Page 11; [0304], Page 12).


Regarding claim 18, *Notargiacomo et al.* further teach that the step (i)

comprises the step of analyzing spectral power (13-17, Fig.4; [0031], [0041],

[0042], [0046], Page 2) of the data-modulated signal ($s_r$, Fig.4).


Regarding claim 21, *Notargiacomo et al.* further teach that the step (i)

comprises the step of generating a control signal ($s_t$, $s_p$, Fig.4; [0059], Page 3)

based on the analysis (13-17, Fig.4; [0031], [0041], [0042], [0046], Page 3); and

step (ii) comprises the step of introducing the phase shift (Abstract, line 11;

[0042], Page 2) between the data signal and the clock signal ($s_2$, and $s_1$ - 2- 4,

Fig.4; $s_1$, Fig.7; [0281], Page 11;  [0301], Page 12) based on the control signal ($s_t$

, $s_p$, Fig.4).


Regarding claim 22, *Notargiacomo et al.* further teach that the step (i)

comprises the step of analyzing spectral shape (13-17, Fig.4, [0042], Page 2;

[0099], Page 4) of the data-modulated signal ($s_r$, Fig.4; [0031], Page 2).


Regarding claim 25, *Notargiacomo et al.* further  (1) filtering the data-

modulated signal using a bandpass filter (14, Fig.4), (2) generating a variable

Application/Control Number: 10/100,521                                    Page 5
Art Unit: 2633

frequency signal (Fig.4), (3) multiplying the output of the bandpass filter and the

variable frequency signal ($s_t$, 7,9,10, Fig.4), (4) filtering the result of multiplication

to produce a filtered signal ($s_p$, Fig.4) corresponding to the spectral shape of the

data-modulated signal ($s_r$, Fig.4), and (5) generating a control signal based on

said filtered signal ($s_t + s_p + s_c$, Fig.4).


   Regarding claim 26, *Notargiacomo et al.* further teach that the step of (iii)

generating the carrier signal ($b_1$, Fig.4; [0298], [0304], Page 12) using a clock

signal ($s_1$ - 2- 4, Fig.4; Fig.7, [0281], Page 11; [0301], Page 12).



3.     The following is a quotation of 35 U.S.C. 103(a) which forms the basis for

all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described
> as set forth in section 102 of this title, if the differences between the subject matter sought to
> be patented and the prior art are such that the subject matter as a whole would have been
> obvious at the time the invention was made to a person having ordinary skill in the art to which
> said subject matter pertains.  Patentability shall not be negatived by the manner in which the
> invention was made.


4.     Claims 3, 4, 20, 23, and 24 are rejected under U.S.C. 103(a) as being

unpatentable over *Notargiacomo et al.* (US 2002/0191261) in view of *Baghdady*

(US Patent No: 4,513,249).


   Regarding claim 3, *Notargiacomo et al.* further teach that the analyzer

comprises a bandpass filter characterized by a pass band, wherein the input

signal is applied to the bandpass filter (14, Fig.4), and a circuit configured to generate the control signal based on said filtered output ($s_t$ and $s_p$, Fig.4).

Notargiacomo et al. differ from the invention claimed in that Notargiacomo et al. do not teach an envelope detector configured to measure power of the input signal in the pass band, and a low pass filter configured to filter the output of the envelope detector. However, Baghdady from same field of endeavor teaches how to use an envelope detector (1, 5, Fig.1) and lowpass filter (6, Fig.1). Therefore, it would have been obvious to a person having ordinary skill in the art at the time of the invention to incorporate an envelope detector and a lowpass filter, such as the ones of Baghdady, to the system of Notargiacomo et al. in order to discriminate the intensity of low-frequency component of a received modulated signal.

Regarding claim 4, Notargiacomo et al. differ from the invention claimed in that Notargiacomo et al. do not teach the pass band corresponds to a spectral null in the input signal. However Baghdady discloses how to use a pass band corresponding to null spectrum (Col.5, line 55). Therefore, it would have been obvious to a person having ordinary skill in the art at the time of the invention to incorporate the knowledge about pass band null spectrum, such as that taught by Baghdady, into the transmission system of Notargiacomo et al., in order to perform on-line testing for relative powers of desired or undesired signals and improve data recovery using synchronization signal component carried in a notched spectrum.

Application/Control Number: 10/100,521                                    Page 7
Art Unit: 2633

Regarding claim 20, *Notargiacomo et al.* further teach that the step (i)
comprises the steps of (1) applying the data-modulated signal to a bandpass
filter characterized by a pass band (14, Fig.4), and (4) generating a control signal
based on said filtered output ($s_t$, $s_p$, Fig.4).

*Notargiacomo et al.* differ from the invention claimed in that *Notargiacomo*
*et al.* do not teach the step (i) comprises the steps of a filtering the output of the
envelope detector using a low pass filter and measuring power of the data-
modulated signal in the pass band using an envelope detector.  However,
*Baghdady* teaches how to use an envelope detector (1, 5, Fig.1), a lowpass filter
(6, Fig.1) to filter the output of the envelope detector and a technique to measure
the envelope output of the data- modulated signal (Col.2, lines 1-3, Col.1, lines
17-20).  Therefore, it would have been obvious to a person having ordinary skill
in the art at the time of the invention to incorporate the information about an
envelope detector, lowpass filter, and the detection method, such as the ones of
*Baghdady,* into the transmission system of *Notargiacomo et al.,* in order to
provide a simple on-line technique to measure the relative powers of a desired
signal and undesired signals or noise power.


Regarding claim 23, *Notargiacomo et al.* differ from the invention claimed
in that *Notargiacomo et al.* do not teach the step (i) comprises the step of
analyzing the concavity of a spectral null in the data-modulated signal.  However
*Baghdady* teaches how to analyze a null spectrum of a data modulated signal
(Fig.1, Col.5, lines 1-2, 21-23, 39-41, 55).  Therefore, it would have been obvious

Application/Control Number: 10/100,521                                    Page 8
Art Unit: 2633

to a person having ordinary skill in the art at the time of the invention to
incorporate the method about how to analyze a null spectrum, such as the one of
*Baghdady,* into the transmission system of *Notargiacomo et al.,* in order to
provide a signal processing for amplitude modulated signals to be separated
from other linearly combined signals.

        Regarding claim 24, *Notargiacomo et al.* differ from the invention claimed
in that *Notargiacomo et al.* do not teach the step (ii) comprises the step of
minimizing said concavity.  However *Baghdady* teaches minimizing null band
(Col.5, lines 39-41; 2, Fig.2).  Therefore, it would have been obvious to a person
having ordinary skill in the art at the time of the invention to incorporate the
method about how to minimize a null spectrum, such as the one of *Baghdady,*
into the transmission system of *Notargiacomo et al.,* in order to facilitate the on-
line measurement of relative powers of desired or undesired signals.

5.      Claim 5 is rejected under U.S.C. 103(a) as being unpatentable over
*Notargiacomo et al.* (US 2002/0191261) in view of *Baghdady* (US Patent No:
4,513,249) as applied to claim 3 above, and in further view of *Ishikawa et al.* (US
Patent No: 5,418,815).

        Regarding claim 5, the transmission system of *Notargiacomo et al.* and
*Baghdady* differs from the invention claimed in that *Notargiacomo et al.* and
*Baghdady* do not teach the circuit comprises an analog-to-digital converter (ADC)

Application/Control Number: 10/100,521                                   Page 9
Art Unit: 2633

configured to digitize the filtered output of the envelope detector; a digital

processor configured to generate a digital control signal based on the digitized

signal from the ADC; and a digital-to-analog converter configured to generate the

control signal based of the digital control signal. However, *Ishikawa et al.* from

the same field of endeavor teach how to use a A/D converter (843, 844, Fig.2;

Col.2, line 67) converts the analog output of amplifier (834 Fig.2) to digital data

signal, which is converted back to analog data by D/A converter (848, Fig.2) used

to control the local oscillator (838, fig.2). Therefore, it would have been obvious

to a person having ordinary skill in the art at the time of the invention to

incorporate a A/D and D/A converters, such as the ones of *Ishikawa et al.,* to the

transmission system of Notargiacomo et al. modified by *Baghdady* in order to

produce a control signal by using digital technique to perform precisely detect

intermediate frequency component located in a notched band for optical

transmission system.


6.      Claims 7 and 19 are rejected under U.S.C. 103(a) as being unpatentable

over *Notargiacomo et al.* (US 2002/0191261) in view of *Tsujimoto (*US Patent No:

5,367,536).


        Regarding claim 7, *Notargiacomo et al.* differ from the invention claimed in

that *Notargiacomo et al.* do not teach the control signal is generated based on

the concavity of the spectral shape of the input signal corresponding to a spectral

null in the input signal. However, *Tsujimoto* from the same field of endeavor

Application/Control Number: 10/100,521                                        Page 10
Art Unit: 2633

disclose technique about null spectrum a communication system (Col.2. lines 33-34; 62, 23, 24, and 25, Fig.1).   Therefore, it would have been obvious to a person having ordinary skill in the art at the time of the invention to incorporate the method, such as the one of *Tsujimoto,* into the transmission system of *Notargiacomo et al.* in order to achieve synchronization for controlling burst data recovery in a telecommunication.

Regarding claim 19, *Notargiacomo et al.* differ from the invention claimed in that *Notargiacomo et al.* do not the step (i) comprises the step of analyzing spectral power in a spectral band corresponding to a spectral null of the data-modulated signal.   However, *Tsujimoto,* teaches that a band corresponds to a null spectrum (Col.2, lines 32-34) and how to detect the intermediate frequency component (Col.2, lines 43-46).   Therefore, it would have been obvious to a person having ordinary skill in the art at the time of the invention to incorporate a technique, such as the one of *Tsujimoto,* into the transmission system of *Notargiacomo et al.* in order to recovery a desired intermediate frequency component located in a specially notched spectral portion.

7.      Claims 8, 9 and 10 are rejected under U.S.C. 103(a) as being unpatentable over *Notargiacomo et al.* (US 2002/0191261) in view of *Ishikawa et al.* (US Patent No: 5,418,815).

Application/Control Number: 10/100,521                                    Page 11
Art Unit: 2633

        Regarding claim 8, *Notargiacomo et al.* further teach that a bandpass filter
(14, Fig.4) configured to filter the input signal ($s_r$, Fig.4), a mixer (11, Fig.4)
configured to multiply the output of the bandpass filter (14, Fig.4) and the variable
frequency signal (7-10, Fig.4), a low pass filter (16, Fig.4) configured to filter the
output of the mixer (11, Fig.4) to produce a filtered signal ($s_p$, Fig.4)
corresponding to the spectral shape of the input signal ($s_r$, Fig.4); and a circuit (6,
8, and 250, Fig.4) configured to generate the control signal ($s_t$, $s_p$, Fig.4) based
on said filtered signal.

        *Notargiacomo et al.* differ from the invention claimed in that *Notargiacomo
et al.* do not teach the analyzer comprises a voltage-controlled oscillator (VCO)
configured to generate a variable frequency signal. *Ishikawa et al.,* disclose that
a voltage control oscillator (Col.18, lines 48-50; 543, Fig.14) used in receiving
system. Therefore, it would have been obvious to a person having ordinary skill
in the art at the time of the invention to incorporate a VCO, such as the one of
*Ishikawa et al.,* in order to the transmission system of *Notargiacomo et al.* to
provide a stable oscillator source.


        Regarding claim 9, *Notargiacomo et al.* differ from the invention claimed in
that *Notargiacomo et al.* do not teach the analyzer further comprises a sawtooth
generator configured to drive the VCO and provide a reference signal to the
circuit, wherein the reference signal corresponds to the frequency of the variable
frequency signal and the circuit uses the reference signal to generate the control
signal. However, *Ishikawa et al. teach a* sawtooth signal source (Col.14, lines

54-55; 414 NCO, Fig.13) used in the receiving system. Therefore, it would have been obvious to a person having ordinary skill in the art at the time of the invention to incorporate a pattern signal source, such as the one of *Ishikawa et al.,* to the transmission system of *Notargiacomo et al.* in order to generate a sawtooth wave supplied to Sine and Cosine functional converters.

Regarding claim 10, *Notargiacomo et al.* further teach that an amplifier (13, Fig.4), configured to generate an output voltage corresponding to the power of the filtered signal ($s_r$, Fig.4), and a circuit configured to generate the control signal (6-11,14-18, Fig.4) based on said filtered output ($s_t$ and $s_p$, Fig.4).

*Notargiacomo et al.* differ from the invention claimed in that *Notargiacomo et al.* do not teach an analog-to-digital converter configured to digitize the output of the amplifier, a digital processor configured to generate a digital control signal based on the digitized output of the amplifier, and a digital-to-analog converter configured to generate the control signal based on the digital control signal. However, *Ishikawa et al.,* teach how to use an A/D converter (843, 844, Fig.2; Col.2, line 67) converts the analog output of amplifier (834 Fig.2) to digital data signal to be processed by a processor (845, Fig.2) for data identification. The identified results from the processor are converted back to analog data signal by D/A converter (848, Fig.2) and the output is used as a control signal to control the local oscillator (838, Fig.2). Therefore, it would have been obvious to a person having ordinary skill in the art at the time of the invention to incorporate an A/D and D/A converters and a processor, such as the ones of *Ishikawa et al.,*

to the transmission system of Notargiacomo et al. in order to making use of digital technique to provide a much more precisely control for a data transmission system.

8.      Claims 13 and 14 are rejected under U.S.C. 103(a) as being unpatentable over *Notargiacomo et al.* (US 2002/0191261) in view of *Taneda* (US 2001/0030791).

Regarding claim 13, *Notargiacomo et al.* further teach that the optical transmitter comprises a first driver (250, 6, 200, Fig.6) configured to generate a first driving signal ($b_p + b_t + b_c$, Fig.4) based on the clock signal ($s_1$ - 2- 4, Fig.4, [0281], Page 11), an E/O modulator (100, Fig.4) configured to receive an optical input from a laser (240, Fig.4) and to modulate said optical input ($b_1$, Fig.4) based on the first driving signal to produce the carrier signal ($b_1$ Fig.4), a second driver (915-917, Fig.4) configured to generate a second driving signal ($s_2$, Fig.4) based on the clock signal ($s_1$ - 2- 4, Fig.4; [0281]; Page 11; Fig.4,), and an E/O modulator (100, Fig.4) configured to receive the carrier signal ($b_1$, Fig.4) and to modulate said carrier signal based on the second driving signal ($s_2$, Fig.4) to produce the data-modulated optical signal ($b_1$, $b_{2f}$, Fig.4).

*Notargiacomo et al.* differ from the invention claimed in that *Notargiacomo et al.* do not teach a first electro-optic (E/O) modulator and a second E/O modulator. However, *Taneta* from the same field of endeavor disclose a transmission system using two E/O modulators (2a and 2b, Fig.5). Therefore, it

Application/Control Number: 10/100,521                                    Page 14
Art Unit: 2633

would have been obvious to a person having ordinary skill in the art at the time of

the invention to incorporate E/O modulators, such as the ones of *Taneta*, in the

modulation system of *Notargiacomo et al.* in order to optimize modulation of

optical signal by applying each of the data - clock signals and phase adjustment

control signal to different modulators separately.

Regarding claim 14, *Notargiacomo et al.* further teach that the optical input

is a continuous wave (CW) signal ($b_1$, Fig.4) and the apparatus further comprises

the laser (240, Fig.4).

9.      Claims 16 and 28 are rejected under U.S.C. 103(a) as being unpatentable

over *Notargiacomo et al.* (US 2002/0191261) in view of *Bergano* (US

2002/0191260)

Regarding claims 16 and 28, *Notargiacomo et al.* differ from the invention

claimed in that *Notargiacomo et al.* do not teach the carrier signal comprises an

optical train of soliton pulses. However, *Bergano*, from the same field of

endeavor, discloses optical carrier of soliton pulse train ([0004], Page 1; [0021],,

Page 2). Therefore, it would have been obvious to a person having ordinary skill

in the art at the time of the invention to incorporate the soliton light pulse train,

such as the one disclosed by *Bergano* into the transmission system of

*Notargiacomo et al.* in order to improve synchronization in soliton based optical

communication system for a long distance transmission.

Application/Control Number: 10/100,521                                    Page 15
Art Unit: 2633

10.     Claim 27 is rejected under U.S.C. 103(a) as being unpatentable over
*Notargiacomo et al.* (US 2002/0191261) in view of *Fuller et al.* (US Patent No:
6,671,079).

        Regarding claim 27, *Notargiacomo et al.* further teach that the step (iii)
comprises the steps of generating a phase-shifted clock signal ($b_p + b_t + b_c$, 919,
Fig.4)

        *Notargiacomo et al.* differ from the invention claimed in that *Notargiacomo
et al.* do not teach using the phase-shifted clock signal to generate a carrier
signal.  However *Fuller et al.* from the same field of endeavor introduce how to
use clock signal to produce a carrier signal in another carver modulator (104,
Fig.2).   Therefore, it would have been obvious to a person having ordinary skill
in the art at the time of the invention to incorporate a clock signal, as the one of
*Fuller et al.,* into the carver modulator to modulate the CW laser beam to the
clock-based pulse train before modulated by data signal in the transmission
system of *Notargiacomo et al.* in order to obtain less interfering distortion in
transmitted signal.


### *Conclusion*

11.     The prior art made of record and not relied upon is considered pertinent to
applicant's disclosure.

        1. *Crutcher,* US patent No: 4,546,322, is about Adaptive modulater for
arbitrary amplitude and phase keyd modulation signals.

Application/Control Number: 10/100,521                                    Page 16
Art Unit: 2633

     2. *Pleasant et al.* US Patent No: 6,496,079, is about optical to microwave
converter using direct modulation phase shift keying.

     3. *Beaulieu et al.,* US 2002/0149824, is about synchronization of an
optical pulse stream with an electrical signal.

     4. *Il et al, ,* US patent No: 6,693,734, is about apparatus and method for
controlling electro-optic modulator.


12.     Any inquiry concerning this communication or earlier communications from
the examiner should be directed to Leming Wang whose telephone number is
571 272 3030.  The examiner can normally be reached on 8:00AM - 5:00PM.

     If attempts to reach the examiner by telephone are unsuccessful, the
examiner's supervisor, Jason Chan can be reached on 571 272 3112.  The fax
phone number for the organization where this application or proceeding is
assigned is 703-872-9306.

     Information regarding the status of an application may be obtained from
the Patent Application Information Retrieval (PAIR) system.  Status information
for published applications may be obtained from either Private PAIR or Public
PAIR.  Status information for unpublished applications is available through
Private PAIR only.  For more information about the PAIR system, see http://pair-
direct.uspto.gov. Should you have questions on access to the Private PAIR
system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-
free).

Application/Control Number: 10/100,521                                     Page 17

Art Unit: 2633

lw

JASON CHAN
SUPER        PATENT EXAMINER
T.            TER 2600


JASON CHAN
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 2600

| *Notice of References Cited* | | | | Application/Control No. 10/100,521 | | Applicant(s)/Patent Under Reexamination SINSKY, JEFFREY H. | |
|---|---|---|---|---|---|---|---|
| | | | | Examiner Leming Wang | | Art Unit 2633 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | | | Classification |
|---|---|---|---|---|---|---|---|
| | A | US-2002/0191261 | 12-2002 | Notargiacomo et al. | | | 359/181 |
| | B | US-4,513,249 | 04-1985 | Baghdady, Elie J. | | | 327/356 |
| | C | US-5,367,536 | 11-1994 | Tsujimoto, Ichiro | | | 375/269 |
| | D | US-5,418,815 | 05-1995 | Ishikawa et al. | | | 375/216 |
| | E | US-6,671,079 | 12-2003 | Fuller et al. | | | 359/264 |
| | F | US-2002/0191260 | 12-2002 | Bergano, Neal S. | | | 359/181 |
| | G | US-2001/0030791 | 10-2001 | Taneda, Yasuhisa | | | 359/181 |
| | H | US- | | | | | |
| | I | US- | | | | | |
| | J | US- | | | | | |
| | K | US- | | | | | |
| | L | US- | | | | | |
| | M | US- | | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

*PATENT*

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Re: Attorney Docket No. Sinsky 4

In re application of:     Jeffrey H. Sinsky

| | | | |
|---|---|---|---|
| Serial No.: | 10/100,521 | Group Art Unit: | 2633 |
| Filed: | 03/18/2002 | Examiner: | Wang, Leming |
| Matter No.: | 990.0388 | Phone No.: | 571-272-3030 |

For:     Correcting Misalignment Between Data and a Carrier Signal in Transmitters

**AMENDMENT TRANSMITTAL**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

Transmitted herewith is an Amendment in the above-identified application.

[ ]     No additional fee for claims is required.

| | Claims After Amendment | Highest No. Previously Paid For | | Present Extra | Additional Fee |
|---|---|---|---|---|---|
| Total | 36 | minus      28 | = | 8   x 50 = | $400 |
| Independent | 4 | minus       3 | = | 1   x 200 = | $200 |
| Multiple Dependent Claim(s), if applicable | | | | 0   x 360= | $0 |
| | | | | TOTAL FEE | $600 |

[ ]     It is hereby petitioned for an extension of time in accordance with 37 C.F.R. §1.136(a).  The appropriate fee required by 37 C.F.R. §1.17 is calculated as shown below.

Response filed within:

[ ] first     - $   120.00

[ ] second - $   450.00

[ ] third     - $1,020.00

[ ] fourth   - $1,590.00

[ ] fifth      - $2,160.00

month after time period set

[X]     Payment by credit card *(Form PTO-2038 enclosed)*

[ ]     A check in the amount of $_____.00 is enclosed.

[ ]     Please charge **Mendelsohn & Associates, P.C.** Deposit Account No. 50-0782 the amount of $_____.  A duplicate copy of this sheet is attached.

[X]     The Commissioner is hereby authorized to charge any underpayment of the following fees associated with this communication or credit any overpayment to **Deposit Account No. 50-0782**.  A duplicate copy of this sheet is attached.

[X]     Any filing fees under 37 C.F.R. §1.16 for the presentation of extra claims.

[X]     Any patent application processing fees under 37 C.F.R. §1.17.

Date: 6/8/05

Customer No. 46850
Mendelsohn & Associates, P.C.
1500 John F. Kennedy Blvd., Suite 405
Philadelphia, PA  19102

Yuri Gruzdkov
Reg. No. 50,762
(215) 557-8544
Agent for Applicants

*CUSTOMER NO. 46850*                                                                    ***PATENT***

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Re: Attorney Docket No. Sinsky 4

In re application of:        Jeffrey H. Sinsky

| | | | |
|---|---|---|---|
| Serial No.: | 10/100,521 | Group Art Unit: | 2633 |
| Filed: | 03/18/2002 | Examiner: | Wang, Leming |
| Matter No.: | 990.0388 | Phone No.: | 571-272-3030 |

For:    Correcting Misalignment Between Data and a Carrier Signal in Transmitters

## AMENDMENT UNDER 37 CFR 1.111

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir:

This Amendment is filed in response to the office action of 03/10/2005.

\*                 \*                 \*                 \*                 \*

Certification Under 37 CFR 1.8

Date of Deposit  06 / 08 / 2005

I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail under 37 CFR 1.8 on the date indicated above and is addressed to the Commissioner for Patents, P.O. Box 1450, Alexandria, VA  22313-1450.

Amy Laudenslager
(Name of person mailing)                                      (Signature of person mailing)

06/13/2005 LWONDIM1 00000033 10100521

01 FC:1202                    400.00 OP
02 FC:1201                    200.00 OP

## CLAIMS

1.     (Currently amended) An apparatus for reducing misalignment between a carrier signal and a data signal, the apparatus comprising:

(a)     an analyzer configured (i) to analyze <u>spectral power of</u> an input signal corresponding to the carrier and data signals<u>, the spectral power being in a spectral band corresponding to a spectral null of the input signal</u>, and (ii) to generate a control signal based on the analysis; and

(b)     a phase shifter configured to introduce a phase shift between the data signal and a clock signal using the control signal, wherein the carrier signal is based on the clock signal.

2.     (Canceled)

3.     (Currently amended) The invention of claim [[2]] <u>1</u>, wherein the analyzer comprises:

(1)     a bandpass filter characterized by a pass band<u>, which includes the spectral band</u>, wherein the input signal is applied to the bandpass filter;

(2)     an envelope detector configured to measure power of the input signal in the pass band;

(3)     a low pass filter configured to filter the output of the envelope detector; and

(4)     a circuit configured to generate the control signal based on said filtered output.

4.     (Canceled)

5.     (Original) The invention of claim 3, wherein the circuit comprises:

an analog-to-digital converter (ADC) configured to digitize the filtered output of the envelope detector;

a digital processor configured to generate a digital control signal based on the digitized signal from the ADC; and

a digital-to-analog converter configured to generate the control signal based on the digital control signal.

6.     (Original) The invention of claim 1, wherein the analysis implemented in the analyzer is based on spectral shape of the input signal.

7.     (Original) The invention of claim 6, wherein the control signal is generated based on the concavity of the spectral shape of the input signal corresponding to a spectral null in the input signal.

8.     (Original) The invention of claim 6, wherein the analyzer comprises:

(1)     a bandpass filter configured to filter the input signal;

(2)     a voltage-controlled oscillator (VCO) configured to generate a variable frequency signal;

(3)     a mixer configured to multiply the output of the bandpass filter and the variable frequency signal;

(4)     a low pass filter configured to filter the output of the mixer to produce a filtered signal corresponding to the spectral shape of the input signal; and

(5)     a circuit configured to generate the control signal based on said filtered signal.

9.     (Original) The invention of claim 8, wherein the analyzer further comprises a sawtooth generator configured to drive the VCO and provide a reference signal to the circuit, wherein the reference signal corresponds to the frequency of the variable frequency signal and the circuit uses the reference signal to generate the control signal.

10.     (Original) The invention of claim 8, wherein the circuit comprises:

an amplifier, configured to generate an output voltage corresponding to the power of the filtered signal;

an analog-to-digital converter configured to digitize the output of the amplifier;

a digital processor configured to generate a digital control signal based on the digitized output of the amplifier; and

a digital-to-analog converter configured to generate the control signal based on the digital control signal.

11.      (Original) The invention of claim 1, further comprising a photodetector configured to (i) receive a data-modulated optical signal corresponding to the carrier and data signals and (ii) generate the input signal.

12.      (Original) The invention of claim 11, further comprising an optical transmitter configured to generate the data-modulated optical signal based on the data signal and the clock signal.

13.      (Original) The invention of claim 12, wherein the optical transmitter comprises:

a first driver configured to generate a first driving signal based on the clock signal;

a first electro-optic (E/O) modulator configured to receive an optical input from a laser and to modulate said optical input based on the first driving signal to produce the carrier signal;

a second driver configured to generate a second driving signal based on the data signal; and

a second E/O modulator configured to receive the carrier signal and to modulate said carrier signal based on the second driving signal to produce the data-modulated optical signal.

14      (Original) The invention of claim 13, wherein:

the optical input is a continuous wave (CW) signal; and

the apparatus further comprises the laser.

15.      (Original) The invention of claim 11, wherein the phase shifter is configured to shift the phase of the clock signal and apply the shifted clock signal to the optical transmitter.

16.      (Original) The invention of claim 1, wherein the carrier signal comprises an optical train of soliton pulses.

17.      (Currently amended) A method of reducing misalignment between a carrier signal and a data signal, comprising the steps of:

(i)      analyzing spectral power of a data-modulated signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding to a spectral null of the data-modulated signal; and

(ii)      introducing a phase shift between the data signal and a clock signal based on the analysis, wherein the carrier signal is based on the clock signal.

18-19.  (Canceled)

20.      (Currently amended) The invention of claim [[18]] 17, wherein step (i) comprises the steps of:

(1)      applying the data-modulated signal to a bandpass filter characterized by a pass band, which includes the spectral band;

(2)      measuring power of the data-modulated signal in the pass band using an envelope detector;

(3)      filtering the output of the envelope detector using a low pass filter; and

(4)      generating a control signal based on said filtered output.

21.      (Original) The invention of claim 17, wherein step (i) comprises the step of generating a control signal based on the analysis; and step (ii) comprises the step of introducing the phase shift between the data signal and the clock signal based on the control signal.

22.      (Original) The invention of claim 17, wherein step (i) comprises the step of analyzing spectral shape of the data-modulated signal.

23.      (Original) The invention of claim 22, wherein step (i) comprises the step of analyzing the concavity of a spectral null in the data-modulated signal.

24.      (Original) The invention of claim 23, wherein step (ii) comprises the step of minimizing said concavity.

25.      (Original) The invention of claim 22, wherein step (i) comprises the steps of:
(1)      filtering the data-modulated signal using a bandpass filter;
(2)      generating a variable frequency signal;
(3)      multiplying the output of the bandpass filter and the variable frequency signal;
(4)      filtering the result of multiplication to produce a filtered signal corresponding to the spectral shape of the data-modulated signal; and
(5)      generating a control signal based on said filtered signal.

26.      (Original) The invention of claim 17, further comprising the step of:
(iii)     generating the carrier signal using the clock signal.

27.      (Original) The invention of claim 26, wherein step (iii) comprises the steps of generating a phase-shifted clock signal and using the phase-shifted clock signal to generate the carrier signal.

28.      (Original) The invention of claim 17, wherein the carrier signal comprises an optical train of soliton pulses.

29.      (New) The invention of claim 17, wherein step (ii) comprises the step of maximizing said spectral power.

30.      (New) The invention of claim 17, wherein the spectral band is located between about $0.5f$ GHz and about $0.7f$ Ghz, where $f$ Gbit/s is a bit rate of the data-modulated signal.

31.      (New) The invention of claim 1, wherein the control signal is generated such as to maximize said spectral power.

32.      (New) The invention of claim 1, wherein the spectral band is located between about $0.5f$ GHz and about $0.7f$ Ghz, where $f$ Gbit/s is a bit rate of the data-modulated signal.

33.      (New) A method of reducing misalignment between a carrier signal and a data signal, comprising the steps of:
(i)      analyzing concavity of a spectral null in a data-modulated signal corresponding to the carrier and data signals; and
(ii)     introducing a phase shift between the data signal and a clock signal based on the analysis, wherein the carrier signal is based on the clock signal.

-4-

34.     (New) The invention of claim 33, wherein the spectral null corresponds to a spectral band located between about $0.5f$ GHz and about $0.7f$ Ghz, where $f$ Gbit/s is a bit rate of the data-modulated signal.

35.     (New) The invention of claim 33, wherein step (ii) comprises the step of minimizing said concavity.

36.     (New) The invention of claim 33, wherein step (i) comprises the steps of:
(1)     filtering the data-modulated signal using a bandpass filter;
(2)     generating a variable frequency signal;
(3)     multiplying the output of the bandpass filter and the variable frequency signal;
(4)     filtering the result of multiplication to produce a filtered signal corresponding to the spectral shape of the data-modulated signal; and
(5)     generating a control signal based on said filtered signal.

37.     (New) An apparatus for reducing misalignment between a carrier signal and a data signal, the apparatus comprising:
(a)     an analyzer configured (i) to analyze concavity of a spectral null in an input signal corresponding to the carrier and data signals, and (ii) to generate a control signal based on the analysis; and
(b)     a phase shifter configured to introduce a phase shift between the data signal and a clock signal using the control signal, wherein the carrier signal is based on the clock signal.

38.     (New) The invention of claim 37, wherein the spectral null corresponds to a spectral band located between about $0.5f$ GHz and about $0.7f$ Ghz, where $f$ Gbit/s is a bit rate of the input signal.

39.     (New) The invention of claim 37, wherein the control signal is generated such as to minimize said concavity.

40.     (New) The invention of claim 37, wherein the analyzer comprises:
(1)     a bandpass filter configured to filter the input signal;
(2)     a voltage-controlled oscillator (VCO) configured to generate a variable frequency signal;
(3)     a mixer configured to multiply the output of the bandpass filter and the variable frequency signal;
(4)     a low pass filter configured to filter the output of the mixer to produce a filtered signal corresponding to the spectral shape of the input signal; and
(5)     a circuit configured to generate the control signal based on said filtered signal.

## REMARKS/ARGUMENTS

Claims 1-28 were previously pending in the application. Claims 2, 4, and 18-19 are canceled; claims 1, 3, 17, 20 are amended; and new claims 29-40 are added herein. Assuming the entry of this amendment, claims 1, 3, 5-17, and 20-40 are now pending in the application. The Applicant hereby requests further examination and reconsideration of the application in view of the foregoing amendments and these remarks.

In paragraph 2, the Examiner rejected claims 1, 2, 6, 11, 12, 15, 17, 18, 21, 22, 25, and 26 under 35 U.S.C. § 102(e) as being anticipated by Notargiacomo. In paragraph 4, the Examiner rejected claims 3, 4, 20, 23, and 24 under 35 U.S.C. § 103(a) as being unpatentable over Notargiacomo in view of Baghdady. In paragraph 5, the Examiner rejected claim 5 under 35 U.S.C. § 103(a) as being unpatentable over Notargiacomo in view of Baghdady, and in further view of Ishikawa. In paragraph 6, the Examiner rejected claims 7 and 19 under 35 U.S.C. § 103(a) as being unpatentable over Notargiacomo in view of Tsujimoto. In paragraph 7, the Examiner rejected claims 8, 9, and 10 under 35 U.S.C. § 103(a) as being unpatentable over Notargiacomo in view of Ishikawa. In paragraph 8, the Examiner rejected claims 13 and 14 under 35 U.S.C. § 103(a) as being unpatentable over Notargiacomo in view of Taneda. In paragraph 9, the Examiner rejected claims 16 and 28 under 35 U.S.C. § 103(a) as being unpatentable over Notargiacomo in view of Bergano. In paragraph 10, the Examiner rejected claim 27 under 35 U.S.C. § 103(a) as being unpatentable over Notargiacomo in view of Fuller. For the following reasons, the Applicant submits that all pending claims are allowable over the cited references.

Claims 1, 3, 5-17, and 20-32:

Claim 1 is amended to include limitations recited in original claims 2 and 4 (now canceled). Claim 17 is amended to include limitations recited in original claims 18 and 19 (now canceled).

Amended claim 1 is directed to an apparatus for reducing misalignment between a carrier signal and a data signal. The apparatus has: (a) an analyzer configured (i) to analyze spectral power of an input signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding to a spectral null of the input signal, and (ii) to generate a control signal based on the analysis; and (b) a phase shifter configured to introduce a phase shift between the data signal and a clock signal using the control signal, wherein the carrier signal is based on the clock signal.

Notargiacomo discloses a method of analog modulation of an optical signal and an optical emitter using this method. A preferred embodiment of the optical emitter is shown in Notargiacomo's Figs. 4, which the Examiner relied upon in the rejection of original claim 1. More specifically, the optical emitter shown in Notargiacomo's Fig. 4 has radiation source (e.g., laser) **240**, which generates carrier signal b1. Signal b1 is then injected into optical modulator **100**, which produces a modulated signal having two components, b2 and b2f. Component b2 is produced due to modulation of carrier signal b1 by data signal s2 (see, e.g., paragraph [0210]); and component b2f is produced due to modulation of the carrier signal by a signal having pilot tone sf produced by oscillator **7** (see, e.g., paragraph [0216]). Component b2f has a second harmonic of the pilot tone, and the intensity of component b2f depends on how far the current operating point of modulator **100** is from the optimal operating point (Q) for the modulator (see, e.g., paragraphs [0216] and [0217]). For example, if modulator **100** operates at the optimal operating point, then the intensity of component b2f is at a minimum, and, in the ideal case of a perfectly linear transfer function for modulator **100**, component b2f is completely absent (see, e.g., paragraph [0218]). Thus, by analyzing the intensity of component b2f and adjusting the bias voltage applied to BIAS port **919** of modulator **100**, it is possible to maintain the

operating point of the modulator at the optimum operating point (Q). The latter function is served by Notargiacomo's control circuit **200** and compensation circuit **250**.

In the rejection of original claim 1, the Examiner stated that:

Notargiacomo et al. teach that an apparatus for reducing misalignment between a carrier signal (b1, Fig. 4) and a data signal s2, Fig. 4), the apparatus comprising: (a) an analyzer (200, Fig. 6) configured (i) to analyze (13-17, Fig. 4, [0042], Page 2; [0099], Page 4) an input signal corresponding to the carrier and data signals (sr, Fig. 4), and (ii) to generate a control signal based on the analysis (st, sp, Fig. 4; [0059], Page 3); and (b) a phase shifter (4, 6, Fig. 4; Abstract, line 11) configured to introduce a phase shift ([0042], Page 2) between the data signal (s2, Fig. 4) and a clock signal (s1 - 2 - 4, Fig. 4) using the control signal (st, sp, Fig.4), wherein the carrier signal is based on the clock signal (b1 - b2, Fig. 4; s1, Fig. 7, [0281], Page 11; [0301], Page 12]).

First of all, the Applicant submits that, in addition to being incorrect, this statement is not even self-consistent. For example, in the first part of the statement, the Examiner interprets signals b1, s1, s2, and sr to be the carrier, data, clock, and input signals, respectively. But, in the last part of the statement, the Examiner switches to a different interpretation, in which signal b2 suddenly becomes the carrier signal and signal s1 becomes the clock signal. The Applicant submits that the Examiner cannot have it both ways at the same time; it is either one or the other. For example, if b1 is the carrier signal, and s2 is the clock signal, as in the first interpretation, then the Applicant fails to see how it is possible for the carrier signal (b1, which is generated by independent radiation source **240**) to be based on the clock signal (s2, which is produced by amplification and removal of dc components from a completely separate and independent data signal, s1). On the other hand, if b2 is the carrier signal and s1 is the clock signal, as in the second interpretation, then which signal is the data signal? In view of the foregoing, the Applicant requests clarification of the Examiner's reasoning or, in the alternative, withdrawal of all rejections based on Notargiacomo as improper.

Second, the Applicant submits that, even if the rejection of original claim 1 over Notargiacomo were proper, which the Applicant does not admit, it is clear that Notargiacomo relies on analyzing spectral power in a spectral band corresponding to a characteristic peak (i.e., the second harmonic of the pilot tone) of the modulated signal, and not in a spectral band corresponding to a spectral null of that signal, as explicitly recited in amended claim 1. As such, it is submitted that amended claim 1 is allowable over Notargiacomo.

To reject original claim 4, limitations of which are now present in amended claim 1, the Examiner combined Notargiacomo with Baghdady. Baghdady discloses a method of separating the strongest of a plurality of linearly combined signals and suppressing that signal (see, e.g., col. 1, lines 9-12). Thus, similar to Notargiacomo, Baghdady seeks to minimize (suppress) the intensity of a peak. The Applicant submits that Baghdady does not teach or even suggest "an analyzer configured (i) to analyze spectral power of an input signal corresponding to the carrier and data signals in a spectral band corresponding to a spectral null of the input signal." Furthermore, the Examiner's reliance in the rejection of original claim 4 on Baghdady's col. 5, line 55, stating that "The output signal of the envelope detector is filtered by a lowpass filter having a null at zero Hertz" is completely misplaced because the quoted text talks about a null of the filter, and not a null of the signal, as explicitly recited in amended claim 1 (and original claim 4).

To reject original claim 19, which has a limitation analogous to that of original claim 4, the Examiner combined Notargiacomo with Tsujimoto. Tsujimoto discloses a TDMA transmission system

that enables high-speed transmission of communication bursts by parallel transmission of synchronization bursts and data bursts (see, e.g., col. 1, lines 61-64). More specifically, at the transmitter, a data burst is modulated on an intermediate-frequency (IF) carrier, and a spectral null is artificially created in the center frequency region of the spectrum of the modulated data burst. Then, a synchronization (sync) burst is modulated on the IF carrier so that its spectrum corresponds to the center frequency region of the data burst. A superimposed signal having the sync and data bursts is then transmitted. At the receiver, the carrier signal corresponding to the sync burst is recovered by passing the superimposed signal through a bandpass filter having a passband corresponding to the spectral null of the data burst, and a clock signal is recovered using the carrier signal (see, e.g., Tsujimoto's Fig. 2, elements **22, 23, 24,** and **25**). Using the recovered clock signal, the superimposed signal is then synchronously detected to recover the original data burst.

It is clear from the above description that Tsujimoto does not teach or even suggest at least the limitation of "the carrier signal is based on the clock signal." In fact, in the system of Tsujimoto, it is quite the opposite, the clock signal is based on the carrier signal, and not vice versa.

Ishikawa discloses an RF receiver capable of automatically discriminating between analog and digitally modulated signals. The Examiner does not contend that Ishikawa teaches or suggests any of the limitations of amended claim 1.

Taneda discloses an optical transmitter adapted to convert an electrical NRZ data signal into a corresponding optical RZ output signal. The transmitter has two optical modulators, each connected to a bias-control circuit. Each of the bias control circuits is configured to maintain an optimal driving voltage for the corresponding modulator based on a relatively low-frequency modulation signal (e.g., signal **15a** having a frequency of about 10 kHz added to the data modulation signal having a frequency of about 10 GHz). An optical component in the optical output signal corresponding to the low-frequency modulation signal is then detected by the control circuit, and the bias voltage is adjusted to minimize the intensity of that component (e.g., signal **69**, paragraph [0033]). Thus, similar to Notargiacomo, Taneda relies on analyzing spectral power in a spectral band corresponding to a characteristic peak of the modulated signal, and not in a spectral band corresponding to a spectral null of that signal, as explicitly recited in amended claim 1.

Bergano discloses an optical transmitter designed to synchronously modulate the amplitude, phase, and polarization of an optical signal to provide a signal that has relatively high tolerance to distortions induced in a long-haul transmission line (see, e.g., paragraph [0006]). A representative embodiment of the optical transmitter is shown, e.g., in Bergano's Fig. 1. This transmitter employs variable delay element **109** adapted "to selectively adjust the phase of the amplitude modulation imparted by amplitude modulator **107** relative to the phase of the data modulation imparted by data modulator **102**" (see paragraph [0015]). However, Bergano is completely silent about any control signals that element **109** might be using to select the phase-shift value. Therefore, Bergano cannot possibly teach at least the limitation of "a phase shifter configured to introduce a phase shift between the data signal and a clock signal using the control signal."

Fuller discloses an optical transmitter having a source of CW light and two optical modulators. The first optical modulator is adapted to generate an optical pulse stream in response to a radio frequency (RF) driving signal and a DC bias signal, and the second optical modulator is adapted to modulate the optical pulse stream using an electrical data signal. The transmitter has a processor that dithers the phase of the RF driving signal and the level of the DC bias signal using first and second dither signals (e.g., low-level audio tones), respectively. The processor then detects the first and/or second dither signals in the modulated optical signal and adjusts the phase of the RF driving signal and/or level of the DC bias

signal to null the detected first and/or second dither signals, thereby maintaining optimal driving conditions for the first optical modulator. Thus, Fuller also relies on tracking the intensity of a specific <u>spectral peak</u> in the modulated signal, and <u>not</u> a <u>spectral null</u>, as explicitly recited in amended claim 1.

In view of the foregoing, the Applicant submits that the cited references, independently or in combination, fail to teach or even suggest the limitations of claim 1. It is therefore submitted that claim 1 is allowable over these references. It is further submitted that, for the same reasons that claim 1 is allowable, claim 17 is also allowable. Since claims 3, 5-16, and 20-32 depend variously from claims 1 and 17, it is submitted that those claims are allowable over the cited references.

<u>Claims 33-40:</u>

New claim 33 corresponds to original claim 23 rewritten in independent form. Support for new claim 37 can be found in original claims 1 and 7.

Claim 33 is directed to a method of reducing misalignment between a carrier signal and a data signal. The method has the steps of: (i) analyzing concavity of a spectral null in a data-modulated signal corresponding to the carrier and data signals; and (ii) introducing a phase shift between the data signal and a clock signal based on the analysis, wherein the carrier signal is based on the clock signal.

To reject original claim 23, the Examiner combined Notargiacomo and Baghdady. In particular, on page 7 of the office action, the Examiner stated that "Baghdady teaches how to analyze a null spectrum of a data modulated signal (Fig. 1, col. 5, lines 1-2, 21-23, 39-41, 55)."

In response, the Applicant submits that arguments substantially analogous to those presented above for the allowability of claim 1 over Notargiacomo similarly apply to claim 33. Furthermore, the Applicant reiterates that the Examiner's reliance on Baghdady is misplaced because, in the quoted text, Baghdady talks about a null of the <u>filter</u>, and <u>not</u> a null of the <u>signal</u>, as explicitly recited in claim 33. It is therefore submitted that the rejection of original claim 23 is improper and that claim 33 is allowable over the combination of Notargiacomo and Baghdady.

To reject original claim 7, which has a limitation substantially analogous to that present in original claim 23, the Examiner combined Notargiacomo and Tsujimoto. In response, the Applicant reiterates the above-presented argument that Tsujimoto does not teach or even suggest at least the limitation of "the carrier signal is based on the clock signal." In addition, the Applicant submits that nowhere in the specification does Tsujimoto teach or even suggest that "concavity of a spectral null in a data-modulated signal" is somehow analyzed. In fact, Tsujimoto does not mention the term "concavity" or its synonyms or functional equivalents at all in his disclosure.

In view of the foregoing, the Applicant submits that claim 33 is allowable over the cited references. It is further submitted that, for the same reasons that claim 33 is allowable, claim 37 is also allowable. Since claims 34-36 and 38-40 depend variously from claims 33 and 37, it is submitted that those claims are also allowable over the cited references.

<u>Claims 29 and 31:</u>

Claim 29 recites a limitation of maximizing the spectral power in the spectral band corresponding to the spectral null. Claim 31 recites a substantially analogous limitation. The Applicant submits that none of the cited references teaches or suggests such limitations. If anything, Notargiacomo,

Baghdady, Taneda, and Fuller teach suppressing (minimizing) their corresponding spectral peaks. This fact provides additional reasons for the allowability of claims 29 and 31 over the cited references.

<u>Claims 30, 32, 34, and 38:</u>

Each of claims 30, 32, 34, and 38 recites a limitation of "the spectral null corresponds to a spectral band located between about $0.5f$ GHz and about $0.7f$ Ghz, where $f$ Gbit/s is a bit rate of the data-modulated signal." The Applicant submits that none of the cited references teaches or suggests such a limitation. This fact provides additional reasons for the allowability of these claims over the cited references.

<u>Claims 35 and 39:</u>

Claim 35 recites a limitation of minimizing the concavity of the spectral null. Claim 39 recites a substantially analogous limitation. The Applicant submits that none of the cited references teaches or suggests such a limitation. This fact provides additional reasons for the allowability of these claims over the cited references.

In view of the above amendments and remarks, the Applicant believes that the now-pending claims are in condition for allowance. Therefore, the Applicant believes that the entire application is now in condition for allowance, and early and favorable action is respectfully solicited.

Respectfully submitted,

Date: 6/8/05

Customer No. 46850
Mendelsohn & Associates, P.C.
1500 JFK Blvd., Suite 405
Philadelphia, Pennsylvania  19102

Yuri Gruzdkov
Registration No. 50,762
Agent for Applicant
(215) 557-8544 (phone)
(215) 557-8477 (fax)

*CUSTOMER NO. 46850*                                              **PATENT**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Re:  Attorney Docket No. <u>Sinsky 4</u>

In re application of:  <u>Jeffrey H. Sinsky</u>

| | | | |
|---|---|---|---|
| Serial No.: | <u>10/100,521</u> | Group Art Unit: | <u>2633</u> |
| Filed: | <u>03/18/2002</u> | Examiner: | <u>Wang, Leming</u> |
| Matter No.: | <u>990.0388</u> | Phone No.: | <u>571-272-3030</u> |

For:  <u>Correcting Misalignment Between Data and a Carrier Signal in Transmitters</u>

### **TRANSMITTAL OF CORRECTED DRAWING(S)**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

In response to the Office Action dated <u>03/10/2005,</u> the Applicant herewith submits <u>1</u> sheet of corrected drawing for Fig. <u>7</u> showing changes in red ink, pursuant to MPEP §§ 608.2(r) and (v).  Replacement drawing for Fig. <u>7</u> is also submitted herewith.

Respectfully submitted,

Date: _6/8/05_

Customer No. 46850                          Yuri Gruzdkov
Mendelsohn & Associates, P.C.               Registration No. 50,762
1500 John F. Kennedy Blvd., Suite 405       Agent for Applicant
Philadelphia, Pennsylvania  19102           (215) 557-8544

*                    *                    *                    *                    *

<u>Certification Under 37 CFR 1.8</u>

Date of Deposit _June 8, 2005_

I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail under 37 CFR 1.8 on the date indicated above and is addressed to the Commissioner for Patents, P.O. Box 1450, Alexandria, VA  22313-1450.

<u>Amy Laudenslager</u>
(Name of person mailing)                    (Signature of person mailing)



Annotated Marked-up Drawing



FIG. 7



Replacement Drawing

7/9



FIG. 7

# PATENT APPLICATION FEE DETERMINATION RECORD
### Effective October 1, 2001

**Application or Docket Number**
10/100,521
~~Samue09~~

## CLAIMS AS FILED - PART I

| | (Column 1) | (Column 2) | SMALL ENTITY TYPE ☐ | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|
| | | | RATE | FEE | | RATE | FEE |
| TOTAL CLAIMS | 28 | | BASIC FEE | 370.00 | OR | BASIC FEE | 740.00 |
| FOR | NUMBER FILED | NUMBER EXTRA | X$ 9= | | OR | X$18= | |
| TOTAL CHARGEABLE CLAIMS | 28 minus 20= * | 8 | X42= | | OR | X84= | |
| INDEPENDENT CLAIMS | 2 minus 3 = * | ~~6~~ | +140= | | OR | +280= | |
| MULTIPLE DEPENDENT CLAIM PRESENT | | ☐ | TOTAL | | OR | TOTAL | |

\* If the difference in column 1 is less than zero, enter "0" in column 2

SMW 6-17-05
Amdt 6-10-05

## CLAIMS AS AMENDED - PART II

| | | (Column 1) | | (Column 2) | (Column 3) | SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
| **AMENDMENT A** | Total | * 26 | Minus | ** 28 | = 8 | X$ 9= | | OR | X$18= | $400⁰⁰ |
| | Independent | * 4 | Minus | *** 3 | = 1 | X42= | | OR | X84= | $200⁰⁰ |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | ☐ | +140= | | OR | +280= | |
| | | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | $600⁰⁰ |

| | | (Column 1) | | (Column 2) | (Column 3) | | | OR | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
| **AMENDMENT B** | Total | * | Minus | ** | = | X$ 9= | | OR | X$18= | |
| | Independent | * | Minus | *** | = | X42= | | OR | X84= | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | ☐ | +140= | | OR | +280= | |
| | | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

| | | (Column 1) | | (Column 2) | (Column 3) | | | OR | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
| **AMENDMENT C** | Total | * | Minus | ** | = | X$ 9= | | OR | X$18= | |
| | Independent | * | Minus | *** | = | X42= | - | OR | X84= | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | ☐ | +140= | | OR | +280= | |
| | | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
\*\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875  (Rev. 8/01)      *U.S. Government Printing Office: 2001 — 484-484/55268      Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE



## UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/100,521 | 03/18/2002 | Jeffrey H. Sinsky | Sinsky 4 | 5080 |

| | | | EXAMINER | |
|---|---|---|---|---|
| 46850 | 7590 | 08/08/2005 | WANG, LEMING | |

MENDELSOHN & ASSOCIATES, P.C.
1500 JOHN F. KENNEDY BLVD., SUITE 405
PHILADELPHIA, PA  19102

| ART UNIT | PAPER NUMBER |
|---|---|
| 2638 | |

DATE MAILED: 08/08/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

| ***Office Action Summary*** | Application No. | Applicant(s) |
|---|---|---|
| | 10/100,521 | SINSKY, JEFFREY H. |
| | Examiner | Art Unit | |
| | Leming Wang | 2638 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>10 June 2005</u>.

2a)☒ This action is **FINAL**.   2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

4)☒ Claim(s) <u>1-40</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1,3,5-7,11-17,20-23,26-28,33 and 37</u> is/are rejected.

7)☒ Claim(s) <u>8-10,24,25,29-32,34-36 and 38-40</u> is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

## Application Papers

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08)
    Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application (PTO-152)

6)☐ Other: _____.

Application/Control Number: 10/100,521                                      Page 2

Art Unit: 2638

## DETAILED ACTION

### *Response to Amendment*

1.      Applicant's arguments with respect to claims 1-4 and 7-9 have been considered,

but are moot in view of new rejection ground(s).

### *Claim Rejections - 35 USC § 103*

2.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

3.      Claims 1, 6, 7, 11-15, 17, 21- 23, 26, 33, and 37 are rejected under 35 U.S.C.

103(a) as being unpatentable over *Beaulieu et al.* (US Pub. No: 2002/0149824) in view

of *Sobiski et al.* (US Patent No: 6,487,352).

        Regarding claims 1 and 17, *Beaulieu et al.* teach that an apparatus for reducing

misalignment between a carrier signal and a data signal (Abstract, lines 2-3), the

apparatus comprising: (a) an analyzer (140/260/250, Fig.7) configured (i) to analyze

spectral power of input signal or data modulated signal (Portion of data signal 190 is

branched by optical coupler 200, and detected by 210 and further detected by a power

detector, 230, Fig.7, note that the spectral power value output from 230 corresponds to

the wavelength passband of filter 220) corresponding to the carrier and data signals

Application/Control Number: 10/100,521                                          Page 3
Art Unit: 2638

(Note that the power spectrum value output from 230 corresponds to the carriers clock

modulated carrier 280 and data signals 170 branched from 190, Fig.7), and (ii) to

generate a control signal based on the analysis (Output signal from micro-controller

140, Fig.7); and (b) a phase shifter (120, Fig.7) configured to introduce a phase shift

between the data signal and a clock signal ([0010], phase shift between clock signal

and data 170 is achieved by adjusting 120, Fig.7) using the control signal (Output signal

from Micro-controller 140, Fig.7), wherein the carrier signal is based on the clock signal

(Carrier 280 is firstly modulated by clock signal output from 110, Fig.7,).

Beaulieu et al. differ from the invention claimed in that Beaulieu et al. do not

teach measuring a spectral band corresponds to a spectral null in the input signal

(Sobiski et al. teach measuring the power spectrum and locating null as shown in Fig.5.

Note that by using the detection method as shown in Fig.3, the profile and shifting of a

null spectrum can be determined, as shown in Fig.5, Col.7, lines 48-49, 57-60, spectral

"hole" is equivalent to "null").  Therefore, it would have been obvious to a person having

ordinary skill in the art at the time of the invention to adapt the method of determining

spectral power of a null in optical spectrum, such as the one taught by Sobiski et al. with

the transmission system of Beaulieu et al., to solve the alignment problem happened in

the synchronization between clock and data signal, as taught by Beaulieu et al. ([008]),

corresponding to the spectral varying in null located and monitored by using the method

of Sobiski et al. (Fig.3) in order to further reduce distortion in transmission of a high

speed optical signals (In Fig.3, Sobiski et al. teach detecting a spectrum by using a

Application/Control Number: 10/100,521                                           Page 4
Art Unit: 2638

plurality detection devices and filters corresponding to respective wavelengths including

null band).


Regarding claims 6, 22, and 23, *Beaulieu et al.* do not teach that the analysis

implemented in the analyzer is based on spectral power of the input signal (*Sobiski et*

*al.* teach a method to determine and analyzing the spectrum profile, Fg.3, and the

graphical representations of "hole" shifting and the "hole" become deeper when

dispersion increases, Fig.5, therefore it would have obvious in the art at the time of the

invention to adapt the method, such as the one of *Sobiski et al.,* into the system of

*Beaulieu et al.* in order to determine the dispersion happening more precisely).


Regarding claim 7, *Beaulieu et al.* differ from the invention claimed in that

*Beaulieu et al.* do not teach a spectral band corresponds to a spectral null in the input

signal.  However *Sobiski et al.* discloses measuring and analyzing a null spectrum

(*Sobiski et al.* teach the null become deeper when dispersion increases, see, Fig.5,

Col.7, lines 48-49, 57-60, spectral "hole" is equivalent to "null").  Therefore, it would

have been obvious to a person having ordinary skill in the art at the time of the invention

to adapt the method of determining spectral power of a null in optical spectrum, such as

the one taught by *Sobiski et al.* with the transmission system of *Beaulieu et al.,* to solve

the alignment problem happened in the synchronization between clock and data signal,

as taught by *Beaulieu et al.* ([008]), corresponding to the spectral varying in null located

and monitored by using the method of *Sobiski et al.* (Fig.3) in order to further reduce

Application/Control Number: 10/100,521                                        Page 5
Art Unit: 2638

distortion in transmission of a high speed optical signals (In Fig.3, *Sobiski et al.* teach

detecting a spectrum by using a plurality detection devices and filters corresponding to

respective wavelengths including null band).


      Regarding claim 11, *Beaulieu et al.* further teach that a photodetector (210, Fig.7)

configured to (i) receive a data-modulated optical signal (Optical signal branched from

200, Fig.7) corresponding to the carrier (Corresponding clock-modulated carrier, 280,

Fig.7) and data signals (170, Fig.7) and (ii) generate the input signal (Signal output from

210, Fig.7).


      Regarding claim 12, *Beaulieu et al.* further teach that an optical transmitter

(100/160, Fig.7) configured to generate the data-modulated optical signal (Modulated by

170, Fig.7) based on the data signal (170, Fig.7) and the clock signal (Clock signal from

110, Fig.7).


      Regarding claim 13, *Beaulieu et al.* further teach that the optical transmitter

comprises a first driver (100 Fig.7) configured to generate a first driving signal (Clock

signal modulated carrier signal, 280, Fig.7) based on the clock signal (Clock signal from

110, Fig.7), an E/O modulator (160, Fig.7) configured to receive an optical input from a

laser (90, Fig.7) and to modulate said optical input (optical beam from 90, Fig.7) based

on the first driving signal to produce the carrier signal (Clock signal modulated optical

carrier 280,  Fig.7), a second driver (Data signal driver 180,  Fig.7) configured to

Application/Control Number: 10/100,521                                    Page 6
Art Unit: 2638

generate a second driving signal (Data signal 170, Fig.7) based on the clock signal

(Clock signal generated carriers is modulated by the data signal 170, Fig.7), and an E/O

modulator (160, Fig.7) configured to receive the carrier signal (Optical beam from 90,

Fig.7) and to modulate said carrier signal based on the second driving signal (By data

signal 170, Fig.7) to produce the data-modulated optical signal (Data modulate optical

signal 190).

The system of *Beaulieu et al.* and *Sobiski et al.* differs from the invention claimed

in that *Beaulieu et al.* and *Sobiski et al.* do not teach the pulse generator is an electro-

optic (E/O) modulator.  However, it is old and known in the art at the time of invention to

use an electro-optical modulator to generate optical carriers driven directly by clock

signal, for example, see US Pub. No: 2001/0030791 (2a and 2b, Fig.5) in order to

produce a higher-rate carrier with better modulation index.


Regarding claim 14, *Beaulieu et al.* further teach that the optical input is a

continuous wave (CW) signal (CW laser, 90, Fig.7) and the apparatus further comprises

the laser (240, Fig.4).


Regarding claim 15, *Beaulieu et al.* further teach the phase shifter (120, Fig.7) is

configured to shift the phase of the clock signal ([0046, lines 2-3]) and apply the shifted

clock signal to the optical transmitter (Shifted clock signal output from 110 applied to

100/160, Fig.7).

Application/Control Number: 10/100,521                                          Page 7
Art Unit: 2638

Regarding claim 21, *Beaulieu et al.* further teach that the step (i) comprises the
step of generating a control signal (Control signal generated at 140, Fig.7) based on the
analysis ([0046]); and step (ii) comprises the step of introducing the phase shift ([0045],
lines 5-8) between the data signal and the clock signal ([0045], lines 5-8) based on the
control signal ([0045], line 6).

Regarding claim 26, *Beaulieu et al.* further teach that the step of (iii) generating
the carrier signal (Carrier signal is generated at 100, fig.7) using a clock signal (Clock
signal from 110, Fig.7).

Regarding claim 27, *Beaulieu et al.* further teach that the step (iii) comprises the
steps of generating a phase-shifted clock using the phase-shifted clock signal to
generate a carrier signal (Phase shifted clock signal from 120 through driver 110 to
drive the first carver 100 to produce a carrier signal, Fig.7).

Regarding claims 33 and 37, *Beaulieu et al.* teach a method of reducing
misalignment between a carrier signal and a data signal, comprising the steps of: (ii)
introducing a phase shift ([0042], Page 2) between the data signal (170,Fig.7) and a
clock signal (Clock signal from 110, Fig.7) using the control signal (control signal
generated by 110, Fig.7), wherein the carrier signal is based on the clock signal (Carrier
is firstly modulated by the clock signal, Fig.7).

Application/Control Number: 10/100,521                                    Page 8
Art Unit: 2638

   *Beaulieu et al.* differ from the invention claimed in that *Beaulieu et al.* do not

teach analyzing concavity of a spectral null in a data modulated signal corresponding to

the carrier and data signals.   However *Sobiski et al.* discloses measuring and

analyzing a null spectrum (*Sobiski et al.* teach the null become wider and deeper when

dispersion increases, see, Fig.5, Col.7, lines 48-49, 57-60, spectral "hole" is equivalent

to "null").  Therefore, it would have been obvious to a person having ordinary skill in the

art at the time of the invention to adapt the method of determining spectral power of a

null in optical spectrum, such as the one taught by *Sobiski et al.* with the transmission

system of *Beaulieu et al.,* to solve the alignment problem happened in the

synchronization between clock and data signal, as taught by *Beaulieu et al.* ([008]),

corresponding to the spectral varying in null located and monitored by using the method

of *Sobiski et al.* (Fig.3) in order to further reduce distortion in transmission of a high

speed optical signals (In Fig.3, *Sobiski et al.* teach detecting a spectrum by using a

plurality detection devices and filters corresponding to respective wavelengths including

null band).


4.      Claims 3 and 20 are rejected under U.S.C. 103(a) as being unpatentable over

*Beaulieu et al.* (US Pub. No: 2002/0149824) in view of *Sobiski et al.* (US Patent No:

6,487,352) and further in view of *Baghdady* (US Patent No: 4,513,249).


       Regarding claim 3, *Beaulieu et al.* further teach that the analyzer comprises a

bandpass filter characterized by a pass band, wherein the input signal is applied to the

Application/Control Number: 10/100,521                                          Page 9
Art Unit: 2638

bandpass filter ([0045], lines 26-29), and a circuit configured to generate the control

signal based on said filtered output (Control signal output from 140, Fig.7).

The system of *Beaulieu et al.* and *Sobiski et al.* differs from the invention claimed

in that *Beaulieu et al.* and *Sobiski et al.* do not teach an envelope detector configured to

measure power of the input signal in the pass band, and a low pass filter configured to

filter the output of the envelope detector.   However, *Baghdady* from same field of

endeavor teaches how to use an envelope detector (1, 5, Fig.1) and lowpass filter (6,

Fig.1).  Therefore, it would have been obvious to a person having ordinary skill in the art

at the time of the invention to incorporate an envelope detector and a lowpass filter,

such as the ones of *Baghdady*, to the system of *Beaulieu et al.* and *Sobiski et al.* in

order to reduce interfering of jamming signal in discrimination of a low-frequency

component of a received modulated signal.


Regarding claim 20, *Beaulieu et al.* further teach that the step (i) comprises the

steps of (1) applying the data-modulated signal to a bandpass filter characterized by a

pass band (Branched optical signal from 200 is detected by 210, and 230, and sent into

band pass filter, Fig.7, [0045], lines 26-29), and (4) generating a control signal based on

said filtered output (Control signal output from 140, Fig.7).

The system of *Beaulieu et al.* and *Sobiski et al.* differs from the invention claimed

in that *Beaulieu et al.* and *Sobiski et al.* do not teach the step (i) comprises the steps of

a filtering the output of the envelope detector using a low pass filter and measuring

power of the data-modulated signal in the pass band using an envelope detector.

Application/Control Number: 10/100,521                                    Page 10
Art Unit: 2638

However, *Baghdady* teaches how to use an envelope detector (1, 5, Fig.1), a lowpass

filter (6, Fig.1) to filter the output of the envelope detector and a technique to measure

the envelope output of the data- modulated signal (Col.2, lines 1-3, Col.1, lines 17-20).

Therefore, it would have been obvious to a person having ordinary skill in the art at the

time of the invention to incorporate an envelope detector and a lowpass filter, such as

the ones of *Baghdady*, to the system of *Beaulieu et al.* and *Sobiski et al.*  in order to

reduce interfering of jamming signal in discrimination of a low-frequency component of a

received modulated signal.


5.      Claim 5 is rejected under U.S.C. 103(a) as being unpatentable over *Beaulieu et*

*al.* (US Pub. No: 2002/0149824) in view of *Sobiski et al.* (US Patent No: 6,487,352) and

further in view of *Ishikawa et al.* (US Patent No: 5,418,815).


        Regarding claim 5, the transmission system of *Beaulieu et al.* and *Sobiski et al.*

differs from the invention claimed in that *Beaulieu et al.* and *Sobiski et al.* do not teach

the circuit comprises an analog-to-digital converter (ADC) configured to digitize the

filtered output of the envelope detector; a digital processor configured to generate a

digital control signal based on the digitized signal from the ADC; and a digital-to-analog

converter configured to generate the control signal based of the digital control signal.

However, *Ishikawa et al.* teach how to use a A/D converter (843, 844, Fig.2; Col.2, line

67) converts the analog output of amplifier (834 Fig.2) to digital data signal, which is

converted back to analog data by D/A converter (848, Fig.2) used to control the local

Application/Control Number: 10/100,521                                    Page 11
Art Unit: 2638

oscillator (838, fig.2). Therefore, it would have been obvious to a person having

ordinary skill in the art at the time of the invention to incorporate a A/D and D/A

converters, such as the ones of *Ishikawa et al.,* to the transmission system of *Beaulieu*

*et al.* and *Sobiski et al.* in order to perform precisely detection of intermediate frequency

component located in a null band for optical transmission system.


6.      Claims 16 and 28 are rejected under U.S.C. 103(a) as being unpatentable over

*Beaulieu et al.* (US Pub. No: 2002/0149824) in view of *Sobiski et al.* (US Patent No:

6,487,352) and further in view of *Bergano* (US 2002/0191260).


        Regarding claims 16 and 28, the system of *Beaulieu et al.* and  *Sobiski et al.*

differs from the invention claimed in that *Beaulieu et al.* and  *Sobiski et al.* do not teach

the carrier signal comprises an optical train of soliton pulses. However, *Bergano*, from

the same field of endeavor, discloses optical carrier of soliton pulse train ([0004], Page

1; [0021], Page 2). Therefore, it would have been obvious to a person having ordinary

skill in the art at the time of the invention to incorporate the soliton light pulse train, such

as the one disclosed by *Bergano* into the transmission system *Beaulieu et al.* and

*Sobiski et al.* in order to improve synchronization in optical communication system for a

long distance transmission.


**Allowable Subject Matter**

Application/Control Number: 10/100,521                                    Page 12
Art Unit: 2638

7.      Claims 8-10, 24, 25, 29-32, 34-36, and 38-40 are objected to as being dependent

upon a rejected base claim, but would be allowable if rewritten in independent form

including all of the limitations of the base claim and any intervening claims.


                                   ***Conclusion***

8.      The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure.

        1. *Crutcher* (US patent No: 4,546,322) teach Adaptive modulater for arbitrary

amplitude and phase key modulation signals.

        2. *Pleasant et al.* (US Patent No: 6,496,079) teach optical to microwave

converter using direct modulation phase shift keying.

        3. *Beaulieu et al.* (US 2002/0149824) teach synchronization of an optical pulse

stream with an electrical signal.

        4. *Dinu et al.* (US Pub. No: 2002/0176129) teach null spectrum happening due to

dispersion.


9.      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Leming Wang whose telephone number is 571 272

3030. The examiner can normally be reached on 8:30AM - 5:00PM.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Kenneth Vanderpuye can be reached on 571 272 3078. The fax phone

Application/Control Number: 10/100,521                                    Page 13
Art Unit: 2638

number for the organization where this application or proceeding is assigned is 703-
872-9306.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).

Leming Wang
7/25/2005

KENNETH VANDERPUYE
PRIMARY EXAMINER

| *Notice of References Cited* | Application/Control No. 10/100,521 | Applicant(s)/Patent Under Reexamination SINSKY, JEFFREY H. | |
|---|---|---|---|
| | Examiner Leming Wang | Art Unit 2638 | Page 1 of 1 |

### U.S. PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-2002/0149824 | 10-2002 | Beaulieu et al. | 359/158 |
| | B | US-6,487,352 | 11-2002 | Sobiski et al. | 385/122 |
| | C | US-4,513,249 | 04-1985 | Baghdady, Elie J. | 327/356 |
| | D | US-5,418,815 | 05-1995 | Ishikawa et al. | 375/216 |
| | E | US-2002/0191260 | 12-2002 | Bergano, Neal S. | 359/181 |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

*2633*

**CUSTOMER NO. 46850**                                          **PATENT**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Re:  Attorney Docket No. <u>Sinsky 4</u>

In re application of:        <u>Jeffrey H. Sinsky</u>

| | | | |
|---|---|---|---|
| Serial No.: | <u>10/100,521</u> | Group Art Unit: | <u>2633</u> |
| Filed: | <u>03/18/2002</u> | Examiner: | <u>Wang, Leming</u> |
| Matter No.: | <u>990.0388</u> | Phone No.: | <u>571-272-3030</u> |

For:   <u>Correcting Misalignment Between Data and a Carrier Signal in Transmitters</u>

## <u>RESPONSE UNDER 37 CFR 1.111</u>

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir:

This Response is filed in response to the office action of <u>08/08/2005</u>.

\*            \*            \*            \*            \*

<u>Certification Under 37 CFR 1.8</u>

Date of Deposit  <u>10/25/2005</u>

I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail under 37 CFR 1.8 on the date indicated above and is addressed to the Commissioner for Patents, P.O. Box 1450, Alexandria, VA  22313-1450.

Amy Laudenslager
(Name of person mailing)

(Signature of person mailing)

## REMARKS/ARGUMENTS

Claims 1, 3, 5-17, and 20-40 are pending in the application. The Applicant hereby requests further examination and reconsideration of the application in view of these arguments and remarks.

References Not Listed on Form PTO-892:

In paragraph 8, the Examiner stated that the following references not relied upon in the office action have been made of record: Crutcher (U.S. Patent No: 4,546,322); Pleasant et al. (U.S. Patent No: 6,496,079); and Dinu et al. (U.S. Publication No: 2002/0176129). However, the Examiner has not listed these references on the PTO-892 forms for the current or previous office actions. The Applicant requests that these references be listed on a PTO-892 form to properly make them of record in these proceedings.

Claim Rejections:

In paragraph 3, the Examiner rejected claims 1, 6, 7, 11-15, 17, 21-23, 26, 33, and 37 under 35 U.S.C. § 103(a) as being unpatentable over Beaulieu in view of Sobiski. In paragraph 4, the Examiner rejected claims 3 and 20 under 35 U.S.C. § 103(a) as being unpatentable over Beaulieu in view of Sobiski and in further view of Baghdady. In paragraph 5, the Examiner rejected claim 5 under 35 U.S.C. § 103(a) as being unpatentable over Beaulieu in view of Sobiski and in further view of Ishikawa. In paragraph 6, the Examiner rejected claims 16 and 28 under 35 U.S.C. § 103(a) as being unpatentable over Beaulieu in view of Sobiski and in further view of Bergano. In paragraph 7, the Examiner objected to claims 8-10, 24, 25, 29-32, 34-36, and 38-40 as being dependent upon a rejected base claim, but indicated that those claims would be allowable if rewritten in independent form. For the following reasons, the Applicant submits that all pending claims are allowable over the cited references.

Claim 1 is directed to an apparatus for reducing misalignment between a carrier signal and a data signal. The apparatus has: (a) an analyzer configured (i) to analyze spectral power of an input signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding to a spectral null of the input signal, and (ii) to generate a control signal based on the analysis; and (b) a phase shifter configured to introduce a phase shift between the data signal and a clock signal using the control signal, wherein the carrier signal is based on the clock signal.

Beaulieu discloses an optical transmitter adapted to produce a modulated optical signal by synchronizing an electrical modulation signal with an optical pulse stream that is being modulated using that electrical modulation signal. On page 3 of the office action, the Examiner admitted that Beaulieu does not teach "measuring a spectral band correspond[ing] to a spectral null of the input signal." However, the Examiner proceeded to state that "Sobiski et al. teach measuring the power spectrum and locating null as shown in Fig. 5."

Sobiski discloses an optical receiver designed to reduce the adverse effects of chromatic dispersion by (i) detecting a spectral hole caused by chromatic dispersion in the transmission link and (ii) reintroducing the missing or reduced spectral components corresponding to the spectral hole back into the optical signal. For the following reasons, the Applicant submits that one of ordinary skill in the art would not be motivated to combine the teachings of Beaulieu and Sobiski and that the combination of Beaulieu and Sobiski is improper.

First of all, the teachings of Beaulieu are directed to an optical transmitter while those of Sobiski are directed to an optical receiver. One of ordinary skill in the art would not be motivated to apply, at an

optical transmitter, a signal monitoring technique which is utilized at an optical receiver, because the transmitter and receiver serve different functions and are normally separated in the communication system by a significant distance, e.g., hundreds of meters or even kilometers.

Next, one of ordinary skill in the art would not be motivated to use the technique disclosed by Sobiski in the apparatus disclosed by Beaulieu because observable changes in the pulse shapes caused by signal misalignment in Beaulieu are the opposite of those caused by chromatic dispersion in Sobiski. More specifically, signal misalignment causes optical-pulse shortening because portions of the optical pulses located in temporal proximity to the edges of the gate-pulse are cut off (see, e.g., Beaulieu's Fig. 4). In contrast, the well-known effect of chromatic dispersion is optical-pulse broadening (see, e.g., Sobiski's Fig. 1).

Finally, there is no teaching or suggestion in either Beaulieu or Sobiski that the spectral manifestations of signal misalignment at an optical modulator and those of chromatic dispersion might be similar. Without such teaching or suggestion, one of ordinary skill in the art would not be motivated to use a technique developed for the detection of chromatic dispersion in the detection of signal misalignment.

As a matter of law, a modification and/or combination of reference teachings is improper unless the prior art suggests such a modification or combination. In particular, it is improper to reject the claimed invention as an obvious combination of the teachings of two prior art references when the prior art provided no teaching, suggestion, or incentive supporting the combination. Also, a challenger to the validity of a patent cannot simply pick and choose among the individual elements of assorted prior art references to create the claimed invention; the challenger has the burden to show some teaching or suggestion in the references to support their use in the particular claimed combination. Furthermore, without a suggestion in the prior art for a necessary modification and/or combination, a rejection on the grounds of obviousness is an improper use of hindsight. Both the suggestion and the expectation of success must be founded in the prior art, not in the applicant's disclosure.

For all these reasons, the Applicant submits that the rejection of claim 1 over the combination of Beaulieu and Sobiski is improper and should be withdrawn. For similar reasons, the Applicant submits that the rejections of claims 17, 33, and 37 over the combination of Beaulieu and Sobiski are also improper and should be withdrawn. Since the rejections of claims 3, 5, 6, 7, 11-16, 20-23, 26, and 28, which depend variously from claims 1 and 17, rely on the combination of Beaulieu and Sobiski, it is further submitted that these rejections are improper and should be withdrawn as well. The Applicant submits therefore that the rejections of claims under § 103 have been overcome.

In view of the above arguments and remarks, the Applicant believes that the now pending claims are in condition for allowance. Therefore, the Applicant believes that the entire application is now in condition for allowance, and early and favorable action is respectfully solicited.

Respectfully submitted,

Date: 10/25/05

Customer No. 46850
Mendelsohn & Associates, P.C.
1500 John F. Kennedy Blvd., Suite 405
Philadelphia, Pennsylvania 19102

Yuri Gruzdkov
Registration No. 50,762
Agent for Applicant
(215) 557-8544 (phone)
(215) 557-8477 (fax)



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

46850          7590          02/10/2006

MENDELSOHN & ASSOCIATES, P.C.
1500 JOHN F. KENNEDY BLVD., SUITE 405
PHILADELPHIA, PA 19102

| EXAMINER |  |
|---|---|
| LEUNG, CHRISTINA Y |  |
| ART UNIT | PAPER NUMBER |
| 2633 |  |

DATE MAILED: 02/10/2006

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/100,521 | 03/18/2002 | Jeffrey H. Sinsky | SINSKY 4 | 5080 |

TITLE OF INVENTION: CORRECTING MISALIGNMENT BETWEEN DATA AND A CARRIER SIGNAL IN TRANSMITTERS

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $1400 | $300 | $1700 | 05/10/2006 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.   THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT.   SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED.   THIS STATUTORY PERIOD CANNOT BE EXTENDED.   SEE 35 U.S.C. 151.   THE ISSUE FEE DUE INDICATED ABOVE REFLECTS A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE APPLIED IN THIS APPLICATION.   THE PTOL-85B (OR AN EQUIVALENT) MUST BE RETURNED WITHIN THIS PERIOD EVEN IF NO FEE IS DUE OR THE APPLICATION WILL BE REGARDED AS ABANDONED.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL should be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). Even if the fee(s) have already been paid, Part B - Fee(s) Transmittal should be completed and returned. If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), to: **Mail**    Mail Stop ISSUE FEE
                                                                              Commissioner for Patents
                                                                              P.O. Box 1450
                                                                              Alexandria, Virginia 22313-1450
                                                                     **or Fax** (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

| CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address) | Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission. |
|---|---|

46850        7590        02/10/2006

MENDELSOHN & ASSOCIATES, P.C.
1500 JOHN F. KENNEDY BLVD., SUITE 405
PHILADELPHIA, PA 19102

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

| | (Depositor's name) |
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/100,521 | 03/18/2002 | Jeffrey H. Sinsky | SINSKY 4 | 5080 |

TITLE OF INVENTION: CORRECTING MISALIGNMENT BETWEEN DATA AND A CARRIER SIGNAL IN TRANSMITTERS

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $1400 | $300 | $1700 | 05/10/2006 |

| EXAMINER | | ART UNIT | CLASS-SUBCLASS | |
|---|---|---|---|---|
| LEUNG, CHRISTINA Y | | 2633 | 398-198000 | |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                                    (B) RESIDENCE: (CITY and STATE or COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :    ☐ Individual  ☐ Corporation or other private group entity  ☐ Government

**4a. The following fee(s) are enclosed:**

☐ Issue Fee

☐ Publication Fee (No small entity discount permitted)

☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s):**

☐ A check in the amount of the fee(s) is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The Director is hereby authorized by charge the required fee(s), or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status** (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.         ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

The Director of the USPTO is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.
NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.



U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/100,521 | 03/18/2002 | Jeffrey H. Sinsky | SINSKY 4 | 5080 |

| | |
|---|---|
| 46850        7590        02/10/2006 | EXAMINER |
| MENDELSOHN & ASSOCIATES, P.C. | LEUNG, CHRISTINA Y |

| | |
|---|---|
| 1500 JOHN F. KENNEDY BLVD., SUITE 405 | ART UNIT | PAPER NUMBER |
| PHILADELPHIA, PA 19102 | 2633 | |

DATE MAILED: 02/10/2006

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 662 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 662 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101    or (571)-272-4200.

PTOL-85 (Rev. 01/06) Approved for use through 04/30/2007.

| *Notice of Allowability* | Application No. | Applicant(s) |
|---|---|---|
| | 10/100,521 | SINSKY, JEFFREY H. |
| | Examiner | Art Unit | |
| | Christina Y. Leung | 2633 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *response filed 27 October 2005*.

2. ☒ The allowed claim(s) is/are *1,3,5-17 and 20-40*.

3. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some*   c) ☐ None  of the:

       1. ☐ Certified copies of the priority documents have been received.

       2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

       3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

4. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

        1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____ .

    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of

        Paper No./Mail Date _____ .

**Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☒ Notice of References Cited (PTO-892)

2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3. ☐ Information Disclosure Statements (PTO-1449 or PTO/SB/08), Paper No./Mail Date _____

4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application (PTO-152)

6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

7. ☐ Examiner's Amendment/Comment

8. ☐ Examiner's Statement of Reasons for Allowance

9. ☐ Other _____ .

*Christina Y Leung*
*Christina Y Leung*
*Primary Examiner*
*Art Unit 2633*

| | | | | |
|---|---|---|---|---|
| ***Notice of References Cited*** | Application/Control No.<br><br>10/100,521 | Applicant(s)/Patent Under Reexamination<br>SINSKY, JEFFREY H. | | |
| | Examiner<br><br>Christina Y. Leung | Art Unit<br><br>2633 | Page 1 of 1 | |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-2002/0176129 A1 | 11-2002 | Dinu et al. | 359/110 |
| * | B | US-4,546,322 A | 10-1985 | Crutcher, W. Larkin | 329/308 |
| * | C | US-6,496,079 B1 | 12-2002 | Pleasant et al. | 332/103 |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)        **Notice of References Cited**        Part of Paper No. 20060120