# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **WSOU Investments, LLC d/b/a Brazos Licensing and Development,**<br><br>Plaintiff,<br><br>v.<br><br>**Xilinx, Inc.,**<br><br>Defendant. | REDACTED - PUBLIC VERSION<br>(Filed March 7, 2022)<br><br>CA No. 20-1228-CFC<br>CA No. 20-1229-CFC<br>CA No. 20-1231-CFC<br>CA No. 20-1232-CFC<br>CA No. 20-1233-CFC<br><br> |

## DECLARATION OF JONATHAN MCNEAL SMITH IN SUPPORT OF XILINX, INC.'S REQUEST FOR AN ORDER COMPELLING COMPLETE INFRINGEMENT CONTENTIONS AND FURTHER INTERROGATORY RESPONSES

I, Jonathan McNeal Smith, hereby declare:

1.      I am counsel of record for Xilinx, Inc.  I have knowledge of the facts set forth below.  If called as a witness, I could and would testify competently as to this declaration.

2.      Attached as Exhibit A is a true and correct copy of Xilinx's First Set of Interrogatories, served on November 12, 2021.

3.      Attached as Exhibit B is a true and correct copy of WSOU's responses to Xilinx's First Set of Interrogatories, served on December 13, 2021.

4.      Attached as Exhibit C is a true and correct copy of WSOU's initial claim chart for the '653 Patent, as amended on November 8, 2021.

5.      Attached as Exhibit D is a true and correct copy of WSOU's initial claim chart for the '838 Patent, as amended on November 8, 2021.

6.      Attached as Exhibit E is a true and correct copy of WSOU's initial claim chart for the '938 Patent, as amended on November 8, 2021.

7.      Attached as Exhibit F is a true and correct copy of  WSOU's initial claim chart for the '950 Patent, as amended on November 8, 2021.

8.      Attached as Exhibit G is a true and correct copy of WSOU's initial claim chart for the '971 Patent, as amended on November 8, 2021.

9.      Attached as Exhibit H is a true and correct copy of Xilinx's invalidity contention claim chart for the '838 Patent anticipated by the UltraScale device.

- 1 -

10.     Attached as Exhibit I is a true and correct copy of Xilinx's invalidity contention claim chart for the '838 Patent anticipated by the Virtex-5 device.

11.     Attached as Exhibit J is a true and correct copy of Xilinx's invalidity claim chart for the '838 Patent anticipated by the Virtex-6 device.

12.     Attached as Exhibit K is a true and correct copy of correspondence sent from Xilinx's counsel to WSOU's counsel on November 11, 2021.

13.     Attached as Exhibit L is a true and correct copy of a whitepaper entitled Understanding Key Parameters for RF-Sampling Data Converters, available at https://www.xilinx.com/support/documentation/white_papers/wp509-rfsampling-data-converters.pdf, which WSOU cited throughout its initial claim chart for the '950 Patent, for example at page 4.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this date:       February 28, 2022

By:        /s/ Jonathan McNeal Smith
           Jonathan McNeal Smith

In:        Los Angeles, California

29136702

- 2 -

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 7, 2022, a copy of the

foregoing document was served on the persons listed below in the manner

indicated:

### <u>BY E-MAIL</u>

James M. Lennon
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
jlennon@devlinlawfirm.com

Jonathan K. Waldrop
Darcy L. Jones
Marcus A. Barber
John W. Downing
Heather S. Kim
ThucMinh Nguyen
KASOWITZ BENSON TORRES LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065
jwaldrop@kasowitz.com
djones@kasowitz.com
mbarber@kasowitz.com
jdowning@kasowitz.com
hkim@kasowitz.com
tnguyen@kasowitz.com

Isaac Rabicoff
RABICOFF LAW FIRM LLC
5680 King Centre Drive, Suite 645
Alexandria, VA 22315
isaac@rabilaw.com

Paul G. Williams
KASOWITZ BENSON TORRES LLP
1230 Peachtree Street N.E., Suite 2445
Atlanta, GA 30309
pwilliams@kasowitz.com

Shelley Ivan
Hershy Stern
Joshua A. Whitehill
Howard L. Bressler
Bradley P. Lerman
Noah P. Dorman
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
sivan@kasowitz.com
hstern@kasowitz.com
jwhitehill@kasowitz.com
hbressler@kasowitz.com
blerman@kasowitz.com
ndorman@kasowitz.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Xilinx, Inc.*

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WSOU INVESTMENTS, LLC d/b/a
BRAZOS LICENSING AND
DEVELOPMENT,

                        Plaintiff,

        v.

XILINX, INC.,

                    Defendant.

C.A. No. 20-1228-CFC-JLH
(Consolidated)

## DEFENDANT XILINX, INC.'S FIRST SET OF INTERROGATORIES (NOS. 1–13)

Pursuant to Federal Rule of Civil Procedure 33, Defendant Xilinx, Inc.

("Xilinx") serves these Interrogatories upon Plaintiff WSOU Investments, LLC

d/b/a Brazos Licensing and Development.  Plaintiff should respond to these

Interrogatories within thirty (30) days of service and in accordance with the

definitions and instructions below.

## DEFINITIONS AND INSTRUCTIONS

The following definitions and instructions shall apply when responding to

these Interrogatories:

1.      "Plaintiff," "WSOU," "You," and "Your" mean WSOU Investments,

LLC d/b/a Brazos Licensing and Development and any and all parents,

subsidiaries, partners, joint ventures, and affiliates thereof, all divisions,

predecessors, successors, and assigns of each of the foregoing, and all officers,

directors, employees, agents, and all other persons acting or purporting to act on behalf of or under the control of any of the foregoing.

2.    "Defendant" and "Xilinx" mean defendant Xilinx, Inc.

3.    "'653 Patent" means U.S. Patent No. 6,784,653.

4.    "'950 Patent" means U.S. Patent No. 7,068,950.

5.    "'938 Patent" means U.S. Patent No. 7,613,938.

6.    "'971 Patent" means U.S. Patent No. 7,903,971.

7.    "'838 Patent" means U.S. Patent No. 9,312,838.

8.    "Asserted Patents" means the '653 Patent, '950 Patent, '938 Patent, '971 Patent, and '838 Patent, collectively, and each of their patent claims.

9.    "Asserted Claims" mean those patent claims of the Asserted Patents that You assert are infringed by any Accused Products.

10.    "Accused Products" means any and all Xilinx products accused of infringing the Asserted Patents in Your complaint and infringement contentions, and any supplementations thereto.

11.    "Cases" means those above-captioned consolidated cases filed by WSOU against Xilinx in the District of Delaware: Case Nos. 20-1228, 20-1229, 20-1231, 20-1232, and 20-1233, collectively.

12.    "Communication" means any transmission of information by any means including conversations, calls, letters, notes, reports, filings, memoranda,

28800269.1

-2-

facsimiles, telexes, telecopies, electronic mail, text messages, attachments, and other computer or electronic transmissions, as well as any memorialization, recordings, or transcripts of the same including depositions and hearings and their transcripts.

13.    "Document" means and is defined to be synonymous and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a) including, without limitation, electronic documents, paper documents, letters, notes, reports, filings, memoranda, facsimiles, telexes, telecopies, e-mail, text messages, photographs, videotapes and video recordings, audiotapes and audio recordings, transcripts, computer databases, computer tapes, archives, copies, backups, electronically stored information, and any other electronic materials, all prior drafts of the foregoing, and all copies or reproductions of the foregoing on which any mark, alteration, writing, modification, or other change from the original has been made.  A draft or non-identical copy or reproduction is a separate document.

14.    The term "Encumbrance" shall mean any claims to, rights in, security interest in, option in, or collateral in a patent, patent application, or portfolio having patent or intellectual property rights by a party other than the owner or a patentee, and regardless of whether any of the foregoing is actual, contingent, optional, revocable, past, present, or future.

15.    "Identify" and "identification" when referring to a person mean to give sufficient information to identify the person including, to the extent known, the person's full name, present or last known address, and, when referring to a natural person, the person's business title, location, and present or last known place of employment and, if not presently employed by Plaintiff, his or her home address.

16.    "Identify" and "identification" when referring to a document, written communication, or electronic communication, the terms "identify" and "identification" mean to provide the Bates number of the document and, if not evident from the face of the document, its date, authors and recipients, or, if the document has not been produced, the

(a)    type of document;

(b)    general subject matter;

(c)    date of the document;

(d)    author(s), addressee(s), and recipient(s); and

(e)    if You are not in possession of the document, the last time You were in possession of the document and the circumstances of its loss or destruction.

17.    "Identify" when referring to a communication means to:

(a)    identify all persons who communicated;

(b)    identify all persons to whom the communication was addressed, if practicable; otherwise a general description of the persons to whom the statement was addressed;

    (c)    identify all persons who participated in, witnessed, sent, or received the communication;

    (d)    state the date and manner of the communication and the place at which the communication was made;

    (e)    describe, in as much detail as You presently know, what was said, written, and otherwise communicated by each person; and

    (f)    if the communication was memorialized, recorded, or referenced in any documents, identify those documents.

18.    "Infringe" and "infringement" mean all acts of infringement under 35 U.S.C. § 271, including direct and indirect infringement whether literal or by the doctrine of equivalents, as well as willful infringement and any request for enhanced damages under 35 U.S.C. § 284.

19.    "Parties" means the Plaintiff and Defendant collectively, and "Party" means either Plaintiff or Defendant individually.

20.    "Person" and "Persons" mean natural persons, proprietorships, firms, corporations, partnerships, joint ventures, groups, associations, organizations, or any other natural or legal entity of any kind.

21.    "Prior Art" means and is defined to have the full scope as used in 35 U.S.C. § 101 *et seq.*, including any United States or foreign patent, patent application, printed publication, knowledge, use, sale, offer for sale, disclosure, commercialization, apparatus, method, product, system, prototype, experiment, simulation, testing, or other act or event defined or referred to in 35 U.S.C. §§ 102 and 103, taken singly or in combination, that is dated or may have occurred prior to

28800269.1

any patent application filing date or conception date of the claimed subject matter of the Asserted Patents, or that was made more than a year before the effective filing date of the claimed subject matter of the Asserted Patents.

22. "Product" means a system, method, apparatus, commercial product, prototype, experiment, test, tangible article, hardware, circuit, chip, software or program, or thing that is or has been conceived of, reduced to practice, designed, made, used, sold, offered for sale, imported, prototyped, tested, or commercialized. This definition expressly includes any product that is Prior Art or that is an Accused Product.

23. "Relate to," "relating to," "related to," "relates to," and similar expressions mean and shall be construed broadly to mean evidencing, constituting, affecting, referring to, comprising, illustrating, recording, memorializing, or discussing.

24. "Thing" means and is defined to be synonymous and equal in scope to the usage of the term "tangible things" in Federal Rule of Civil Procedure 34(a) including, without limitation, products, components, devices, models, mockups, prototypes, systems, hardware, circuits, chips, software and programs, and all other tangible things, all prior versions or attempts to create the foregoing, and all reproductions of the foregoing that have undergone any alteration, modification,

addition, removal, revision, copying, reproduction, or other change.  A non-identical thing is a separate thing.

25.    "Third Party" and "third-party" mean and refer to any person other than Plaintiff and Defendant including, but not limited to, customers, end users, distributors, retailers, vendors, installers, owners, investors, advisors, and consultants.

26.    "Transfer of Rights" means any transfer of any rights, in whole or in part, and whether executed, vested or contingent, of or in a patent or a patent portfolio and all related Documents, as well as in any related lawsuits, including but not limited to an assignment, non-exclusive license, exclusive license, settlement agreement, covenant not to sue, sale, option, lease, right to sue for damages, security interest, collateral interest, profit sharing, payment, right to damages, royalty right, or any other transfer of any rights granted in a patent or patent portfolio, or in the outcome of any litigation or licensing asserting a patent or patent portfolio.

27.    The use of the singular form of any word includes the plural and vice versa.

28.    Each of the words defined above is intended to have its definition as set forth above, regardless of whether the word is capitalized in each of these Interrogatories.

28800269.1

29.     If You do not respond to any Interrogatory, in whole or in part, on the grounds of privilege, for each such Interrogatory provide (i) the Person or Persons who have knowledge of the withheld information, (ii) the complete basis for the claim of privilege, and (iii) a description of the information adequate to support the contention that the information withheld is privileged.

30.     Consistent with the requirements of Rule 26(e) of the Federal Rules of Civil Procedure, answers to these Interrogatories must be promptly supplemented or corrected as new or additional information becomes available to Plaintiff.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Describe in detail and in full the complete basis for Your allegation that Xilinx has and continues to directly infringe the Asserted Patents, including for each Accused Product, Asserted Patent and Asserted Claim each specific act of direct infringement (manufacture, use, sale, offer for sale, within the United States, or importation into the United States), each allegedly-infringing feature of each Accused Product and how that feature allegedly meets each limitation of the Asserted Claims, all Persons having knowledge of the alleged direct infringement, and all Documents, Communications, and Things related to or that You rely upon for Your allegation of direct infringement.

28800269.1

**INTERROGATORY NO. 2:**

Describe and identify in detail and in full all Prior Art related to or asserted against the Asserted Patents or any of their Asserted Claims, including all and each patent, patent application, printed publications, knowledge, use, sale, offer for sale, disclosure, commercialization, apparatus, method, product, system, prototype, experiment, simulation, and testing, and for each such Prior Art all Persons knowledgeable of the Prior Art and all related Documents and Communications.

**INTERROGATORY NO. 3:**

Describe in detail and in full Your assertions that the Asserted Claims are not invalid, including the complete basis for Your assertion that any Prior Art asserted by Xilinx does not qualify as Prior Art, does not meet the limitations of the Asserted Claims, does not anticipate the Asserted Claims, or would not have been obvious to combine or otherwise render the Asserted Claims obvious, and for Your assertion that the Asserted Claims are definite, enabled, satisfy the written description requirement, and patentable subject matter, as well as any related Documents, Communications, and Things related to Your assertions.

**INTERROGATORY NO. 4:**

Describe in detail and in full each Transfer of Rights in or Encumbrances of the Asserted Patents or any portfolio having the Asserted Patents, including for each such transfer or encumbrance the parties and date of the transfer and

28800269.1

encumbrance, the rights transferred or encumbered, the consideration for the transfer or encumbrance, all material terms of the transfer or encumbrance, all Persons knowledgeable of the transfer or encumbrance, and all related Documents and Communications including any related agreements.

**INTERROGATORY NO. 5:**

Describe in detail and in full the conception of each Asserted Claim of the Asserted Patents, including who conceived of each Asserted Claim, what was conceived and each person's contribution to the conception, when and where the conception took place, why the invention was conceived, including the problem, issue, or Prior Art and how they were solved, addressed, overcome, or improved upon by the Asserted Claim and according to the inventors, and all related Documents, Communications, and Things.

**INTERROGATORY NO. 6:**

Describe in detail and in full each reduction to practice, embodiment, or infringement of each Asserted Claim of the Asserted Patents, including who reduced to practice, embodied, or infringed each Asserted Claim, what was reduced to practice, embodied, or infringed, when and where the reduction to practice, embodiment, or infringement took place, any diligence between the alleged conception and reduction to practice if performed by the inventors of the

Asserted Claims and all corroborating evidence of diligence, and all related Documents, Communications, and Things.

**INTERROGATORY NO. 7:**

Describe and identify in detail and in full what Plaintiff contends is the proper measure of and legal basis for damages for Xilinx's alleged infringement, including whether damages should be based on lost profits or a reasonably royalty, any reasonable royalty rate that should be used to compute damages and the factual basis for that rate, including all factors, e.g. *Georgia Pacific* factors, that You will rely on to establish the royalty rate and the basis for using those factors, the base that this royalty is to be applied to and how it was determined, all Documents that You contend support the use of said rate(s) and base(s) or lost profits, and all Persons with knowledge related to Your claim for damages.

**INTERROGATORY NO. 8:**

Describe and explain in detail for each legal agreement, including any and all agreements that include a Transfer of Rights in the Accused Patents, that are license or settlement agreements produced by the Parties, or that otherwise allegedly relate to the issue of damages, whether and why the agreement is comparable (or not comparable) for computing a reasonable royalty under the *Georgia Pacific* factors. Your response should include, but not be limited to, explaining why each agreement (*e.g.*, assignment, exclusive license, non-exclusive

28800269.1

license, covenant not to sue, settlement, sales agreement, security agreement, funding agreement, loan agreement) is or is not comparable in structure, form, rights granted, royalty rate, licensed products, or any other terms and conditions. To the extent that any Party asserts that any agreements are comparable (or not comparable), Your response should also address each agreement identified by that Party.

**<u>INTERROGATORY NO. 9:</u>**

Describe and identify in detail and in full each Communication by or between Plaintiff (including any legal representative, agent, or associate of Plaintiff), the inventors of the Asserted Patents, and any Third Party regarding the Asserted Patents, portfolios having the Asserted Patents, their alleged inventions, of the Cases, including but not limited to communications with, negotiations with, or claims against any third party concerning the possible licensing or infringement thereof and/or settlement of any patent infringement lawsuit, the dates and parties involved and the results thereof (including an identification of each license or settlement agreement relating in any way to the Asserted Patents), and identifying all Persons with knowledge of facts relating to such licensing or enforcement efforts and all related Documents.

28800269.1

**INTERROGATORY NO. 10:**

Describe and identify in detail and in full every Communication by or between Plaintiff (including any legal representative, agent, prosecution counsel, or associate of Plaintiff), any prior owners or predecessors-in-interest of the Asserted Patents, the inventors of the Asserted Patents, and/or prosecution counsel of the Asserted Patents, regarding the filing and prosecution of the Asserted Patents and their patent applications, as well as any Prior Art identified, considered, disclosed, or known to them before the issuance of the Asserted Patents, including any analysis of the Prior Art, the relation between the Prior Art and the patent applications for the Asserted Patents, and whether to submit or disclose any such Prior Art to the U.S. Patent and Trademark Office ("USPTO") during prosecution of the applications for the Asserted Patents, as well as all related Documents and Communications and all Persons with knowledge of the foregoing.

**INTERROGATORY NO. 11:**

Describe and identify in detail and in full all persons, investors, firms, prior owners, predecessors-in-interest, and/or other entities who have a financial interest in any payments received or to be received by Plaintiff relating to any one of the Asserted Patents, or any other patent or patent application purchased or otherwise acquired directly or indirectly by Plaintiff from Alcatel Lucent and/or Wade and

Co., including but not limited to the licensing of any of the patents and/or the

recovery of any settlement, damages, or judgment in this action, and the nature of

the ownership interest or financial interest of any such person, investor, firm, prior

owner, predecessor-in-interest, or other entity, and explain how payments received

would be disbursed.

## INTERROGATORY NO. 12:

Describe and identify in detail and in full Plaintiff's contentions, and the

factual basis for such contentions, as to the pertinent art for each Asserted Claim,

the level of ordinary skill in that art at the time of the alleged invention, and any

"objective evidence" or "secondary considerations" of the non-obviousness of any

such Asserted Claim in accordance with, for example, *Graham v. John Deere Co.*,

383 U.S. 1, 17 (1966).

## INTERROGATORY NO. 13:

Describe and identify in detail and in full the purpose, formation,

commercial activities, and business model of WSOU from its incorporation to date,

including but not limited to its principals, officers, directors, owners, managers,

and investors, its business activities, units, divisions, and affiliates, its intellectual

property acquisition, divestiture, licensing, and litigation, the number and location

of its offices and employees and their general responsibilities and positions, any

research and development or commercial products, services, tangible or intangible

28800269.1

assets, or intellectual property designed, developed, marketed, promoted, offered,

manufactured, licensed, or sold by WSOU, all funding of or equities in WSOU,

any partnerships or joint ventures with or of WSOU, and all related Documents,

Communications, and Things.

28800269.1

Dated: November 12, 2021

OF COUNSEL:

Hilda C. Galvan
Christopher A. Buxton
JONES DAY
2727 North Harwood Street
Dallas, TX 75201-1515
(214) 220-3939
hcgalvan@jonesday.com
cbuxton@jonesday.com

David B. Cochran
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216) 586-7029
dcochran@jonesday.com

Thomas W. Ritchie
JONES DAY
77 West Wacker Dr.
Chicago, IL 60601-1692
(312) 269-4003
twritchie@jonesday.com

Jonathan McNeal Smith
Jones Day
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
(213) 243-2559
jonathansmith@jonesday.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Robert M. Vrana*

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
(302) 571-6600
agaza@ycst.com
rvrna@ycst.com

*Attorneys for Xilinx, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 12, 2021, a copy of the

foregoing document was served on the persons listed below in the manner

indicated:

**BY E-MAIL**

James M. Lennon
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
jlennon@devlinlawfirm.com

Jonathan K. Waldrop
Darcy L. Jones
Marcus A. Barber
John W. Downing
Heather S. Kim
Jack Shaw
ThucMinh Nguyen
KASOWITZ BENSON TORRES LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065
jwaldrop@kasowitz.com
djones@kasowitz.com
mbarber@kasowitz.com
jdowning@kasowitz.com
hkim@kasowitz.com
jshaw@kasowitz.com
tnguyen@kasowitz.com

Isaac Rabicoff
RABICOFF LAW FIRM LLC
5680 King Centre Drive, Suite 645
Alexandria, VA 22315
isaac@rabilaw.com

Paul G. Williams
KASOWITZ BENSON TORRES LLP
1230 Peachtree Street N.E., Suite 2445
Atlanta, GA 30309
pwilliams@kasowitz.com

Shelley Ivan
Hershy Stern
Joshua A. Whitehill
Howard L. Bressler
Bradley P. Lerman
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
sivan@kasowitz.com
hstern@kasowitz.com
jwhitehill@kasowitz.com
hbressler@kasowitz.com
blerman@kasowitz.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Xilinx, Inc.*

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WSOU INVESTMENTS, LLC D/B/A BRAZOS LICENSING AND DEVELOPMENT, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| XILINX, INC., | ) ) |
| Defendant. | ) ) |

C.A. No. 20-cv-1228-CFC-JLH
(Consolidated)

**PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT XILINX, INC.'S
FIRST SET OF INTERROGATORIES (NOS. 1-13)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff WSOU

Investments, LLC d/b/a Brazos Licensing and Development ("Plaintiff" or "WSOU"), hereby

provides its Responses and Objections to Defendant Xilinx's ("Defendant" or "Xilinx") First Set

of Interrogatories (Nos. 1-13) as follows:

**GENERAL OBJECTIONS**

1.      All General Objections are hereby incorporated into each specific response.  Any

objection or lack of objection to any portion of an interrogatory is not to be deemed an admission.

2.      WSOU objects to each and every definition, instruction, and/or interrogatory to the

extent that it purports to impose duties or obligations upon WSOU in excess of or different from

the rules and obligations imposed by the Federal Rules of Civil Procedure, the Local Rules for the

District of Delaware, and any other rules or applicable law.

3.      WSOU objects to each and every definition, instruction, and/or interrogatory as

overly broad, unreasonably burdensome, and oppressive to the extent that it seeks, individually or

1

collectively, information that is not relevant to any claim or defense of the case and therefore not proportional to the needs of this case.

4.      WSOU objects to each and every definition, instruction, and/or interrogatory to the extent that it purports to require WSOU to account for documents, information, or material that is outside the possession, custody, or control of WSOU, on the grounds that such discovery requests are overly broad, unreasonably burdensome, oppressive and will cause undue hardship to WSOU. WSOU further objects to each definition, instruction, and/or interrogatory to the extent that it purports to require information or material that is already in Xilinx's possession, known or disclosed to Xilinx, or which is equally available to Xilinx independently of WSOU.

5.      WSOU objects to each and every definition, instruction, and/or interrogatory to the extent that it purports to require the production or disclosure of any privileged communication or attorney work-product on the grounds that such discovery is impermissible under Rule 26(b) of the Federal Rules of Civil Procedure.  WSOU hereby asserts such privilege, protections, and/or doctrines.  If supplying any of the requested documents, information, or material would result in waiving any applicable privilege or objection based on any such privilege, WSOU objects to providing the documents, information, or material and will not do so.  To the extent that WSOU discloses any information or material subject to the attorney-client privilege, the attorney work-product doctrine, or other applicable privilege, protection or doctrine, such disclosure is inadvertent and does not constitute a waiver of any privilege, protection or doctrine.  Nothing contained herein is intended to be or should be construed as a waiver of the attorney-client privilege, the attorney work-product doctrine, or any other applicable privileges, protections, or doctrines.

2

6.      WSOU objects to each and every interrogatory to the extent that it assumes facts that are not accurate, not known to WSOU, and/or are irrelevant to the claims and defenses in this litigation.

7.      WSOU objects to each and every interrogatory as unreasonably burdensome and cumulative to the extent that it is redundant and/or duplicative of other requests and discovery.

8.      WSOU objects to each and every interrogatory to the extent it seeks documents or information from an unspecified or over-expansive timeframe.

9.      WSOU objects to each and every interrogatory as unduly burdensome to the extent it calls for information not maintained in WSOU's ordinary course of business.

10.      WSOU objects to each and every interrogatory to the extent it seeks documents or information that is confidential or proprietary.      WSOU will only produce such documents or reveal such information subject to the Stipulated Protective Order entered in this Lawsuit.  *See WSOU Investments, LLC d/b/a Brazos Licensing And Development v. Xilinx, Inc.*, Case No. 20-1228-CFC-JLH, D.I. 64.

11.      WSOU objects to each and every interrogatory to the extent that it seeks to elicit documents, information, and materials that comprise third-party proprietary information, trade secrets, or other confidential commercial information that WSOU is obligated not to disclose. Such documents, information, or materials shall be produced only with the consent of the relevant third party or a court order compelling production.

12.      WSOU objects to each and every interrogatory to the extent that it seeks information that is already in the possession, custody or control of Xilinx and/or counsel for the same, or to the extent that it seeks information that is available to Xilinx from other sources with equivalent ease and expense.

13.     WSOU objects to the definitions of "Plaintiff," "WSOU," "You" and "Your" on the grounds that they are overbroad, unreasonably burdensome, oppressive, and not reasonably calculated to lead to the discovery of admissible information, particularly to the extent that they purport to include persons or entities other than WSOU.  WSOU further objects to the definitions of "WSOU," "You" and "Your" to the extent it would require the disclosure of privileged information protected by the attorney-client privilege or attorney work-product doctrine on the grounds that such discovery is impermissible under Rule 26(b) of the Federal Rules of Civil Procedure.  For purposes of responding to these interrogatories, WSOU will interpret the references to WSOU's full or abbreviated name(s), "You" and "Your," to refer to WSOU Investments, LLC d/b/a Brazos Licensing and Development.

14.     WSOU objects to Xilinx's definition of "Accused Products" to the extent that it is too narrow, does not include reasonably similar products, and seeks to exclude Xilinx products that infringe upon the Asserted Patents.

15.     WSOU objects to Xilinx's definition of "relate to," "relating to," "related to," and "relates to" as overly broad and unduly burdensome, to the extent it purports to seek information that is unrelated to the present litigation, and to the extent they exceed the obligations imposed by the Federal Rules, the local rules of this Court, and any orders of this Court entered in this case.

16.     WSOU objects to Xilinx's definition of "Document" and "Thing" on the grounds that it is overly broad, unreasonably burdensome and seeks the production of documents, information, or things not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  WSOU further objects to the definition of "Document" and "Thing" to the extent it requires WSOU to produce documents, information and/or other material outside the scope of Rules 26 and 33 of the Federal Rules of Civil Procedure,

the local rules of this court, and the Court signed Stipulation and Order Regarding Discovery, Including Discovery of Electronically Stored Information (ESI) (D.I. 55, the "ESI Order").  This includes, but is not limited to, its improper demand for e-mail, text messages, and other electronically-stored information that are not required to be produced under the aforementioned stipulation.  Herein, WSOU will interpret "Document" as limited to the materials that fall within the scope of Rules 26 and 33 of the Federal Rules of Civil Procedure and the Court's ESI Order.

17.     WSOU objects to Xilinx's definition of "Communication" as overly broad and unduly burdensome, to the extent it purports to seek information that is unrelated to the present litigation, and to the extent they exceed the obligations imposed by the Federal Rules, the local rules of this Court, and any orders of this Court entered in this case, including the ESI Order. This includes, but is not limited to, its improper demand for electronic mail, text messages, and other electronic transmissions that are not required to be produced under the aforementioned stipulation. Herein, WSOU will interpret "Communication" as limited to the materials that fall within the scope of Rules 26 and 33 of the Federal Rules of Civil Procedure and the Court's ESI Order.

18.     WSOU objects to Xilinx's definition of "Encumbrance" as overly broad and unduly burdensome, to the extent it purports to seek information that is unrelated to the present litigation, is not limited in timing or scope, and to the extent it exceeds the obligations imposed by the Federal Rules, the local rules of this Court, and any orders of this Court entered in this case.

19.     WSOU objects to Xilinx's definition of "identify" and "identification" as overly broad and unduly burdensome, to the extent it purports to seek information that is unrelated to the present litigation, demands address information, and to the extent they exceed the obligations imposed by the Federal Rules, the local rules of this Court, and any orders of this Court entered in this case.

20.     WSOU objects to Xilinx's use of "any" and "all" as overly broad and unduly burdensome, to the extent it purports to seek information that is unrelated to the present litigation, and to the extent they exceed the obligations imposed by the Federal Rules, the local rules of this Court, and any orders of this Court entered in this case.

21.     WSOU objects to Xilinx's definition of "Person" and "Persons" as overly broad and unduly burdensome, to the extent they purports to seek information that is unrelated to the present litigation, and to the extent they exceed the obligations imposed by the Federal Rules, the local rules of this Court, and any orders of this Court entered in this case.

22.     WSOU objects to Xilinx's definition of "Product" as overly broad and unduly burdensome, to the extent it purports to seek information that is unrelated to the present litigation, and to the extent it exceeds the obligations imposed by the Federal Rules, the local rules of this Court, and any orders of this Court entered in this case.

23.     WSOU objects to Xilinx's definition of "Transfer of Rights" as overly broad and unduly burdensome, to the extent it purports to seek information that is unrelated to the present litigation, and to the extent it exceeds the obligations imposed by the Federal Rules, the local rules of this Court, and any orders of this Court entered in this case.

24.     WSOU objects to Xilinx's Instructions as overly broad and unduly burdensome to the extent they purport to seek information or impose obligations that is unrelated to the present litigation, and to the extent they exceed the obligations imposed by the Federal Rules, the local rules of this Court, or any orders of this Court entered in this case.

25.     WSOU objects to each and every interrogatory to the extent it improperly seeks to require WSOU to marshal all of its available proof and limit the evidence that Plaintiff may present at the trial at this matter.  WSOU reserves all objections to the use of any responses herein, whether

6

at trial or otherwise.

26.     By providing responses, WSOU does not concede the relevancy of the subject matter of any interrogatory.  WSOU's responses are made expressly subject to, and without waiver of, any objections as to competency, relevancy, materiality, privilege, or admissibility of any of the information referred to or produced in connection with the responses given herein, or of the subject matter thereof, in any proceeding.  The responses are made subject to WSOU's right to object at any proceeding involving or relating to the subject matter of the interrogatories responded to herein.

27.     For every response, document, information, or thing produced, WSOU reserves the right to interpose at trial all objections to competence, authenticity, relevance, materiality, propriety, admissibility and any and all other objections that would exclude the information from evidence.

28.     WSOU has made and will make a reasonable and good faith effort to gather information responsive to these interrogatories.  However, WSOU and its attorneys have not completed their discovery or preparation for trial, nor have they concluded their analysis of information gathered to date by the parties.  Discovery is ongoing in this matter, and the following responses and any documents, information or things produced pursuant to the responses are based on WSOU's present state of recollection, knowledge, and belief.  They are subject to additional or different information that WSOU may discover, and, as such, WSOU reserves the right to amend and/or supplement these objections and/or responses and to produce further documents and information, if necessary, as additional facts are developed and additional documents that are discovered.  WSOU reserves the right to rely on facts, documents, or other information that may develop or come to its attention at a later time.

29.     WSOU reserves the right to make further objections to these Definitions and Instructions in the context of responses to any future Interrogatories in which these Definitions, Instructions, and/or similar Definitions or Instructions appear.

### SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS FOR INTERROGATORIES (Nos. 1-13)

**INTERROGATORY NO. 1:**

Describe in detail and in full the complete basis for Your allegation that Xilinx has and continues to directly infringe the Asserted Patents, including for each Accused Product, Asserted Patent and Asserted Claim each specific act of direct infringement (manufacture, use, sale, offer for sale, within the United States, or importation into the United States), each allegedly-infringing feature of each Accused Product and how that feature allegedly meets each limitation of the Asserted Claims, all Persons having knowledge of the alleged direct infringement, and all Documents, Communications, and Things related to or that You rely upon for Your allegation of direct infringement.

**RESPONSE TO INTERROGATORY NO. 1:**

WSOU incorporates by reference its General Objections as if fully set forth herein.  WSOU objects to this interrogatory as vague, ambiguous, calling for speculation, and subject to multiple interpretations in its use of the terms "Communications" and "related to."  WSOU objects to this interrogatory as overbroad, unduly burdensome, oppressive, and not proportional to the needs of the case to the extent it purports to require WSOU to identify "all Documents, Communications, and Things related to or that You rely upon" and to "describe in detail in full the complete basis for Your allegation that Xilinx has and continues to directly infringe the Asserted Patents."  WSOU further objects to this interrogatory because it imposes burdens and obligations different from, and beyond those imposed by, the local rules of the District of Delaware or those imposed by the

Federal Rules of Civil Procedure.  WSOU further objects to this interrogatory as it calls for legal conclusions.  WSOU objects to this interrogatory to the extent it seeks discovery of information or material that is outside the possession, custody, or control of WSOU.  WSOU objects to this interrogatory to the extent that it prematurely requires expert discovery, opinions and/or testimony and improperly seeks WSOU to marshal all its available proof and limit the evidence that WSOU may present at the trial of this matter.  WSOU objects to this interrogatory as compound to the extent it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63).  WSOU objects to this interrogatory to the extent it seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege and/or any other applicable privilege or immunity from discovery.  WSOU hereby applies all such privileges and/or immunities.

Subject to, and without waiving the foregoing objections, WSOU responds as follows:

WSOU incorporates by reference, as if fully set forth herein, the factual bases set forth in its original and amended complaints (including the exhibits thereto), WSOU's infringement contentions (and any amendments thereto) and disclosure of Asserted Claims, and WSOU's forthcoming expert report(s).

The infringing products include at least the products identified in WSOU's original and amended Complaints and WSOU's infringement contentions (and any amendment thereto), which are incorporated herein by reference.  Xilinx has yet to produce all relevant documents, including but not limited to complete core technical documents for each Accused Product and reasonably similar products and basic information concerning the Accused Products (*e.g.*, documents concerning the functionality, source code, financials, sales and marketing data).  WSOU reserves the right to supplement this response as Xilinx produces additional information about the Accused

9

Products.  For further clarity, the infringed claims include those claims already identified in WSOU's original and amended complaints and WSOU's infringement contentions (and any amendments thereto).  WSOU refers Xilinx to the documents identified in WSOU's original and amended complaints and infringement contentions (and any amendments).

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

**INTERROGATORY NO. 2:**

Describe and identify in detail and in full all Prior Art related to or asserted against the Asserted Patents or any of their Asserted Claims, including all and each patent, patent application, printed publications, knowledge, use, sale, offer for sale, disclosure, commercialization, apparatus, method, product, system, prototype, experiment, simulation, and testing, and for each such Prior Art all Persons knowledgeable of the Prior Art and all related Documents and Communications.

**RESPONSE TO INTERROGATORY NO. 2:**

WSOU incorporates by reference its General Objections as if fully set forth herein.  WSOU objects to this interrogatory as vague, ambiguous, calling for speculation, and subject to multiple interpretations in its use of the terms "Prior Art," "related to," "experiment," "simulation," "testing," "Communications," and "related."  WSOU further objects to this interrogatory because it imposes burdens and obligations different from, and beyond those imposed, by the local rules of the District of Delaware or those imposed by the Federal Rules of Civil Procedure.  WSOU objects to this interrogatory to the extent it seeks discovery on pre-suit investigation.  WSOU objects to this interrogatory to the extent it is premature, requires expert testimony, and seeks to attack the validity of the Asserted Patents.  As an initial matter, the '653, '950, '938, '971, and '838 Patents

are entitled to a presumption of validity.  *See* 35 U.S.C. § 282(a).  Xilinx bears the burden of proving invalidity by clear and convincing evidence, including any factors it contends support a finding of obviousness.  *See Tech Licensing Corp. v. Videotek Inc.,* 545 F.3d 1316, 1327 (Fed. Cir. 2008); *Microsoft Corp. v. i4i Ltd. Partnership,* 131 S. Ct. 2238, 2243 (2011) ("[T]he burden of proving invalidity [is] on the attacker.  That burden is constant and never changes."); *Greenwood v. Hattori Seiko Co.*, Ltd., 900 F.2d 238, 241 (Fed. Cir. 1990) ("[O]ne attacking the validity of a patent must present clear and convincing evidence establishing the facts which lead to the legal conclusion that the patent is invalid.").  To the extent this request asks WSOU to summarize publicly available or recorded documents, WSOU objects to this request as unduly burdensome because the publicly available information is as readily available to Xilinx as to WSOU. WSOU objects to this interrogatory as compound to the extent it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63).  WSOU objects to this interrogatory to the extent it seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege and/or any other applicable privilege or immunity from discovery.  WSOU hereby applies all such privileges and/or immunities.

Subject to, and without waiving the foregoing objections, WSOU responds as follows:

WSOU identifies the following documents that may be responsive to this interrogatory pursuant to Federal Rule of Civil Procedure 33(d):  *See* WSOU-XILINX_000001 - WSOU-XILINX_001051.

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

**INTERROGATORY NO. 3:**

Describe in detail and in full Your assertions that the Asserted Claims are not invalid, including the complete basis for Your assertion that any Prior Art asserted by Xilinx does not qualify as Prior Art, does not meet the limitations of the Asserted Claims, does not anticipate the Asserted Claims, or would not have been obvious to combine or otherwise render the Asserted Claims obvious, and for Your assertion that the Asserted Claims are definite, enabled, satisfy the written description requirement, and patentable subject matter, as well as any related Documents, Communications, and Things related to Your assertions.

**RESPONSE TO INTERROGATORY NO. 3:**

WSOU incorporates by reference its General Objections as if fully set forth herein.  WSOU objects to this interrogatory as vague, ambiguous, calling for speculation, and subject to multiple interpretations in its use of the terms "Prior Art," "subject matter," "related," "Communications," and "related to."  WSOU objects to this interrogatory as overbroad, unduly burdensome, oppressive, and not proportional to the needs of the case to the extent it purports to require WSOU to identify "any related Documents, Communications, and Things related to Your assertions." WSOU objects to this interrogatory as overly broad and unduly burdensome as it purports to require WSOU to "describe in detail and in full Your assertions that the Asserted Claims are not invalid, including the complete basis for Your assertion that any Prior Art asserted by Xilinx does not qualify as Prior Art."  WSOU further objects to this interrogatory because it imposes burdens and obligations different from, and beyond those imposed by, the local rules of the District of Delaware or those imposed by the Federal Rules of Civil Procedure.  WSOU objects to this interrogatory to the extent that it prematurely requires expert discovery, opinions and/or testimony and improperly seeks WSOU to marshal all its available proof and limit the evidence that WSOU

12

may present at the trial of this matter.  WSOU objects to this interrogatory to the extent that it seeks legal conclusions.  WSOU objects to this interrogatory as compound to the extent that it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63).  As an initial matter, the '653, '950, '938, '971, and '838 Patents are entitled to a presumption of validity.  *See* 35 U.S.C. § 282(a).  Xilinx bears the burden of proving invalidity by clear and convincing evidence, including any factors it contends support a finding of obviousness.  *See Tech Licensing Corp. v. Videotek Inc.,* 545 F.3d 1316, 1327 (Fed. Cir. 2008); *Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2243 (2011) ("[T]he burden of proving invalidity [is] on the attacker.  That burden is constant and never changes."); *Greenwood v. Hattori Seiko Co.*, Ltd., 900 F.2d 238, 241 (Fed. Cir. 1990) ("[O]ne attacking the validity of a patent must present clear and convincing evidence establishing the facts which lead to the legal conclusion that the patent is invalid.").  Because Xilinx bears the burden of proving invalidity, WSOU objects to this interrogatory as overly broad to the extent it seeks WSOU's contentions with respect to arguments Xilinx has not raised.  WSOU objects to this interrogatory to the extent it seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege and/or any other applicable privilege or immunity from discovery.  WSOU hereby applies all such privileges and/or immunities.

Subject to, and without waiving the foregoing objections, WSOU responds as follows:

This interrogatory is premature.  If Xilinx satisfies its burden by making a prima facie case of invalidity through its expert report, WSOU will rebut Xilinx's position through its expert report. WSOU reserves the right to supplement this response, including by supplementing it after receiving Xilinx's expert report and after submitting WSOU's expert report.

13

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

**INTERROGATORY NO. 4:**

Describe in detail and in full each Transfer of Rights in or Encumbrances of the Asserted Patents or any portfolio having the Asserted Patents, including for each such transfer or encumbrance the parties and date of the transfer and encumbrance, the rights transferred or encumbered, the consideration for the transfer or encumbrance, all material terms of the transfer or encumbrance, all Persons knowledgeable of the transfer or encumbrance, and all related Documents and Communications including any related agreements.

**RESPONSE TO INTERROGATORY NO. 4:**

WSOU incorporates by reference its General Objections as if fully set forth herein.  WSOU objects to this interrogatory as overbroad, unduly burdensome, oppressive, and not proportional to the needs of the case to the extent it seeks WSOU to " describe in detail and in full each Transfer of Rights in or Encumbrances."  WSOU further objects to this interrogatory because it imposes burdens and obligations different from, and beyond those imposed by the local rules of the District of Delaware or those imposed by the Federal Rules of Civil Procedure.  WSOU further objects to this interrogatory as vague, ambiguous, calling for speculation, unlimited in scope and time, and subject to multiple interpretations in its use of the terms "Communications" and "related."  WSOU objects to this interrogatory as compound to the extent it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63).  To the extent this request asks WSOU to summarize publicly available or recorded documents, WSOU objects to this request as unduly burdensome because the publicly available

14

information is as readily available to Xilinx as to WSOU. WSOU further objects to this interrogatory to the extent it seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege and/or any other applicable privilege or immunity from discovery. WSOU hereby applies all such privileges and/or immunities.

Subject to, and without waiving the foregoing objections, WSOU responds as follows:

Pursuant to Federal Rule of Civil Procedure 33(d), WSOU will produce relevant, responsive, non-privileged, and discoverable documents with responsive information that are in its possession, custody, or control, to the extent that any such documents exist, and can be located and/or were located after a reasonable search, including any relevant executed assignment agreements within its custody or control it believes sufficient to respond to this request.

WSOU further identifies the following documents that may be responsive to this interrogatory pursuant to Federal Rule of Civil Procedure 33(d): *See* WSOU-XILINX_003945 – WSOU-XILINX_005481.

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

**INTERROGATORY NO. 5:**

Describe in detail and in full the conception of each Asserted Claim of the Asserted Patents, including who conceived of each Asserted Claim, what was conceived and each person's contribution to the conception, when and where the conception took place, why the invention was conceived, including the problem, issue, or Prior Art and how they were solved, addressed, overcome, or improved upon by the Asserted Claim and according to the inventors, and all related Documents, Communications, and Things.

**RESPONSE TO INTERROGATORY NO. 5:**

WSOU incorporates by reference its General Objections as if fully set forth herein. WSOU objects to this interrogatory as vague, ambiguous, calling for speculation, and subject to multiple interpretations in its use of the terms "Prior Art," "Communications," and "related." WSOU objects to this interrogatory as overbroad, oppressive, unreasonably burdensome, and disproportionate to the needs of this case as it purports to require WSOU to describe "in detail and in full the conception of each Asserted Claim of the Asserted Patents" and "each person's contribution." WSOU further objects to this interrogatory because it imposes burdens and obligations different from, and beyond those imposed by, the local rules of the District of Delaware or those imposed by the Federal Rules of Civil Procedure. WSOU objects to this interrogatory to the extent it seeks discovery of information or materials that are outside the possession, custody, or control of WSOU. WSOU objects to this interrogatory as it seeks legal conclusions. WSOU objects to this interrogatory as compound to the extent it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63). WSOU objects to this interrogatory to the extent it seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege and/or any other applicable privilege or immunity from discovery. WSOU hereby applies all such privileges and/or immunities.

Subject to, and without waiving the foregoing objections, WSOU responds as follows:

**'653 Patent**: The '653 Patent claims priority to United States application serial number 10/192,549 filed on July 11, 2002. WSOU contends that each of the Asserted Claims of the '653 Patent is entitled to a priority date not later than July 11, 2002. The priority data from the file histories for the '653 Patent is also incorporated by reference. WSOU also identifies the file

histories as containing evidence of conception.  A bates-numbered copy of the file histories of the '653 Patent and family members has been produced.

**'950 Patent**:  The '950 Patent claims priority to United States application serial number 10/100,521 filed on March 18, 2002.  WSOU contends that each of the Asserted Claims of the '950 Patent is entitled to a priority date not later than March 18, 2002.  The priority data from the file histories for the '950 Patent is also incorporated by reference.  WSOU also identifies the file histories as containing evidence of conception.  A bates-numbered copy of the file histories of the '950 Patent and family members has been produced.

**'938 Patent**:  The '938 Patent claims priority to United States application serial number 11/370,618 filed on March 8, 2006. WSOU contends that each of the Asserted Claims of the '938 Patent is entitled to a priority date not later than March 8, 2006.  The priority data from the file histories for the '938 Patent is also incorporated by reference.  WSOU also identifies the file histories as containing evidence of conception.  A bates-numbered copy of the file histories of the '938 Patent and family members has been produced.

**'971 Patent**:  The '971 Patent claims priority to United States application serial number 11/390,313 filed on March 28, 2006. WSOU contends that each of the Asserted Claims of the '971 Patent is entitled to a priority date not later than March 28, 2006.  The priority data from the file histories for the '971 Patent is also incorporated by reference.  WSOU also identifies the file histories as containing evidence of conception.  A bates-numbered copy of the file histories of the '971 Patent and family members has been produced.

**'838 Patent**:  The '838 Patent claims priority to United States application serial number 14/107,878 filed on December 16, 2013.  WSOU contends that each of the Asserted Claims of the '838 Patent is entitled to a priority date not later than December 16, 2013.  The priority data from

the file histories for the '838 Patent is also incorporated by reference.  WSOU also identifies the file histories as containing evidence of conception.  A bates-numbered copy of the file histories of the '838 Patent and family members has been produced.

WSOU further identifies the following documents that may be responsive to this interrogatory pursuant to Federal Rule of Civil Procedure 33(d): *See* WSOU-XILINX_000001 - WSOU-XILINX_001051.

While the patent applications came into existence prior to their filing dates, WSOU is not presently relying on conception dates earlier than the priority filing dates listed on the patent applications (including parent or prior applications).  However, WSOU reserves the right to supplement its response to this interrogatory as additional facts arise.

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

**INTERROGATORY NO. 6:**

Describe in detail and in full each reduction to practice, embodiment, or infringement of each Asserted Claim of the Asserted Patents, including who reduced to practice, embodied, or infringed each Asserted Claim, what was reduced to practice, embodied, or infringed, when and where the reduction to practice, embodiment, or infringement took place, any diligence between the alleged conception and reduction to practice if performed by the inventors of the Asserted Claims and all corroborating evidence of diligence, and all related Documents, Communications, and Things.

**RESPONSE TO INTERROGATORY NO. 6:**

WSOU incorporates by reference its General Objections as if fully set forth herein.  WSOU objects to this interrogatory as vague, ambiguous, calling for speculation, and subject to multiple interpretations in its use of the terms "diligence," "Communications," and "related."  WSOU objects to this interrogatory as overbroad, oppressive, unreasonably burdensome, and disproportionate to the needs of this case as it purports to require WSOU to describe "in detail and in full each reduction to practice, embodiment or infringement."  WSOU further objects to this interrogatory because it imposes burdens and obligations different from, and beyond those imposed by, the local rules of the District of Delaware or those imposed by the Federal Rules of Civil Procedure.  WSOU objects to this interrogatory to the extent it seeks discovery of information or materials that are outside the possession, custody, or control of WSOU.  WSOU objects to this interrogatory as it seeks legal conclusions.  WSOU objects to this interrogatory as compound to the extent it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63).  WSOU objects to this interrogatory to the extent it seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege and/or any other applicable privilege or immunity from discovery.  WSOU hereby applies all such privileges and/or immunities.

Subject to, and without waiving the foregoing objections, WSOU responds as follows:

**'653 Patent**:  The '653 Patent claims priority to United States application serial number 10/192,549 filed on July 11, 2002. WSOU contends that each of the Asserted Claims of the '653 Patent is entitled to a priority date not later than July 11, 2002.  The priority data from the file histories for the '653 Patent is also incorporated by reference.  WSOU also identifies the file

histories as containing evidence of reduction to practice.  A bates-numbered copy of the file histories of the '653 Patent and family members has been produced.

**'950 Patent**:  The '950 Patent claims priority to United States application serial number 10/100,521 filed on March 18, 2002. WSOU contends that each of the Asserted Claims of the '950 Patent is entitled to a priority date not later than March 18, 2002.  The priority data from the file histories for the '950 Patent is also incorporated by reference.  WSOU also identifies the file histories as containing evidence of reduction to practice.  A bates-numbered copy of the file histories of the '950 Patent and family members has been produced.

**'938 Patent**:  The '938 Patent claims priority to United States application serial number 11/370,618 filed on March 8, 2006. WSOU contends that each of the Asserted Claims of the '938 Patent is entitled to a priority date not later than March 8, 2006.  The priority data from the file histories for the '938 Patent is also incorporated by reference.  WSOU also identifies the file histories as containing evidence of reduction to practice.  A bates-numbered copy of the file histories of the '938 Patent and family members has been produced.

**'971 Patent**:  The '971 Patent claims priority to United States application serial number 11/390,313 filed on March 28, 2006. WSOU contends that each of the Asserted Claims of the '971 Patent is entitled to a priority date not later than March 28, 2006.  The priority data from the file histories for the '971 Patent is also incorporated by reference.  WSOU also identifies the file histories as containing evidence of reduction to practice.  A bates-numbered copy of the file histories of the '971 Patent and family members has been produced.

**'838 Patent**:  The '838 Patent claims priority to United States application serial number 14/107,878 filed on December 16, 2013.  WSOU contends that each of the Asserted Claims of the '838 Patent is entitled to a priority date not later than December 16, 2013.  The priority data from

the file histories for the '838 Patent is also incorporated by reference.  WSOU also identifies the file histories as containing evidence of reduction to practice.  A bates-numbered copy of the file histories of the '838 Patent and family members has been produced.

WSOU further identifies the following documents that may be responsive to this interrogatory pursuant to Federal Rule of Civil Procedure 33(d):  *See* WSOU-XILINX_000001 - WSOU-XILINX_001051.

While the patent applications came into existence prior to their filing dates, WSOU is not presently relying on reduction to practice dates earlier than the priority filing dates listed on the patent applications (including parent or prior applications).  However, WSOU reserves the right to supplement its response to this interrogatory as additional facts arise.

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

**<u>INTERROGATORY NO. 7</u>:**

Describe and identify in detail and in full what Plaintiff contends is the proper measure of and legal basis for damages for Xilinx's alleged infringement, including whether damages should be based on lost profits or a reasonably royalty, any reasonable royalty rate that should be used to compute damages and the factual basis for that rate, including all factors, e.g. *Georgia Pacific* factors, that You will rely on to establish the royalty rate and the basis for using those factors, the base that this royalty is to be applied to and how it was determined, all Documents that You contend support the use of said rate(s) and base(s) or lost profits, and all Persons with knowledge related to Your claim for damages.

**RESPONSE TO INTERROGATORY NO. 7:**

WSOU incorporates by reference its General Objections as if fully set forth herein.  WSOU objects to this interrogatory as overbroad, oppressive, unduly burdensome, and ambiguous in its use of the term "all Persons with knowledge related to."   WSOU further objects to this interrogatory as unduly burdensome as the interrogatory is not limited in time and/or scope and is not proportional to the needs of this case.  WSOU further objects to this interrogatory because it imposes burdens and obligations different from, and beyond those imposed, by the local rules of the District of Delaware or those imposed by the Federal Rules of Civil Procedure.  WSOU objects to this interrogatory to the extent that it prematurely requires expert discovery, opinions and/or testimony and improperly seeks WSOU to marshal all its available proof and limit the evidence that WSOU may present at the trial of this matter.  WSOU further objects to this interrogatory to the extent it requires WSOU and/or its experts to analyze documents and information in Xilinx's possession, custody, or control.  WSOU objects to this interrogatory to the extent that it seeks legal conclusions.  WSOU objects to this interrogatory as compound to the extent it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63).  WSOU objects to this interrogatory to the extent it seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege and/or any other applicable privilege or immunity from discovery.  WSOU hereby applies all such privileges and/or immunities.

Subject to, and without waiving the foregoing objections, WSOU responds as follows:

Xilinx's infringement of WSOU's Asserted Patents has caused and continues to cause WSOU to suffer damages.  WSOU intends to seek all relief and recover all remedies available under the Patent Act for Xilinx's infringement of its Asserted Patent, including monetary damages

pursuant to 35 U.S.C. § 284 to compensate for said infringement in an amount no less than a reasonable royalty for use of the inventions by Xilinx, plus interest and costs.  WSOU also intends to seek prejudgment interest from the date of infringement to the date of judgment, an on-going royalty for future infringement, any supplemental damages as appropriate, and its attorneys' fees and costs.  Such damage computations, however, cannot be completed until further discovery has taken place and WSOU has obtained necessary information from Xilinx.  The computation of damages will also require expert analysis.

WSOU incorporates by reference, as if fully set forth herein, the factual basis set forth in its original complaint (and any amendments thereto), WSOU's infringement contentions and disclosure of Asserted Claims (and any amendments thereto), and WSOU's forthcoming expert report(s).  WSOU further identifies the following documents that may be responsive to this interrogatory pursuant to Federal Rule of Civil Procedure 33(d):  *See* WSOU-XILINX_003945 - WSOU-XILINX_006340.

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

**INTERROGATORY NO. 8:**

Describe and explain in detail for each legal agreement, including any and all agreements that include a Transfer of Rights in the Accused Patents, that are license or settlement agreements produced by the Parties, or that otherwise allegedly relate to the issue of damages, whether and why the agreement is comparable (or not comparable) for computing a reasonable royalty under the Georgia Pacific factors.  Your response should include, but not be limited to, explaining why each agreement (e.g., assignment, exclusive license, non-exclusive license, covenant not to sue,

settlement, sales agreement, security agreement, funding agreement, loan agreement) is or is not comparable in structure, form, rights granted, royalty rate, licensed products, or any other terms and conditions.  To the extent that any Party asserts that any agreements are comparable (or not comparable), Your response should also address each agreement identified by that Party.

**RESPONSE TO INTERROGATORY NO. 8:**

WSOU incorporates by reference its General Objections as if fully set forth herein.  WSOU objects to this interrogatory as overbroad, oppressive, unduly burdensome, and ambiguous in its use of the term "otherwise allegedly relate to the issue of damages."  WSOU objects to this request to the extent it seeks irrelevant information, is not proportional to the needs of this case, is overbroad, unduly burdensome, and oppressive because it imposes burdens and obligations different from, and beyond those imposed by the local rules of the District of Delaware or those imposed by the Federal Rules of Civil Procedure.  WSOU objects to this interrogatory to the extent it refers to materials in Xilinx's possession, custody, or control or that have not been produced by Xilinx.  WSOU objects to this interrogatory to the extent that it prematurely requires expert discovery, opinions and/or testimony and improperly seeks WSOU to marshal all its available proof and limit the evidence that WSOU may present at the trial of this matter.  WSOU further objects to this interrogatory to the extent it requires WSOU and/or its experts to analyze documents and information in Xilinx's possession, custody, or control.  WSOU objects to this interrogatory to the extent that it seeks legal conclusions.  WSOU objects to this interrogatory as compound to the extent it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63).  WSOU objects to this interrogatory to the extent it seeks discovery of information or material that is outside the possession, custody, or control of WSOU.  WSOU objects to this interrogatory to the extent it

seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege and/or any other applicable privilege or immunity from discovery. WSOU hereby applies all such privileges and/or immunities.

Subject to, and without waiving the foregoing objections, WSOU responds as follows: Pursuant to Federal Rule of Civil Procedure 33(d), WSOU will produce relevant, responsive, non-privileged, and discoverable documents with responsive information that are in its possession, custody, or control, to the extent that any such documents exist, and can be located and/or were located after a reasonable search, including any relevant executed assignment agreements and/or licenses within its custody or control it believes sufficient to respond to this request.

WSOU further identifies the following documents that may be responsive to this interrogatory pursuant to Federal Rule of Civil Procedure 33(d):  *See* WSOU-XILINX_003945 - WSOU-XILINX_006340.

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

**INTERROGATORY NO. 9:**

Describe and identify in detail and in full each Communication by or between Plaintiff (including any legal representative, agent, or associate of Plaintiff), the inventors of the Asserted Patents, and any Third Party regarding the Asserted Patents, portfolios having the Asserted Patents, their alleged inventions, of the Cases, including but not limited to communications with, negotiations with, or claims against any third party concerning the possible licensing or infringement thereof and/or settlement of any patent infringement lawsuit, the dates and parties involved and the results thereof (including an identification of each license or settlement agreement

relating in any way to the Asserted Patents), and identifying all Persons with knowledge of facts relating to such licensing or enforcement efforts and all related Documents.

**RESPONSE TO INTERROGATORY NO. 9:**

WSOU incorporates by reference its General Objections as if fully set forth herein.  WSOU objects to this interrogatory as vague, ambiguous, calling for speculation, and subject to multiple interpretations in its use of the terms "Communication," "negotiations," and "relating to."  WSOU objects to this interrogatory as overbroad, unduly burdensome, oppressive, and not proportional to the needs of the case to the extent it purports to require WSOU to "Describe and identify in detail and in full each Communication."  WSOU further objects to this interrogatory because it imposes burdens and obligations different from, and beyond those imposed by, the local rules of the District of Delaware or those imposed by the Federal Rules of Civil Procedure.  WSOU further objects to this request as not relevant to any claim or defense in the case to the extent it seeks information or documents on Patents that are not asserted in this litigation.  WSOU objects to this request as it is not limited in time and/or scope to information relevant to the present litigation.  WSOU objects to this request to the extent that it seeks documents that may contain information subject to third-party confidentiality restrictions.  WSOU objects to this interrogatory as compound to the extent it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63).  WSOU further objects to this request to the extent it seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege, common interest privilege, and/or any other applicable privilege or immunity from discovery.  WSOU hereby applies all such privileges and/or immunities.

Subject to, and without waiving the foregoing objections, WSOU responds as follows:

Pursuant to Federal Rule of Civil Procedure 33(d), WSOU will produce relevant, responsive, non-privileged, and discoverable documents with responsive information that are in its possession, custody, or control, to the extent that any such documents exist, and can be located and/or were located after a reasonable search, including any relevant executed assignment agreements and/or licenses within its custody or control it believes sufficient to respond to this request.

WSOU further identifies the following documents that may be responsive to this interrogatory pursuant to Federal Rule of Civil Procedure 33(d): *See* WSOU-XILINX_003945 - WSOU-XILINX_006292.

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

**INTERROGATORY NO. 10:**

Describe and identify in detail and in full every Communication by or between Plaintiff (including any legal representative, agent, prosecution counsel, or associate of Plaintiff), any prior owners or predecessors-in-interest of the Asserted Patents, the inventors of the Asserted Patents, and/or prosecution counsel of the Asserted Patents, regarding the filing and prosecution of the Asserted Patents and their patent applications, as well as any Prior Art identified, considered, disclosed, or known to them before the issuance of the Asserted Patents, including any analysis of the Prior Art, the relation between the Prior Art and the patent applications for the Asserted Patents, and whether to submit or disclose any such Prior Art to the U.S. Patent and Trademark Office ("USPTO") during prosecution of the applications for the Asserted Patents, as well as all related Documents and Communications and all Persons with knowledge of the foregoing.

**RESPONSE TO INTERROGATORY NO. 10:**

WSOU incorporates by reference its General Objections as if fully set forth herein.  WSOU objects to this interrogatory as overbroad, unduly burdensome, oppressive, and not proportional to the needs of the case to the extent it purports to require WSOU to "Describe and identify in detail and in full every Communication" and to identify actions taken by any "prior owners or predecessors-in-interest."  WSOU further objects to this interrogatory because it imposes burdens and obligations different from, and beyond those imposed by, the local rules of the District of Delaware or those imposed by the Federal Rules of Civil Procedure.  WSOU objects to this request as calling for speculation, subject to multiple interpretations, and vague and ambiguous in its use of the terms "Communication," "regarding," "related," and "Prior Art."  WSOU objects to this request as it is not limited in time and/or scope to information relevant to the present litigation. WSOU objects to this interrogatory to the extent it seeks discovery of information or material that is outside the possession, custody, or control of WSOU.  WSOU objects to this request to the extent that it seeks documents that may contain information subject to third-party confidentiality restrictions.  WSOU objects to this interrogatory as compound to the extent it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63).  WSOU further objects to this request to the extent it seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege, common interest privilege, and/or any other applicable privilege or immunity from discovery.  WSOU hereby applies all such privileges and/or immunities.

Subject to, and without waiving the foregoing objections, WSOU responds as follows:

WSOU identifies the following documents that may be responsive to this interrogatory pursuant to Federal Rule of Civil Procedure 33(d):  *See* WSOU-XILINX_000001 - WSOU-XILINX_001051.

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

**INTERROGATORY NO. 11:**

Describe and identify in detail and in full all persons, investors, firms, prior owners, predecessors-in-interest, and/or other entities who have a financial interest in any payments received or to be received by Plaintiff relating to any one of the Asserted Patents, or any other patent or patent application purchased or otherwise acquired directly or indirectly by Plaintiff from Alcatel Lucent and/or Wade and Co., including but not limited to the licensing of any of the patents and/or the recovery of any settlement, damages, or judgment in this action, and the nature of the ownership interest or financial interest of any such person, investor, firm, prior owner, predecessor-in-interest, or other entity, and explain how payments received would be disbursed.

**RESPONSE TO INTERROGATORY NO. 11:**

WSOU incorporates by reference its General Objections as if fully set forth herein.  WSOU objects to this interrogatory as overbroad, unduly burdensome, oppressive, and not proportional to the needs of the case to the extent it purports to require WSOU to "Describe and identify in detail and in full all persons, investors, firms, prior owners, predecessors-in-interest, and/or other entities who have a financial interest."  WSOU objects to this request to the extent it seeks irrelevant information, is not proportional to the needs of this case, is overbroad, unduly burdensome, and oppressive because it imposes burdens and obligations different from, and beyond those imposed

by the local rules of the District of Delaware or those imposed by the Federal Rules of Civil Procedure. WSOU objects to this request as calling for speculation, subject to multiple interpretations, and vague and ambiguous in its use of the term "ownership interest" and "financial interest." WSOU objects to this request because information relating to litigation funding is irrelevant to any claim or defense. WSOU objects to this interrogatory as compound to the extent it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63). WSOU further objects to this request to the extent it seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege, common interest privilege, and/or any other applicable privilege or immunity from discovery. WSOU hereby applies all such privileges and/or immunities.

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

**INTERROGATORY NO. 12:**

Describe and identify in detail and in full Plaintiff's contentions, and the factual basis for such contentions, as to the pertinent art for each Asserted Claim, the level of ordinary skill in that art at the time of the alleged invention, and any "objective evidence" or "secondary considerations" of the non-obviousness of any such Asserted Claim in accordance with, for example, *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).

**RESPONSE TO INTERROGATORY NO. 12:**

WSOU incorporates by reference its General Objections as if fully set forth herein. WSOU objects to this interrogatory as overly broad and unduly burdensome as it purports to require

WSOU to "Describe and identify in detail and in full Plaintiff's contentions, and the factual basis for such contentions." WSOU objects to this interrogatory as vague, ambiguous, calling for speculation, and subject to multiple interpretations in its use of the terms "pertinent art," and "ordinary skill." WSOU further objects to this interrogatory because it imposes burdens and obligations different from, and beyond those imposed by, the local rules of the District of Delaware or those imposed by the Federal Rules of Civil Procedure. WSOU objects to this interrogatory to the extent that it prematurely requires expert discovery, opinions and/or testimony and improperly seeks WSOU to marshal all its available proof and limit the evidence that WSOU may present at the trial of this matter. WSOU objects to this interrogatory to the extent that it seeks legal conclusions. As an initial matter, the '653, '950, '938, '971, and '838 Patents are entitled to a presumption of validity. *See* 35 U.S.C. § 282(a). Xilinx bears the burden of proving invalidity by clear and convincing evidence, including any factors it contends support a finding of obviousness. *See Tech Licensing Corp. v. Videotek Inc.,* 545 F.3d 1316, 1327 (Fed. Cir. 2008); *Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2243 (2011) ("[T]he burden of proving invalidity [is] on the attacker. That burden is constant and never changes."); *Greenwood v. Hattori Seiko Co.*, Ltd., 900 F.2d 238, 241 (Fed. Cir. 1990) ("[O]ne attacking the validity of a patent must present clear and convincing evidence establishing the facts which lead to the legal conclusion that the patent is invalid."). WSOU objects to this interrogatory as compound to the extent it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63). WSOU objects to this interrogatory to the extent it seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege and/or any other applicable privilege or immunity from discovery. WSOU hereby applies all such privileges and/or immunities.

31

Subject to, and without waiving the foregoing objections, WSOU responds as follows:

This interrogatory is premature.  If Xilinx satisfies its burden by making a prima facie case of invalidity through its expert report, WSOU will rebut Xilinx's position through its expert report. WSOU reserves the right to supplement this response, including by supplementing it after receiving Xilinx's expert report and after submitting WSOU's expert report.

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

**INTERROGATORY NO. 13:**

Describe and identify in detail and in full the purpose, formation, commercial activities, and business model of WSOU from its incorporation to date, including but not limited to its principals, officers, directors, owners, managers, and investors, its business activities, units, divisions, and affiliates, its intellectual property acquisition, divestiture, licensing, and litigation, the number and location of its offices and employees and their general responsibilities and positions, any research and development or commercial products, services, tangible or intangible assets, or intellectual property designed, developed, marketed, promoted, offered, manufactured, licensed, or sold by WSOU, all funding of or equities in WSOU, any partnerships or joint ventures with or of WSOU, and all related Documents, Communications, and Things.

**RESPONSE TO INTERROGATORY NO. 13:**

WSOU incorporates by reference its General Objections as if fully set forth herein.  WSOU objects to this interrogatory as overly broad and unduly burdensome as it purports to require WSOU to "Describe and identify in detail and in full the purpose, formation, commercial activities, and business model of WSOU."  WSOU further objects to this request to the extent it seeks

irrelevant information, is not proportional to the needs of this case, is overbroad, unduly burdensome, and oppressive because it imposes burdens and obligations different from, and beyond those imposed by the local rules of the District of Delaware or those imposed by the Federal Rules of Civil Procedure.  WSOU objects to this request as it is not limited in time and/or scope to information relevant to the present litigation.  WSOU objects to this interrogatory as compound to the extent it contains discrete subparts that each count separately toward the total number of interrogatories allowed by the Court's Scheduling Order (D.I. 63).  WSOU further objects to this request to the extent it seeks information that is protected by the attorney-client privilege, the attorney work-product immunity, settlement privilege, common interest privilege, and/or any other applicable privilege or immunity from discovery.  WSOU hereby applies all such privileges and/or immunities.

Subject to and without waiving the foregoing objections, based on its understanding of the request and after a reasonably proportional search and review of relevant documents, WSOU responds as follows:

WSOU refers Xilinx to WSOU's Initial Disclosure, Paragraph Three Disclosures, and Amended Initial Disclosures, served on Xilinx on August 11, 2021, October 11, 2021 and November 12, 2021, respectively.  WSOU further states: Pursuant to Rule 33(d), WSOU will produce and identify relevant formation documents relating to WSOU's organization from which Xilinx can, with substantially the same burden as WSOU, ascertain information that is reasonably responsive to this request and proportional to the needs of the case.

Discovery and WSOU's investigation in this case are ongoing, and WSOU expressly reserves the right to amend and/or supplement this response, if necessary, as further information is discovered in this matter.

Dated:  December 13, 2021

OF COUNSEL:

Jonathan K. Waldrop
Darcy L. Jones
Marcus A. Barber
ThucMinh Nguyen
John W. Downing
Heather S. Kim
Jack Shaw
KASOWITZ BENSON TORRES LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065
(650) 453-5170

Shelley Ivan
Howard L. Bressler
Bradley P. Lerman
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

Paul G. Williams
KASOWITZ BENSON TORRES LLP
1230 Peachtree Street, NE, Suite 2445
Atlanta, GA 30309

Respectfully submitted,

DEVLIN LAW FIRM LLC

By:  _/s/ James M. Lennon___
James M. Lennon (No. 4570)
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
jlennon@devlinlawfirm.com

*Attorneys for Plaintiff*
*WSOU Investments LLC d/b/a*
*Brazos Licensing and Development*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 13th, 2021, I have served a copy the above document

via email on the counsel for Defendant.


*/s/ Jonathan K. Waldrop*
Jonathan K. Waldrop

# EXHIBIT C

**Exhibit 1**

**Initial Claim Chart
U.S. Patent No. 6,784,653 (the "Asserted Patent")
Claims 1 and 7  (the "Asserted Claims")**

The accused instrumentalities include, without limitation, Xilinx Filed Programmable Gate Arrays ("FPGA") devices/products and System on Chip ("SoC") devices/products with transceivers (such as the GTY and GTH transceivers), and evaluation kits that comprise the foregoing devices, including, but not limited to, Xilinx Spartan-6 devices and/or products; Xilinx Vertex-7 devices and/or products; Xilinx Kintex-7 devices and/or products; Xilinx Artix-7 devices and/or products; Xilinx Spartan-7 devices and/or products; Xilinx Kintex UltraScale devices and/or products; Xilinx Kintex UltraScale+ devices and/or products; Xilinx Virtex UltraScale devices and/or products; Xilinx Virtex UltraScale+ devices and/or products; Xilinx Artix UltraScale+ devices and/or products; Xilinx Zynq-7000 SoC devices and/or products; Xilinx Zynq UltraScale+ MPSoC devices and/or products; Xilinx Zynq UltraScale+ RFSoC devices and/or products; Xilinx Versal ACAP devices and/or products; Xilinx Kintex UltraScale FPGA KCU105 Evaluation Kit with transceivers, such as GTY and/or GTH transceivers; Xilinx Kintex UltraScale FPGA KCU1250 Characterization Kit with transceivers, such as GTY and/or GTH transceivers; Xilinx Kintex UltraScale+ FPGA KCU116 Evaluation Kit with transceivers, such as GTY and/or GTH transceivers; Xilinx Virtex UltraScale FPGA VCU108 Evaluation Kit with transceivers, such as GTY and/or GTH transceivers; Xilinx Virtex UltraScale FPGA VCU108 Evaluation Kit with transceivers, such as GTY and/or GTH transceivers; Xilinx Virtex UltraScale+ FPGA VCU118 Evaluation Kit with transceivers, such as GTY and/or GTH transceivers; Zynq UltraScale+ MPSoC ZCU102 Evaluation Kit with transceivers, such as GTY and/or GTH transceivers; Zynq UltraScale+ MPSoC ZCU104 Evaluation Kit with transceivers, such as GTY and/or GTH transceivers; Zynq UltraScale+ MPSoC ZCU106 Evaluation Kit with transceivers, such as GTY and/or GTH transceivers; and any other Xilinx device, product and instrumentality that operates using the similar components and/or functionality.

The following infringement analysis for certain accused instrumentalities is exemplary and applicable to other accused instrumentalities.  Further, WSOU does not intend the following exemplary claim chart to be limiting, and WSOU reserves its rights to pursue other accused instrumentalities, patent claims, evidence, and infringement arguments in this case.

WSOU does not intend the following exemplary claim chart to be limiting, and WSOU reserves its rights to pursue other accused instrumentalities, patent claims, evidence, and infringement arguments in this case.

| Claims | Exemplary Infringement Analysis with Exemplary Infringement Evidence |
|---|---|
| **7Pre.** Method of evaluating a binary input signal of a transmission link and of recognizing the edges of an eye diagram of the input signal, | To the extent the preamble is limiting, the accused instrumentalities enable the practice of a method of evaluating a binary input signal of a transmission link and of recognizing the edges of an eye diagram of the input signal.  *See, e.g.,* XILINX WSOU-0001667-XILINX WSOU-0001758; XILINX WSOU-0009168-XILINX WSOU-0009212; XILINX WSOU-0009213-XILINX WSOU-0009216; XILINX WSOU-0010634-XILINX WSOU-0010662 at 10643-10647; XILINX WSOU-0017308-XILINX WSOU-0017331 at 17308-17313, 17320, 17323-17330; XILINX_WSOU-0018200-XILINX_WSOU-0018216; XILINX_WSOU-0018217-XILINX_WSOU-0018238; XILINX_WSOU-0018239-XILINX_WSOU-0018312 at 18281-18300; XILINX WSOU-0018341-XILINX WSOU-0018353; XILINX WSOU-0018354-XILINX WSOU-0018376; XILINX WSOU-0018377-XILINX WSOU-0018400; XILINX WSOU-0018401-XILINX WSOU-0018420; XILINX WSOU-0018748-XILINX WSOU-0018992; XILINX WSOU-0019023-XILINX WSOU-0019030; XILINX WSOU-0020032-XILINX WSOU-0020040; XILINX_WSOU-0023124-XILINX_WSOU-0023140; XILINX_WSOU-0023141-XILINX WSOU-0023156; XILINX WSOU-0024281-XILINX WSOU-0024312; XILINX WSOU-0024281-XILINX WSOU-0024312; XILINX WSOU-0024313-XILINX WSOU-0024361; XILINX WSOU-0024408-XILINX WSOU-0024434; XILINX WSOU-0025129-XILINX WSOU-0025164; XILINX WSOU-0025830-XILINX WSOU-0025849; XILINX_WSOU-0025850-XILINX_WSOU-0026129; XILINX_WSOU-0028608-XILINX_WSOU-0028698; XILINX_WSOU-0030474 - XILINX_WSOU-0030489.<br><br>As an example, the GTY transceivers in Xilinx's UltraScale architecture are power-efficient transceivers that support line rates up to 30.5 Gb/s in UltraScale FPGAs. The Xilinx UltraScale architecture is an ASIC-class All Programmable architecture that enables high levels of system performance with smart processing, while efficiently routing and processing data on-chip. The GTY transceiver in UltraScale architecture is highly configurable and tightly integrated with the programmable logic resources of the UltraScale architecture and it supports a wide variety of applications, as exemplified below.<br><br>### Features<br><br>The GTY transceivers in the UltraScale architecture are power-efficient transceivers, supporting line rates from 500 Mb/s to 30.5 Gb/s in UltraScale FPGAs and 32.75 Gb/s in UltraScale+ FPGAs. The GTY transceiver is highly configurable and tightly integrated with the programmable logic resources of the UltraScale architecture. Table 1-1 summarizes the features by functional group that support a wide variety of applications. |

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 12, Exhibit A[1]

As an example, the GTY and GTH transceivers in the Xilinx's UltraScale and UltraScale+ architectures include support for optical networking, as illustrated below.

The GTY transceiver supports these use modes:

- PCI Express, Revision 1.1/2.0/3.0

- SFF-8431 (SFP+)

- 10GBASE-R/KR

- Interlaken

- 10 Gb attachment unit interface (XAUI), reduced pin extended attachment unit interface (RXAUI), 100 Gb attachment unit interface (CAUI), 40 Gb attachment unit interface (XLAUI)

- Common packet radio interface (CPRI™), open base station architecture initiative (OBSAI)

- OC-48/192

- Optical channel transport unit (OTU): OTU-1, OTU-2, OTU-3, OTU-4

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 13, Exhibit A

| Zynq UltraScale+ MPSoCs | | | |
|---|---|---|---|
| Type | PS-GTR | GTH | GTY |
| Qty | 4 | 0–44 | 0–28 |
| Max. Data Rate | 6.0Gb/s | 16.3Gb/s | 32.75Gb/s |
| Min. Data Rate | 1.25Gb/s | 0.5Gb/s | 0.5Gb/s |
| Applications | • PCIe Gen2<br>• USB<br>• Ethernet | • Backplane<br>• HMC | • 100G+ Optics<br>• Chip-to-Chip<br>• 25G+ Backplane<br>• HMC |

---

[1] WSOU-XILINX_001052-WSOU-XILINX_001498

Source: https://www.xilinx.com/support/documentation/data_sheets/ds891-zynq-ultrascale-plus-overview.pdf , Page 29, Exhibit B[2]

The GTH transceiver supports these use modes:

- PCI Express, Revision 1.1/2.0/3.0
- SFF-8431 (SFP+)
- 10GBASE-R/KR
- Interlaken
- 10 Gb attachment unit interface (XAUI), reduced pin extended attachment unit interface (RXAUI), 100 Gb attachment unit interface (CAUI), 40 Gb attachment unit interface (XLAUI)
- Common packet radio interface (CPRI™), open base station architecture initiative (OBSAI)
- OC-48/192
- Optical channel transport unit (OTU): OTU-1, OTU-2, OTU-3, OTU-4

Source: https://www.xilinx.com/support/documentation/user_guides/ug576-ultrascale-gth-transceivers.pdf, Page 17, Exhibit C[3]

 XILINX®                          Zynq UltraScale+ MPSoC Data Sheet: DC and AC Switching Characteristics

*Table 107:* **GTH Transceiver Protocol List** *(cont'd)*

| Protocol | Specification | Serial Rate (Gb/s) | Electrical Compliance |
|---|---|---|---|
| UHD-SDI[2] | SMPTE ST-2081 6G, SMPTE ST-2082 12G | 6 and 12 | Compliant |
| Hybrid memory cube (HMC) | HMC-15G-SR | 10, 12.5, and 15.0 | Compliant |
| MoSys Bandwidth Engine | CEI-11-SR and CEI-11-SR (overclocked) | 10.3125, 15.5 | Compliant |
| CPRI | CPRI_v_6_1_2014-07-01 | 0.6144–12.165 | Compliant |
| HDMI[2] | HDMI 2.0 | All | Compliant |
| Passive optical network (PON) | 10G-EPON, 1G-EPON, NG-PON2, XG-PON, and 2.5G-PON | 0.155–10.3125 | Compliant |

---

[2] WSOU-XILINX_001499-WSOU-XILINX_001540
[3] WSOU-XILINX_001541-WSOU-XILINX_002058

|  | Source: https://www.xilinx.com/support/documentation/data_sheets/ds925-zynq-ultrascale-plus.pdf, Page 88, Exhibit D[4]<br><br>As an example, the UltraScale GTY and GTH transceivers comprise an RX eye scan feature which provides a mechanism to measure and visualize the receiver eye margin, as shown below.<br><br>The GTY transceivers RX eye scan provides a mechanism to measure and visualize the receiver eye margin after the equalizer. Additional use modes enable several other methods to determine and diagnose the effects of equalization settings.<br><br>Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 224, Exhibit A<br><br>The GTH transceivers RX eye scan provides a mechanism to measure and visualize the receiver eye margin after the equalizer. Additional use modes enable several other methods to determine and diagnose the effects of equalization settings.<br><br>Source: https://www.xilinx.com/support/documentation/user_guides/ug576-ultrascale-gth-transceivers.pdf, Page 17, Exhibit C<br><br>The binary input signal (or binary bit stream) received from the transmission lines (or transmission link) is sampled with a large sample count in order to find the error count over a the large number of samples and obtain the BER (Bit Error Rate). When sampling is repeated number of times with varying sampling positions (with the help of horizontal and vertical offsets), it produces a statistical eye diagram, as exemplified below. |

---

[4] WSOU-XILINX_002059-WSOU-XILINX_002167

A single eye scan measurement consists of accumulating the number of data samples (sample count) and the number of times that the offset sample disagreed with the data sample (error count). The bit error ratio (BER) at the programmed vertical and horizontal offset is the ratio of the error count to the sample count. The sample count can range from tens of thousands to greater than $10^{14}$.

Repeating such BER measurements for the full array of horizontal and vertical offsets (or a subsampled set of offsets) produces a BER map as shown in Figure 4-17, commonly referred to as a *statistical eye*, where the color map represents $\log_{10}$(BER). In this view, the eye is apparently smaller than a traditional oscilloscope view (as in Figure 4-17) because it has been closed by very low probability jitter and noise that does not show up in the much lower number of samples of an oscilloscope.

Because this functionality puts no restrictions on the data patterns being received nor requires any changes in the RX settings, it can be performed while application data is being received without error. Furthermore, no interconnect logic is required—only the ability to read and write attributes.

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 225, Exhibit A

The four endpoints (or four corners) of the eye diagram constitute edges of the eye. Two opposite corners that constitute the span of the eye (vertical span or horizontal span) are called the edges of the eye.  Thus, the eye diagram has two horizontal edges and two vertical edges. Below shows an example of a statistical eye diagram (on the right side) and shows the position of sampling points (on the left side). The data is usually sampled at the center of the eye (or at center of 1 bit waveform, a high or a low) and is named as "data sample" while the vertical and horizontal offsets offset the sampling point by the amount to provide an "offset sample" for the same 1 bit waveform.



*Figure 4-17:*   **Offset Sample and Data Sample to Calculate BER as a
Function of Offset—the Statistical Eye**

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page
224, Exhibit A

In addition to direct infringement of this claim by Xilinx (including its employees), Xilinx also has indirectly
infringed and continues to indirectly infringe by actively inducing others to directly infringe this claim by using the
accused instrumentalities to perform all the elements of this claim. For instance, Xilinx has actively induced
infringement by encouraging the use of the accused instrumentalities in ways that infringe this claim. Xilinx knew
or should have known that such encouragement would induce infringement. Such induced infringement has
occurred at least since Xilinx became aware of the Asserted Patent.  Xilinx has had knowledge of the Asserted
Patent at least since the date when the complaint was filed. Xilinx has taken active steps with the specific intent to
encourage and cause others to use each accused instrumentality in ways that infringe this claim. Such active steps by
Xilinx with specific intent to induce infringement have included, among other things, advertising, promoting,
marketing, making available for use, offering to sell, and/or selling the accused instrumentalities to others;
encouraging and influencing other companies to import, offer to sell, and/or sell the accused instrumentalities; and
directing and instructing others to use the accused instrumentalities in infringing ways. Xilinx has performed the
aforementioned active steps with the knowledge of the Asserted Patent at least since the date when the complaint
was filed in this case.

Further, Xilinx has indirectly infringed and continues to indirectly infringe this claim by contributing to infringement of this claim. For instance, components of the accused instrumentalities are known by Xilinx to be especially made or especially adapted for use to infringe this claim, and each is not a staple article or commodity of commerce suitable for substantial non-infringing uses. Xilinx contributes to the infringement of this claim by making available for use, offering for sale, selling, and/or importing the components of the instrumentalities, to third parties, who, for example, use such components to practice this claim.  Moreover, Xilinx has had notice of the Asserted Patent at least as of the filing date of the complaint in this case.

The following exemplary schematic and source code evidence further illustrates how this claim is met by the accused instrumentalities:



The following additional schematic evidence further illustrates how this claim is met by the accused instrumentalities:



| | |
|---|---|
| ███████████████████████ | |
| 7a. wherein a decision circuit is directly connected to an integrator, | The accused instrumentalities comprise a decision circuit directly connected to an integrator.  *See, e.g.,* XILINX_WSOU-0001667-XILINX_WSOU-0001758 at 1672-1674, 1698-1708, 1710-1712, 1719-1726; XILINX_WSOU-0009168-XILINX_WSOU-0009212; XILINX_WSOU-0009213-XILINX_WSOU-0009216; XILINX_WSOU-0010634-XILINX_WSOU-0010662 at 10643-10647; XILINX_WSOU-0017308-XILINX_WSOU-0017331 at 17308-17313, 17320, 17323-17330; XILINX_WSOU-0018200-XILINX_WSOU-0018216; XILINX_WSOU-0018217-XILINX_WSOU-0018238; XILINX_WSOU-0018239-XILINX_WSOU-0018312 at 18281-18300; XILINX_WSOU-0018341-XILINX_WSOU-0018353; XILINX_WSOU-0018354-XILINX_WSOU-0018376; XILINX_WSOU-0018377-XILINX_WSOU-0018400; XILINX_WSOU-0018401-XILINX_WSOU-0018420; XILINX_WSOU-0018748-XILINX_WSOU-0018992; XILINX_WSOU-0019023-XILINX_WSOU-0019030; XILINX_WSOU-0020032-XILINX_WSOU-0020040; XILINX_WSOU-0023124-XILINX_WSOU-0023140; XILINX_WSOU-0023141-XILINX_WSOU-0023156; XILINX_WSOU-0024281-XILINX_WSOU-0024312.  For instance, the decision making circuit in the accused instrumentalities is shown as part of the Physical Medium Attachment (PMA) Architecture. The Rx Input (or input digital signal) to the PMA architecture is equalized and fed to the 'Error-detection, screening and de-serialization' block (or decision circuit). The 'Error-detection, screening and de-serialization' (or decision circuit) block also gets inputs from HORZ_OFFSET (Horizontal Offset) and VERT_OFFSET (Vertical Offset) that act like a variable threshold (or Uvar) in this realization of the circuit, as exemplified below.  Alternatively, Output (Rdata and Sdata) of the 'Error-detection, screening and de-serialization' block is fed to the PCS (Physical Coding Sublayer) interface that contains the block, which is the integrator, literally or under the doctrine of equivalents. |

11



*Figure 4-18:*   **PMA Architecture to Support Eye Scan**

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 226, Exhibit A

The PCS architecture is fed with the Rdata and Sdata signals that are the signals from the decision making blocks as shown literally or under the doctrine of equivalents. The Rdata and Sdata signals are connected to the 'Error counter' block (or integrator) of the PCS (Physical Coding Sublayer) Architecture.



*Figure 4-19:*   **PCS Architecture to Support Eye Scan**

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 227, Exhibit A

The Sdata bus bits show error (if found) after comparison of other data sample and offset sample, by making the bit of Sdata bus high.

Figure 4-19 describes the portion of the PCS architecture that supports eye scan. The 80-bit Rdata bus contains the data samples, and each bit of the 80-bit Sdata bus is one if and only if the corresponding data sample and offset sample are not equal. (See ES_ERRDET_EN in Table 4-20, page 233.)

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 227, Exhibit A

The ES_ERRDET_EN signal decides if the EXOR kind of operation is performed before the *Sdata* bus signal is fed to the Error Counter block.  This ES_ERRDET_EN signal gives the option to choose or discard usage of EXOR kind of operation (use of EXOR operation is found in the prior art) before the signals are fed to the error counter (or integrator).

| ES_ERRDET_EN | Boolean | 1: Each bit of the Sdata bus is 1 if and only if the corresponding offset data sample does not agree with the recovered data sample. This is used for the statistical eye view.<br><br>0: Each bit of the Sdata bus is the recovered data sample. Therefore, if no errors occurred, the Sdata bus would be identical to the Rdata bus. This is used for the waveform view. |
|---|---|---|

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 234, Exhibit A

The following exemplary schematic and source code evidence further illustrates how this claim element is met by the accused instrumentalities:



The following additional schematic evidence further illustrates how this claim element is met by the accused instrumentalities:



| | |
|---|---|
| 7b. and comprising the steps of providing the input signal and a variable threshold to the decision circuit and | The accused instrumentalities enable the practice of the steps of providing the input signal and a variable threshold to the decision circuit.  *See, e.g.,* XILINX  WSOU-0001667-XILINX  WSOU-0001758 at 1672-1674, 1698-1708, 1710-1712, 1719-1726; XILINX  WSOU-0009168-XILINX  WSOU-0009212; XILINX  WSOU-0009213-XILINX  WSOU-0009216; XILINX  WSOU-0010634-XILINX  WSOU-0010662 at 10643-10647; XILINX  WSOU-0017308-XILINX  WSOU-0017331 at 17308-17313, 17320, 17323-17330; XILINX  WSOU-0018200-XILINX  WSOU-0018216; XILINX  WSOU-0018217-XILINX  WSOU-0018238; XILINX  WSOU-0018239-XILINX  WSOU-0018312 at 18281-18300; XILINX_WSOU-0018341-XILINX_WSOU-0018353; XILINX_WSOU-0018354-XILINX_WSOU-0018376; XILINX_WSOU-0018377-XILINX_WSOU-0018400; XILINX_WSOU-0018401-XILINX_WSOU-0018420; XILINX_WSOU-0018748-XILINX_WSOU-0018992; XILINX  WSOU-0019023-XILINX  WSOU-0019030; XILINX  WSOU-0020032-XILINX  WSOU-0020040; XILINX  WSOU-0023124-XILINX  WSOU-0023140; XILINX_WSOU-0023141-XILINX_WSOU-0023156; XILINX_WSOU-0024281-XILINX_WSOU-0024312.<br><br>For eample, the following shows that the Rx input (or input signal) and the HORZ_OFFSET (Horizontal Offset) and VERT_OFFSET (Vertical Offset) signals (or variable threshold signals) being eventually fed to the 'Error-detection, screening and de-serialization' block (or the decision circuit). |



*Figure 4-18:* **PMA Architecture to Support Eye Scan**

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 226, Exhibit A

The HORZ_OFFSET signal and VERT_OFFSET signal advances or delays the sampling time of the offset samples thus creating a variable threshold condition for comparing the data samples. The incoming data signal is compared against this variable threshold to generate the decision making signal.

The blocks with shaded gray in Figure 4-18 describe the portion of the PMA architecture that supports eye scan. The horizontal offset (HORZ_OFFSET) advances or delays the sampling time of the offset samples relative to the data samples. The vertical offset (VERT_OFFSET) raises or lowers the differential voltage threshold to which the equalized waveform is compared. The data samples are deserialized into the Rdata bus, and the offset samples are deserialized into the Sdata bus.

When in DFE mode (RXLPMEN=0), due to the *unrolled* first DFE tap, two separate eye scan measurements are needed, one at +UT and one at –UT, to measure the TOTAL BER at a given vertical and horizontal offset.

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 226, Exhibit A

The following exemplary source code evidence further illustrates how this claim element is met by the accused instrumentalities:



The following additional schematic evidence further illustrates how this claim element is met by the accused instrumentalities:



| | |
|---|---|
| 7c. using an output signal of the integrator to recognize the edges of the eye diagram. | The accused instrumentalities enable using an output signal of the integrator to recognize the edges of the eye diagram. *See, e.g.,* XILINX_WSOU-0001667-XILINX_WSOU-0001758 at 1672-1674, 1698-1708, 1710-1712, 1719-1726; XILINX_WSOU-0009168-XILINX_WSOU-0009212; XILINX_WSOU-0009213-XILINX_WSOU-0009216; XILINX_WSOU-0010634-XILINX_WSOU-0010662 at 10643-10647; XILINX_WSOU-0017308-XILINX_WSOU-0017331 at 17308-17313, 17320, 17323-17330; XILINX_WSOU-0018200-XILINX_WSOU-0018216; XILINX_WSOU-0018217-XILINX_WSOU-0018238; XILINX_WSOU-0018239-XILINX_WSOU-0018312 at 18281-18300; XILINX_WSOU-0018341-XILINX_WSOU-0018353; XILINX_WSOU-0018354-XILINX_WSOU-0018376; XILINX_WSOU-0018377-XILINX_WSOU-0018400; XILINX_WSOU-0018401-XILINX_WSOU-0018420; XILINX_WSOU-0018748-XILINX_WSOU-0018992; XILINX_WSOU-0019023-XILINX_WSOU-0019030; XILINX_WSOU-0020032-XILINX_WSOU-0020040; XILINX_WSOU-0023124-XILINX_WSOU-0023140; XILINX_WSOU-0023141-XILINX_WSOU-0023156; XILINX_WSOU-0024281-XILINX_WSOU-0024312. <br><br> Output signal (es_error_count) of the Error Detector block (or the integrator) that is sent to the DRP (Dynamic Reconfiguration Port) interface, provides information about the edges of the Eye diagram. |



*Figure 4-19:* **PCS Architecture to Support Eye Scan**

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 227, Exhibit A

Detection of edge of the eye diagram of the received signal, results from the error signal that is generated out of the 'Error-detection, screening and de-serialization block'.  PCS architecture (that generates the output signal es_error_count) is fed with the Rdata and Sdata signals that are generated from the 'Error-detection, screening and de-serialization' block (these signals are the signals from the decision making blocks as shown, literrally or under the doctrine of equivalents).  The Rdata and Sdata signals are connected to the 'Error counter' block (or integrator) of the PCS (Physical Coding Sublayer) Architecture.  When the variable threshold is at the edge of the eye diagram,

an error signal is generated. Similarly, when the offset sample is obtained at the edge of the eye diagram and compared to the data sample sampled at the center of the eye diagram, an error signal is generated.

This error (if found) is shown on the Sdata bus by making a bit of Sdata bus high, after comparison of the data sample and offset sample. The ES_ERRDET_EN signal controls if the EXOR kind of operation is performed before the Sdata bus signal is fed to the Error Counter block.  This ES_ERRDET_EN signal gives the option to choose or discard usage of EXOR kind of operation (found in the prior art) before the Sdata bus signal is fed to the error counter.

Figure 4-19 describes the portion of the PCS architecture that supports eye scan. The 80-bit Rdata bus contains the data samples, and each bit of the 80-bit Sdata bus is one if and only if the corresponding data sample and offset sample are not equal. (See ES_ERRDET_EN in Table 4-20, page 233.)

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 227, Exhibit A

| ES_ERRDET_EN | Boolean | 1: Each bit of the Sdata bus is 1 if and only if the corresponding offset data sample does not agree with the recovered data sample. This is used for the statistical eye view. |
| | | 0: Each bit of the Sdata bus is the recovered data sample. Therefore, if no errors occurred, the Sdata bus would be identical to the Rdata bus. This is used for the waveform view. |

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 234, Exhibit A

As the error counter accumulates an error count over time [shown below], the counter is an integrator, literraly or under the doctrine of equivalents.

The error counter accumulates an error count over time. Counting the total number of bit errors for a statistical eye view requires setting ES_SDATA_MASK[159:80] = {80{1'b1}}. For this usage, the error counter counts the total number of bit errors (1-bits) in Sdata[79:0]. High ES_SDATA_MASK bits can omit selected bits of Sdata from being checked. Commonly, a statistical eye view uses ES_SDATA_MASK[159:0] = {80{1'b1}, 80{1'b0}} for 80-bit data (see Table 4-20). Error bits in Sdata[159:80] are not counted because Sdata[159:80] contains the previous value of Sdata[79:0] that was counted in the previous cycle. The number of bit errors counted in a given cycle is the number of values of k in the range 0 to 79 for which the condition Sdata_FIFO[k] AND NOT ES_SDATA_MASK[k] is satisfied.

Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 228, Exhibit A

The following exemplary source code evidence further illustrates how this claim element is met by the accused instrumentalities:

The following additional schematic evidence further illustrates how this claim element is met by the accused instrumentalities:





| 1Pre. Eye monitor for evaluating a binary input signal of a transmission link and for recognizing the edges of an eye diagram of the input signal, comprising | To the extent the preamble is limiting, the accused instrumentalities include an eye monitor for evaluating a binary input signal of a transmission link and for recognizing the edges of an eye diagram of the input signal.  (*See, e.g.,* the corresponding analysis for 7Pre. for infringement analysis for this preamble.)<br><br>By way of an example, the UltraScale GTY Transceivers comprise an RX eye scan (i.e., eye monitor) which provides a mechanism to measure and visualize the receiver eye margin, as exemplified below.<br><br>The GTY transceivers RX eye scan provides a mechanism to measure and visualize the receiver eye margin after the equalizer. Additional use modes enable several other methods to determine and diagnose the effects of equalization settings.<br><br>Source: https://www.xilinx.com/support/documentation/user_guides/ug578-ultrascale-gty-transceivers.pdf, Page 224, Exhibit A |

███████████████████

| | |
|---|---|
| | In addition to direct infringement of this claim by Xilinx (including its employees), Xilinx also has indirectly infringed and continues to indirectly infringe by actively inducing others to directly infringe this claim by using the accused instrumentalities. For instance, Xilinx has actively induced infringement by encouraging the use of the accused instrumentalities in ways that infringe this claim. Xilinx knew or should have known that such encouragement would induce infringement. Such induced infringement has occurred at least since Xilinx became aware of the Asserted Patent.  Xilinx has had knowledge of the Asserted Patent at least since the date when the complaint was filed. Xilinx has taken active steps with the specific intent to encourage and cause others to use each accused instrumentality in ways that infringe this claim. Such active steps by Xilinx with specific intent to induce infringement have included, among other things, advertising, promoting, marketing, making available for use, offering to sell, and/or selling the accused instrumentalities to others; encouraging and influencing other companies to import, offer to sell, and/or sell the accused instrumentalities; and directing and instructing others to use the accused instrumentalities in infringing ways. Xilinx has performed the aforementioned active steps with the knowledge of the Asserted Patent at least since the date when the complaint was filed in this case.<br><br>Further, Xilinx has indirectly infringed and continues to indirectly infringe this claim by contributing to infringement of this claim. For instance, components of the accused instrumentalities are known by Xilinx to be especially made or especially adapted for use to infringe this claim, and each is not a staple article or commodity of commerce suitable for substantial non-infringing uses. Xilinx contributes to the infringement of this claim by making available for use, offering for sale, selling, and/or importing the components of the instrumentalities, to third parties, who, for example, use such components to practice this claim.  Moreover, Xilinx has had notice of the Asserted Patent at least as of the filing date of the complaint in this case. |
| 1a. a decision circuit which is directly connected to an integrator, | The accused instrumentalities comprise a decision circuit which is directly connected to an integrator. (*See, e.g.,* the corresponding analysis for 7a. for infringement analysis for this element.) |
| 1b. wherein the input signal and a variable threshold are provided to the decision circuit | The accused instrumentalities comprise an eye monitor for evaluating a binary input signal of a transmission link and for recognizing the edges of an eye diagram of the input signal, comprising a decision circuit which is directly connected to an integrator, wherein the input signal and a variable threshold are provided to the decision circuit. (*See, e.g.,* the corresponding analysis for 7b. for infringement analysis for this claim element.) |
| 1c. and wherein an output signal of the integrator is | The accused instrumentalities comprise an eye monitor for evaluating a binary input Signal of a transmission link and for recognizing the edges of an eye diagram of the input signal, comprising a decision circuit which is directly |

| used to recognize the edges of the eye diagram. | connected to an integrator, wherein the input signal and a variable threshold are provided to the decision circuit and wherein an output Signal of the integra tor is used to recognize the edges of the eye diagram.  (*See, e.g.,* the corresponding analysis for 7c. for infringement analysis for this claim element.) |

# EXHIBIT D

███████████████████████████

**Exhibit 5**

**Initial Claim Chart**
**U.S. Patent No. 9,312,838 (the "Asserted Patent")**
**Claim 1 (the "Asserted Claim")**

The accused instrumentalities include, without limitation, Field Programmable Gate Arrays ("FPGA") devices/products and System on Chip ("SoC") devices/products, including but not limited to:  Virtex UltraScale devices/products, including but not limited to Virtex UltraScale devices, Virtex UltraScale FPGA VCU108 Evaluation Kit, and Virtex UltraScale FPGA VCU110 Development Kit; Kintex UltraScale devices/products, including but not limited to Kintex UltraScale devices, Kintex UltraScale FPGA KCU105 Evaluation Kit, and Kintex UltraScale FPGA KCU1250 Characterization Kit; Virtex UltraScale+ devices/products, including but not limited to Virtex UltraScale+ devices, Virtex UltraScale+ FPGA VCU118 Evaluation Kit; Kintex UltraScale+ devices/products, including but not limited to Kintex UltraScale+ devices, Kintex UltraScale+ FPGA KCU116 Evaluation Kit; Artix UltraScale+ devices/products, including Artix UltraScale+ devices; Zynq UltraScale+ devices/products, including but not limited to Zynq UltraScale+ devices, Zynq UltraScale+ MPSoC ZCU102 Evaluation Kit, Zynq UltraScale+ MPSoC ZCU104 Evaluation Kit, Zynq UltraScale+ MPSoC ZCU106 Evaluation Kit, Zynq UltraScale+ RFSoC ZCU216 Evaluation Kit, Zynq UltraScale+ RFSoC ZCU208 Evaluation Kit, Zynq UltraScale+ RFSoC ZCU1285 Characterization Kit, Zynq UltraScale+ RFSoC ZCU111 Evaluation Kit, Zynq UltraScale+ RFSoC ZCU1275 Characterization Kit, Zynq UltraScale+ RFSoC ZCU1275 Characterization Kit, and Zynq UltraScale+ RFSoC Development Kit with Qorvo RF Front End; and any other Xilinx device, product and instrumentality that operates using the similar components and/or functionality.

WSOU Investments, LLC ("WSOU" or "Plaintiff") contends that Xilinx, Inc. ("Xilinx" or "Defendant"), including Xilinx's employees, directly infringes each of the Asserted Claim, either literally or under the doctrine of equivalents. WSOU also contends that Xilinx has indirectly infringed and continues to indirectly infringe by contributing to and actively inducing infringement of one or more of the Asserted Claim.

The following infringement analysis for certain accused instrumentalities is exemplary and applicable to other accused instrumentalities.  Further, WSOU does not intend the following exemplary claim chart to be limiting, and WSOU reserves its rights to pursue other accused instrumentalities, patent claims, evidence, and infringement arguments in this case.

| Claim | Exemplary Infringement Analysis with Exemplary Infringement Evidence |
|---|---|
| 1Pre.<br><br>An apparatus, comprising:<br><br><br>1a.<br>first and second clocks operable to generate first and second input clock signals, respectively, wherein the first and second input clock signals are asynchronous in relation to one another; | To the extent the preamble is limiting, the accused instrumentalities include an apparatus comprising first and second clocks operable to generate first and second input clock signals, respectively, wherein the first and second input clock signals are asynchronous in relation to one another. *See, e.g.,* XILINX_WSOU-0002327-XILINX_WSOU-0002355 at 2327 & 2340; XILINX_WSOU-0002327-XILINX_WSOU-0002355 at 2327 & 2340; XILINX_WSOU-0033733-XILINX_WSOU-0033767; XILINX_WSOU-0004536-XILINX_WSOU-0004628 at 4571, 4579, 4580 & 4611;  XILINX_WSOU-0006514-XILINX_WSOU-0006584 at 6520-6526 & 6540-6547; XILINX_WSOU-0006806-XILINX_WSOU-0006815; XILINX_WSOU-0009217-XILINX_WSOU-0009279 at 9226-9229; XILINX_WSOU-0010663-XILINX_WSOU-0010682 at 10667; XILINX_WSOU-0009004-XILINX_WSOU-0009055 at 9018; XILINX_WSOU-0009934-XILINX_WSOU-0010040 at 9946; XILINX_WSOU-0017332-XILINX_WSOU-0017432; XILINX_WSOU-0017433-XILINX_WSOU-0017487 at 17438-17446 & 17452-17453; XILINX_WSOU-0017488-XILINX_WSOU-0017565 at 17496-17502 & 17508-17527; XILINX_WSOU-0017566-XILINX_WSOU-0017668; XILINX_WSOU-0018142-XILINX_WSOU-0018199 at 18190-18192; XILINX_WSOU-0018239-XILINX_WSOU-0018312 at 18273-18279; XILINX_WSOU-0021368-XILINX_WSOU-0021435; XILINX_WSOU-0023436-XILINX_WSOU-0023461; XILINX_WSOU-0030714-XILINX_WSOU-0030827; XILINX_WSOU-0030714-XILINX_WSOU-0030827-XILINX_WSOU-0030893; XILINX_WSOU-0031434-XILINX_WSOU-0031463; XILINX_WSOU-0031816-XILINX_WSOU-0031821; XILINX_WSOU-0034248-XILINX_WSOU-0034285.<br><br>For instance, the Xilinx UltraScale Architecture governs the design and function of the Xilinx Kintex, Virtex, and Zynq devices, as exemplified below.<br><br>Further, the Xilinx UltraScale Architecture clock resources manage complex and simple clocking requirements.  The clock management tiles (CMT) are used to provide clock frequency synthesis, deskew, and jitter filtering functionality. In the Xilinx UltraScale architecture-based devices, the CMT comprises a mixed-mode clock manager (MMCM) and two phase-locked loops (PLLs). The MMCMs function as frequency synthesizers, and jitter filters for either internal/external clocks and deskew clocks, as exemplified below. |

# Family Comparisons

*Table 1:* **Device Resources**

| | Artix UltraScale+ FPGA | Kintex UltraScale FPGA | Kintex UltraScale+ FPGA | Virtex UltraScale FPGA | Virtex UltraScale+ FPGA | Zynq UltraScale+ MPSoC | Zynq UltraScale+ RFSoC |
|---|---|---|---|---|---|---|---|
| MPSoC Processing System | | | | | | ✓ | ✓ |
| RF-ADC/DAC | | | | | | | ✓ |
| SD-FEC | | | | | | | ✓ |
| System Logic Cells (K) | 96–308 | 318–1,451 | 356–1,843 | 783–5,541 | 862–8,938 | 81–1,143 | 489–930 |
| Block Memory (Mb) | 3.5–10.5 | 12.7–75.9 | 12.7–60.8 | 44.3–132.9 | 23.6–94.5 | 3.8–34.6 | 22.8–38.0 |
| UltraRAM (Mb) | | | 0–81 | | 90–360 | 0–36 | 13.5–45.0 |
| HBM DRAM (GB) | | | | | 0–16 | | |
| DSP (Slices) | 400–1,200 | 768–5,520 | 1,368–3,528 | 600–2,880 | 1,320–12,288 | 216–3,528 | 1,872–4,272 |
| DSP Performance (GMAC/s) | 1,860 | 8,180 | 6,287 | 4,268 | 21,897 | 6,287 | 7,613 |
| Transceivers | 8–12 | 12–64 | 16–76 | 36–120 | 32–128 | 0–72 | 8–16 |
| Max. Transceiver Speed (Gb/s) | 16.3 | 16.3 | 32.75 | 30.5 | 58.0 | 32.75 | 32.75 |
| Max. Serial BW (bidir) (Gb/s) | 393 | 2,086 | 3,268 | 5,616 | 8,384 | 3,268 | 1,048 |
| Memory Interface Perf (Mb/s) | 2,400 | 2,400 | 2,666 | 2,400 | 2,666 | 2,666 | 2,666 |
| I/O Pins | 128–304 | 312–832 | 280–668 | 338–1,456 | 208–2,072 | 82–668 | 152–408 |

Source: https://www.xilinx.com/support/documentation/data_sheets/ds890-ultrascale-overview.pdf, Page 1, Exhibit B[1]

---

[1] WSOU-XILINX_003895-WSOU-XILINX_003944

# Clock Management Tile

## Overview

In UltraScale™ architecture-based devices, the clock management tile (CMT) includes a mixed-mode clock manager (MMCM) and two phase-locked loops (PLLs). The main purpose of the PLL is to generate clocking for the I/Os. But it also contains a limited subset of the MMCM functions that can be used for general clocking purposes.

The clock input connectivity allows multiple resources to provide the reference clock(s) to the MMCM. The number of output counters (dividers) is eight, with some of them capable of driving out an inverted clock signal (180° phase shift). MMCMs have infinite fine phase shift capability in either direction and can be used in dynamic phase shift mode. The resolution of the fine phase shift depends on the voltage-controlled oscillator (VCO) frequency. Fractional divide functionality in increments of 1/8th (0.125) for CLKFBOUT and CLKOUT0 are available to support greater clock frequency synthesis capability. UltraScale architecture-based devices have a spread spectrum (SS) capability. If the MMCM spread-spectrum feature is not used, a spread spectrum on an external input clock will not be filtered and thus passed on to the output clock.

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 35, Exhibit A[2]

For example, the MMCM architecture comprises two input multiplexers that select a first input clock (input or reference clock; CLKIN1 or CLKIN2) signal and a second input clock (feedback clock; CLKFB or CLKFBOUT) signal. The MMCM block diagram shown below also comprises a PLL (blocks PFD to VCO). The phase-frequency detector (PFD) in the PLL is equipped to compare two asynchronous signals (i.e two signals with variable phase and frequency difference). Hence, both of the input clock signals are asynchronous relative to each other, as shown below.

---

[2] WSOU-XILINX_003793-WSOU-XILINX_003894

## MMCMs

UltraScale architecture-based devices contain one CMT per I/O bank. The MMCMs serve as frequency synthesizers for a wide range of frequencies, and as jitter filters for either external or internal clocks, and deskew clocks.

Input multiplexers select the reference and feedback clocks from either the global clock I/Os or the clock routing or distribution resources. Each clock input has a programmable counter divider (D). The phase-frequency detector (PFD) compares both phase and frequency of the rising edges of both the input (reference) clock and the feedback clock. If a minimum High/Low pulse is maintained, the duty cycle is ancillary. The PFD is used to generate a signal proportional to the phase and frequency between the two clocks. This signal drives the charge pump (CP) and loop filter (LF) to generate a reference voltage to the VCO. The PFD produces an up or down signal to the charge pump and loop filter to determine whether the VCO should operate at a higher or lower frequency. When VCO operates at a frequency that is too high, the PFD activates a down signal causing the control

**UltraScale Architecture Clocking Resources**
UG572 (v1.10.1) August 25, 2021          www.xilinx.com

Send Feedback      **35**

 **XILINX**®                          *Chapter 3:* **Clock Management Tile**

voltage to be reduced, thus decreasing the VCO operating frequency. When the VCO operates at a frequency that is too low, an up signal increases voltage. The VCO produces eight output phases and one variable phase for fine-phase shifting. Each output phase can be selected as the reference clock to the output counters (Figure 3-1). Each counter can be independently programmed for a given customer design. A special counter M is also provided. This counter controls the feedback clock of the MMCM, allowing a wide range of frequency synthesis.

In addition to integer divide output counters, MMCMs add a fractional counter for CLKOUT0 and CLKFBOUT.

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Pages 35-36, Exhibit A



*Figure 3-1:*   **Detailed MMCM Block Diagram**

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 36, Exhibit A

In addition to direct infringement of this claim by Xilinx (including its employees), Xilinx also has indirectly infringed and continues to indirectly infringe by actively inducing others to directly infringe this claim by using the accused instrumentalities. For instance, Xilinx has actively induced infringement by encouraging the use of the accused instrumentalities in ways that infringe this claim. Xilinx knew or should have known that such encouragement would induce infringement. Such induced infringement has occurred at least since Xilinx became aware of the Asserted Patent.  Xilinx has had knowledge of the Asserted Patent at least since the date when the complaint was filed. Xilinx has taken active steps with the specific intent to encourage and cause others to use each accused instrumentality in ways that infringe this claim. Such active steps by Xilinx with specific intent to induce infringement have included, among other things, advertising, promoting, marketing, making available for use, offering to sell, and/or selling the accused instrumentalities to others; encouraging and influencing other companies to import, offer to sell, and/or sell the accused instrumentalities; and directing and instructing others to use the accused instrumentalities in infringing ways.

Xilinx has performed the aforementioned active steps with the knowledge of the Asserted Patent at least since the date when the complaint was filed in this case.

Further, Xilinx has indirectly infringed and continues to indirectly infringe this claim by contributing to infringement of this claim. For instance, components of the accused instrumentalities are known by Xilinx to be especially made or especially adapted for use to infringe this claim, and each is not a staple article or commodity of commerce suitable for substantial non-infringing uses. Xilinx contributes to the infringement of this claim by making available for use, offering for sale, selling, and/or importing the components of the instrumentalities, to third parties, who, for example, use such components to practice this claim.  Moreover, Xilinx has had notice of the Asserted Patent at least as of the filing date of the complaint in this case.

As shown by the following exemplary schematic evidence, the accused instrumentalities have clocks that are operable to generate first and second input clock signals that are asynchronous in relation to one another.  For instance, the asynchronous relation can occur for a change in phase or frequency for the reference frequency, or for a change in the feedback divider value.  For either situation, the inputs to the phase / frequency detector (PFD) become asynchronous at that moment in time.

| 1b.<br>a first edge detector configured to receive the first input clock signal, the first edge detector operable to detect a rising edge of the first input clock signal and to generate a first enable signal; | The accused instrumentalities comprise a first edge detector configured to receive the first input clock signal, the first edge detector operable to detect a rising edge of the first input clock signal and to generate a first enable signal.  *See, e.g.,* XILINX_WSOU-0002327-XILINX_WSOU-0002355 at 2327 & 2340; XILINX_WSOU-0002327-XILINX_WSOU-0002355 at 2327 & 2340; XILINX_WSOU-0033733-XILINX_WSOU-0033767; XILINX_WSOU-0004536-XILINX_WSOU-0004628 at 4571, 4579, 4580 & 4611; XILINX_WSOU-0006514-XILINX_WSOU-0006584 at 6540-6547; XILINX_WSOU-0006806-XILINX_WSOU-0006815; XILINX_WSOU-0009217-XILINX_WSOU-0009279 at 9226-9229; XILINX_WSOU-0010663-XILINX_WSOU-0010682 at 10667; XILINX_WSOU-0009004-XILINX_WSOU-0009055 at 9018; XILINX_WSOU-0009934-XILINX_WSOU-0010040 at 9946; XILINX_WSOU-0017332-XILINX_WSOU-0017432; XILINX_WSOU-0017433-XILINX_WSOU-0017487 at 17438-17446 & 17452-17453; XILINX_WSOU-0017488-XILINX_WSOU-0017565 at 17496-17502 & 17508-17527; XILINX_WSOU-0017566-XILINX_WSOU-0017668; XILINX_WSOU-0018142-XILINX_WSOU-0018199 at 18190-18192; XILINX_WSOU-0018239-XILINX_WSOU-0018312 at 18273-18279; XILINX_WSOU-0021368-XILINX_WSOU-0021435; XILINX_WSOU-0023436-XILINX_WSOU-0023461.<br><br>As examples, the MMCM comprises of two input MUXes (Multiplexers) that serve as edge detectors (asynchronous MUX), as exemplified below.  Each edge detector receives an input clock signal (select line 'S') and detects a rising edge of that input clock signal to generate enable signals (Clock output of the asynchronous MUX).<br><br>For instance, each MUX has two input lines and a select line. The asynchronous MUX timing diagram below shows that, before the 'S' line transitioned from low to high, $I_0$ was selected to be the output signal 'O'. When the S line transitioned from low to high (i.e., rising edge of the clock was detected), $I_1$ was selected to be the output signal 'O', and thus a first clock signal was enabled. |



*Figure 3-1:* **Detailed MMCM Block Diagram**

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 36, Exhibit A



*Figure 2-9:* **BUFGMUX as BUFGCTRL**

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 21, Exhibit A



Figure 2-15 shows the asynchronous MUX timing diagram.

*Figure 2-15:*   **Asynchronous MUX Timing Diagram**

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 26, Exhibit A

The following exemplary schematic evidence further illustrates how this claim element is met by the accused instrumentalities:

| | |
|---|---|
| 1c.<br><br>a second edge detector configured to receive the second input clock signal, the second edge detector operable to detect the rising edge of the second input clock signal and to generate a second enable signal; | The accused instrumentalities comprise a second edge detector configured to receive the second input clock signal, the second edge detector operable to detect the rising edge of the second input clock signal and to generate a second enable signal.  *See, e.g.,* XILINX_WSOU-0002327-XILINX_WSOU-0002355 at 2327 & 2340; XILINX_WSOU-0002327-XILINX_WSOU-0002355 at 2327 & 2340; XILINX_WSOU-0033733-XILINX_WSOU-0033767; XILINX_WSOU-0004536-XILINX_WSOU-0004628 at 4571, 4579, 4580 & 4611; XILINX_WSOU-0006514-XILINX_WSOU-0006584 at 6540-6547; XILINX_WSOU-0006806-XILINX_WSOU-0006815; XILINX_WSOU-0009217-XILINX_WSOU-0009279 at 9226-9229; XILINX_WSOU-0010663-XILINX_WSOU-0010682 at 10667; XILINX_WSOU-0009004-XILINX_WSOU-0009055 at 9018; XILINX_WSOU-0009934-XILINX_WSOU-0010040 at 9946; XILINX_WSOU-0017332-XILINX_WSOU-0017432; XILINX_WSOU-0017433-XILINX_WSOU-0017487 at 17438-17446 & 17452-17453; XILINX_WSOU-0017488-XILINX_WSOU-0017565 at 17496-17502 & 17508-17527; XILINX_WSOU-0017566-XILINX_WSOU-0017668; XILINX_WSOU-0018142-XILINX_WSOU-0018199 at 18190-18192; XILINX_WSOU-0018239-XILINX_WSOU-0018312 at 18273-18279; XILINX_WSOU-0021368-XILINX_WSOU-0021435; XILINX_WSOU-0023436-XILINX_WSOU-0023461.<br><br>For instance, the MMCM comprises two input MUXes (Multiplexers) that serve as edge detectors (asynchronous MUX), as exemplified below.  Each edge detector receives an input clock signal (select line 'S') and detects a rising edge of that input clock signal to generate enable signals (Clock output of the asynchronous MUX).<br><br>As other examples, each MUX comprises two input lines and a select line. The asynchronous MUX timing diagram below shows that before the S line transitioned from low to high, $I_0$ was selected to be the output signal 'O'. When the S line transitioned from low to high (rising edge of the clock was detected), $I_1$ was selected to be the output signal 'O', and thus a first clock signal was enabled. |



*Figure 3-1:* **Detailed MMCM Block Diagram**

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 36, Exhibit A



Figure 2-9:   **BUFGMUX as BUFGCTRL**

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 21, Exhibit A



Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 26, Exhibit A

The following exemplary schematic evidence further illustrates how this claim element is met by the accused instrumentalities:

| 1d. a first divider configured to receive the first enable signal and operable to generate a first adjusted enable signal based on a first predetermined factor; and | The accused instrumentalities comprise a first divider configured to receive the first enable signal and operable to generate a first adjusted enable signal based on a first predetermined factor. *See, e.g.,* XILINX_WSOU-0002327-XILINX_WSOU-0002355 at 2327 & 2340; XILINX_WSOU-0002327-XILINX_WSOU-0002355 at 2327 & 2340; XILINX_WSOU-0033733-XILINX_WSOU-0033767; XILINX_WSOU-0004536-XILINX_WSOU-0004628 at 4571, 4579, 4580 & 4611; XILINX_WSOU-0006514-XILINX_WSOU-0006584 at 6540-6547; XILINX_WSOU-0006806-XILINX_WSOU-0006815; XILINX_WSOU-0009217-XILINX_WSOU-0009279 at 9226-9229; XILINX_WSOU-0010663-XILINX_WSOU-0010682 at 10667; XILINX_WSOU-0009004-XILINX_WSOU-0009055 at 9018; XILINX_WSOU-0009934-XILINX_WSOU-0010040 at 9946; XILINX_WSOU-0017332-XILINX_WSOU-0017432; XILINX_WSOU-0017433-XILINX_WSOU-0017487 at 17438-17446 & 17452-17453; XILINX_WSOU-0017488-XILINX_WSOU-0017565 at 17496-17502 & 17508-17527; XILINX_WSOU-0017566-XILINX_WSOU-0017668; XILINX_WSOU-0018142-XILINX_WSOU-0018199 at 18190-18192; XILINX_WSOU-0018239-XILINX_WSOU-0018312 at 18273-18279; XILINX_WSOU-0021368-XILINX_WSOU-0021435; XILINX_WSOU-0023436-XILINX_WSOU-0023461. <br><br> For example, in the MMCM architecture, the clock output signal (first enable signal) from one of the two BUFGMUX is connected to a counter divider 'D' (first divider). The counter divider ('D') is thus configured to receive the clock output signal (first enable signal), as exemplified below.  The output from the counter divider 'D' is a first adjusted enable signal generated based on a first predetermined factor. <br><br> The 9 signals were included in the line from LF to VCO. |



Figure 3-1:   **Detailed MMCM Block Diagram**

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 35, Exhibit A

Input multiplexers select the reference and feedback clocks from either the global clock I/Os or the clock routing or distribution resources. Each clock input has a programmable counter divider (D). The phase-frequency detector (PFD) compares both phase and

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 35, Exhibit A

17

| | |
|---|---|
| | The following exemplary schematic evidence further illustrates how this claim element is met by the accused instrumentalities:  |
| 1e.<br>a dual clock generator configured to receive the first adjusted enable signal and the second enable signal, and in response operable to generate a reference clock signal and transmit the reference clock signal over a single conductor. | The accused instrumentalities comprise a dual clock generator configured to receive the first adjusted enable signal and the second enable signal, and in response operable to generate a reference clock signal and transmit the reference clock signal over a single conductor. *See, e.g.,* XILINX_WSOU-0002327-XILINX_WSOU-0002355 at 2327 & 2340; XILINX_WSOU-0002327-XILINX_WSOU-0002355 at 2327 & 2340; XILINX_WSOU-0033733-XILINX_WSOU-0033767; XILINX_WSOU-0004536-XILINX_WSOU-0004628 at 4571, 4579, 4580 & 4611; XILINX_WSOU-0006514-XILINX_WSOU-0006584 at 6540-6547; XILINX_WSOU-0006806-XILINX_WSOU-0006815; XILINX_WSOU-0009217-XILINX_WSOU-0009279 at 9226-9229; XILINX_WSOU-0010663-XILINX_WSOU-0010682 at 10667; XILINX_WSOU-0009004-XILINX_WSOU-0009055 at 9018; XILINX_WSOU-0009934-XILINX_WSOU-0010040 at 9946; XILINX_WSOU-0017332-XILINX_WSOU-0017432; XILINX_WSOU-0017433-XILINX_WSOU-0017487 at 17438-17446 & 17452-17453; XILINX_WSOU-0017566-XILINX_WSOU-0017668; XILINX_WSOU-0018142-XILINX_WSOU-0018199 at 18190-18192; XILINX_WSOU-0018239-XILINX_WSOU-0018312 at 18273-18279; XILINX_WSOU-0021368-XILINX_WSOU-0021435; XILINX_WSOU-0023436-XILINX_WSOU-0023461. |

For instance, the first adjusted enable signal and the second enable signal that are output from the counter divider 'D' and a second MUX 'BUFGMUX', respectively, are sent to a dual clock generator module (blocks from PFD to VCO). The phase-frequency detector (PFD) generates a signal proportional to the phase and frequency of both enable signals. The PFD produces an up or down signal to the charge pump (CP) and loop filter (LF) to determine whether the voltage-controlled oscillator (VCO) should operate at a higher or lower frequency, as exemplified below.  Eight signals can eventually be sent out from the VCO and one of those signals is the reference clock signal (CLKOUT), which is then transmitted forward over a single conductor, as exemplified below.



*Figure 3-1:*   **Detailed MMCM Block Diagram**

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 36, Exhibit A

19

## MMCMs

UltraScale architecture-based devices contain one CMT per I/O bank. The MMCMs serve as frequency synthesizers for a wide range of frequencies, and as jitter filters for either external or internal clocks, and deskew clocks.

Input multiplexers select the reference and feedback clocks from either the global clock I/Os or the clock routing or distribution resources. Each clock input has a programmable counter divider (D). The phase-frequency detector (PFD) compares both phase and frequency of the rising edges of both the input (reference) clock and the feedback clock. If a minimum High/Low pulse is maintained, the duty cycle is ancillary. The PFD is used to generate a signal proportional to the phase and frequency between the two clocks. This signal drives the charge pump (CP) and loop filter (LF) to generate a reference voltage to the VCO. The PFD produces an up or down signal to the charge pump and loop filter to determine whether the VCO should operate at a higher or lower frequency. When VCO operates at a frequency that is too high, the PFD activates a down signal causing the control

**UltraScale Architecture Clocking Resources**
UG572 (v1.10.1) August 25, 2021          www.xilinx.com                    Send Feedback          35

**EΣ XILINX**®                                              Chapter 3:  Clock Management Tile

voltage to be reduced, thus decreasing the VCO operating frequency. When the VCO operates at a frequency that is too low, an up signal increases voltage. The VCO produces eight output phases and one variable phase for fine-phase shifting. Each output phase can be selected as the reference clock to the output counters (Figure 3-1). Each counter can be independently programmed for a given customer design. A special counter M is also provided. This counter controls the feedback clock of the MMCM, allowing a wide range of frequency synthesis.

In addition to integer divide output counters, MMCMs add a fractional counter for CLKOUT0 and CLKFBOUT.

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 35-36, Exhibit A

The following exemplary documentary evidence further illustrates how this claim element is met by the accused instrumentalities:

The following exemplary schematic evidence further illustrates how this claim element is met by the accused instrumentalities:



# EXHIBIT E

███████████████████████████

**Exhibit 3**

**Initial Claim Chart**
**U.S. Patent No. 7,613,938 (the "Asserted Patent")**
**Claim 13 (the "Asserted Claim")**

The accused instrumentalities include, without limitation, Xilinx boards and kits, including Xilinx FPGA boards, Xilinx SoC boards, Xilinx System-on-Modules, and Alveo Data Center accelerator cards, including but not limited to:  Zynq UltraScale+ devices/products, including but not limited to RFSoC ZCU216 Evaluation Kit, MPSoC ZCU102 Evaluation Kit, MPSoC ZCU104 Evaluation Kit, MPSoC ZCU106 Evaluation Kit, RFSoC ZCU208 Evaluation Kit, RFSoC ZCU1285 Characterization Kit, RFSoC ZCU111 Evaluation Kit, RFSoC ZCU1275 Characterization Kit; Avnet Ultra96-V2 device/products; Avnet UltraZed-EV Starter Kit devices/products; UltraZed-EG Starter Kit devices/products; Zynq UltraScale+ RFSoC Development Kit with Qorvo RF Front End (Avnet) devices/products; and/or any other Xilinx device, product, and instrumentality that operate using the similar components and/or functionality.

WSOU Investments, LLC ("WSOU" or "Plaintiff") contends that Xilinx, Inc. ("Xilinx" or "Defendant"), including Xilinx's employees, directly infringes each of the Asserted Claim, either literally or under the doctrine of equivalents. WSOU also contends that Xilinx has indirectly infringed and continues to indirectly infringe by contributing to and actively inducing infringement of one or more of the Asserted Claim.

The following infringement analysis for certain accused instrumentalities is exemplary and applicable to other accused instrumentalities.  Further, WSOU does not intend the following exemplary claim chart to be limiting, and WSOU reserves its rights to pursue other accused instrumentalities, patent claims, evidence, and infringement arguments in this case.

| Claim | Exemplary Infringement Analysis with Exemplary Infringement Evidence |
|---|---|
| 13Pre.<br>A circuit card comprising: | To the extent the preamble is limiting, the accused instrumentalities include circuit cards. *See, e.g.,* XILINX_WSOU-0000001-XILINX_WSOU-0000014; XILINX_WSOU-0000060; XILINX_WSOU-0000065-XILINX_WSOU-0000092; XILINX_WSOU-0000093-XILINX_WSOU-0000158; XILINX_WSOU-0000605-XILINX_WSOU-0000608; XILINX_WSOU-0000656-XILINX_WSOU-0000783; XILINX_WSOU-0000935; XILINX_WSOU-0001060-XILINX_WSOU-0001063; XILINX_WSOU-0001064-XILINX_WSOU-0001123; XILINX_WSOU-0001142-XILINX_WSOU-0001185; XILINX_WSOU-0001265-XILINX_WSOU-0001299; XILINX_WSOU-0001470- XILINX_WSOU-0001540; XILINX_WSOU-0001627-XILINX_WSOU-0001666; XILINX_WSOU-0001763-XILINX_WSOU-0001801; XILINX_WSOU-0001759-XILINX_WSOU-0001762; XILINX_WSOU-0004154-XILINX_WSOU-0004209; XILINX_WSOU-0007826-XILINX_WSOU-0007875; XILINX_WSOU-0009217-XILINX_WSOU-0009279 at 9235-9236, 9241-9247; XILINX_WSOU-0009004-XILINX_WSOU-0009055 at 9038 & 9043; XILINX_WSOU-0009498-XILINX_WSOU-0009568 at 9537 & 9539-9541; XILINX_WSOU-0017179-XILINX_WSOU-0017307 at 17218 & 17232; XILINX_WSOU-0032516-XILINX_WSOU-0032661; XILINX_WSOU-0000472-484; XILINX_WSOU-0001337-1347; XILINX_WSOU-0001541-1546; XILINX_WSOU-0002318-2326; XILINX_WSOU-0002997-3005; XILINX_WSOU-0003885-3894; XILINX_WSOU-0004522-5235; XILINX_WSOU-0005854-5867; XILINX_WSOU-0006500-6513; XILINX_WSOU-0006817-6821; XILINX_WSOU-0007029-7033; XILINX_WSOU-0007352-7365; XILINX_WSOU-00007661-7674.<br><br>For instance, Zynq UltraScale+with RFSoC ZCU216 includes a circuit card.  The Zynq-Ultra scale+ consists of a pair of Cortex-A5 processors integrated with programmable logic for excellent performance and maximum design flexibility, as shown below. |



Zynq UltraScale+ RFSoC ZCU216
Evaluation Kit
Learn More

Source: https://www.xilinx.com/products/boards-and-kits/see-all-evaluation-boards.html, Exhibit A[1]

Xilinx Evaluation Boards, such as the Zynq UltraScale+ with RFSoC ZCU216, include a circuit card.  For instance, the Xilinx Evaluation board provides real-time control hard engines for graphics, packet processing, and capabilities in the programming logic, as shown below.

---

[1]  WSOU-XILINX_002312-WSOU-XILINX_002322

All Zynq® UltraScale+ devices provide 64-bit processor scalability while combining real-time control hard engines for graphics, video, waveform, and packet processing capabilities in the programmable logic. Integrating an Arm®-based system for advanced analytics and on-chip programmable logic for task acceleration creates unlimited possibilities for applications including 5G Wireless, next generation ADAS, and Industrial Internet-of-Things.

The RFSoC devices are similar to the basic MPSoC devices with the addition of key RF subsystems for multi-band, multi-mode cellular radios and cable infrastructure (DOCSIS). The RFSoC devices combine the processing system with programmable logic located near RF-ADCs, RF-DACs, and soft-decision FEC (SD-FEC) units to enable a complete software-defined radio including direct RF sampling data converters, enabling CPRI™ and multi-gigabit Ethernet-to-RF on a single, highly programmable SoC.

Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf#nameddest=xPlatformManagementUnit, Page 25, Exhibit A

⚠ **CAUTION:**

Customers should **only** move SysMon jumpers on our Evaluation Boards with the board powered-OFF.

Handling of any raw circuit card such as a Xilinx Evaluation Board must be performed in an ESD safe environment and following proper ESD precautions, especially when changing onboard jumpers.

Source: https://www.xilinx.com/support/answers/64141.html, Exhibit C[2]

In addition to direct infringement of this claim by Xilinx (including its employees), Xilinx also has indirectly infringed and continues to indirectly infringe by actively inducing others to directly infringe this claim by using the

---

[2] WSOU-XILINX_003537-WSOU-XILINX_003540

<table>
<tr><td></td><td>accused instrumentalities. For instance, Xilinx has actively induced infringement by encouraging the use of the accused instrumentalities in ways that infringe this claim. Xilinx knew or should have known that such encouragement would induce infringement. Such induced infringement has occurred at least since Xilinx became aware of the Asserted Patent.  Xilinx has had knowledge of the Asserted Patent at least since the date when the complaint was filed. Xilinx has taken active steps with the specific intent to encourage and cause others to use each accused instrumentality in ways that infringe this claim. Such active steps by Xilinx with specific intent to induce infringement have included, among other things, advertising, promoting, marketing, making available for use, offering to sell, and/or selling the accused instrumentalities to others; encouraging and influencing other companies to import, offer to sell, and/or sell the accused instrumentalities; and directing and instructing others to use the accused instrumentalities in infringing ways. Xilinx has performed the aforementioned active steps with the knowledge of the Asserted Patent at least since the date when the complaint was filed in this case.

Further, Xilinx has indirectly infringed and continues to indirectly infringe this claim by contributing to infringement of this claim. For instance, components of the accused instrumentalities are known by Xilinx to be especially made or especially adapted for use to infringe this claim, and each is not a staple article or commodity of commerce suitable for substantial non-infringing uses. Xilinx contributes to the infringement of this claim by making available for use, offering for sale, selling, and/or importing the components of the instrumentalities, to third parties, who, for example, use such components to practice this claim.  Moreover, Xilinx has had notice of the Asserted Patent at least as of the filing date of the complaint in this case.</td></tr>
<tr><td>13a.<br>one or more devices,</td><td>The accused instrumentalities comprise one or more devices.   *See, e.g.,* XILINX_WSOU-0000060; XILINX_WSOU-0000065-XILINX_WSOU-0000092; XILINX_WSOU-0000093-XILINX_WSOU-0000158; XILINX_WSOU-0000605-XILINX_WSOU-0000608;  XILINX_WSOU-0000656-XILINX_WSOU-0000783; XILINX_WSOU-0000935; XILINX_WSOU-0001142-XILINX_WSOU-0001185;  XILINX_WSOU-0001470-XILINX_WSOU-0001540;  XILINX_WSOU-0001763-XILINX_WSOU-0001801; XILINX_WSOU-0001759-XILINX_WSOU-0001762; XILINX_WSOU-0004154-XILINX_WSOU-0004209;  XILINX_WSOU-0007826-XILINX_WSOU-0007875;  XILINX_WSOU-0009217-XILINX_WSOU-0009279 at 9235-9236, 9241-9247; XILINX_WSOU-0011190-XILINX_WSOU-0011233 at 11193; XILINX_WSOU-0009004-XILINX_WSOU-0009055 at 9038 & 9043; XILINX_WSOU-0009498-XILINX_WSOU-0009568 at 9537 & 9539-9541.

For instance, the accused  instrumentalities comprise Cortex processors, peripherals, and system monitors for performing different functions, as exemplified below.</td></tr>
</table>

## Real-time Processing Unit

### Introduction

The Zynq® UltraScale+™ MPSoC includes a pair of Cortex®-R5F processors for real-time processing based on the Cortex-R5F MP processor core from Arm®. The Cortex-R5F processor implements the Arm v7-R architecture and includes a floating-point unit that implements the Arm VFPv3 instruction set.

Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf, Page 83, Exhibit B[3]

The exemplary evidence below shows some of the devices' powered status, such as Peripherals, PMU, and System Monitor.

---

[3] WSOU-XILINX_002323-WSOU-XILINX_003536

*Table 6-14:*   **Deep-sleep Configuration**

| Configuration Type | Status | Description |
|---|---|---|
| Cortex-R5F | Powered down | |
| TCM configuration | In retention | Either TCM or OCM is powered down. |
| OCM configuration | In retention | |
| Device security | Suspended | |
| Peripheral | Suspended | Wake up peripheral logic might be active. |
| PLLs | Powered down | |
| System Monitor | Powered down | During power down, the SysOsc clock can go to 20 MHz ±50%. |
| RTC and BBRAM | Included | Switched to the $V_{CC\_PSAUX}$ rail. |
| PMU | Suspended | The wake logic is active. |
| MPSoC debug | Powered down | MPSoC debug is mostly in FPD. The LPD portion is suspended. |
| eFUSE | Suspended | |
| Components outside the LPD | Powered down | |
| PL internal power | Powered down | |

Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf, Page 150,
Exhibit B



XILINX_WSOU-0011190-XILINX_WSOU-0011233 at 11193

| 13b. a controller for controlling operation of the circuit card, | The accused instrumentalities comprise a controller for controlling operation of the circuit card. *See, e.g.,* XILINX_WSOU-0000060; XILINX_WSOU-0000065-XILINX_WSOU-0000092; XILINX_WSOU-0000093-XILINX_WSOU-0000158; XILINX_WSOU-0000605-XILINX_WSOU-0000608; XILINX_WSOU-0000656-XILINX_WSOU-0000783; XILINX_WSOU-0000935; XILINX_WSOU-0001142-XILINX_WSOU-0001185; |
|---|---|

XILINX_WSOU-0001470- XILINX_WSOU-0001540 at 1473; XILINX_WSOU-0001547-XILINX_WSOU-0001625 at 1555-1560;  XILINX_WSOU-0001763-XILINX_WSOU-0001801; XILINX_WSOU-0001759-XILINX_WSOU-0001762; XILINX_WSOU-0004154-XILINX_WSOU-0004209;  XILINX_WSOU-0007826-XILINX_WSOU-0007875;  XILINX_WSOU-0009217-XILINX_WSOU-0009279 at 9235-9236, 9241-9247; XILINX_WSOU-0011190-XILINX_WSOU-0011233 at 11193;  XILINX_WSOU-0009004-XILINX_WSOU-0009055 at 9038 & 9043; XILINX_WSOU-0009498-XILINX_WSOU-0009568 at 9537 & 9539-9541.

For instance, the accused instrumentalities include Cortex-R5 Processors for real-time processing, thereby controlling multiple functionalities of the circuit card (controller for controlling operation of the circuit card), as shown below.



# Real-time Processing Unit

## Introduction

The Zynq® UltraScale+™ MPSoC includes a pair of Cortex®-R5F processors for real-time processing based on the Cortex-R5F MP processor core from Arm®. The Cortex-R5F processor implements the Arm v7-R architecture and includes a floating-point unit that implements the Arm VFPv3 instruction set.

In the Cortex-R5F processor, interrupt latency is kept low by interrupting and restarting load-store multiple instructions. This is achieved by having a dedicated peripheral port that provides low latency access to the interrupt controller and by having tightly coupled memory ports for low latency and deterministic accesses to local RAM.

The Cortex-R5F processor is used for many safety-critical applications.

Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf#nameddest=xPlatformManagementUnit, Page 83, Exhibit B

| 13c. a switch responsive to a command received from the controller, for causing | The accused instrumentalities comprise a switch responsive to a command received from the controller, for causing electrical Power to at least one device to be decoupled therefrom for a predetermined period of time. *See, e.g.,* XILINX_WSOU-0000060; XILINX_WSOU-0000065-XILINX_WSOU-0000092; XILINX_WSOU-0000093- |
| --- | --- |

| | |
|---|---|
| electrical Power to at least one device to be decoupled therefrom for a predetermined period of time, and | XILINX_WSOU-0000158;  XILINX_WSOU-0000605-XILINX_WSOU-0000608;  XILINX_WSOU-0000656-XILINX_WSOU-0000783;  XILINX_WSOU-0000935;  XILINX_WSOU-0001142-XILINX_WSOU-0001185;  XILINX_WSOU-0001470- XILINX_WSOU-0001540 at 1473; XILINX_WSOU-0001547-XILINX_WSOU-0001625 at 1555-1560;  XILINX_WSOU-0001763-XILINX_WSOU-0001801; XILINX_WSOU-0001759-XILINX_WSOU-0001762; XILINX_WSOU-0004154-XILINX_WSOU-0004209;  XILINX_WSOU-0007826-XILINX_WSOU-0007875;  XILINX_WSOU-0009217-XILINX_WSOU-0009279 at 9235-9236, 9241-9247;  XILINX_WSOU-0011190-XILINX_WSOU-0011233 at 11193;  XILINX_WSOU-0009004-XILINX_WSOU-0009055 at 9038 & 9043; XILINX_WSOU-0009498-XILINX_WSOU-0009568 at 9537 & 9539-9541.<br><br>Fo instance, the  accused instrumentalities comprise a Platform Management Unit (PMU).  A PMU performs power management in the circuit card, as exemplified below.<br><br><br><br>Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf, Page 120, Exhibit B<br><br>The PMU (switch) receives a request from Cortex-R5 processor (controller), to power up and power down the peripherals. The PMU also enables and disables clocks and reset, as exemplified below. |

## Platform Management and Boot

The PMU receives requests from other processors to power up and power down peripherals and other units by power sequencing nodes and islands. The PMU also enables and disables clocks and resets.

Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf, Page 34, Exhibit B

The Cortex-R5 processor initiates the Power-down procedure with PMU (a switch responsive to a command received from the controller).

The Power-down procedure constitutes of setting the alarm. This procedure causes an interrupt to the PMU to Power-down multiple devices (for causing electrical Power to at least one device to be decoupled), as exemplified below.

***Power Down Procedure***

The power down is initiated by the Cortex-R5F MPCore. As the TCM is placed in retention, the Cortex-R5F MPCore is required to do the following (Figure 6-4).

1. Set the TCM bit in the RAM_RET_CNTRL register.

2. Set the TCM bit in the REQ_PWRDWN_TRIG register while the interrupt is masked for the TCM in the REQ_PWRDWN_INT_MASK register.

3. Set the RPU and TCM bits in the REQ_PWRUP_TRIG register while the interrupt mask bits for those fields are disabled.

4. Set the RPU bit in the REQ_SWRST_TRIG while the interrupt mask bit for it is disabled.

5. Set the alarm.

6. Disable interrupts.

7. Set the SLCR bit to request for a direct RPU power down and execute a WFI instruction.

This procedure causes an interrupt to the PMU to power down the RPU.

Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf, Page 151, Exhibit B

*Table 6-14:*   **Deep-sleep Configuration**

| Configuration Type | Status | Description |
|---|---|---|
| Cortex-R5F | Powered down | |
| TCM configuration | In retention | Either TCM or OCM is powered down. |
| OCM configuration | In retention | |
| Device security | Suspended | |
| Peripheral | Suspended | Wake up peripheral logic might be active. |
| PLLs | Powered down | |
| System Monitor | Powered down | During power down, the SysOsc clock can go to 20 MHz ±50%. |
| RTC and BBRAM | Included | Switched to the $V_{CC\_PSAUX}$ rail. |
| PMU | Suspended | The wake logic is active. |
| MPSoC debug | Powered down | MPSoC debug is mostly in FPD. The LPD portion is suspended. |
| eFUSE | Suspended | |
| Components outside the LPD | Powered down | |
| PL internal power | Powered down | |

Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf, Page 150,
Exhibit B

The controller sets the alarm with the use of the Real-Time Clock, which helps the system to wake up by generating
an interrupt at a predetermined time, as exemplified below.

13

| | |
|---|---|
| | **Wake on Real-time Clock**<br><br>This feature allows the system to wake up at a pre-determined time using the internal real-time clock (RTC). Configure the RTC to generate an interrupt when it reaches a specific time and date.<br><br>Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf, Page 148, Exhibit B |
| 13d. an electrical power device, operable independent of the controller, that causes electrical Power to the at least one device and the controller to be restored after the predetermined time period if the electrical Power was also decoupled from the controller. | The accused instrumentalities comprise an electrical power device, operable independent of the controller, that causes electrical Power to the at least one device and the controller to be restored after the predetermined time period if the electrical Power was also decoupled from the controller.  *See, e.g.,* XILINX_WSOU-0000060; XILINX_WSOU-0000065-XILINX_WSOU-0000092; XILINX_WSOU-0000093-XILINX_WSOU-0000158; XILINX_WSOU-0000605-XILINX_WSOU-0000608; XILINX_WSOU-0000656-XILINX_WSXILINX_WSOU-0001142-XILINX_WSOU-0001185; ILINX_WSOU-0001470- XILINX_WSOU-0001540 at 1473; XILINX_WSOU-0001547-XILINX_WSOU-0001625 at 1555-1560; XILINX_WSOU-0001763-XILINX_WSOU-0001801; XILINX_WSOU-0001759-XILINX_WSOU-0001762; XILINX_WSOU-0004154-XILINX_WSOU-0004209; XILINX_WSOU-0007826-XILINX_WSOU-0007875; XILINX_WSOU-0009217-XILINX_WSOU-0009279 at 9235-9236, 9241-9247; XILINX_WSOU-0011190-XILINX_WSOU-0011233 at 11193;  XILINX_WSOU-0009004-XILINX_WSOU-0009055 at 9038 & 9043; XILINX_WSOU-0009498-XILINX_WSOU-0009568 at 9537 & 9539-9541.<br><br>The Power supply unit of the circuit card with PMU (i.e., an electrical power device, operable independent of the controller) is responsible for providing power to the circuitry. PMU software control circuitry controls each power domain, and each power domain can be isolated independently, as exemplified below. |



Figure 6-1:   Power Domains and Islands

Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf, Page 122, Exhibit B

The RTC generates an interrupt to PMU. The PMU proceeds for the RPU power-up, as exemplified below.

**Wake Procedure**

Once the RTC alarm generates an interrupt to the PMU, the handler for the RTC wake detects if there is a firmware loaded for this purpose. If not, the handler checks whether an on-demand procedure is queued up in the PMU. Prior to the power down, the Cortex-R5F MPCore requests for the power up of the RPU and TCM while the interrupts for the power-up requests are masked. It requests the Cortex-R5F MPCore reset to be released while the interrupt for that request is masked, again. Upon waking up from the RTC, the PMU proceeds with the RPU power-up and issues the Cortex-R5F MPCore reset. Figure 6-5 shows the flowchart for wake-up from a deep sleep.

1. RPU and TCM power up requests are unmasked as a part of the RTC wake.

2. Cortex-R5F MPCore reset request is unmasked as a part of the RTC wake.

3. TCM is powered up first as a result of the follow-up TCM power-up interrupt.

4. RPU is powered up as a result of the follow-up RPU power-up interrupt.

Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf, Page 152, Exhibit B

The Cortex-R5 processor (controller) can also be powered off. The PMU issues the Cortex-R5 MP Core reset.

*Table 6-14:*   **Deep-sleep Configuration**

| Configuration Type | Status | Description |
|---|---|---|
| Cortex-R5F | Powered down | |
| TCM configuration | In retention | |
| OCM configuration | In retention | Either TCM or OCM is powered down. |
| Device security | Suspended | |
| Peripheral | Suspended | Wake up peripheral logic might be active. |
| PLLs | Powered down | |
| System Monitor | Powered down | During power down, the SysOsc clock can go to 20 MHz ±50%. |
| RTC and BBRAM | Included | Switched to the $V_{CC\_PSAUX}$ rail. |
| PMU | Suspended | The wake logic is active. |
| MPSoC debug | Powered down | MPSoC debug is mostly in FPD. The LPD portion is suspended. |
| eFUSE | Suspended | |
| Components outside the LPD | Powered down | |
| PL internal power | Powered down | |

Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf, Page 150, Exhibit B

The controller sets the alarm with the use of RTC, as exemplified below.  The power supply unit of the circuit card with PMU detects an interrupt from the RTC wake-up/power up the system (controller and devices), as exemplified below.

## Wake on Real-time Clock

This feature allows the system to wake up at a pre-determined time using the internal real-time clock (RTC). Configure the RTC to generate an interrupt when it reaches a specific time and date.

Source: https://www.xilinx.com/support/documentation/user_guides/ug1085-zynq-ultrascale-trm.pdf, Page 148,

Exhibit B

The following exemplary documentary evidence further illustrates how this claim element is met by the accused instrumentalities:



# EXHIBIT F

**Exhibit 2**

**Initial Claim Chart**
**U.S. Patent No. 7,068,950 (the "Asserted Patent")**
**Claims 1 and 17 (the "Asserted Claims")**

The accused instrumentalities include, without limitation, Xilinx Field Programmable Gate Arrays ("FPGA") devices/products and System on Chip ("SOC") devices/products, including, but not limited to, Virtex UltraScale devices/products; Kintex UltraScale devices/products; Virtex UltraScale+ devices/products; Kintex UltraScale+ devices/products; Artix UltraScale+ devices/products; Zynq UltraScale+ devices/products; and/or any other Xilinx device, product, and instrumentality that operate using the similar components and/or functionality.

WSOU Investments, LLC ("WSOU" or "Plaintiff") contends that Xilinx, Inc. ("Xilinx" or "Defendant"), including Xilinx's employees, directly infringes each of the Asserted Claims, either literally or under the doctrine of equivalents. WSOU also contends that Xilinx has indirectly infringed and continues to indirectly infringe by contributing to and actively inducing infringement of one or more of the Asserted Claims.

The following infringement analysis for certain accused instrumentalities is exemplary and applicable to other accused instrumentalities. Further, WSOU does not intend the following exemplary claim chart to be limiting, and WSOU reserves its rights to pursue other accused instrumentalities, patent claims, evidence, and infringement arguments in this case.

| Claims | Exemplary Infringement Analysis with Exemplary Infringement Evidence |
|---|---|
| 17pre.<br>A method of reducing misalignment between a carrier signal and a data signal, comprising the steps of: | To the extent the preamble is limiting, the accused instrumentalities enable the practice of reducing misalignment between a carrier signal and a data signal. *See, e.g.,* XILINX_WSOU-0017332-XILINX_WSOU-0017432 at 17337-17343; XILINX_WSOU-0022932-XILINX_WSOU-0022939; XILINX_WSOU-0023157-XILINX_WSOU-0023160; XILINX_WSOU-0023827-XILINX_WSOU-0023866; XILINX_WSOU-0028608-XILINX_WSOU-0028698.<br><br>For example, the Xilinx Zynq Ultrascale+ is a Multiprocessor SoC that provides high system-level performance-per-watt. Zynq Ultrascale+ device combines a high-performance ARM-based multicore, multiprocessing system with ASIC-class programmable logic and is capable of offloading critical applications, such as graphics and video pipelining, to dedicated processing blocks, as exemplified below. |

## Zynq UltraScale+ MPSoC

**OVERVIEW**

Zynq® UltraScale+™ MPSoCs combine a high-performance Arm®-based multicore, multiprocessing system with ASIC-class programmable logic. These devices, equipped with dual- and quad-core application processors, deliver maximum scalability and are capable of offloading critical applications, such as graphics and video pipelining, to dedicated processing blocks, along with a full complement of integrated peripherals and connectivity cores suitable for next-generation systems.

Fully integrated programmable logic enables custom co-processors and custom memory hierarchies to meet application specific needs, including deep learning processing units (DPU) for AI/ML processing. The 16nm FinFET+ programmable logic communicates with the processing system through 6,000 interconnects, enabling bandwidth that is not possible with multichip solutions. Dramatic power savings are achieved through fine-grained control of power domains and gated power islands. With specialized processing elements for different workloads, Zynq UltraScale+ MPSoCs are optimal single-chip platforms for both cost-sensitive and high-performance applications.

Source: https://www.xilinx.com/support/documentation/product-briefs/zynq-ultrascale-plus-product-brief.pdf, Page 1, Exhibit A[1]

The UltraScale+ architecture introduces intermodulation onto the signals that it receives. Two or more signal frequencies are combined, and intermodulation distortion is created. These two or more signals can be both data and carrier signals, as exemplified below.

Any complex signal contains components at several frequencies simultaneously. Nonlinearity in the converter's transfer function not only causes distortion of a pure tone, it causes two or more signal frequencies to interact and produce intermodulation products. When this happens, the result is called intermodulation distortion, or IM3.

Source: https://www.xilinx.com/support/documentation/white_papers/wp509-rfsampling-data-converters.pdf, Page 11, Exhibit C[2]

The Zynq Ultrascale+ uses data modulation to assess the misalignment of the data and carrier signals. Adjacent Channel Leakage Ratio (ACLR) is used to depict the power emitted or leaked into adjacent channels of the communication system, as exemplified below.



*Figure 14:* **RF-ADC ACLR for 5 x 20MHz 64QAM Modulation @ 3,500MHz (Loopback Mode)**

Source: https://www.xilinx.com/support/documentation/white_papers/wp509-rfsampling-data-converters.pdf, Page 16, Exhibit C

---

[1] WSOU-XILINX_002168-WSOU-XILINX_002169
[2] WSOU-XILINX_002272-WSOU-XILINX_002291

Once the misalignment has been assessed, the multi-mode clock manager (MMCM) within the Ultrascale+ will attempt to reduce it through phase shifting, which enables synthesis capabilities, as exemplified below.

MMCMs have infinite fine phase shift capability in either direction and can be used in dynamic phase shift mode. MMCMs also have a fractional counter in either the feedback path or in one output path, enabling further granularity of frequency synthesis capabilities.

Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 8, Exhibit B[3]

In addition to direct infringement of this claim by Xilinx (including its employees), Xilinx also has indirectly infringed and continues to indirectly infringe by actively inducing others to directly infringe this claim by using the accused instrumentalities to perform all the steps of this claim. For instance, Xilinx has actively induced infringement by encouraging the use of the accused instrumentalities in ways that infringe this claim. Xilinx knew or should have known that such encouragement would induce infringement. Such induced infringement has occurred at least since Xilinx became aware of the Asserted Patent.  Xilinx has had knowledge of the Asserted Patent at least since the date when the complaint was filed. Xilinx has taken active steps with the specific intent to encourage and cause others to use each accused instrumentality in ways that infringe this claim. Such active steps by Xilinx with specific intent to induce infringement have included, among other things, advertising, promoting, marketing, making available for use, offering to sell, and/or selling the accused instrumentalities to others; encouraging and influencing other companies to import, offer to sell, and/or sell the accused instrumentalities; and directing and instructing others to use the accused instrumentalities in infringing ways. Xilinx has performed the aforementioned active steps with the knowledge of the Asserted Patent at least since the date when the complaint was filed in this case.

Further, Xilinx has indirectly infringed and continues to indirectly infringe this claim by contributing to infringement of this claim. For instance, components of the Accused Instrumentalities are known by Xilinx to be especially made or especially adapted for use to infringe this claim, and each is not a staple article or commodity of commerce suitable for substantial non-infringing uses. Xilinx contributes to the infringement of this claim by making available for use, offering for sale, selling, and/or importing the components of the instrumentalities, to third parties, who, for example, use such components to practice this claim.  Moreover, Xilinx has had notice of the Asserted Patent at least as of the filing date of the complaint in this case.

---

[3] WSOU-XILINX_002170-WSOU-XILINX_002271

| 17a. (i) analyzing spectral power of a data-modulated signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding to a spectral null of the data-modulated signal; and | The accused instrumentalities enable analyzing spectral power of a data-modulated signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding to a spectral null of the data-modulated signal. *See, e.g.,* XILINX_WSOU-0017332-XILINX_WSOU-0017432 at 17337-17343; XILINX_WSOU-0023157-XILINX_WSOU-0023160; XILINX_WSOU-0023827-XILINX_WSOU-0023866; XILINX_WSOU-0028608-XILINX_WSOU-0028698.<br><br>For example, Xilinx Zynq Ultrascale+ includes various analog to digital converters (ADC) for measuring signal-to-noise ratio (SNR), signal-to- (noise + distortion) ratio (SNDR), and the effective number of bits (ENOB). These ADCs analyze spectral component power as well as noise in data, and performance, as exemplified below.<br><br>**Signal-to-(Noise + Distortion) Ratio (SNDR)**<br><br>SNDR (also called SINAD) is the ratio of RMS signal power to (a) total noise power and (b) the RMS sum of all other spectral components power plus all other harmonic components power at the output (excluding DC), when the input is a sinusoidal wave.<br><br>Source: https://www.xilinx.com/support/documentation/white_papers/wp509-rfsampling-data-converters.pdf, Page 4, Exhibit C<br><br>Intermodulation distortion (IM3) within Ultrascale+ happens when two or more signal frequencies (such as data and carrier signals) interact to produce intermodulation products, as exemplified below.<br><br>Any complex signal contains components at several frequencies simultaneously. Nonlinearity in the converter's transfer function not only causes distortion of a pure tone, it causes two or more signal frequencies to interact and produce intermodulation products. When this happens, the result is called intermodulation distortion, or IM3.<br><br>Source: https://www.xilinx.com/support/documentation/white_papers/wp509-rfsampling-data-converters.pdf, Page 11, Exhibit C<br><br>Xilinx Zynq Ultrascale+ characterizes the performance of RF-sampling data by using an adjacent channel leakage ratio (ACLR) to characterize the ratio of modulated signal power versus power emitted or leaked into adjacent channels of the communication system, as exemplified below. |

> ACLR is a key standards-compliant spectrum measurement designed for use in wireless radio systems such as 3GPP 5G, LTE, and W-CDMA. As shown in Figure 11, it characterizes the ratio of modulated signal power versus power emitted or leaked into adjacent channels of the communication system. The ability to vary channel bandwidths and adjacent channel spacing is required within the context of various communication protocols. To measure ACLR of the device under test (DUT), a modulated signal generator or DAC is commonly utilized.

Source: https://www.xilinx.com/support/documentation/white_papers/wp509-rfsampling-data-converters.pdf, Page 14, Exhibit C

The data-modulated signals can be leaked into another channel. ACLR will show signal data if it has been leaked into another channel, therefore creating a spectral null within the channel as the spectral power has dropped, as exemplified below.



Source: https://www.xilinx.com/support/documentation/white_papers/wp509-rfsampling-data-converters.pdf, Page 14, Exhibit C

| | |
|---|---|
| 17b.<br>(ii) introducing a phase shift between the data signal and a clock signal based on the analysis, wherein the carrier signal is based on the clock signal. | The accused instrumentalities enable introducing a phase shift between the data signal and a clock signal based on the analysis, wherein the carrier signal is based on the clock signal. *See, e.g.,* XILINX_WSOU-0017332-XILINX_WSOU-0017432 at 17337-17343; XILINX_WSOU-0023157-XILINX_WSOU-0023160; XILINX_WSOU-0023827-XILINX_WSOU-0023866; XILINX_WSOU-0028608-XILINX_WSOU-0028698.<br><br>For example, Xilinx Zynq Ultrascale+ provides a mixed-mode clock manager (MMCM) to dynamically change the clock output frequency. The MMCM has phase shift capabilities in either direction and can be used in dynamic phase shift mode, as shown below<br><br>MMCMs have infinite fine phase shift capability in either direction and can be used in dynamic phase shift mode. MMCMs also have a fractional counter in either the feedback path or in one output path, enabling further granularity of frequency synthesis capabilities.<br><br>Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 8, Exhibit B<br><br>The MMCM uses the clock outputs to control the modulation period. The frequency is modulated along with CLKFBOUT and CLKOUT (clock signals) within the MMCM, as exemplified below.<br><br>The MMCME# can generate a spread-spectrum clock from a standard fixed frequency oscillator when SS_EN is set to TRUE (see Figure 3-12). Within the MMCME#, the VCO frequency is modulated along with CLKFBOUT and CLKOUT[6:4,1,0]. Clock outputs CLKOUT[3:2] are used to control the modulation period and are not available for general use. As long as the clock frequency is adjusted slowly, the spread-spectrum does not affect the period jitter of the MMCME#.<br><br>Source: https://www.xilinx.com/support/documentation/user_guides/ug572-ultrascale-clocking.pdf, Page 62, Exhibit B<br><br>The clock outputs are then used for possible phase-shifting within the MMCM as they correlate together, as exemplified below. |



> Delay Time is a counter that counts the number of VCO clock cycles to delay the output. This means that there is a direct correlation between the possible phase shift for the clock output and the divide value for that particular output. As the divide value increases, finer phase shift steps are available. The Delay Time counter allows for a phase offset of up to 64 VCO clock cycles.

Source:
https://www.xilinx.com/support/documentation/application_notes/xapp888_7Series_DynamicRecon.pdf, Page 3, Exhibit D[4]

The following exemplary documentary and source code evidence further illustrates how this claim element is met by the accused instrumentalities:

| 1pre.<br>An apparatus for reducing misalignment between a | To the extent the preamble is limiting, the accused instrumentalities include an apparatus for reducing misalignment between a carrier signal and a data signal.  (*See, e.g.,* the corresponding analysis for 17Pre. for infringement analysis for this preamble.) |
| --- | --- |

| carrier signal and a data signal, the apparatus comprising: | In addition to direct infringement of this claim by Xilinx (including its employees), Xilinx also has indirectly infringed and continues to indirectly infringe by actively inducing others to directly infringe this claim by using the accused instrumentalities. For instance, Xilinx has actively induced infringement by encouraging the use of the accused instrumentalities in ways that infringe this claim. Xilinx knew or should have known that such encouragement would induce infringement. Such induced infringement has occurred at least since Xilinx became aware of the Asserted Patent.  Xilinx has had knowledge of the Asserted Patent at least since the date when the complaint was filed. Xilinx has taken active steps with the specific intent to encourage and cause others to use each accused instrumentality in ways that infringe this claim. Such active steps by Xilinx with specific intent to induce infringement have included, among other things, advertising, promoting, marketing, making available for use, offering to sell, and/or selling the accused instrumentalities to others; encouraging and influencing other companies to import, offer to sell, and/or sell the accused instrumentalities; and directing and instructing others to use the accused instrumentalities in infringing ways. Xilinx has performed the aforementioned active steps with the knowledge of the Asserted Patent at least since the date when the complaint was filed in this case.

Further, Xilinx has indirectly infringed and continues to indirectly infringe this claim by contributing to infringement of this claim. For instance, components of the accused instrumentalities are known by Xilinx to be especially made or especially adapted for use to infringe this claim, and each is not a staple article or commodity of commerce suitable for substantial non-infringing uses. Xilinx contributes to the infringement of this claim by making available for use, offering for sale, selling, and/or importing the components of the instrumentalities, to third parties, who, for example, use such components to practice this claim.  Moreover, Xilinx has had notice of the Asserted Patent at least as of the filing date of the complaint in this case. |
| 1a.<br>an analyzer configured (i) to analyze spectral power of an input signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding | The accused instrumentalities comprise an analyzer configured (i) to analyze spectral power of an input signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding to a spectral null of the input signal, and (ii) to generate a control signal based on the analysis.  (*See, e.g.,* the corresponding analysis for 17a. for infringement analysis for this element.) |

---

[4] WSOU-XILINX_002292-WSOU-XILINX_002311

| | |
|---|---|
| to a spectral null of the input signal, and (ii) to generate a control signal based on the analysis; and | |
| 1b.<br>a phase shifter configured to introduce a phase shift between the data signal and a clock signal using the control signal, wherein the carrier signal is based on the clock signal. | The accused instrumentalities comprise a phase shifter configured to introduce a phase shift between the data signal and a clock signal using the control signal, wherein the carrier signal is based on the clock signal.  (*See, e.g.,* the corresponding analysis for 17b. for infringement analysis for this element.) |

11

# EXHIBIT G

**Exhibit 4**

**Initial Claim Chart**
**U.S. Patent No. 7,903,971 (the "Asserted Patent")**
**Claims 1 and 15  (the "Asserted Claims")**

The accused instrumentalities include, without limitation, Xilinx Field Programmable Gate Arrays ("FPGA") and 3D IC devices/products, including, but not limited to:  Spartan devices/products; Virtex devices/products; Kintex devices/products; Artix devices/products; Virtex UltraScale devices/products; Kintex UltraScale devices/products; Virtex UltraScale+ devices/products; Kintex UltraScale+ devices/products; Artix UltraScale+ devices/products; Virtex UltraScale+ 58G PAM4 devices/products; and any other Xilinx device, product and instrumentality that operates using the similar components and/or functionality.

WSOU Investments, LLC ("WSOU" or "Plaintiff") contends that Xilinx, Inc. ("Xilinx" or "Defendant"), including Xilinx's employees, directly infringes each of the Asserted Claims, either literally or under the doctrine of equivalents. WSOU also contends that Xilinx has indirectly infringed and continues to indirectly infringe by contributing to and actively inducing infringement of one or more of the Asserted Claims.

The following infringement analysis for certain accused instrumentalities is exemplary and applicable to other accused instrumentalities.  Further, WSOU does not intend the following exemplary claim chart to be limiting, and WSOU reserves its rights to pursue other accused instrumentalities, patent claims, evidence, and infringement arguments in this case.

| Claims | Exemplary Infringement Analysis with Exemplary Infringement Evidence |
|---|---|
| 1Pre.<br>A method of operating a passive optical network comprising | To the extent the preamble is limiting, the accused instrumentalities enable the practice of operating a passive optical network. *See, e.g.*, XILINX_WSOU-0000181-XILINX_WSOU-0000218; XILINX_WSOU-0000605-XILINX_WSOU-0000608; XILINX_WSOU-0004536-XILINX_WSOU-0004628; XILINX_WSOU-0024408-XILINX_WSOU-0024434; XILINX_WSOU-0010634-XILINX_WSOU-0010662; XILINX_WSOU-0011366-XILINX_WSOU-0011383; XILINX_WSOU-0025830-XILINX_WSOU-0025849; XILINX_WSOU-0018341-XILINX_WSOU-0018353; XILINX_WSOU-0018200-XILINX_WSOU-0018216; XILINX_WSOU-0018217-XILINX_WSOU-0018238; XILINX_WSOU-0000472-484; XILINX_WSOU-0001337-1347; XILINX_WSOU-0001541-1546; XILINX_WSOU-0002318-2326; XILINX_WSOU-0002997-3005; XILINX_WSOU-0003885-3894; XILINX_WSOU-0004522-5235; XILINX_WSOU-0005854-5867; XILINX_WSOU-0006500-6513; XILINX_WSOU-0006817-6821; XILINX_WSOU-0007029-7033; XILINX_WSOU-0007352-7365; XILINX_WSOU-00007661-7674.<br><br>For instance, Xilinx provides a range of FPGA products such as Virtex Ultrascale and Virtex Ultrascale+ to implement in a network architecture, as exemplified below.<br><br>FPGA Leadership across Multiple Process Nodes<br><br>Xilinx offers a comprehensive multi-node portfolio to address requirements across a wide set of applications. Whether you are designing a state-of-the art, high-performance networking application requiring the highest capacity, bandwidth, and performance, or looking for a low-cost, small footprint FPGA to take your software-defined technology to the next level, Xilinx FPGAs and 3D ICs provide you with system integration while optimizing for performance/watt.<br><br>Xilinx Multi-Node Product Portfolio Offering<br><br>**45nm** — SPARTAN **28nm** — VIRTEX, KINTEX, ARTIX, SPARTAN **20nm** — VIRTEX UltraSCALE, KINTEX UltraSCALE **16nm** — VIRTEX UltraSCALE+, KINTEX UltraSCALE+ |

Source: https://www.xilinx.com/products/silicon-devices/fpga.html, Exhibit A[1]

## General Description

Xilinx® UltraScale™ architecture comprises high-performance FPGA, MPSoC, and RFSoC families that address a vast spectrum of system requirements with a focus on lowering total power consumption through numerous innovative technological advancements.

**Kintex® UltraScale FPGAs:** High-performance FPGAs with a focus on price/performance, using both monolithic and next-generation stacked silicon interconnect (SSI) technology. High DSP and block RAM-to-logic ratios and next-generation transceivers, combined with low-cost packaging, enable an optimum blend of capability and cost.

**Kintex UltraScale+™ FPGAs:** Increased performance and on-chip UltraRAM memory to reduce BOM cost. The ideal mix of high-performance peripherals and cost-effective system implementation. Kintex UltraScale+ FPGAs have numerous power options that deliver the optimal balance between the required system performance and the smallest power envelope.

**Virtex® UltraScale FPGAs:** High-capacity, high-performance FPGAs enabled using both monolithic and next-generation SSI technology. Virtex UltraScale devices achieve the highest system capacity, bandwidth, and performance to address key market and application requirements through integration of various system-level functions.

**Virtex UltraScale+ FPGAs:** The highest transceiver bandwidth, highest DSP count, and highest on-chip and in-package memory available in the UltraScale architecture. Virtex UltraScale+ FPGAs also provide numerous power options that deliver the optimal balance between the required system performance and the smallest power envelope.

**Zynq® UltraScale+ MPSoCs:** Combine the Arm® v8-based Cortex®-A53 high-performance energy-efficient 64-bit application processor with the Arm Cortex-R5F real-time processor and the UltraScale architecture to create the industry's first programmable MPSoCs. Provide unprecedented power savings, heterogeneous processing, and programmable acceleration.

**Zynq® UltraScale+ RFSoCs:** Combine RF data converter subsystem and forward error correction with industry-leading programmable logic and heterogeneous processing capability. Integrated RF-ADCs, RF-DACs, and soft-decision FECs (SD-FEC) provide the key subsystems for multiband, multi-mode cellular radios and cable infrastructure.

Source: https://www.xilinx.com/support/documentation/data_sheets/ds890-ultrascale-overview.pdf, Page 1, Exhibit B[2]

As an example, Xilinx UltraScale+ FPGA family provides ASIC-class architecture that is used to enable multi-hundred gigabit-per-second levels of system performance with smart processing, while efficiently routing and processing data on-chip, as exemplified below.

---

[1] WSOU-XILINX_003541-WSOU-XILINX_003542
[2] WSOU-XILINX_003543-WSOU-XILINX_003592

## UltraScale Architecture

### Staying a Generation Ahead with an Extra Node of Value

Xilinx's new 16nm and 20nm UltraScale™ families are based on the first architecture to span multiple nodes from planar through FinFET technologies and beyond, while also scaling from monolithic through 3D ICs. At 20nm Xilinx pioneered the first ASIC-class architecture to enable multi-hundred gigabit-per-second levels of system performance with smart processing at full line rates, scaling to terabits and teraflops. At 16nm, UltraScale+ families combine new memory, 3D-on-3D, and multi-processing SoC (MPSoC) technologies to deliver a generation ahead of value.

The new Xilinx UltraScale+ FPGA portfolio is comprised of the Kintex® UltraScale+ FPGA and Virtex® UltraScale+ FPGA and 3D IC families, while the Zynq® UltraScale+ family includes the industry's first MPSoCs. Optimized at the system level, UltraScale+ devices deliver value far beyond a traditional process node migration – providing 2–5X greater system-level performance/watt over 28nm devices, far more systems integration and intelligence, and the highest level of security and safety.



Realizing 2-5X system level performance-per-watt vs. 28nm solutions



Zynq UltraScale+ MPSoC by Vamsi Boppana, VP of Processor Development

Source: https://www.xilinx.com/products/technology/ultrascale.html, Exhibit J[3]

For instance, Virtex UltraScale+ FPGAs such as 58G PAM4 FPGAs (e.g. XCVU29P) include 58Gb/s transceivers (58G) to enable optics, faster interconnect, chip-to-opics support, and superior high-quality signal for 50/100/200/400G optics and protocols, as exemplified below.

---

[3] WSOU-XILINX_003792-WSOU-XILINX_003792



Source: https://www.xilinx.com/products/silicon-devices/fpga/virtex-ultrascale-plus-58g.html, Exhibit C[4]



To help drive the next wave of Ethernet deployment, Xilinx is integrating 58Gb/s transceivers into its 16nm FinFET+ Virtex® UltraScale+™ FPGA family.

Virtex UltraScale+ 58G PAM4 FPGAs double bandwidth on existing infrastructure and extend ASIC lifetimes. Providing the fastest transceivers in a hardware programmable device, timed with new optics availability, these FPGAs allow users to build future-proof systems.

Source: https://www.xilinx.com/products/silicon-devices/fpga/virtex-ultrascale-plus-58g.html, Exhibit C

---

[4] WSOU-XILINX_003593-WSOU-XILINX_003602

Key Features and Benefits

**Fastest Transceivers**

Up to 48 transceivers running up to 58Gb/s PAM4 for multi-terabit systems and up to 32 transceivers operating at 32.75Gb/s for 25G interoperability

**Flexible Connectivity**

28G and 58G backplanes, 32.75Gb/s and 58Gb/s of chip-to-chip, and chip-to-optics support

**Superior Signal Integrity**

Superior high-quality signal for 50/100/200/400G optics and protocols via enhanced continuous adaptive RX equalization and built-in KR-FEC

**Enhanced DSP Cores**

Up to 38 TOPs (22 TeraMACs) of DSP compute performance for diverse applications in the data center

**Footprint Reduction**

Eliminating discrete ICs for Ethernet, gearboxes, memory, and PCIe enables small footprint system design without comprising performance

**Integrated Block for PCI Express**

PCIe® Gen3x 16 in all devices and PCIe Gen4x 8 with CCIX support in select devices enable complete end-to-end solutions that support multi-100G ports

Source: https://www.xilinx.com/products/silicon-devices/fpga/virtex-ultrascale-plus-58g.html, Exhibit C



Source: https://www.xilinx.com/support/documentation/product-briefs/Virtex-ultrascale-plus-58g-product-brief.pdf, Page 1, Exhibit D[5]

---

[5] WSOU-XILINX_003603-WSOU-XILINX_003604



Source: https://www.xilinx.com/support/documentation/product-briefs/Virtex-ultrascale-plus-58g-product-brief.pdf, Exhibit D

As further examples, Xilinx Ultra Scale+ architecture operates various types of PON (passive optical network) by implementations in different network entities. The Xilinx Ultra Scale FPGAs are used by the PON networks, as exemplified below.

## Summary

This application note describes the implementation of an ITU-T G.987- and ITU-T G.989-compliant fractional burst clock data recovery (BCDR) circuit for an optical line termination (OLT) unit operating at 1.25 and 2.5 Gb/s in a passive optical network (PON), such as G-PON, XG-PON1, NG-PON2, and 10G EPON [Ref 1][Ref 2].

*Note:*  For standards and PON terms, see the References section.

Download the Reference Design Files for this application note from the Xilinx website. For detailed information about the design files, see Reference Design.

## Introduction

XG-PON and NG-PON2 are ITU-T next-generation optical access technology. One of the most challenging components in the PON environment is the BCDR, operating on burst signals at 2.488 Gb/s and 1.244 Gb/s. Based on a fully synchronous oversampling technology, the implementation of the BCDR described in this application note is well suited to Kintex® and Virtex® UltraScale™ FPGAs due to the low required minimum oversampling ratio and the highly pipelined oversampling technology. The speed grade requirement is driven by the GTH transceivers, which should run at a minimum of 12.44 Gb/s, that is, five times the line rate or more.

Source:   https://www.xilinx.com/support/documentation/application_notes/xapp1277-burst-clk-data-rec-pon-apps-ultrascale.pdf, Page 1, Exhibit E[6]

The following exemplary documentary evidence further illustrates how this claim element is met by the accused instrumentalities:

| | |
|---|---|
| 1a. an optical line termination being connected via a plurality of optical fibers to a plurality of network | The accused instrumentalities enable the practice of operating a passive optical network comprising an optical line termination being connected via a plurality of optical fibers to a plurality of network terminations. *See, e.g.,* XILINX_WSOU-0000181-XILINX_WSOU-0000218; XILINX_WSOU- |

---

[6]  WSOU-XILINX_003605-WSOU-XILINX_003626

| terminations and comprising the step of | 0000605-XILINX_WSOU-0000608; XILINX_WSOU-0004536-XILINX_WSOU-0004628 at 4544,4546, 4549, 4551 & 4571.<br><br>For instance, the Virtex UltraScale+ FPGA is used for a Passive Optical Network, where an OLT (Optical Line Termination) is connected to Optical Network Units (or, a plurality of network terminations) via a plurality of fibers, as exemplified below.<br><br>Overview of a PON Network <br><br>**Overview of a PON Network**<br><br>This section is optional for experienced users. Its main purpose is to outline the operating principles of an XG-PON access network, particularly from the topology point of view.<br><br>Figure 1 illustrates the XG-PON architecture for downstream transmission. The OLT transmits a single optical stream at 9.95 Gb/s to the passive splitter. The splitter replicates the same data stream for each optical network terminal (ONT) connected to it. The downstream data transmission is continuous, thus all ONTs do not operate in burst mode. The data received by all ONTs is the same, but only a fraction of that can be decoded by each ONT.<br><br>https://www.xilinx.com/support/documentation/application_notes/xapp1277-burst-clk-data-rec-pon-apps-ultrascale.pdf, Page 3, Exhibit E |



Source:    https://www.xilinx.com/support/documentation/application_notes/xapp1277-burst-clk-data-rec-pon-apps-ultrascale.pdf, Page 3, Exhibit E



Source: https://www.xilinx.com/support/documentation/application_notes/xapp1277-burst-clk-data-rec-pon-apps-ultrascale.pdf, Page 4, Exhibit E

PON is a shared network which brings fiber cabling and signals to the homes using a point to the multipoint scheme that enables a single optical fiber to serve multiple premises using passive components, as exemplified below.

A Passive Optical Network (PON) is a fiber-optic access network architecture that brings fiber cabling and signals to the home using a point-to-multipoint scheme that enables a single optical fiber to serve multiple premises by means of passive components. A PON consists of an Optical Line Terminal (OLT) at the service provider's central office and a number of Optical Network Units (ONUs) near end users. It is a shared network, in that the OLT sends a single stream of downstream traffic that is seen by all ONUs. Each ONU only reads the content of those packets that are addressed to it. There are different types of PON standards, which mainly differ from each other in terms of their data rates.

Source: https://www.ijert.org/research/performance-analysis-of-unidirectional-and-bidirectional-broadband-passive-optical-networks-IJERTV4IS010550.pdf, Page 1, Exhibit F[7]

Schematic representation of PON with OLT and Network Terminations (NT) is exemplified below.



| | |
|---|---|
| | Source: https://www.researchgate.net/figure/Schematic-representation-of-a-PON_fig2_267331102, Exhibit G[8] |
| 1b: generating an optical signal for transmission over one of the plurality of optical fibers, the optical signal including a plurality of signal states, each signal state corresponding to a different sequence of bits, | The accused instrumentalities enable generating an optical signal for transmission over one of the plurality of optical fibers, the optical signal including a plurality of signal states, each signal state corresponding to a different sequence of bits.  *See, e.g.,* XILINX_WSOU-0000181-XILINX_WSOU-0000218; XILINX_WSOU-0000605-XILINX_WSOU-0000608; XILINX_WSOU-0004536-XILINX_WSOU-0004628 at 4544,4546, 4549, 4551 & 4571. <br><br> For instance, a PON is divided from remote node to different Optical Network Units (a plurality of Optical Fibres), as shown below. <br><br>  <br><br> Source:     https://www.researchgate.net/figure/Schematic-representation-of-a-PON_fig2_267331102, Exhibit G |

---

[7] WSOU-XILINX_003627-WSOU-XILINX_003631
[8] WSOU-XILINX_003632-WSOU-XILINX_003635

As further examples, Xilinx's UltraScale+ FPGAs include 58Gb/s transceivers that support 58G PAM 4 technology. These FPGAs including 58G transceivers are used in the ONUs and OLT of the Passive Optical Network, as exemplified elow.



58G PAM4 Technology

Enabling Next Wave of Ethernet Deployment

Source: https://www.xilinx.com/products/technology/high-speed-serial/58g.html, Exhibit H[9]

The GMT transceivers in the UltraScale FPGA transmit the signal to a plurality of receiver ports with the help of dual channels. The channels support different signalling rate and different sequence of bits, as exemplified below.

---

[9] WSOU-XILINX_003636-WSOU-XILINX_003637

## Features

The GTM transceiver in the UltraScale+ FPGA is a high performance transceiver, supporting line rates between 10.3 Gb/s and 58 Gb/s. Based on the available PLL divider configurations in the GTM transceivers, the following line rates are supported:

- PAM4 modulation:
  - 58 Gb/s – 39.2 Gb/s
  - 29 Gb/s – 20.6 Gb/s
- NRZ modulation:
  - 29 Gb/s – 19.6 Gb/s
  - 14.5 Gb/s – 10.3 Gb/s

The GTM transceiver is Xilinx's first PAM4 enabled transceiver that is highly configurable and tightly integrated with the programmable logic resources of the FPGA. The table below summarizes the features by functional group that support a wide variety of applications.

Source: https://www.xilinx.com/support/documentation/user_guides/ug581-ultrascale-gtm-transceivers.pdf, Page 7, Exhibit I[10]

---

[10] WSOU-XILINX_003638-WSOU-XILINX_003791

<table>
<tr>
<td></td>
<td>

## TX Gray Encoder

GTM transmitters in UltraScale+ devices support two types of binary encoding options: linear coding and Gray coding. By using Gray coding, only one bit error per symbol is made for incorrect decisions, thus reducing the bit-error rate by more than 33%. The following figure illustrates the differences between linear coding and Gray coding.

*Figure 34:* **Transmitted PAM4 Signal Bit Encoding**



Source: https://www.xilinx.com/support/documentation/user_guides/ug581-ultrascale-gtm-transceivers.pdf, Page 77, Exhibit I

</td>
</tr>
<tr>
<td>

1c. wherein the plurality of signal states and the number of bits in each sequence are increased based on a transmission quality of the optical signal on the one of the plurality of optical fibers.

</td>
<td>

The accused instrumentalities enable the practice of a method wherein the plurality of signal states and the number of bits in each sequence are increased based on a transmission quality of the optical signal on the one of the plurality of optical fibers. *See, e.g.,* XILINX_WSOU-0004536-XILINX_WSOU-0004628 at 4544,4546, 4549, 4551 & 4571.

For instance, the GMT transceivers are programmable and can transmit data with different bit sequence based on the selection of modulation scheme during its programming. For example, when NRZ modulation scheme is selected, then data is transmitted with the help of one bit per symbol, however if the modulation scheme is switched to PAM, then the data is transmitted with using two bits per symbol. In this manner, the number of bits in each sequence can be increased based on the transmission quality of optical signal by designer of the Optical Network, as exemplified below.

</td>
</tr>
</table>

| | |
|---|---|
| | **Use Modes**<br><br>The GTM TX has the ability to transmit serial data using two different modulation schemes: NRZ and PAM4. NRZ signals contains one bit of information per symbol, while PAM4 signals contain two bits of information per symbol. Using PAM4 modulation doubles the transmitted data bandwidth while maintaining the same unit interval (UI). To program the GTM TX to a desired signal modulation mode, the user must configure the attribute TXMODSEL for CH0 or CH1.<br><br>Source: https://www.xilinx.com/support/documentation/user_guides/ug581-ultrascale-gtm-transceivers.pdf, Page 90, Exhibit I<br><br>**Use Modes**<br><br>The GTM RX has the ability to receive serial data using two different modulation schemes: NRZ and PAM4. NRZ signals contain one bit of information per symbol, while PAM4 signals contain two bits of information per symbol. Using PAM4 modulation doubles the transmitted data bandwidth while maintaining the same unit interval (UI). To program the GTM RX to a desired signal modulation mode, the user must configure the attribute RXMODSEL for CH0 or CH1.<br><br>Source: https://www.xilinx.com/support/documentation/user_guides/ug581-ultrascale-gtm-transceivers.pdf, Page 99, Exhibit I |
| 15Pre. An optical line termination being part of a passive optical network comprising | To the extent the preamble is limiting, the accused instrumentalities include an optical line termination being part of a passive optical network.  (*See, e.g.,* the corresponding analysis for 1Pre. for infringement analysis for this preamble.)<br><br>In addition to direct infringement of this claim by Xilinx (including its employees), Xilinx also has indirectly infringed and continues to indirectly infringe by actively inducing others to directly infringe this claim by using the accused instrumentalities. For instance, Xilinx has actively induced infringement by encouraging the use of the accused instrumentalities in ways that infringe this claim. Xilinx knew or should have known that such encouragement would induce infringement. Such induced infringement has occurred at least since Xilinx became aware of the Asserted Patent.  Xilinx has had knowledge of the Asserted Patent at least since the date when the complaint was filed. Xilinx has taken active steps with the specific intent to encourage and cause others to use each accused |

| | |
|---|---|
| | instrumentality in ways that infringe this claim. Such active steps by Xilinx with specific intent to induce infringement have included, among other things, advertising, promoting, marketing, making available for use, offering to sell, and/or selling the accused instrumentalities to others; encouraging and influencing other companies to import, offer to sell, and/or sell the accused instrumentalities; and directing and instructing others to use the accused instrumentalities in infringing ways. Xilinx has performed the aforementioned active steps with the knowledge of the Asserted Patent at least since the date when the complaint was filed in this case.<br><br>Further, Xilinx has indirectly infringed and continues to indirectly infringe this claim by contributing to infringement of this claim. For instance, components of the accused instrumentalities are known by Xilinx to be especially made or especially adapted for use to infringe this claim, and each is not a staple article or commodity of commerce suitable for substantial non-infringing uses. Xilinx contributes to the infringement of this claim by making available for use, offering for sale, selling, and/or importing the components of the instrumentalities, to third parties, who, for example, use such components to practice this claim.  Moreover, Xilinx has had notice of the Asserted Patent at least as of the filing date of the complaint in this case. |
| 15a.  said optical line termination being connected via a plurality of optical fibers to a plurality of network terminations | The accused instrumentalities comprise an optical line termination being connected via a plurality of optical fibers to a plurality of network terminations.  (*See, e.g.,* the corresponding analysis for 1a. for infringement analysis for this element.) |
| 15b.  wherein the optical line termination is configured to generate an optical signal including a plurality of signal states, each signal state corresponding to a different sequence of bits, | The accused instrumentalities comprise an optical line termination that is configured to generate an optical signal including a plurality of signal states, each signal state corresponding to a different sequence of bits,  (*See, e.g.,* the corresponding analysis for 1b. for infringement analysis for this element.) |
| 15c.  wherein the plurality of signal states and the number of bits in each sequence are increased based on a | The accused instrumentalities comprise an optical line termination wherein the plurality of signal states and the number of bits in each sequence are increased based on a transmission quality of the |

| transmission quality of the optical signal of the one of the plurality of optical fibers. | optical signal of the one of the plurality of optical fibers.  (*See*, *e.g.*, the corresponding analysis for 1c. for infringement analysis for this element.) |
|---|---|

# EXHIBIT H

## EXHIBIT E-9
## U.S. PATENT NO. 9,312,838

The asserted claims of U.S. Patent No. 9,312,838 ("the '838 patent") are anticipated and/or obvious in view of Xilinx Kintex and Virtex UltraScale FPGA devices ("UltraScale FPGAs") and in view of the UltraScale Architecture Clocking Resources: Advance Specification User Guide, UG572 (v1.0) ("UG572"), published by Xilinx, Inc., either alone or combination with the knowledge of a person of ordinary skill in the art ("POSITA"), or in combination with one or more other references disclosed in Xilinx's Invalidity Contentions, including the other charted references.  Schematics and RTL code further evidencing the design of the UltraScale FPGA device are available for review on a Source Code Review computer, as set forth in paragraph 12 of the Protective Order, at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801.

UltraScale FPGA devices were in public use, on sale, or otherwise available to the public at least as early as December 2013.  UG572 was published on December 10, 2013.  Therefore, both UltraScale FPGA devices and UG572 qualify as prior art under at least AIA 35 U.S.C. § 102(a)(1).

WSOU alleges that the mixed-mode clock manager (MMCM) architecture in the accused products infringes the '838 Patent.  (*See* Plaintiff's Amended Initial Claim Charts, Ex. 5 (Nov. 8, 2021).)  To be clear, Xilinx disputes these allegations.  Furthermore, Xilinx developed the MMCM architecture before the application for the '838 Patent was filed in December 2013, and has been making and selling products that incorporate that architecture ever since.  To the extent that the '838 Patent claims are construed to encompass the accused products as alleged by WSOU, then the claims are invalid as anticipated by that same functionality in Xilinx's UltraScale products that were developed and sold before the '838 Patent was filed, as illustrated in the chart below.  *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) ("A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'" (quoting *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003))).

The use of claim terms in the chart below is based on WSOU's construction of claim terms in its infringement contentions, as understood by Xilinx.  This chart should not be construed as consenting to or agreeing with WSOU's construction of claim terms.  Because discovery is ongoing and the Court has not completed the claim construction process, Xilinx reserves all rights to amend its invalidity contentions based on new information produced in discovery or on the Court's constructions.

| '838 Claim Language | Prior Art References |
|---|---|
| 1(pre) An apparatus, comprising: | To the extent the preamble is limiting, UG572 discloses it.  According to WSOU's infringement contentions, the UltraScale FPGAs include an apparatus comprising first and second clocks |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH                                    U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| 1(a) first and second clocks operable to generate first and second input clock signals, respectively, wherein the first and second input clock signals are asynchronous in relation to one another; | operable to generate first and second input clock signals, respectively, wherein the first and second input clock signals are asynchronous in relation to one another.<br><br>For instance, the Xilinx UltraScale Architecture governs the design and function of the Xilinx Kintex, Virtex, and Zynq devices, as exemplified below.<br><br>Further, the Xilinx UltraScale Architecture clock resources manage complex and simple clocking requirements.  The clock management tiles (CMT) are used to provide clock frequency synthesis, deskew, and jitter filtering functionality.  In the Xilinx UltraScale architecture-based devices, the CMT comprises a mixed-mode clock manager (MMCM) and two phase-locked loops (PLLs).  The MMCMs function as frequency synthesizers, and jitter filters for either internal/external clocks and deskew clocks, as exemplified below.<br><br>*See, e.g.,* |

| '838 Claim Language | Prior Art References |
|---|---|
| | # Clock Management Tile<br><br>## Introduction<br><br>In UltraScale architecture-based devices, the clock management tile (CMT) includes a mixed-mode clock manager (MMCM) and two phase-locked loops (PLLs). The main purpose of the PLL is to generate clocking for the I/Os. But it also contains a limited subset of the MMCM functions for fabric use.<br><br>The clock input connectivity allows multiple resources to provide the reference clock(s) to the MMCM. The number of output counters (dividers) is eight, with some of them capable of driving out an inverted clock signal (180° phase shift). MMCMs have infinite fine phase shift capability in either direction and can be used in dynamic phase shift mode. The resolution of the fine phase shift depends on the voltage-controlled oscillator (VCO) frequency. Fractional divide functionality in increments of 1/8th (0.125) for CLKFBOUT and CLKOUT0 are available to support greater clock frequency synthesis capability. UltraScale architecture-based devices have a spread spectrum capability. If the MMCM spread spectrum feature is not used, a spread spectrum on an external input clock will not be filtered and thus passed on to the output clock.<br><br>UG572, at 30.<br><br>For example, the MMCM architecture comprises two input multiplexers that select a first input clock (input or reference clock; CLKIN1 or CLKIN2) signal and a second input clock (feedback clock; CLKFB or CLKFBOUT) signal. The MMCM block diagram shown below also comprises a PLL (blocks PFD to VCO). The phase-frequency detector (PFD) in the PLL is equipped to compare two asynchronous signals (i.e two signals with variable phase and frequency difference). Hence, according to WSOU's infringement contentions, both of the input clock signals are asynchronous relative to each other, as shown below.<br><br>*See, e.g.,* |

| '838 Claim Language | Prior Art References |
|---|---|
| | **MMCMs**<br><br>UltraScale architecture-based devices contain one CMT per I/O bank. The MMCMs serve as frequency synthesizers for a wide range of frequencies, and as jitter filters for either external or internal clocks, and deskew clocks.<br><br>Input multiplexers select the reference and feedback clocks from either the global clock I/Os or the clock routing or distribution resources. Each clock input has a programmable counter divider (D). The phase-frequency detector (PFD) compares both phase and frequency of the rising edges of both the input (reference) clock and the feedback clock. If a minimum High/Low pulse is maintained, the duty cycle is ancillary. The PFD is used to generate a signal proportional to the phase and frequency between the two clocks. This signal drives the charge pump (CP) and loop filter (LF) to generate a reference voltage to the VCO. The PFD produces an up or down signal to the charge pump and loop filter to determine whether the VCO should operate at a higher or lower frequency. When VCO operates at a frequency that is too high, the PFD activates a down signal causing the control voltage to be reduced, thus decreasing the VCO operating frequency. When the VCO operates at a frequency that is too low, an up signal increases voltage. The VCO produces eight output phases and one variable phase for fine-phase shifting. Each output phase can be selected as the reference clock to the output counters (Figure 3-1). Each counter can be independently programmed for a given customer design. A special counter M is also provided. This counter controls the feedback clock of the MMCM, allowing a wide range of frequency synthesis.<br><br>In addition to integer divide output counters, MMCMs add a fractional counter for CLKOUT0 and CLKFBOUT.<br><br>UG572, at 30-31. |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH                                    U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | <br><br>*Figure 3-1:*  Detailed MMCM Block Diagram<br><br>UG572, at 31.<br><br>According to WSOU's infringement contentions, the following exemplary schematic evidence shows that the UltraScale FPGAs have clocks that are operable to generate first and second input clock signals that are asynchronous in relation to one another.  For instance, according to WSOU's infringement contentions, the asynchronous relation can occur for a change in phase or frequency for the reference frequency, or for a change in the feedback divider value.  For either situation, the inputs to the phase / frequency detector (PFD) become asynchronous at that moment in time. |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH                                        U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| |  |
| | To the extent this limitation is not explicitly disclosed by UG572, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the UltraScale FPGAs so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |
| 1(b) a first edge detector configured to receive the first input clock signal, the first edge detector operable to detect a rising edge of the first input clock signal and to generate a first enable signal; | UG572 discloses this limitation.  According to WSOU's infringement contentions, the UltraScale FPGAs comprise a first edge detector configured to receive the first input clock signal, the first edge detector operable to detect a rising edge of the first input clock signal and to generate a first enable signal.<br><br>As examples, the MMCM comprises two input MUXes (Multiplexers) that serve as edge detectors (asynchronous MUX), as exemplified below.  According to WSOU's infringement contentions, each edge detector receives an input clock signal (select line 'S') and detects a rising edge of that input clock signal to generate enable signals (Clock output of the asynchronous MUX).<br><br>For instance, each MUX has two input lines and a select line.  The asynchronous MUX timing diagram below shows that, before the 'S' line transitioned from low to high, $I_0$ was selected to be the output signal 'O'.  When the S line transitioned from low to high (i.e., rising edge of the clock was detected), $I_1$ was selected to be the output signal 'O', and thus a first clock signal was enabled.<br><br>*See, e.g.*, |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH
U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
| --- | --- |
| | Figure 3-1:   Detailed MMCM Block Diagram<br><br>UG572, at 31. |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH ███████████████████                     U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | <br><br>Figure 2-9:   BUFGMUX as BUFGCTRL<br><br>UG572, at 20.<br><br>Figure 2-15 shows the asynchronous MUX timing diagram.<br><br>Figure 2-15:   Asynchronous MUX Timing Diagram |

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | UG572, at 23.<br><br>According to WSOU's infringement contentions, the following exemplary schematic evidence further illustrates how this claim element is met by the UltraScale FPGAs:<br><br><br><br>To the extent this limitation is not explicitly disclosed by UG572, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the UltraScale FPGAs so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |
| 1(c) a second edge detector configured to receive the second input clock signal, the second edge detector operable to detect the rising edge of the second input clock signal and to generate a second enable signal; | UG572 discloses this limitation. According to WSOU's infringement contentions, the UltraScale FPGAs comprise a second edge detector configured to receive the second input clock signal, the second edge detector operable to detect a rising edge of the second input clock signal and to generate a second enable signal.<br><br>For instance, the MMCM comprises two input MUXes (Multiplexers) that serve as edge detectors (asynchronous MUX), as exemplified below. According to WSOU's infringement contentions, each edge detector receives an input clock signal (select line 'S') and detects a rising edge of that input clock signal to generate enable signals (Clock output of the asynchronous MUX). |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH                                    U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | As other examples, each MUX has two input lines and a select line.  The asynchronous MUX timing diagram below shows that, before the 'S' line transitioned from low to high, $I_0$ was selected to be the output signal 'O'.  When the S line transitioned from low to high (i.e., rising edge of the clock was detected), $I_1$ was selected to be the output signal 'O', and thus a clock signal was enabled.<br><br>*See, e.g.,*<br><br><br>*Figure 3-1:* **Detailed MMCM Block Diagram**<br>UG572, at 31. |

| '838 Claim Language | Prior Art References |
|---|---|
| | <br><br>*Figure 2-9*:   **BUFGMUX as BUFGCTRL**<br><br>UG572, at 20.<br><br>Figure 2-15 shows the asynchronous MUX timing diagram.<br><br>*Figure 2-15*:   **Asynchronous MUX Timing Diagram** |

████████████████████████ U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | UG572, at 23.<br><br>According to WSOU's infringement contentions, the following exemplary schematic evidence further illustrates how this claim element is met by the UltraScale FPGAs:<br><br><br><br>To the extent this limitation is not explicitly disclosed by UG572, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the UltraScale FPGAs so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |
| 1(d) a first divider configured to receive the first enable signal and operable to generate a first adjusted enable signal based on a first predetermined factor; and | UG572 discloses this limitation.  According to WSOU's infringement contentions, the UltraScale FPGAs comprise a first divider configured to receive the first enable signal and operable to generate a first adjusted enable signal based on a first predetermined factor.<br><br>For example, in the MMCM architecture, the clock output signal (first enable signal) from one of the two BUFGMUX is connected to a counter divider 'D' (first divider).  The counter divider ('D') is thus configured to receive the clock output signal (first enable signal), as exemplified below. The output from the counter divider 'D' is a first adjusted enable signal generated based on a first predetermined factor. |

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
|  | The 9 signals were included in the line from LF to VCO. <br><br> *See, e.g.,* <br><br>  <br><br> *Figure 3-1:* Detailed MMCM Block Diagram <br><br> UG572, at 31. <br><br> Input multiplexers select the reference and feedback clocks from either the global clock I/Os or the clock routing or distribution resources. Each clock input has a programmable counter divider (D). The phase-frequency detector (PFD) compares both phase and <br><br> UG572, at 30. |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH                                      U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | According to WSOU's infringement contentions, the following exemplary schematic evidence further illustrates how this claim element is met by the UltraScale FPGAs:<br><br>To the extent this limitation is not explicitly disclosed by UG572, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the UltraScale FPGAs so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |
| 1(e) a dual clock generator configured to receive the first adjusted enable signal and the second enable signal, and in response operable to generate a reference clock signal and transmit the reference clock signal over a single conductor. | UG572 discloses this limitation. According to WSOU's infringement contentions, the UltraScale FPGAs comprise a dual clock generator configured to receive the first adjusted enable signal and the second enable signal, and in response operable to generate a reference clock signal and transmit the reference clock signal over a single conductor.<br><br>For instance, the first adjusted enable signal and the second enable signal that are output from the counter divider 'D' and a second MUX 'BUFGMUX', respectively, are sent to a dual clock generator module (blocks from PFD to VCO, according to WSOU's infringement contentions). The phase-frequency detector (PFD) generates a signal proportional to the phase and frequency of both enable signals. The PFD produces an up or down signal to the charge pump (CP) and loop filter (LF) to determine whether the voltage-controlled oscillator (VCO) should operate at a higher or lower frequency, as exemplified below. Eight signals can eventually be sent out from the VCO |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH                              U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
|  | and one of those signals is the reference clock signal (CLKOUT), which is then transmitted forward over a single conductor, as exemplified below.<br><br>*See, e.g.,*<br><br><br><br>*Figure 3-1:*   Detailed MMCM Block Diagram<br><br>UG572, at 31. |

| '838 Claim Language | Prior Art References |
|---|---|
| | ## MMCMs<br><br>UltraScale architecture-based devices contain one CMT per I/O bank. The MMCMs serve as frequency synthesizers for a wide range of frequencies, and as jitter filters for either external or internal clocks, and deskew clocks.<br><br>Input multiplexers select the reference and feedback clocks from either the global clock I/Os or the clock routing or distribution resources. Each clock input has a programmable counter divider (D). The phase-frequency detector (PFD) compares both phase and frequency of the rising edges of both the input (reference) clock and the feedback clock. If a minimum High/Low pulse is maintained, the duty cycle is ancillary. The PFD is used to generate a signal proportional to the phase and frequency between the two clocks. This signal drives the charge pump (CP) and loop filter (LF) to generate a reference voltage to the VCO. The PFD produces an up or down signal to the charge pump and loop filter to determine whether the VCO should operate at a higher or lower frequency. When VCO operates at a frequency that is too high, the PFD activates a down signal causing the control voltage to be reduced, thus decreasing the VCO operating frequency. When the VCO operates at a frequency that is too low, an up signal increases voltage. The VCO produces eight output phases and one variable phase for fine-phase shifting. Each output phase can be selected as the reference clock to the output counters (Figure 3-1). Each counter can be independently programmed for a given customer design. A special counter M is also provided. This counter controls the feedback clock of the MMCM, allowing a wide range of frequency synthesis.<br><br>In addition to integer divide output counters, MMCMs add a fractional counter for CLKOUT0 and CLKFBOUT.<br><br>UG572, at 30-31.<br><br>According to WSOU's infringement contentions, the following exemplary schematic evidence further illustrates how this claim element is met by the UltraScale FPGAs: |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | |
|---|---|
| |  |
| | To the extent this limitation is not explicitly disclosed by UG572, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the UltraScale FPGAs so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |

# EXHIBIT I

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

**EXHIBIT E-7**
**U.S. PATENT NO. 9,312,838**

The asserted claims of U.S. Patent No. 9,312,838 ("the '838 patent") are anticipated and/or obvious in view of the Virtex-5 family of FPGAs from Xilinx ("Virtex-5") and in view of the Xilinx UG190 Virtex-5 FPGA User Guide v3.2 ("User Guide"), either alone or combination with the knowledge of a person of ordinary skill in the art ("POSITA"), or in combination with one or more other references disclosed in Xilinx's Invalidity Contentions, including the other charted references. Schematics further evidencing the design of the Virtex-5 FPGA device are available for review on a Source Code Review computer, as set forth in paragraph 12 of the Protective Order, at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801.

Virtex-5 FPGA devices were in public use, on sale, or otherwise available to the public at least as early as December 2007. The User Guide was published as version 3.2 on December 11, 2007 and as version 5.4 on March 16, 2012. Therefore, both Virtex-5 FPGA devices and the User Guide qualify as prior art at least under 35 U.S.C. § 102(a)(1).

WSOU alleges that the mixed-mode clock manager (MMCM) architecture in the accused products infringes the '838 Patent. (*See* Plaintiff's Amended Initial Claim Charts, Ex. 5 (Nov. 8, 2021).) To be clear, Xilinx disputes these allegations. Furthermore, Xilinx developed the MMCM architecture before the application for the '838 Patent was filed in December 2013, and has been making and selling products that incorporate that architecture ever since. To the extent that the '838 Patent claims are construed to encompass the accused products as alleged by WSOU, then the claims are invalid as anticipated by that same functionality in Xilinx's Virtex-5 products that were developed and sold before the '838 Patent was filed, as illustrated in the chart below. *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) ("A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'" (quoting *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003))).

The use of claim terms in the chart below is based on WSOU's construction of claim terms in its infringement contentions, as understood by Xilinx. This chart should not be construed as consenting to or agreeing with WSOU's construction of claim terms. Because discovery is ongoing and the Court has not completed the claim construction process, Xilinx reserves all rights to amend its invalidity contentions based on new information produced in discovery or on the Court's constructions.

| '838 Claim Language | Prior Art References |
|---|---|
| 1(pre) An apparatus, comprising; | To the extent the preamble is limiting, the User Guide discloses it. According to WSOU's infringement contentions, the Virtex-5 includes an apparatus comprising first and second clocks operable to generate first and second input clock signals, respectively, wherein the first and second input clock signals are asynchronous in relation to one another. |

1

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| 1(a) first and second clocks operable to generate first and second input clock signals, respectively, wherein the first and second input clock signals are asynchronous in relation to one another; | The Virtex-5 clock resources manage complex and simple clocking requirements. The clock management tiles (CMT) are used to provide clock frequency synthesis, deskew, and jitter filtering functionality. In Virtex-5 devices, the CMT comprises two digital clock managers (DCMs) and a phase-locked loop (PLL). The PLL functions as a frequency synthesizer, and jitter filter for either internal/external clocks and deskew clocks, as exemplified below. |

*See, e.g.,*

## *Phase-Locked Loops (PLLs)*

### Introduction

The Virtex-5 clock management tile (CMT) includes two DCMs and one PLL. There are dedicated routes within a CMT to couple together various components. Each block within the tile can be treated separately; however, there exists a dedicated routing between blocks creating restrictions on certain connections. Using these dedicated routes frees up global resources for other design elements. Additionally, the use of local routes within the CMT provides an improved clock path because the route is handled locally, reducing chances for noise coupling.

The CMT diagram (Figure 3-1) shows a high-level view of the connection between the various clock input sources and the DCM-to-PLL and PLL-to-DCM dedicated routing. The six (total) PLL output clocks are muxed into a single clock signal for use as a reference clock to the DCMs. Two output clocks from the PLL can drive the DCMs. These two clocks are 100% independent. PLL output clock 0 could drive DCM1 while PLL output clock 1 could drive DCM2. Each DCM output can be muxed into a single clock signal for use as a reference clock to the PLL. Only one DCM can be used as the reference clock to the PLL at any given time. A DCM can not be inserted in the feedback path of the PLL. Both the PLLs or DCMs of a CMT can be used separately as stand-alone functions. The outputs from the PLL are not spread spectrum.

User Guide, at 85.

2

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | **Phase Lock Loop (PLL)** |
| | Virtex-5 devices contain up to six CMT tiles. The PLLs main purpose is to serve as a frequency synthesizer for a wide range of frequencies, and to serve as a jitter filter for either external or internal clocks in conjunction with the DCMs of the CMT. |
| | The PLL block diagram shown in Figure 3-2 provides a general overview of the PLL components. |
| | User Guide, at 86. |
| | For example, the PLL architecture comprises two input multiplexers that select a first input clock (input or reference clock; CLKIN1 or CLKIN2) signal and a second input clock (feedback clock; CLKFB or CLKFBOUT) signal. The PLL block diagram shown below also comprises blocks PFD to VCO. The phase-frequency detector (PFD) in the PLL is equipped to compare two asynchronous signals (i.e two signals with variable phase and frequency difference). Hence, according to WSOU's infringement contentions, both of the input clock signals are asynchronous relative to each other, as shown below. |
| | *See, e.g.,* |

3

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | Input muxes select the reference and feedback clocks from either the IBUFG, BUFG, IBUF, PLL outputs, or one of the DCMs. Each clock input has a programmable counter D. The Phase-Frequency Detector (PFD) compares both phase and frequency of the input (reference) clock and the feedback clock. Only the rising edges are considered because as long as a minimum High/Low pulse is maintained, the duty cycle is not important. The PFD is used to generate a signal proportional to the phase and frequency between the two clocks. This signal drives the Charge Pump (CP) and Loop Filter (LF) to generate a reference voltage to the VCO. The PFD produces an up or down signal to the charge pump and loop filter to determine whether the VCO should operate at a higher or lower frequency. When VCO operates at too high of a frequency, the PFD activates a down signal, causing the control voltage to be reduced decreasing the VCO operating frequency. When the VCO operates at too low of a frequency, an up signal will increase voltage. The VCO produces eight output phases. Each output clock can be selected as the reference clock to the output counters (Figure 3-3.) Each counter can be independently programmed for a given customer design. A special counter, M, is also provided. This counter controls the feedback clock of the PLL allowing a wide range of frequency synthesis.<br><br>User Guide, at 87. |

4

WSOU v. Xilinx, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| |  Figure 3-3:  Detailed PLL Block Diagram <br><br> User Guide, at 88. <br><br> To the extent this limitation is not explicitly disclosed by the User Guide, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the Virtex-5 so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |
| 1(b) a first edge detector configured to receive the first | The User Guide discloses this limitation.  According to WSOU's infringement contentions, the Virtex-5 comprises a first edge detector configured to receive the first input clock signal, the first |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| input clock signal, the first edge detector operable to detect a rising edge of the first input clock signal and to generate a first enable signal; | edge detector operable to detect a rising edge of the first input clock signal and to generate a first enable signal.<br><br>As examples, the PLL comprises two input MUXes (Multiplexers) that serve as edge detectors (asynchronous MUX), as exemplified below. According to WSOU's infringement contentions, each edge detector receives an input clock signal (select line 'S') and detects a rising edge of that input clock signal to generate enable signals (Clock output of the asynchronous MUX).<br><br>For instance, each MUX has two input lines and a select line. The asynchronous MUX timing diagram below shows that, before the 'S' line transitioned from low to high, I0 was selected to be the output signal 'O'. When the S line transitioned from low to high (i.e., rising edge of the clock was detected), I1 was selected to be the output signal 'O', and thus a first clock signal was enabled.<br><br>*See, e.g.,* |

U.S. Patent No. 9,312,838

WSOU v. Xilinx, Case No. 1:20-cv-01233-CFC-JLH

| '838 Claim Language | Prior Art References |
|---|---|
| | <br><br>*Figure 3-3:* **Detailed PLL Block Diagram**<br><br>User Guide, at 88. |

| Prior Art References | '838 Claim Language |
|---|---|
|  | |

8

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | User Guide, at 32. |
| | To the extent this limitation is not explicitly disclosed by the User Guide, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the Virtex-5 so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |
| 1(c) a second edge detector configured to receive the second input clock signal, the second edge detector operable to detect the rising edge of the second input clock signal and to generate a second enable signal; | UG572 discloses this limitation. According to WSOU's infringement contentions, the Virtex-5 comprises a second edge detector configured to receive the second input clock signal, the second edge detector operable to detect a rising edge of the second input clock signal and to generate a second enable signal. |
| | For instance, the PLL comprises two input MUXes (Multiplexers) that serve as edge detectors (asynchronous MUX), as exemplified below. According to WSOU's infringement contentions, each edge detector receives an input clock signal (select line 'S') and detects a rising edge of that input clock signal to generate enable signals (Clock output of the asynchronous MUX). |
| | As other examples, each MUX has two input lines and a select line. The asynchronous MUX timing diagram below shows that, before the 'S' line transitioned from low to high, I$_0$ was selected to be the output signal 'O'. When the S line transitioned from low to high (i.e., rising edge of the clock was detected), I$_1$ was selected to be the output signal 'O', and thus a clock signal was enabled. |
| | *See, e.g.,* |

9

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| |  *Figure 3-3:* **Detailed PLL Block Diagram** User Guide, at 88. |

10

| Prior Art References | '838 Claim Language |
|---|---|
|  | |

*Figure 1-8:* **BUFGMUX as BUFGCTRL**

User Guide, at 29.

*Figure 1-14:* **Asynchronous Mux Timing Diagram**

11

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | User Guide, at 32.<br><br>To the extent this limitation is not explicitly disclosed by the User Guide, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the Virtex-5 so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |
| 1(d) a first divider configured to receive the first enable signal and operable to generate a first adjusted enable signal based on a first predetermined factor; and | The User Guide discloses this limitation.  According to WSOU's infringement contentions, the Virtex-5 comprises a first divider configured to receive the first enable signal and operable to generate a first adjusted enable signal based on a first predetermined factor.<br><br>For example, in the PLL architecture, the clock output signal (first enable signal) from one of the two BUFGMUX is connected to a counter divider 'D' (first divider).  The counter divider ('D') is thus configured to receive the clock output signal (first enable signal), as exemplified below.  The output from the counter divider 'D' is a first adjusted enable signal generated based on a first predetermined factor.<br><br>The 8 signals were included in the line from LF to VCO.<br><br>*See, e.g.,* |

12

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| |  |

*Figure 3-3:* **Detailed PLL Block Diagram**

User Guide, at 88.

Input muxes select the reference and feedback clocks from either the IBUFG, BUFG, IBUF, PLL outputs, or one of the DCMs. Each clock input has a programmable counter D. The Phase-Frequency Detector (PFD) compares both phase and frequency of the input (reference) clock and the feedback clock. Only the rising edges are considered because as User Guide, at 87.

To the extent this limitation is not explicitly disclosed by the User Guide, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the Virtex-5 so

WSOU v. Xilinx, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |
| 1(e) a dual clock generator configured to receive the first adjusted enable signal and the second enable signal, and in response operable to generate a reference clock signal and transmit the reference clock signal over a single conductor. | The User Guide discloses this limitation. According to WSOU's infringement contentions, the Virtex-5 comprises a dual clock generator configured to receive the first adjusted enable signal and the second enable signal, and in response operable to generate a reference clock signal and transmit the reference clock signal over a single conductor. |
| | For instance, the first adjusted enable signal and the second enable signal that are output from the counter divider 'D' and a second MUX 'BUFGMUX', respectively, are sent to a dual clock generator module (blocks from PFD to VCO, according to WSOU's infringement contentions). The phase-frequency detector (PFD) generates a signal proportional to the phase and frequency of both enable signals. The PFD produces an up or down signal to the charge pump (CP) and loop filter (LF) to determine whether the voltage-controlled oscillator (VCO) should operate at a higher or lower frequency, as exemplified below. Eight signals can eventually be sent out from the VCO and one of those signals is the reference clock signal (CLKOUT), which is then transmitted forward over a single conductor, as exemplified below. |
| | See, e.g., |

14

| '838 Claim Language | Prior Art References |
|---|---|
| |  Figure 3-3: Detailed PLL Block Diagram<br><br>User Guide, at 88. |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | Input muxes select the reference and feedback clocks from either the IBUFG, BUFG, IBUF, PLL outputs, or one of the DCMs. Each clock input has a programmable counter D. The Phase-Frequency Detector (PFD) compares both phase and frequency of the input (reference) clock and the feedback clock. Only the rising edges are considered because as long as a minimum High/Low pulse is maintained, the duty cycle is not important. The PFD is used to generate a signal proportional to the phase and frequency between the two clocks. This signal drives the Charge Pump (CP) and Loop Filter (LF) to generate a reference voltage to the VCO. The PFD produces an up or down signal to the charge pump and loop filter to determine whether the VCO should operate at a higher or lower frequency. When VCO operates at too high of a frequency, the PFD activates a down signal, causing the control voltage to be reduced decreasing the VCO operating frequency. When the VCO operates at too low of a frequency, an up signal will increase voltage. The VCO produces eight output phases. Each output phase can be selected as the reference clock to the output counters (Figure 3-3.) Each counter can be independently programmed for a given customer design. A special counter, M, is also provided. This counter controls the feedback clock of the PLL allowing a wide range of frequency synthesis. |
| | User Guide, at 87. |
| | To the extent this limitation is not explicitly disclosed by the User Guide, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the Virtex-5 so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |

16

# EXHIBIT J

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

**EXHIBIT E-8**
**U.S. PATENT NO. 9,312,838**

The asserted claims of U.S. Patent No. 9,312,838 ("the '838 patent") are anticipated and/or obvious in view of Xilinx Virtex-6 FPGA devices ("Virtex-6") and in view of Application Note 878 ("XAPP878") v1.1, entitled "MMCM Dynamic Reconfiguration" and published by Xilinx, Inc., either alone or combination with the knowledge of a person of ordinary skill in the art ("POSITA"), or in combination with one or more other references disclosed in Xilinx's Invalidity Contentions, including the other charted references. Schematics further evidencing the design of the Virtex-6 FPGA device are available for review on a Source Code Review computer, as set forth in paragraph 12 of the Protective Order, at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801.

Virtex-6 FPGA devices were in public use, on sale, or otherwise available to the public at least as early as June 2010. XAPP878 was published on June 9, 2010. Therefore, both Virtex-6 FPGA devices and XAPP878 qualify as prior art under at least AIA 35 U.S.C. § 102(a)(1).

WSOU alleges that the mixed-mode clock manager (MMCM) architecture in the accused products infringes the '838 Patent. (*See* Plaintiff's Amended Initial Claim Charts, Ex. 5 (Nov. 8, 2021).) To be clear, Xilinx disputes these allegations. Furthermore, Xilinx developed the MMCM architecture before the application for the '838 Patent was filed in December 2013, and has been making and selling products that incorporate that architecture ever since. To the extent that the '838 Patent claims are construed to encompass the accused products as alleged by WSOU, then the claims are invalid as anticipated by that same functionality in Xilinx's Virtex-6 products that were developed and sold before the '838 Patent was filed, as illustrated in the chart below. *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) ("A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'" (quoting *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003))).

The use of claim terms in the chart below is based on WSOU's construction of claim terms in its infringement contentions, as understood by Xilinx. This chart should not be construed as consenting to or agreeing with WSOU's construction of claim terms. Because discovery is ongoing and the Court has not completed the claim construction process, Xilinx reserves all rights to amend its invalidity contentions based on new information produced in discovery or on the Court's constructions.

| '838 Claim Language | Prior Art References |
|---|---|
| 1(pre) An apparatus, comprising: | To the extent the preamble is limiting, XAPP878 discloses it. XAPP878 describes the mixed-mode clock manager ("MMCM") of the Virtex-6 FPGA, which is an apparatus. |

1

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | *See, e.g.,* |
| | This application note provides a method to dynamically change the clock output frequency, phase shift, and duty cycle of the Virtex®-6 FPGA mixed-mode clock manager (MMCM) through its dynamic reconfiguration port (DRP). An explanation of the behavior of the internal DRP control registers is accompanied by a reference design that uses a state machine to drive the DRP, which ensures the registers are controlled in the correct sequence. |
| | XAPP878, at 1. |
| | To the extent this limitation is not explicitly disclosed by XAPP878, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the Virtex-6 so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |
| 1(a) first and second clocks operable to generate first and second input clock signals, respectively, wherein the first and second input clock signals are asynchronous in relation to one another; | XAPP878 discloses this limitation.  As illustrated in XAPP878, the MMCM comprises two multiplexers that select a first input clock signal (input or reference clock; CLKIN1 or CLKIN2) and a second input clock signal (feedback clock; CLKFB or CLKFBOUT).  The MMCM also comprises a phase-frequency detector (PFD), which—according to WSOU's infringement contentions—is equipped to compare two asynchronous signals.  Hence, both of the input clock signals are asynchronous in relation to one another. |
| | *See, e.g.,* |

WSOU v. Xilinx, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | <br><br>*Figure 1:* MMCM Block Diagram<br><br>XAPP878, at 3.<br><br>To the extent this limitation is not explicitly disclosed by XAPP878, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the Virtex-6 so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |
| 1(b) a first edge detector configured to receive the first input clock signal, the first edge detector operable to | XAPP878 discloses this limitation. According to WSOU's infringement contentions, multiplexers can serve as edge detectors and generate enable signals. As illustrated in XAPP878, the MMCM comprises a first multiplexer (first edge detector) configured to receive a first input clock signal |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| detect a rising edge of the first input clock signal and to generate a first enable signal; | (CLKIN1 or CLKIN2) and to detect a rising edge of that input clock signal to generate a first enable signal.<br><br>*See, e.g.,*<br><br><br><br>*Figure 1:*  **MMCM Block Diagram**<br><br>XAPP878, at 3.<br><br>To the extent this limitation is not explicitly disclosed by XAPP878, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the Virtex-6 so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |

| '838 Claim Language | Prior Art References |
|---|---|
| 1(c) a second edge detector configured to receive the second input clock signal, the second edge detector operable to detect the rising edge of the second input clock signal and to generate a second enable signal; | XAPP878 discloses this limitation. According to WSOU's infringement contentions, multiplexers can serve as edge detectors and generate enable signals. As illustrated in XAPP878, the MMCM comprises a second multiplexer (second edge detector) configured to receive a second input clock signal (CLKFB or CLKFBOUT) and to detect a rising edge of that input clock signal to generate a second enable signal.<br><br>*See, e.g.,*<br><br><br><br>*Figure 1:* **MMCM Block Diagram**<br><br>XAPP878, at 3. |

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | To the extent this limitation is not explicitly disclosed by XAPP878, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the Virtex-6 so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |
| 1(d) a first divider configured to receive the first enable signal and operable to generate a first adjusted enable signal based on a first predetermined factor; and | XAPP878 discloses this limitation. According to WSOU's infringement contentions, the MMCM comprises a first divider configured to receive the first enable signal and operable to generate a first adjusted enable signal based on a first predetermined factor. Specifically, as illustrated in XAPP878, the clock output signal (first enable signal) from one of the two multiplexers (edge detectors) is connected to a counter divider 'D' (first divider). The counter divider ('D') is thus configured to receive the clock output signal (first enable signal). The output from the counter divider 'D' is a first adjusted enable signal generated based on a first predetermined factor. <br><br> *See, e.g.,* |

6

*WSOU v. Xilinx*, Case No. 1:20-cv-0123-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| |  Figure 1:  MMCM Block Diagram <br><br> XAPP878, at 3. <br><br> To the extent this limitation is not explicitly disclosed by XAPP878, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the Virtex-6 so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |
| 1(e) a dual clock generator configured to receive the first adjusted enable signal and the second enable signal, and in | XAPP878 discloses this limitation.  According to WSOU's infringement contentions, the first adjusted enable signal and the second enable signal that are output from the counter divider and a second edge detector are sent to a dual clock generator module (blocks from PFD to VCO). Specifically, the first adjusted enable signal and the second enable signal are passed to the PFD. |

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| response operable to generate a reference clock signal and transmit the reference clock signal over a single conductor. | According to WSOU's infringement contentions, the PFD generates a signal proportional to the phase and frequency of both enable signals. The PFD produces an up or down signal to the charge pump CP and the loop filter LF to determine whether the VCO should operate at a higher or lower frequency. The VCO then produces multiple output phases, each of which can be selected as a reference clock (reference clock signal) that is then transmitted forward over a single conductor. According to WSOU's infringement contentions, blocks PFD to VCO make up a dual clock generator. Therefore, the module comprising blocks PFD to VCO is a dual clock generator.<br><br>*See, e.g.,*<br><br><br><br>*Figure 1:*  **MMCM Block Diagram**<br><br>XAPP878, at 3. |

8

*WSOU v. Xilinx*, Case No. 1:20-cv-01233-CFC-JLH

U.S. Patent No. 9,312,838

| '838 Claim Language | Prior Art References |
|---|---|
| | To the extent this limitation is not explicitly disclosed by XAPP878, it is inherent or obvious. Moreover, it would have been obvious to one of ordinary skill in the art to modify the Virtex-6 so as to include this claim limitation in light of the knowledge possessed by one of ordinary skill in the art. |

# EXHIBIT K

# JONES DAY

555 SOUTH FLOWER STREET, FIFTIETH FLOOR • LOS ANGELES, CA 90071.2300

TELEPHONE: +1.213.489.3939 • FACSIMILE: +1.213.243.2539

Direct Number:  (213) 243-2559
jonathansmith@jonesday.com

469799-600016

November 11, 2021

VIA E-MAIL

Hershy Stern, Esq.
KASOWITZ, BENSON, TORRES LLP
1633 Broadway
New York, NY 10019
HStern@Kasowitz.com

Re:    Civil Action No. 20-cv-1228-CFC-JLH (D. Del.)
       *WSOU v. Xilinx, Inc.*:  WSOU's Infringement Contentions ("ICs")

Dear Counsel:

We write concerning deficiencies with WSOU's Infringement Contentions ("ICs") served on October 27, 2021, as amended on November 8, 2021.  Xilinx reserves the right to raise additional deficiencies in WSOU's claim charts as discovery proceeds.  We ask that WSOU respond to this letter no later than November 17, 2021.

The purpose of infringement contentions is for WSOU to provide Xilinx reasonable notice of its infringement allegations and theories—including, specifically, mapping accused features of the accused products to the claim limitations.  *Intellectual Ventures I LLC v. AT&T Mobility LLC*, C.A. No. 13–1668–LPS, 2017 WL 658469, at *2 (D. Del. Feb. 14, 2017).  Having broadly accused a large number of Xilinx products, it is incumbent upon WSOU to provide notice of its infringement theories for each product.  And, to the extent that WSOU alleges that its ICs and their claim charts are representative for a group of Xilinx products, it is incumbent upon WSOU to explain why this is so—particularly with Xilinx already having produced its core technical documents and source code for every accused Xilinx product.  Xilinx is entitled to this notice for each accused Xilinx product in order to prepare its defenses to WSOU's allegations.

However, WSOU's ICs and their claim charts fail to provide adequate notice about how each accused Xilinx product allegedly meets each claim limitation, and otherwise remain vague and overbroad.  WSOU's ICs also improperly include its already-dismissed indirect infringement contentions.  These and other deficiencies with WSOU's ICs are further detailed below.

NAI-1522814545

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DETROIT
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SAUDI ARABIA • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

Hershy Stern
November 11, 2021
Page 2

**A.    WSOU Has Failed To Provide Notice Of Its Infringement Allegations For Each Of The Xilinx Accused Products**

WSOU has chosen to broadly accuse a large number of Xilinx products.  But WSOU has not charted or otherwise provided notice of its infringement allegations for each of these products, as discussed below.

**1.    WSOU Has Failed To Provide Claim Charts Relating To Each Xilinx Accused Product**

The Court's Scheduling Order required WSOU to "produce an initial claim chart relating each accused product to the asserted claims."  (D.I. 63 ¶ 7(c).)  Contrary to the Court's order, however, WSOU has presented claim charts discussing the features of only some of the accused Xilinx products.  Further, it is unclear in many instances how the specific Xilinx product charted and its allegedly-infringing features supposedly relate to the other accused Xilinx products for the same patent that have not been charted and are not specifically discussed.  As a result, WSOU's ICs do not provide notice of its infringement theories for each accused product.

The '653 Patent:  WSOU's Exhibit 1 claim chart asserts:

> The accused instrumentalities include, without limitation, Xilinx Filed Programmable Gate Arrays ("FPGA") devices/products and System on Chip ("SoC") devices/products **with transceivers (such as the GTY and GTH transceivers)**, and evaluation kits that comprise the foregoing devices, including, but not limited to [list of specific Xilinx devices/products].[1]

(Ex. 1 to ICs, at 1.)  However, WSOU's claim chart maps the claim limitations only to Xilinx's GTY and GTH transceivers.  (*See generally id.*)  Because WSOU's chart is only for these two transceivers, please confirm that WSOU is limiting its infringement allegations to Xilinx FPGA and SoC products having GTY or GTH transceivers.  To the extent that WSOU truly seeks to accuse all Xilinx products "with transceivers," WSOU has failed to provide claim charts relating to each Xilinx accused product or disclosed how those other products allegedly infringe.  Further, WSOU's boilerplate language asserting that the "following infringement analysis for certain accused instrumentalities is exemplary and applicable to other accused instrumentalities," (*id.* at 1), fails to remedy these deficiencies or to provide adequate notice of infringement for any Xilinx products that do not have GTY or GTH transceivers.

---

[1] All emphasis added unless otherwise noted.

Hershy Stern
November 11, 2021
Page 3

    The '950 Patent: WSOU's Exhibit 2 claim chart asserts:

        The accused instrumentalities include, without limitation, ***Xilinx Field Programmable Gate Arrays ("FPGA") devices/products and System on Chip ("SOC") devices/products***, including, but not limited to, Virtex UltraScale devices/products; Kintex UltraScale devices/products; Virtex UltraScale+ devices/products; Kintex UltraScale+ devices/products; Artix UltraScale+ devices/products; Zynq UltraScale+ devices/products; and/or any other Xilinx device, product, and instrumentality that operate using the similar components and/or functionality.

(Ex. 2 to ICs, at 1.)  However, WSOU's claim chart only maps the claim limitations to one category of products: the Xilinx Zynq Ultrascale+.  (*See id.* at 2–10.)  WSOU's claim chart fails to map the claim limitations to any other Xilinx FPGA or SOC devices or products, nor does WSOU explain why its infringement allegations against the Xilinx Zynq Ultrascale+ is representative for any other products or cite evidence supporting that proposition.  Further, WSOU's boilerplate language asserting that the "following infringement analysis for certain accused instrumentalities is exemplary and applicable to other accused instrumentalities," (*id.* at 1), fails to remedy these deficiencies.  Accordingly, please confirm that WSOU's infringement allegations are limited to only the Virtex Zynq Ultrascale+, and that it is withdrawing its allegations against the other identified products.

    The '938 Patent:  WSOU's Exhibit 3 claim chart asserts:

        The accused instrumentalities include, without limitation, ***Xilinx boards and kits***, including Xilinx FPGA boards, Xilinx SoC boards, Xilinx System-on-Modules, and Alveo Data Center accelerator cards, including but not limited to: Zynq UltraScale+ devices/products, including but not limited to RFSoC ZCU216 Evaluation Kit, MPSoC ZCU102 Evaluation Kit, MPSoC ZCU104 Evaluation Kit, MPSoC ZCU106 Evaluation Kit, RFSoC ZCU208 Evaluation Kit, RFSoC ZCU1285 Characterization Kit, RFSoC ZCU111 Evaluation Kit, RFSoC ZCU1275 Characterization Kit; Avnet Ultra96-V2 device/products; Avnet UltraZed-EV Starter Kit devices/products; UltraZed-EG Starter Kit devices/products; Zynq UltraScale+ RFSoC Development Kit with Qorvo RF Front End (Avnet) devices/products; and/or any other Xilinx

Hershy Stern
November 11, 2021
Page 4

> device, product, and instrumentality that operate using the similar
> components and/or functionality.

(Ex. 3 to ICs, at 1.)  However, WSOU's claim chart only maps the claim limitations to one product: the Zynq UltraScale+ RFSoC ZCU216 Evaluation Kit.  (*See generally id.*)  WSOU's IC fail to disclose how any other accused products allegedly infringe, or how the Zynq UltraScale+ RFSoC ZCU216 Evaluation Kit is allegedly representative of other products.

In particular, WSOU maps many claim limitations to Cortex-R5F MP processor cores from ARM; Platform Management Unit (PMU) functionality; and wake on real-time clock functionality.  But WSOU does not map similar alleged features from Xilinx's other accused products, or otherwise explain if these other products allegedly have similar features and operate in a similar fashion.  WSOU's boilerplate language asserting that the "following infringement analysis for certain accused instrumentalities is exemplary and applicable to other accused instrumentalities," (*id.* at 1), once again fails to remedy these deficiencies or to provide adequate notice of infringement for all of the accused boards, accelerator cards, devices, and products.  We therefore ask WSOU to confirm it is limiting its infringement allegations to the Zynq UltraScale+ RFSoC ZCU216 Evaluation Kit, and that it is withdrawing its infringement allegations against any other product.

> The '971 Patent:  WSOU's Exhibit 4 claim chart asserts:

>> The accused instrumentalities include, without limitation, ***Xilinx Field Programmable Gate Arrays ("FPGA") and 3D IC devices/products***, including, but not limited to: Spartan devices/products; Virtex devices/products; Kintex devices/products; Artix devices/products; Virtex UltraScale devices/products; Kintex  UltraScale devices/products; Virtex UltraScale+ devices/products; Kintex UltraScale+ devices/products; Artix UltraScale+ devices/products; Virtex UltraScale+ 58G PAM4 devices/products; and any other Xilinx device, product and instrumentality that operates using the similar components and/or functionality.

(Ex. 4 to ICs, at 1.)  However, WSOU's claim chart only maps the claim limitations to one category of products: the Virtex UltraScale+ FPGA.  (*See id.* at 8–12.)  WSOU's claim chart fails to map all claim limitations to any other accused Xilinx FPGA or 3D IC devices or products, nor does WSOU explain why its infringement allegations against the Virtex

NAI-1522814545

Hershy Stern
November 11, 2021
Page 5

UltraScale+ FPGA is supposedly representative for any other products or cite evidence supporting that proposition.

Moreover, WSOU's infringement allegations are specifically directed, in part, at products that support both PAM4 and NRZ modulation.  (*Id.* at 14–15.)  However, WSOU does not disclose any basis for asserting that all of the accused products support both PAM4 and NRZ modulation or otherwise satisfy the claims—and, indeed, the Virtex UltraScale+ 58G PAM4 is the only accused product that supports both modulation schemes.  (*See, e.g.*, XILINX_WSOU-0013929-47 (showing that Spartan-7 series does even not include a transceiver).)  Therefore, WSOU's infringement contentions are clearly deficient and, indeed, lack merit.  WSOU's boilerplate language asserting that the "following infringement analysis for certain accused instrumentalities is exemplary and applicable to other accused instrumentalities," (*id.* at 1), fails to remedy these deficiencies.  Accordingly, please confirm that WSOU's infringement allegations are limited to the Virtex UltraScale+ FPGA, as well as products allegedly supporting both PAM4 and NRZ modulation, and that WSOU is withdrawing its allegations against the other identified products.

2.     **WSOU's Lengthy String Citations To Xilinx Documents Fail To Provide Notice Of Its Infringement Theories**

The claim charts of WSOU's ICs are also deficient because they include string citations to Xilinx documents at the beginning of each limitation.  These string citations do not explain how each citation relates to the alleged infringement or meets the claim limitation.  Often the citation is to dozens of pages or more—or even entire documents.  In each instance, there is no explanation at all of the document or how the cited portions allegedly related to the claim limitation.  Some examples include the following:

'653 Patent, Element 7a:  "The accused instrumentalities comprise a decision circuit directly connected to an integrator.  *See, e.g.*, XILINX_WSOU-0001667-XILINX_WSOU-0001758 at 1672-1674, 1698-1708, 1710-1712, 1719-1726; XILINX_WSOU-0009168-XILINX_WSOU-0009212; XILINX_WSOU-0009213-XILINX_WSOU-0009216; XILINX_WSOU-0010634-XILINX_WSOU-0010662 at 10643-10647; XILINX_WSOU-0017308-XILINX_WSOU-0017331 at 17308-17313, 17320, 17323-17330; XILINX_WSOU-0018200-XILINX_WSOU-0018216; XILINX_WSOU-0018217-XILINX_WSOU-0018238; XILINX_WSOU-0018239-XILINX_WSOU-0018312 at 18281-18300; XILINX_WSOU-0018341-XILINX_WSOU-0018353; XILINX_WSOU-0018354-XILINX_WSOU-0018376; XILINX_WSOU-0018377-XILINX_WSOU-0018400; XILINX_WSOU-0018401-XILINX_WSOU-0018420; XILINX_WSOU-0018748-XILINX_WSOU-0018992; XILINX_WSOU-0019023-XILINX_WSOU-0019030; XILINX_WSOU-0020032-

Hershy Stern
November 11, 2021
Page 6

XILINX_WSOU-0020040; XILINX_WSOU-0023124-XILINX_WSOU-0023140; XILINX_WSOU-0023141-XILINX_WSOU-0023156; XILINX_WSOU-0024281-XILINX_WSOU-0024312."  (Ex. 1 to ICs, at 11.)

'950 Patent, Element 17a:  "The accused instrumentalities enable analyzing spectral power of a data-modulated signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding to a spectral null of the data-modulated signal. *See, e.g.*, XILINX_WSOU-0017332-XILINX_WSOU-0017432 at 17337-17343; XILINX_WSOU-0023157-XILINX_WSOU-0023160; XILINX_WSOU-0023827-XILINX_WSOU-0023866; XILINX_WSOU-0028608-XILINX_WSOU-0028698."

'938 Patent Element 13b: "The accused instrumentalities comprise a controller for controlling operation of the circuit card.  *See, e.g.*, XILINX_WSOU-0000060; XILINX_WSOU-0000065-XILINX_WSOU-0000092; XILINX_WSOU-0000093-XILINX_WSOU-0000158; XILINX_WSOU-0000605-XILINX_WSOU-0000608; XILINX_WSOU-0000656-XILINX_WSOU-0000783; XILINX_WSOU-0000935; XILINX_WSOU-0001142-XILINX_WSOU-0001185; XILINX_WSOU-0001470- XILINX_WSOU-0001540 at 1473; XILINX_WSOU-0001547-XILINX_WSOU-0001625 at 1555-1560; XILINX_WSOU-0001763-XILINX_WSOU-0001801; XILINX_WSOU-0001759-XILINX_WSOU-0001762; XILINX_WSOU-0004154-XILINX_WSOU-0004209; XILINX_WSOU-0007826-XILINX_WSOU-0007875; XILINX_WSOU-0009217-XILINX_WSOU-0009279 at 9235-9236, 9241-9247; XILINX_WSOU-0011190-XILINX_WSOU-0011233 at 11193; XILINX_WSOU-0009004-XILINX_WSOU-0009055 at 9038 & 9043; XILINX_WSOU-0009498-XILINX_WSOU-0009568 at 9537 & 9539-9541.

'971 Patent Element 1b: "The accused instrumentalities enable generating an optical signal for transmission over one of the plurality of optical fibers, the optical signal including a plurality of signal states, each signal state corresponding to a different sequence of bits. See, e.g., XILINX_WSOU-0000181-XILINX_WSOU-0000218; XILINX_WSOU-0000605-XILINX_WSOU-0000608; XILINX_WSOU-0004536-XILINX_WSOU-0004628 at 4544, 4546, 4549, 4551 & 4571."

'838 Patent Preamble and Element 1a: "To the extent the preamble is limiting, the accused instrumentalities include an apparatus comprising first and second clocks operable to generate first and second input clock signals, respectively, wherein the first and second input clock signals are asynchronous in relation to one another.  *See, e.g.*, XILINX_WSOU-0002327-XILINX_WSOU-0002355 at 2327 & 2340; XILINX_WSOU-0002327-XILINX_WSOU-0002355 at 2327 & 2340; XILINX_WSOU-0033733-XILINX_WSOU-0033767; XILINX_WSOU-0004536-XILINX_WSOU-0004628 at 4571, 4579, 4580 & 4611;

Hershy Stern
November 11, 2021
Page 7

XILINX_WSOU-0006514-XILINX_WSOU-0006584 at 6520-6526 & 6540-6547;
XILINX_WSOU-0006806-XILINX_WSOU-0006815; XILINX_WSOU-0009217-
XILINX_WSOU-0009279 at 9226-9229; XILINX_WSOU-0010663-XILINX_WSOU-0010682
at 10667; XILINX_WSOU-0009004-XILINX_WSOU-0009055 at 9018; XILINX_WSOU-
0009934-XILINX_WSOU-0010040 at 9946; XILINX_WSOU-0017332-XILINX_WSOU-
0017432; XILINX_WSOU-0017433-XILINX_WSOU-0017487 at 17438-17446 & 17452-
17453; XILINX_WSOU-0017488-XILINX_WSOU-0017565 at 17496-17502 & 17508-17527;
XILINX_WSOU-0017566-XILINX_WSOU-0017668; XILINX_WSOU-0018142-
XILINX_WSOU-0018199 at 18190-18192; XILINX_WSOU-0018239-XILINX_WSOU-
0018312 at 18273-18279; XILINX_WSOU-0021368-XILINX_WSOU-0021435;
XILINX_WSOU-0023436-XILINX_WSOU-0023461; XILINX_WSOU-0030714-
XILINX_WSOU-0030827; XILINX_WSOU-0030714-XILINX_WSOU-0030827-
XILINX_WSOU-0030893; XILINX_WSOU-0031434-XILINX_WSOU-0031463;
XILINX_WSOU-0031816-XILINX_WSOU-0031821; XILINX_WSOU-0034248-
XILINX_WSOU-0034285."

     As shown by the above examples (as well as the others in its claim charts not presented above), WSOU often cites entire documents or lengthy sections and pages of a document, rather than provide any pinpoint citation.  However, WSOU can provide pinpoint citations, as it has done in at least a few instances.  Often, the entire string citation or large portions of it are repeated for each claim limitation of the patent.  Most importantly, WSOU does not identify any specific features, allegedly infringing or otherwise, from its citations, leaving it to Xilinx to intuit what portions of these documents supposedly map to the claim limitation.  These lengthy, vague, and repetitive citations do not provide Xilinx notice of WSOU's infringement theories.

     Due to these deficiencies, we ask that WSOU confirm that it does not intend to rely upon these string citations for its infringement theories and mappings for each asserted claim.  In other words, please confirm that WSOU's infringement theories are limited to its specific explanation and discussion of the accused products and associated source code citations that follow the string citations of Xilinx documents at the beginning of each claim limitation.  To the extent that WSOU does intend to rely on these string citations and any disclosures by their associated documents, then WSOU must provide further detail with a specific explanation of how each document allegedly discloses the claim limitation, including of the specifically accused features discussed by the documents and their mapping to the claim limitation.

### 3.    WSOU's Boilerplate Doctrine Of Equivalents Language Is Deficient

     WSOU's ICs fail to disclose any specific infringement theories based on the doctrine of equivalents.  Instead, WSOU's ICs only include generalized boilerplate language attempting to

Hershy Stern
November 11, 2021
Page 8

reserve the right to assert infringement under the doctrine of equivalents.  (*See, e.g.*, Plaintiff's Initial Claim Charts at 2; Ex. 1 at 10, 17-18.; Ex. 2 at 1; Ex. 3 at 1; Ex. 4 at 1; Ex. 5 at 1.)  A "boilerplate reservation of right to assert the doctrine of equivalents at some later point" is insufficient.  *Sonos, Inc. v. D&M Holdings Inc.*, C.A. 14-1330-WCB, 2017 WL 5633204, at *1 (D. Del. Nov. 21, 2017) (Bryson, J.) (granting motion to preclude a doctrine of equivalents theory because the plaintiff did not include such allegations in its infringement contentions).  Accordingly, please confirm that WSOU will withdraw its contentions that any of the accused products infringe under the doctrine of equivalents.

4.       **WSOU's '938 Patent Claim Chart Fails To Identify Each Allegedly-Infringing Feature**

Element 13d of the '938 Patent requires "an electrical power device, operable independent of the controller."  ('938 Patent at 10:8–9.)  However, WSOU's claim chart fails to specifically identify where and how any of the accused products includes "an electrical power device, operable independent of the controller."  (*See* Ex. 3 to ICs, at 14.)  Instead, it ambiguously states that the "Power supply unit of the circuit card with PMU (i.e., an electrical power device, operable independent of the controller) is responsible for providing power to the circuitry."  (Plaintiff's Initial Claim Charts, Ex. 3 at 14.)  By using this ambiguous language, WSOU failed to identify whether the accused "electrical power device" is the "Power Supply unit of the circuit card," the "PMU," or some other component.

To correct this deficiency, please respond by identifying what component of the accused device that WSOU alleges is the "electrical power device."

5.       **WSOU's '971 Patent Claim Chart Does Not Disclose Its Direct Infringement Theory And Appears To Improperly Assert Indirect Infringement**

For the '971 Patent, WSOU asserts that the Xilinx accused instrumentalities "enable the practice of a passive optical network."  However, WSOU does not identify any specific, allegedly-infringing passive optical network that includes the Xilinx accused products.  From its ICs, it appears that WSOU is in effect asserting induced infringement by Xilinx, based upon WSOU's allegation that Xilinx's documents allegedly show that the Xilinx accused products can be used in a passive optical network.

Xilinx is entitled to notice of any ***specific*** passive optical network comprising the accused instrumentalities that WSOU is accusing of ***direct infringement.***  WSOU's ICs are deficient because they do not include any such allegation and otherwise fail to provide notice of the

Hershy Stern
November 11, 2021
Page 9

allegedly-infringing passive optical network.  Moreover, to the extent that WSOU is instead alleging that Xilinx's accused products are suitable for use in such a network, WSOU is in fact alleging induced infringement by Xilinx.  As WSOU is aware, and further discussed in Section B *infra*, WSOU's indirect infringement claims have been dismissed by the Court.  As a result, WSOU's ICs for the '971 Patent are not only deficient, but should be withdrawn if premised on indirect infringement by Xilinx.  Please confirm that WSOU's infringement allegations for the '971 Patent are limited to direct infringement and identify the ***specific*** passive optical network that WSOU is accusing and alleges is directly infringed, as well as each specific Xilinx product that is allegedly part of any such passive optical network.

      6.      **WSOU's '950 Patent Claim Chart Does Not Disclose a Direct Infringement Theory And Improperly Asserts Indirect Infringement**

For the '950 Patent, WSOU asserts that the Xilinx accused instrumentalities analyze spectral power by performing an ACLR measurement.  The ACLR measurement identified in WSOU's claim chart was performed by an RF spectrum analyzer that is not a component of any of the accused products, nor is it a product sold by Xilinx:  "A Rohde & Schwarz FSW26 spectrum analyzer was used to analyze the dynamic performance of the DAC."  (Understanding Key Parameters for RF-Sampling Data Converters at 15 (February 20, 2019), available at https://www.xilinx.com/support/documentation/white_papers/wp509-rfsampling-data-converters.pdf.)  From its ICs, it appears that WSOU is in effect asserting indirect infringement by Xilinx.

As WSOU is aware, and further discussed in Section B *infra*, WSOU's indirect infringement claims have been dismissed by the Court.  As a result, WSOU's ICs for the '950 Patent are not only deficient, but should be withdrawn since they are premised on indirect infringement by Xilinx.

      7.      **WSOU's '838 Patent Claim Chart Establishes That The '838 Patent Is Invalid**

For the '838 Patent, WSOU asserts that the mixed-mode clock manager (MMCM) architecture in Xilinx accused instrumentalities infringes claim 1 of the '838 Patent.  But that same MMCM block diagram was included in Xilinx's products as shown in user support documentation dating back to June 2010.

Hershy Stern
November 11, 2021
Page 10



Figure 1:   MMCM Block Diagram

(MMCM Dynamic Reconfiguration (June 9, 2010), Figure 1, available at https://www.xilinx.com/support/documentation/application_notes/xapp878.pdf.)

Because Xilinx's allegedly infringing MMCM architecture predates the '838 patent's application, the '838 Patent is invalid.  35 U.S.C. §§ 273, 282.  Please confirm that WSOU will withdraw its infringement contentions concerning the '838 Patent

### B.   WSOU's ICs Improperly Assert Indirect Infringement, When Its Indirect Infringement Claims Have Been Dismissed

As WSOU is aware, the Court has adopted the Magistrate Judge's May 21, 2021 Report and Recommendation and dismissed WSOU's indirect infringement claims.  (D.I. 40.)  In its order adopting the R&R, the Court stated in relevant part:

> I adopted in *Zapfraud* "the rule that the operative complaint in a lawsuit fails to state a claim for indirect patent infringement where the defendant's alleged knowledge of the asserted patents is based solely on the content of that complaint or a prior version of the complaint filed in the same lawsuit." *ZapFraud, Inc. v. Barracuda Networks, Inc.*, No. CV 19-1687-CFC-CJB, 2021 WL 1134687, at *4 (D. Del. Mar. 24, 2021).  WSOU has not persuaded me that I should reject that rule.

Hershy Stern
November 11, 2021
Page 11

> WSOU admits that in each case its allegation that the Defendant
> had knowledge of the asserted patents is based solely on the fact
> that the Defendant was served with a prior version of the operative
> complaint.  Accordingly, the Magistrate Judge correctly concluded
> that under *Zapfraud* WSOU failed to state claims of indirect
> infringement against Defendants.

Nonetheless, WSOU's ICs contain multiple allegations of indirect infringement.  First, as explained above WSOU is asserting claim 15 of the '971 Patent, which cannot be directly infringed because it claims a component of a PON (optical line termination) that is not a Xilinx accused instrumentality.  Similarly, as explained above, WSOU asserts infringement of the '950 Patent, but identifies an RF spectrum analyzer that is not a component of any of the accused products.  Second, in its cover pleading, WSOU asserts that "Defendant has indirectly infringed and continues to indirectly infringe by actively inducing and contributing to infringement of one or more of the claims of each of the Asserted Patents through the accused instrumentalities." (Plaintiff's Initial Claim Charts at 2-3.)  Similar language is included throughout the claim charts attached to WSOU's contentions.  (*See, e.g.*, *id.* Ex. 1 at 7-8, 20; Ex. 2 at 1, 5, 10; Ex. 3 at 1, 4-5; Ex. 4 at 1, 17-18; Ex. 5 at 1, 6-7.)  WSOU's indirect infringement allegations are improper in light of the Court's order already dismissing those claims.  Indeed, WSOU's allegations of indirect infringement in its ICs are inoperative in light of the Court's earlier order.  Please confirm that WSOU is immediately withdrawing its indirect infringement assertions in its ICs as well as withdrawing claim 15 of the '971 Patent.

Very truly yours,

*/s/ Jonathan McNeal Smith*

Jonathan McNeal Smith

NAI-1522814545

# EXHIBIT L



**WP509 (v1.0) February 20, 2019**

# Understanding Key Parameters for RF-Sampling Data Converters

*Xilinx® Zynq® UltraScale+™ RFSoCs provide a single device RF-to-output platform for the most demanding applications. Updated performance metrics more accurately present the direct-sampling RF capabilities of these devices.*

### ABSTRACT

In direct-sampling RF designs, data converters are typically characterized by the NSD, IM3, and ACLR parameters rather than by traditional metrics like SNR and ENOB. In software-defined radio and similar narrow-band use cases, it is more important to quantify the amount of data-converter noise falling into the band(s) of interest; legacy data conversion metrics are ill-suited to do this.

This white paper first presents the mathematical relationships underlying traditional ADC parameters—SFDR, SNR, SNDR (SINAD), and ENOB—and illustrates why these metrics provide good characterization of data converters in wide-band applications such as superheterodyne receivers. It then delineates why these metrics are inappropriate for data converters that do not function over their full Nyquist bandwidth, as in direct RF sampling applications like SDR. Derivation and measurement of NSD, IM3, and ACLR are described in detail, including use of the Xilinx RF Data Converter Evaluation Tool in the measurement of RF data conversion parameters.

© Copyright 2019 Xilinx, Inc. Xilinx, the Xilinx logo, Alveo, Artix, ISE, Kintex, Spartan, Versal, Virtex, Vivado, Zynq, and other designated brands included herein are trademarks of Xilinx in the United States and other countries. All other trademarks are the property of their respective owners.

# Introduction

Analog data converters based on vacuum-tube technology were developed during World War II for message encryption systems. Since those early days, industry has defined and adopted key parameters (e.g., SNR, SFDR, and ENOB) to quantify the performance of data converters. These historical parameters were developed for conventional architectures that use mixers and filters for channel selection and for conventional Nyquist-rate (i.e., low-frequency sampling) data converters.

Recently, many new RF sampling data converters have been developed for implementation in software-defined radio (SDR) applications, but the parameters adopted for conventional data converters cannot fully characterize RF sampling converters. A new set of parameters, such as noise spectral density (NSD), 3rd-order intermodulation ratio (IM3), and adjacent-channel leakage ratio (ACLR), are required to define the dynamic performance of RF sampling data converters, especially for direct-RF sampling applications.

Xilinx has been providing highly flexible digital processing solutions over a range of SDR applications for some time. Recently, Xilinx released its industry-first Zynq® UltraScale+™ RFSoC, integrating UltraScale™ architecture programmable logic (PL), soft-decision FECs, and multi-channel RF-ADCs and RF-DACs. In these RF-ADCs (12-bit) and RF-DACs (14-bit), the NSD, IM3, and ACLR metrics compare favorably with the same-resolution bit data converters offered by top-tier analog IC vendors—yet the Xilinx Zynq UltraScale+ RFSoC provides reduced power consumption, greater programmability, and higher integration levels. Thus, the Zynq UltraScale+ RFSoC enables the system designer to create highly flexible SDR applications, while simultaneously addressing many of the challenges associated with competitive direct-RF sampling solutions.

In this white paper, the specifications for both conventional data converters and new RF sampling data converters are described, and the preferred parameters for RF sampling converters are identified.

# Conventional ADC Specifications: SFDR, SNR, SNDR, ENOB

## Spurious-Free Dynamic Range (SFDR)

Spurious-free dynamic range (SFDR) is commonly used to measure the usable dynamic range of a data converter before the spurious component interferes with or distorts the fundamental signal. SFDR is defined as the ratio of the root mean square (RMS) value of the fundamental sine wave signal to the RMS value of the peak spurious signal in the output, measured from 0Hz (DC) to one-half the sampling rate of data converters (i.e., $f_s/2$). The peak spurious component could be harmonically or non-harmonically related.

SFDR can be calculated with the following equation:

$$SFDR_{(dBc)} = 20\log\left(\frac{Fundamental\ Amplitude\ (RMS)}{Largest\ Spur\ Amplitude\ (RMS)}\right) \qquad \textit{Equation 1}$$

or,

$$SFDR_{(dBc)} = Amplitude\ of\ Fundamental - Amplitude\ of\ Largest\ Spur$$

Figure 1 illustrates the SFDR and harmonics performance of the RF-ADC in Zynq UltraScale+ RFSoC, with −1dBFS amplitude @ 240MHz input, such that SFDR = 79.0dBc, measured from the Xilinx RF Data Converter Evaluation Tool included in the ZCU111 Evaluation Kit set-up. [Ref 1]



*Figure 1:*  **Xilinx Zynq UltraScale+ RFSoC 12-bit RF-ADC, where $f_{in}$ = −1dBFS @ 240MHz, $f_s$ = 3.93216 GSPS (SFDR measured by Xilinx RF Data Converter Evaluation Tool)**

According to the above FFT measurement, the largest spur is the third harmonic of the input signal. The SFDR of data converters is often limited by the second or third harmonic of the input signal, but by careful filter design and optimum frequency planning, HD2 and/or HD3 can typically be avoided, greatly improving SFDR. Excluding HD2 and HD3, SFDRxH23 in Figure 1 is 86.42dBc.

## Signal-to-Noise Ratio (SNR)

Signal-to-noise ratio (SNR) is the parameter typically used to quantify the noise in data converters, which is the ratio of the power of the input signal to the power of the noise and is commonly expressed in dB. Similarly SNR can also be evaluated using the RMS value of the signal and noise amplitudes, as shown in Equation 2:

$$SNR = \frac{Power_{signal}}{Power_{noise}}$$

$$= \left(\frac{Amplitude_{signal(RMS)}}{Amplitude_{noise(RMS)}}\right)^2 \qquad\qquad \textit{Equation 2}$$

$$= 20\log\left(\frac{V_{in(RMS)}}{V_{Q(RMS)}}\right)$$

**$\Sigma$ XILINX.**

Understanding Key Parameters for RF-Sampling Data Converters

SNR usually degrades at higher frequency due to sampling jitter. Noise comes from three sources:

- Quantization noise
- Thermal noise of ADC
- Jitter or sampling uncertainty noise

The theoretical maximum SNR for an ADC with a full-scale sine wave input derives from the quantization noise. SNR has another formula representation,

$$SNR = 6.02N + 1.76\text{dB}$$

*Equation 3*

over the Nyquist bandwidth, where $N$ is the number of bits of an ideal ADC. This formula gives the best possible SNR over the whole Nyquist bandwidth, assuming a sine wave input for an ideal $N$-bit data converter (not including harmonic distortion). The SNR of a data converter is also limited by its own thermal noise and sampling clock phase noise. SNR improves when input signal bandwidth is lower than the Nyquist rate. (Detailed derivation is given in the Appendix.) [Ref 2]

## Signal-to-(Noise + Distortion) Ratio (SNDR)

SNDR (also called SINAD) is the ratio of RMS signal power to (a) total noise power and (b) the RMS sum of all other spectral components power plus all other harmonic components power at the output (excluding DC), when the input is a sinusoidal wave.

SNDR is one of the key parameters employed to measure the dynamic performance of data converters because SNDR includes all the noise and spurs over the Nyquist bandwidth. SNDR indicates the quality of the input signal; a higher SNDR means the stronger input power differentiated from noise and spurious performance. The SNDR equation can be represented as:

$$SNDR = 10\log_{10}\left(\frac{P_{Signal}}{P_{Noise} + P_{Distortion}}\right)$$

*Equation 4*

where $P_{Signal}$ is the average power of the signal of interest, noise, and distortion components. SNDR is commonly expressed in dB (decibels), dBc (decibels relative to the carrier), or dBFS (decibels relative to full scale).

SNDR has another equation representation:

$$SNDR = 20\log_{10}\sqrt{10^{\frac{-SNR}{10}} + 10^{\frac{THD}{10}}}$$

*Equation 5*

SNDR is a combination of the SNR and THD specifications, and thus SNDR compares all undesired frequency components with the input frequency, which shows an overall measure of a data converter's dynamic performance.

## Effective Number of Bits (ENOB)

The effective number of bits (ENOB) is a parameter adopted to characterize the quality of a data converter's conversion (in bits) with respect to the input signal over the Nyquist bandwidth. ENOB implies that the converter performs as if it were a theoretically perfect converter. The perfect data converter has absolutely no distortion, and the only noise it exhibits is quantization noise, so SNR would then be equal to SNDR in Equation 3—i.e., $SNR_{(dBFS)} = 6.02N + 1.76$. Therefore, ENOB is another representation of specifying SNDR:

$$ENOB(N) = \frac{SNDR_{(dBFS)} - 1.76}{6.02}$$

Equation 6

where $SNDR_{(dBFS)}$ assumes a full-scale input signal.

For non-ideal data converters, however, SNDR and ENOB degradation includes noise along with imperfections such as device thermal noise, missing output code, harmonics, AC/DC nonlinearity, gain/offset error, and aperture clock phase noise or jitter. Noise on the external bias reference and power-supply rails also decreases ENOB. [Ref 3]

Furthermore, the ENOB value degrades as frequency increases for the same reason that THD degrades with input frequency due to the non-linearity issue. ENOB comes from SNDR, which is related to THD and SNR. To show an accurate ENOB for a data converter, detailed specifications and conditions required are highlighted in the data sheet.

Due to the above criteria, most analog data converter IC vendors generally tend to promote their ENOB in an ideal scenario, especially the ENOB value in the title of the data sheet. However, many system engineers and procurement managers are still curious as to why the measured ENOB value is different from the ideal one in the data sheet. A few key points about ENOB:

- The "number of bits" (12-bit or 14-bit) normally shown in the title of the data converter data sheet refers to digital bit or voltage resolution. This is *not related* to ENOB.
- ENOB is principally a function of noise, non-linearity, and input frequency.
- ENOB is degraded by many external uncertainties (e.g., clock source, power supply).
- ENOB is calculated over the full Nyquist bandwidth (DC to fs/2).
- ENOB is *not* a good metric to analyze direct-RF systems such as SDR.

# Conventional Data Converter Metrics and the SDR

By definition, SFDR, SNR, SNDR, and ENOB are all metrics derived from the data converter's full Nyquist bandwidth with respect to a single-tone sinusoidal wave input.

A traditional high-IF superheterodyne receiver architecture is shown in Figure 2. In this example, an 1,800MHz RF input is down-converted to an intermediate frequency (IF) of 300MHz by mixing with a 1,500MHz local oscillator (LO). The IF signal is aliased back to 54.24MHz by sampling the ADC at 245.76MSPS. In this case, the signal of interest occupies most of the ADC Nyquist bandwidth. Therefore, SNR and ENOB parameters are valid for use in characterizing the dynamic performance of the ADC.



WP509_02_010719

*Figure 2:* **System Block Diagram of High-IF Superheterodyne Receiver**

When this is compared with direct-RF sampling as used in the software-defined radio (SDR), it becomes clear that ENOB is not an accurate parameter for characterizing a data converter. In the SDR example illustrated in Figure 3, the RF-ADC samples a large bandwidth containing the signal of interest, with down-conversion and filtering occurring in the digital domain. The biggest concerns in the direct-RF implementation are the artifacts in the down-sampled and filtered band. The SNR, SFDR, and ENOB defined over the Nyquist bandwidth are not relevant because the out-of-band distortions can be filtered out with good frequency planning.

The most important metric is the sensitivity rather than ENOB, SNR, or SFDR defined over Nyquist bandwidth. NSD, IM3, and ACLR are more relevant specifications to quantify the RF sampling data converter's performance because they reflect the true impact of noise and distortion over the decimated band of interest.

WP509_03_010719

*Figure 3:* **System Block Diagram of Direct-RF Sampling Architecture**

**EXILINX**

## Applications for RF-Sampling Data Converters

The applications listed below are examples of SDR implementations with usable bandwidth narrower than the entire Nyquist bandwidth:

- 4G Long Term Evolution (LTE) multi-carrier
- 5G massive MIMO (sub-6GHz)
- Microwave backhaul
- Phased-array radar

### 4G LTE Multi-Carrier

4G LTE has reached more than 80% penetration in most developed countries. The 4G LTE multi-carrier standard is deployed mainly in frequency bands located within the 700–3,800MHz range with 1–20MHz scalable carrier bandwidth and a maximum five aggregated component carriers.

Two major schemes are used in 4G LTE to govern transmission and reception: frequency-division duplex (FDD) and time-division duplex (TDD). FDD aggregated carriers are split over two different frequencies, making it is possible to transmit and receive signals (DL and UL) simultaneously. In contrast, TDD component carrier frequencies and their bandwidths are the same for DL and UL.

The 4G LTE standard is presented here (Figure 4) as a practical example that illustrates why SNR, SFDR, and ENOB are irrelevant in evaluating narrow-band RF-ADC and RF-DAC performance. For instance, five 20MHz channels can be received in a 100MHz bandwidth centered on 700MHz, and the data converters in the system are sampled at 4,000MSPS.



*Figure 4:* **4G LTE Multi-Carrier Signal Spectrum, 5 x 20MHz BW Centered at 700MHz (4GSPS Sampling)**

- Based on the SNR definition given in the Signal-to-Noise Ratio (SNR) section, the RMS of quantization noise over the entire Nyquist frequency range (i.e., 2,000MHz) is integrated; however, only 20MHz noise channel bandwidth is required to be considered in the 4G LTE implementation.

- Similarly, the Spurious-Free Dynamic Range (SFDR) section reveals the second or third harmonics as the worst-case spurs limiting SFDR performance; thus, SFDR does not affect the performance of the 4G LTE system in the 100MHz receiver bandwidth, assuming correct channel filtering, optimum sampling clock, and good frequency planning. HD2- and HD3-centered frequencies are located at 1,500MHz and 1,750MHz respectively in the Nyquist zone, well removed from the signal. Such out-of-band harmonics are easily filtered out with a bandpass filter in the system.

- Finally, Effective Number of Bits (ENOB) cannot provide realistic system performance metrics because 4G LTE performance is not characterized over the full Nyquist range. [Ref 4]

### 5G Massive MIMO + 4G LTE Multi-Carrier Solution

The 3GPP has specified two frequency ranges (FR1 and FR2) for the 5G wireless communication system as shown in Table 1.

Table 1: **FR1/FR2 Frequency Usage**

| Frequency Range (FR) Designation | Frequency Range (MHz) | Maximum Channel Bandwidth (MHz) |
|---|---|---|
| FR1 (sub-6GHz) | 450–6,000 | 100 |
| FR2 (millimeter wave) | 24,250–52,600 | 400 |

With an optimal balance between coverage and capacity for cost-efficient implementation, the 3,300–5,000MHz segment of C-band is the primary frequency band for the introduction of 5G for FR1 (sub 6GHz). The advantage of using this frequency band can be exploited in combination with 3,300–3,800MHz (using the LTE/NR uplink coexistence feature of the 3GPP standards) allowing operators to benefit from faster, more cost-efficient deployment of C-band, therefore delivering enhanced capacity without incurring network densification costs.

Figure 5 illustrates an example of 5G Massive MIMO with 100MHz signal bandwidth in FR1 plus a 4G LTE multi-carrier solution with three 20MHz signal bandwidth, centered at 3,500MHz with the sampling clock at 4GSPS, folding back to Nyquist zone 1. HD2- and HD3-centered frequencies are located at 1,000MHz and 1,500MHz, respectively, in Nyquist zone 1. A separation bandwidth of 260MHz exists between the 5G signal and HD2, which is wide enough for a bandpass filter to reduce or even filter out the HD2 and HD3. With the simplicity of this 4G LTE implementation, the total signal bandwidth below the 5G implementation is 160MHz, which is much narrower than the whole Nyquist bandwidth (2,000MHz). By carefully selecting the optimum frequency planning of the narrow-band system, the SNR, SFDR, and ENOB metrics are incapable of characterizing the true performance of RF-sampling data converters for both 5G massive MIMO and 4G LTE communication systems. [Ref 5]

*Figure 5:* **5G Massive MIMO Signal Spectrum with 100MHz + 3 x 20MHz Bandwidth Centered at 3,500MHz with Sampling Clock at 4GSPS, Folding Back to Nyquist Zone 1**

# RF-Sampling Data Converter Specifications

As semiconductor process geometry has been getting smaller, transistor maximum frequency ($f_{max}$) has been rapidly increasing. Accordingly, usability and performance of RF-sampling data converter products used in direct-sampling communication applications have been significantly improved. As a result, analog data converter makers have largely agreed to use noise spectral density (NSD), 3rd-order intermodulation distortion (IM3), and adjacent channel leakage ratio (ACLR) to characterize the performance of RF-sampling data converters in their data sheets.

## Noise Spectral Density (NSD)

As previously described, SNR and ENOB metrics consider a data converter's entire Nyquist bandwidth, which is not relevant to today's RF-sampling data converters, especially for SDR applications. In real applications, tight bandpass filters around the band of interest are often employed, and many RF-sampling ADCs include decimation features to extract only the signal bandwidth of interest. Both aspects always eliminate all the noise outside of those bands. Thus, NSD is a more appropriate metric to quantify the RF-sampling data converter's ability because NSD provides the amount of noise energy in 1Hz bandwidth for a data converter.

While NSD has been applied to data converters for some time, it is still new to some engineers and IC procurement managers. By definition, NSD refers to the noise power per hertz of frequency relative to the RF-ADC full scale input tone, commonly expressed as dBFS/Hz, and is applied to examine the noise performance of data converters with distinct sampling rates.

To obtain the NSD of data converters, the RMS quantization noise power over the whole Nyquist bandwidth must be obtained from the SNR equation, which is defined as the ratio of the power of the fundamental signal to the power of the noise integrated over the first Nyquist zone.

$$SNR_{(dB)} \;=\; 10\log_{10}\Big(\frac{P_{fundamental\ signal}}{P_{noise\ (over\ Nyquist\ BW)}}\Big)$$

*Equation 7*

Equation 8 includes the units of the components:

$$SNR_{(dBFS)} = P_{fundamental\ signal\ (dBFS)} - \left(NSD_{(dBFS/Hz)} + 10\log_{10}\left(\frac{fs}{2}\right)_{(Hz)}\right)$$
*Equation 8*

Assuming $P_{fundamental\ signal\ (dBFS)} = 0_{dBFS}$ yields

$$SNR_{(dBFS)} = 0_{dBFS} - NSD_{(dBFS/Hz)} - 10\log_{10}\left(\frac{fs}{2}\right)_{(Hz)}$$
*Equation 9*

Then,

$$NSD_{(dBFS/Hz)} = -SNR_{(dBFS)} - 10\log_{10}\left(\frac{fs}{2}\right)_{(Hz)}$$
*Equation 10*

This NSD equation is useful to evaluate different RF-sampling data converters with different sampling frequencies to characterize which devices have the lowest frequency-band specific noise in SDR applications.

For an ideal 12-bit ADC with a 4GSPS sampling clock,

$$\begin{aligned}
NSD &= -(6.02 \times 12 + 1.76)_{(dBFS)} - 10\log_{10}(4GSPS/2)_{(Hz)} \\
&= -(74 + 93)\ dBFS/Hz \\
&= -167dBFS/Hz
\end{aligned}$$

Figure 6 illustrates the noise power for this device.



*Figure 6:* **Graphical Depiction of SNR and NSD in FFT Spectrum**

For non-ideal data converters, the NSD equation is

$$NSD_{(dBFS/Hz)} = -SNR_{measured(dBFS)} - 10\log_{10}\left(\frac{fs}{2}\right)_{(Hz)}$$
*Equation 11*

The full-scale $SNR_{measured}$ in Equation 11 should be obtained either by direct measurement or from the data sheet supplied by vendors. [Ref 6]

According to the Xilinx Zynq UltraScale+ RFSoC RF Data Converter Evaluation Tool shown in Figure 7 [Ref 6], $58.33_{dBFS}$ of measured SNR and $-151.25_{dBFS}$/Hz of measured NSD are shown on the RF-ADC Performance Characteristics @ 3.93216GSPS sampling clock for $F_{out}$ = 900MHz sine wave at -1dBFS. Verifying this in the above equation,

$$\begin{aligned} \text{RF-ADC NSD}_{(dBFS)} \text{ @ 900MHz} &= -\text{SNR}_{measured(dBFS)} - 10\log_{10}(\text{fs}/2)_{(Hz)} \\ &= -58.33\text{dBFS} - 10\log_{10}(3.93216\text{GSPS}/2) \\ &= -151.33\text{dBFS/Hz} \end{aligned}$$



WP509_07_123018

*Figure 7:* NSD Measurement of RF-ADC on the RF Data Converter Evaluation Tool @ 900MHz

## Third-Order Intermodulation Distortion (IM3)

Any complex signal contains components at several frequencies simultaneously. Nonlinearity in the converter's transfer function not only causes distortion of a pure tone, it causes two or more signal frequencies to interact and produce intermodulation products. When this happens, the result is called intermodulation distortion, or IM3.

Typically, the "two-tone test" is commonly used to measure non-linear behavior (i.e., IM3) for a wide range of RF devices, especially data converters. For instance, a two-tone input signal (f1, f2) with small separation is injected into the RF device (i.e., the ADC), and an output that includes two tones at the exact same frequencies as the input signal is produced *if the ADC is perfectly linear*. For the non-linear ADC, however, 2f1–f2 and 2f2–f1 intermodulation distortion products, as well as nf1 and nf2 harmonic components, are generated. A two-tone test is illustrated in Figure 8.

Some applications, especially those concerned with RF signal processing, are more sensitive to some modulation products than to others. For example, in RF applications, the third-order difference products 2f1–f2 or 2f2–f1 are important because they are closest to the input

frequencies, where other terms can be digitally filtered out. For this reason, terms other than IM3 are usually ignored where IMD is specified for RF applications.

IM3 can lead to serious issues in RF communication systems that create additional frequency components (called "spectral regrowth") in bands adjacent to the modulated signals. In a receive path, spectral regrowth can cause out-of-band signals to interfere with the signal of interest. In a transmit path, on the other hand, bad IM3 can affect adjacent channels which then cannot pass the frequency mask of the wireless protocol. [Ref 3]



*Figure 8:*  **Graphical Depiction of IM3 in Non-Linear System**

The superior IM3 performance of the Zynq UltraScale+ RFSoC RF-DAC at 900MHz input frequency with 20MHz spacing between two generated tones is -85.63dBc at both the 2f1–f2 and 2f2–f1 intermodulation distortion frequencies, with -7.26dBm input, as shown in Figure 9. For the Zynq UltraScale+ RFSoC RF-ADC IM3 measurement, two –7dBm inputs at 900MHz apart from 20MHz spacing from signal generators are used. The IM3 of RF-ADC is -78.08dBc is measured at the RF Evaluation Tool, as shown in Figure 10. Consequently, both RF-DAC and RF-ADC support excellent linearity in the two-tone distortion test, preventing creation of large new frequency components.



*Figure 9:* **Zynq UltraScale+ RFSoC RF-DAC IM3 Measurement with Dual-Tone Input**



*Figure 10:* **Zynq UltraScale+ RFSoC RF-ADC IM3 Measurement, Dual-Tone Input (RF Data Converter Evaluation Tool)**

## Adjacent Channel Leakage Ratio (ACLR)

As wireless demand has been increasing dramatically, the allocated frequency spectrum is getting crowded. Nowadays, the wireless infrastructure requires much greater data capacity and bandwidth to deliver IP services to more subscribers and mobile devices. While transmitting signals through an over-air interface, the power that leaks from a transmitted signal into adjacent channels can interfere with transmission in the adjoining channels and impair overall radio system performance.

ACLR is a key standards-compliant spectrum measurement designed for use in wireless radio systems such as 3GPP 5G, LTE, and W-CDMA. As shown in Figure 11, it characterizes the ratio of modulated signal power versus power emitted or leaked into adjacent channels of the communication system. The ability to vary channel bandwidths and adjacent channel spacing is required within the context of various communication protocols. To measure ACLR of the device under test (DUT), a modulated signal generator or DAC is commonly utilized.



*Figure 11:* **ACLR Graphical Illustration**

The Zynq UltraScale+ RFSoC integrates either 8x8 or 16x16 DAC and ADC channels. To measure ACLR performance of both DAC and ADC, the test setup is easily configured in loopback mode.

Figure 12 illustrates the ACLR measurement use case. A band 42 IQ-modulated signal with 5x20MHz 64QAM LTE carriers is generated at digital baseband in the transmit path, interpolated 8x, and mixed up to 3,500 MHz in two DAC channels. One channel is connected to a frequency spectrum analyzer, while the other channel is looped back to the ADC through an external Mini-Circuits ZRL-3500+ amplifier. Then the 3,500MHz RF signal is decimated 8x and mixed down to baseband. For the clocking scheme, 3,932.16MHz is adopted as the RFSoC data converter sampling clock, while 491.52MHz is applied as the baseband sampling clock.

Understanding Key Parameters for RF-Sampling Data Converters



*Figure 12:* **Zynq UltraScale+ RFSoC ACLR Measurement Use Case**

A Rohde & Schwarz FSW26 spectrum analyzer was used to analyze the dynamic performance of the DAC. Figure 13 shows the spectrum analyzer ACLR measurement for 5 x 20MHz multi-carrier in 64QAM modulation at 3,500MHz transmit output generated by the Zynq UltraScale+ RFSoC DAC with internal PLL sampled at 3,932.16MHz. With the 20MHz offset ("Adj" on the analyzer screen) from the Tx1 and Tx5 channels, ACLR of both upper and lower adjacent channels are about −67dBc. With the 40MHz offset ("Alt1" on the analyzer screen), both ACLRs are −68dBc.

*Figure 13:* **RF-DAC ACLR Measurement for 5 x 20MHz 64QAM Modulation @ 3,500MHz**

For ACLR of the Zynq UltraScale+ RFSoC RF-ADC, 61.42dBc is measured in loopback configuration from DAC to ADC, as shown in Figure 14.

Understanding Key Parameters for RF-Sampling Data Converters



*Figure 14:* **RF-ADC ACLR for 5 x 20MHz 64QAM Modulation @ 3,500MHz (Loopback Mode)**

According to the 3GPP 5G requirement [Ref 7] for a 5G NR base station, the ACLR emission limit of the overall system for transmit path is –45dB with respect to the carrier signal. Therefore, the Zynq UltraScale+ RFSoC ACLR performance (see Xilinx Data Sheet DS926) [Ref 8] is superior, leaving plenty of margin for the rest of the system (e.g., the power amplifier) to reduce design challenges.

# Summary

SNR and ENOB are common parameters used to characterize and evaluate data converters when set up with a sinusoidal input over full Nyquist bandwidth. However, these and other legacy metrics are deprecated for direct-sampling applications because the RF data converters employed in such designs are not required to operate over the full Nyquist bandwidth. Instead, the NSD, IM3, and ACLR parameters are more relevant to the evaluation of devices used in direct-sampling designs. In such use cases, it is more important to quantify the amount of data-converter noise falling into the band(s) of interest. Thus, different RF applications need different sets of parametric specifications to accurately evaluate system design performance. For both narrow-band and more traditional wide-band applications, the accurate measurement (with use-appropriate metrics) of in-band noise, spurious signals, and distortion is required to select the right RF data-handling solution.

With the release of Zynq UltraScale+ RFSoCs, featuring integrated multichannel direct-sampling RF-ADCs, a family of Xilinx devices is now available to fulfill the most demanding RF processing requirements, including the implementation of a complete software-defined radio (SDR) on a single device—another industry-first achievement for Xilinx.

For more information, go to: www.xilinx.com/RFSoC.

# References

1. Xilinx® Zynq® UltraScale+™ RFSoC ZCU111: RF Data Converter Evaluation Tool (website download page).

2. Carusone, Tony Chan; Johns, David A.; Martin, Kenneth W.: *Analog Integrated Circuit Design* (2nd ed., 2012). Hoboken, NJ: John Wiley & Sons, Inc.

3. National Instruments / White Paper, *Understanding Frequency Performance Specifications* (2017).

4. National Semiconductor / Kulchycki, Scott: *Software Defined Radio: Don't Talk to Me about ENOBs,* Part 1; Part 2. *EETimes RF & Microwave Designline* (2010).

5. Huawei Technologies Co., Ltd. / Public Policy Position: *5G Spectrum* (2017).

6. Analog Devices / Beavers, Ian: *Noise Spectral Density: A New ADC Metric?*

7. ETSI / Technical Specification, 3GPP TS 38.101-1 v15.2.0 Release 15: "5G; NR; User Equipment (UE) Radio Transmission and Reception" (2018).

8. Xilinx Data Sheet DS926, *Zynq UltraScale+ RFSoC Data Sheet: DC and AC Switching Characteristics*

Understanding Key Parameters for RF-Sampling Data Converters

# APPENDIX

## Derivation of the Signal-to-Noise Equation  *SNR* = 6.02*N* + 1.76dB:

Consider the quantization errors $V_Q$ in an ideal ADC converter, as shown in Figure 15.



*Figure 15:*  **A Setup to Investigate Quantization Noise**

$V_Q = V_1 - V_{in}$ ;
$V_1 = V_{in} + V_Q$

where $V_1$ is the quantized signal and $V_{in}$ is the input signal of an ideal ADC.

Assume $V_{in}$ to be a ramp input signal; thus, the result $V_1$ is a staircase due to the output from the DAC, as shown in Figure 16.[Ref 2]



*Figure 16:*  **Relationship between $V_1$, $V_{in}$, and $V_Q$, based on setup in Figure 15**

$V_Q$ is the result of the difference between $V_{in}$ and $V_1$, and the RMS value of the noise signal $V_{Q(rms)}$ is given by:

$$V_{Q(rms)} = \sqrt{\left[\frac{1}{T}\int_{-T/2}^{T/2} V_Q^2 \, dt\right]}$$

$$= \sqrt{\left[\frac{1}{T}\int_{-T/2}^{T/2} V_{LSB}^2\left(\frac{-t}{T}\right)^2 dt\right]} \qquad \text{\textit{Equation 12}}$$

$$= \sqrt{\left[\frac{V_{LSB}^2}{T^3}\left(\frac{T^3}{3}\Big|_{-T/2}^{T/2}\right)\right]}$$

The RMS quantization noise measured over the full Nyquist bandwidth from DC to fs/2 is given by:

$$V_{Q(rms)} = \frac{V_{LSB}}{\sqrt{12}} \qquad \text{\textit{Equation 13}}$$

For an ideal data converter, SNR is given by:

$$SNR = 20\log_{10}\left(\frac{V_{in(rms)}}{V_{Q(rms)}}\right)$$

*Equation 14*

Assume the input ($V_{in}$) is a sinusoidal wave. Peak amplitude is $V_{ref}/2$.

$$SNR = 20\log_{10}\left(\frac{V_{in(rms)}}{V_{Q(rms)}}\right)$$

$$= 20\log_{10}\left(\frac{V_{ref}/(2\sqrt{2})}{V_{LSB}/(\sqrt{12})}\right)$$

*Equation 15*

Substituting $V_{LSB} \equiv \dfrac{V_{ref}}{2^N}$ into Equation 15,

$$= 20\log_{10}\left(\frac{V_{ref}/(2\sqrt{2})}{\dfrac{V_{ref}}{2^N}/(\sqrt{12})}\right)$$

$$= 20\log_{10}\left(2^N \times \frac{\sqrt{12}}{\sqrt{8}}\right)$$

*Equation 16*

$$= (6.02N + 1.76)\ \text{dB} \quad \text{over the Nyquist bandwidth.}$$

# Revision History

The following table shows the revision history for this document:

| Date | Version | Description of Revisions |
|------|---------|--------------------------|
| 02/20/2019 | 1.0 | Initial Xilinx release. |

# Disclaimer

The information disclosed to you hereunder (the "Materials") is provided solely for the selection and use of Xilinx products. To the maximum extent permitted by applicable law: (1) Materials are made available "AS IS" and with all faults, Xilinx hereby DISCLAIMS ALL WARRANTIES AND CONDITIONS, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR ANY PARTICULAR PURPOSE; and (2) Xilinx shall not be liable (whether in contract or tort, including negligence, or under any other theory of liability) for any loss or damage of any kind or nature related to, arising under, or in connection with, the Materials (including your use of the Materials), including for any direct, indirect, special, incidental, or consequential loss or damage (including loss of data, profits, goodwill, or any type of loss or damage suffered as a result of any action brought by a third party) even if such damage or loss was reasonably foreseeable or Xilinx had been advised of the possibility of the same. Xilinx assumes no obligation to correct any errors contained in the Materials or to notify you of updates to the Materials or to product specifications. You may not reproduce, modify, distribute, or publicly display the Materials without prior written consent. Certain products are subject to the terms and conditions of Xilinx's limited warranty, please refer to Xilinx's Terms of Sale which can be viewed at http://www.xilinx.com/legal.htm#tos; IP cores may be subject to warranty and support terms contained in a license issued to you by Xilinx. Xilinx products are not designed or intended to be fail-safe or for use in any application requiring fail-safe performance; you assume sole risk and liability for use of Xilinx products in such critical applications, please refer to Xilinx's Terms of Sale which can be viewed at http://www.xilinx.com/legal.htm#tos.

# Automotive Applications Disclaimer

XILINX PRODUCTS ARE NOT DESIGNED OR INTENDED TO BE FAIL-SAFE, OR FOR USE IN ANY APPLICATION REQUIRING FAIL-SAFE PERFORMANCE, SUCH AS APPLICATIONS RELATED TO: (I) THE DEPLOYMENT OF AIRBAGS, (II) CONTROL OF A VEHICLE, UNLESS THERE IS A FAIL-SAFE OR REDUNDANCY FEATURE (WHICH DOES NOT INCLUDE USE OF SOFTWARE IN THE XILINX DEVICE TO IMPLEMENT THE REDUNDANCY) AND A WARNING SIGNAL UPON FAILURE TO THE OPERATOR, OR (III) USES THAT COULD LEAD TO DEATH OR PERSONAL INJURY. CUSTOMER ASSUMES THE SOLE RISK AND LIABILITY OF ANY USE OF XILINX PRODUCTS IN SUCH APPLICATIONS.