**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

WSOU INVESTMENTS, LLC d/b/a BRAZOS
LICENSING AND DEVELOPMENT,

|  |  |  |
|---|---|---|
|  | Plaintiff, |  |
| v. |  | C.A. No. 20-1228-CFC-JLH (Consolidated) |
| XILINX, INC., |  |  |
|  | Defendant. |  |

**JOINT CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

TABLE OF EXHIBITS ................................................................................ VII

TABLE OF ABBREVIATIONS ................................................................. VIII

I.     AGREED UPON CONSTRUCTIONS ................................................... 1

II.    DISPUTED CONSTRUCTIONS ........................................................... 1

    A.    WSOU's Introduction .................................................................. 1

    B.    Xilinx's Introduction ................................................................... 2

    C.    U.S. Patent No. 6,784,653 (Case No. 1:20-cv-01228-CFC-JLH) ........................ 3

        1.   "Directly connected" (claims 1 and 7) .................................. 3

        2.   "Decision circuit" (claims 1 and 7) ..................................... 11

    D.    U.S. Patent No. 7,068,950 (Case No. 1:20-cv-01229-CFC-JLH) ...................... 14

        1.   "An analyzer configured (i) to analyze spectral power of an input signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding to a spectral null of the input signal, and (ii) to generate a control signal based on the analysis" (claim 1) ................................................ 14

        2.   "An input signal …" / "data-modulated signal …" (claims 1 and 17) ................................................................. 27

        3.   "Spectral null" (claims 1 and 17) ........................................ 31

        4.   "A spectral band corresponding to a spectral null" (claims 1 and 17) .................................................................. 35

    E.    U.S. Patent No. 7,613,938 (Case No. 1:20-cv-01231-CFC-JLH) ...................... 42

        1.   "Operable independent of the controller" (claim 13) ............. 42

    F.    U.S. Patent No. 7,903,971 (Case No. 1:20-cv-01232-CFC-JLH) ...................... 48

        1.   "Wherein the plurality of signal states and the number of bits in each sequence are increased" (claims 1, 15) ............................ 48

        2.   "Based on a transmission quality of the optical signal" (claims 1, 15) ................................................................. 56

    G.    U.S. Patent No. 9,312,838 (Case No. 1:20-cv-01233-CFC-JLH) ...................... 60

        1.   "Dual clock generator configured to receive the first adjusted enable signal and the second enable signal, and in response operable to generate a reference clock signal and transmit the reference clock signal over a single conductor." (claim 1) ..................... 60

        2.   "Edge detector" (claim 1) ................................................... 69

## <u>TABLE OF CONTENTS</u>
(continued)

**Page**

3.     "Enable signal" (claim 1) .......................................................... 72

4.     "Reference clock signal" (claim 1) ........................................... 76

# TABLE OF AUTHORITIES

Page

CASES

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
    659 F.3d 1121 (Fed. Cir. 2011).................................................................30

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
    830 F.3d 1341 (Fed. Cir. 2016).................................................................63

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008).................................................................20

*B. Braun Med., Inc. v. Abbott Labs.*,
    124 F.3d 1419 (Fed. Cir. 1997).................................................................20

*Bd. Of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*,
    533 F.3d 1362 (Fed. Cir. 2008).................................................................45

*Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*,
    958 F.3d 1348 (Fed. Cir. 2020).................................................................78

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009).................................................................28

*Enzo Biochem, Inc. v. Applera Corp.*,
    599 F.3d 1325 (Fed. Cir. 2010).............................................................27, 30

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012).................................................................20

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
    93 F.3d 1572 (Fed. Cir. 1996).............................................................7, 45, 47

*Finjan, Inc. v. Cisco Sys., Inc.*,
    837 F. App'x 799 (Fed. Cir. 2020) ............................................................55

*Fisher-Rosemount Sys., Inc. v. ABB Ltd.*,
    No. 4:18-cv-178, 2019 WL 6830806 (S.D. Tex. Dec. 12, 2019) ...........................24

*Freescale Semiconductor, Inc. v. Promos Techs., Inc.*,
    561 F. Supp. 2d 732 (E. D. Tex. 2008)........................................................ passim

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Function Media v. Google, Inc.*,
    708 F.3d 1310 (Fed. Cir. 2013)........................................................................21, 68

*GPNE Corp. v. Apple Inc.*,
    830 F.3d 1365 (Fed. Cir. 2016)................................................................................58

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)....................................................................................................45

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)........................................................................37, 38

*Hill-Rom Services, Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014)................................................................................29

*Huawei Techs. Co. Ltd. v. T-Mobile US, Inc.*,
    No. 2:16-cv-57, 2017 WL 2691227 (E.D. Tex. June 22, 2017) ............................24

*In re Power Integrations, Inc.*,
    884 F.3d 1370 (Fed. Cir. 2018)................................................................................69

*Interval Licensing v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014)................................................................................37

*Kara Tech. Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009)........................................................................58, 59

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
    814 F.3d 1343 (Fed. Cir. 2016)................................................................................10

*Merck & Co. v. Teva Pharm. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005)................................................................................69

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)..................................................................................................2

*Net MoneyIn, Inc. v. Verisign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)........................................................................20, 21

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Noah Sys., Inc. v. Intuit Inc.*,
675 F.3d 1302 (Fed. Cir. 2012)..................................................................20, 21, 68

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)................................................................2, 6, 12, 53

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)...................................................................2, 13, 59

*Semcon IP Inc. v. Amazon.com, Inc.*,
No. 2:18-CV-00192-JRG, 2019 WL 2090006 (E.D. Tex. May 13, 2019) ............................61

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017)....................................................................35

*Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*,
No. 18-362-RGA, 2019 WL 7037656 (D. Del. Dec. 20, 2019).............................24

*SyncPoint Imaging, LLC v. Nintendo of Am. Inc.*,
No. 2:15-cv-247, 2016 WL 55118 (E.D. Tex. Jan. 5, 2016) ................................24

*Tech. Licensing Corp. v. Videotek, Inc.*,
545 F.3d 1316 (Fed. Cir. 2008)....................................................................64

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)............................................................... passim

*Toshiba Corp. v. Imation Corp.*,
681 F.3d 1358 (Fed. Cir. 2012).....................................................................10

*Trs. of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016)....................................................................12

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)......................................................................12

*Vstream Techs., LLC v. PLR Holdings, LLC*,
No. 6:15-cv-974-JRG-JDL, 2016 WL 6211550 (E.D. Tex. Sept. 27, 2016)..........................19

# TABLE OF AUTHORITIES

## (continued)

**Page**

*Widevine Techs., Inc. v. Verimatrix, Inc.*,
No. 2:07-CV-321, 2009 WL 3734106 (E.D. Tex. Nov. 4, 2009)...........................................16

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015).................................................................................18, 19, 63

*WMS Gaming Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999).................................................................................19, 20, 26

*ZeroClick, LLC v. Apple Inc.*,
891 F.3d 1003 (Fed. Cir. 2018).....................................................................................16, 61

**STATUTES**

35 U.S.C. § 112...................................................................................................... passim

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| Ex. B | U.S. Patent No. 6,784,653 (exhibit to the parties' Joint Claim Construction Chart (D.I. 112)) |
| Ex. C | U.S. Patent No. 7,068,950 (exhibit to the parties' Joint Claim Construction Chart (D.I. 112)) |
| Ex. D | U.S. Patent No. 7,613,938 (exhibit to the parties' Joint Claim Construction Chart (D.I. 112)) |
| Ex. E | U.S. Patent No. 7,903,971 (exhibit to the parties' Joint Claim Construction Chart (D.I. 112)) |
| Ex. F | U.S. Patent No. 9,312,838 (exhibit to the parties' Joint Claim Construction Chart (D.I. 112)) |
| Ex. 1 | Expert Declaration of Dr. Daniel Foty |
| Ex. 2 | Expert Declaration of Dr. Duncan MacFarlane |
| Ex. 3 | Expert Declaration of Dr. R. Jacob Baker |
| Ex. 4 | Applicant's September 25, 2008 Amendment/Request for Reconsideration After Non-Final Rejection ('938 patent application) |
| Ex. 5 | Examiner's June 26, 2009 Notice of Allowability ('938 patent application) |
| Ex. 6 | Examiner's December 12, 2008 Non-Final Rejection ('971 patent application) |
| Ex. 7 | Applicant's April 13, 2009 Amendment / Request for Reconsideration After Non-Final Rejection ('971 patent application) |
| Ex. 8 | Applicant's June 7, 2010 Amendment/Request for Reconsideration After Non-Final Rejection ('971 patent application) |
| Ex. 9 | Applicant's March 1, 2010 Arguments/Remarks Made in an Amendment ('971 patent application) |
| Ex. 10 | Xilinx correspondence with WSOU regarding request to dismiss the '838 Patent |
| Ex. 11 | Excerpt from Newton's Telecom Dictionary (18th ed. 2002) |
| Ex. 12 | H. Bulow et al., "Adaptation of an Electronic PMD Mitigator by Maximization of the Eye Opening," 26th European Conference on Optical Communications, Sep. 3–7, 2000, Munich, Germany Proceedings, vol. 3, pp. 209–10 |
| Ex. 13 | Expert Declaration of Nathaniel Polish, Ph.D. in Support of Plaintiff's Opening Claim Construction Brief |
| Ex. 14 | Reply Expert Declaration of Nathaniel Polish, Ph.D. in Support of Plaintiff's Reply Claim Construction Brief |

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| WSOU | Plaintiff WSOU Investments, LLC d/b/a Brazos Licensing and Development |
| Xilinx | Defendant Xilinx, Inc. |
| The parties | Xilinx and WSOU |
| '653 patent | U.S. Patent No. 6,784,653 |
| '950 patent | U.S. Patent No. 7,068,950 |
| '938 patent | U.S. Patent No. 7,613,938 |
| '971 patent | U.S. Patent No. 7,903,971 |
| '838 patent | U.S. Patent No. 9,312,838 |
| The asserted patents | Collectively, the '653 patent, the '950 patent, the '938 patent, the '971 patent, and the '838 patent |
| POSA or POSITA | Person Of Ordinary Skill In The Art |
| FPGA | Field-Programmable Gate Array |
| Polish Decl. | Declaration of Nathaniel Polish, Ph.D. in Support of Plaintiff's Opening Claim Construction Brief |
| Polish Reply Decl. | Declaration of Nathaniel Polish, Ph.D. in Support of Plaintiff's Reply Claim Construction Brief |
| Foty Decl. | Declaration of Daniel Foty, Ph.D. Regarding Claim Construction |
| MacFarlane Decl. | Declaration of Duncan MacFarlane, Ph.D. Regarding Claim Construction |
| Baker Decl. | Declaration of R. Jacob Baker, Ph.D., P.E. Regarding Claim Construction |

*\* All emphasis in Xilinx's positions, and all colored annotations to the asserted patents, their text, and their figures, are added unless indicated otherwise.*

## I.      AGREED UPON CONSTRUCTIONS

The parties have not agreed on constructions for any identified claim terms.

## II.     DISPUTED CONSTRUCTIONS

### A.      WSOU's Introduction

WSOU submits this brief in support of its proposed constructions for the 13 disputed claim terms of the '653, '950, '938, '971, and '838 patents.  These five patents-in-suit stem from applications that were originally filed by Alcatel Lucent entities between 2001 and 2013.  The patents are unrelated, having different sets of inventors, unique specifications, and no familial relationship.

To the extent the disputed terms of these patents require construction, WSOU respectfully asks the Court to adopt WSOU's proposal for each term, which reflect their plain and ordinary meanings in light of the intrinsic record.  Xilinx, by contrast, improperly seeks to import overly narrow limitations from the specification or not tied to the intrinsic record at all.

The Court should also reject Xilinx's assertion that two of the disputed claim phrases—"an analyzer configured ..." in the '950 patent, and "dual clock generator ..." in the '838 patent—are means-plus-function terms.  Neither claim phrase uses the word "means," and Xilinx cannot overcome the resulting presumption that they are not means-plus-function terms.  Rather, a POSA would understand the claims themselves to connote sufficient structure.  Further, even if, *arguendo*, the Court were to find these claim phrases to be means-plus-function terms, Xilinx cannot satisfy its heavy burden of proving by clear and convincing evidence that the claim phrases are indefinite, as it apparently contends.  To the contrary, the specifications provide sufficient corresponding structure for the claimed functions.

Xilinx also cannot establish by clear and convincing evidence that the claim phrase "a spectral band corresponding to a spectral null" in the '950 patent is indefinite.  A POSA would

readily understand what this phrase means in light of the claim language and patent specification, which provides exemplary spectral bands containing spectral nulls along with further explanation.

### B. Xilinx's Introduction

The Federal Circuit explained in its seminal case of *Phillips v. AWH Corp.*:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  Xilinx's proposed claim constructions stay true to this mandate, including being supported by the claim language, specification, and prosecution history, and should be adopted.  WSOU's competing claim constructions do not.

WSOU's plain and ordinary meaning proposals do not resolve parties' claim scope disputes, and are not helpful to the jury.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360–63 (Fed. Cir. 2008) (requiring the court to resolve these disputes).  WSOU frequently ignores the claim language and specifications, seeking improperly broad constructions for terms that are narrower or indefinite.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  In the end, WSOU's conclusory arguments and heavy reliance on extrinsic expert evidence cannot overcome the intrinsic record, and its constructions must be rejected.

C.      U.S. Patent No. 6,784,653 (Case No. 1:20-cv-01228-CFC-JLH)

1.      "Directly connected" (claims 1 and 7)

| WSOU's [Updated] Construction | Xilinx's [Updated] Construction |
|---|---|
| No construction necessary – plain and ordinary meaning.  Should the Court find construction necessary:<br><br>"connected [without an EXOR circuit] such that the output of the decision circuit corresponds to the input of the integrator" | Connected [by a wire or metal trace] with nothing in between |

(a)      WSOU's Opening Position

**WSOU's Introduction for the '653 Patent**:

The '653 patent claims an "eye monitor for evaluating a binary input signal of a transmission link and for recognizing the edges of an eye diagram of the input signal," and a related method. Ex. B ('653 patent) at claims 1, 7.  There are several different aspects of a signal transmission medium that effect its suitability for a given signal.  Ex. 13 (Polish Decl.) ¶ 39.  The so-called "eye monitor" is a convenient and relatively simple way to look at those different aspects in one place.  *Id*.  It was developed at a time when testing technology was somewhat limited.  *Id*. Fig. 2 of the patent, reproduced below on the left, provides a general schematic of an eye diagram; in practice, eye diagrams appear more like the example on the right:

Illustrative Examples of Eye Diagrams




*Left:* Ex. B ('653 patent) at Fig. 2; *right:* Ex. 13 (Polish Decl.) ¶ 40.  Eye diagrams are typically monitored for diagnostic purposes:  A well-formed open eye shape is indicative of good

transmission quality for a given signal, whereas a malformed eye indicates poor transmission quality.  Ex. 13 (Polish Decl.) ¶ 41.  The patented eye monitor allows for greater bit rates than prior art systems.  Ex. B ('653 patent) at 2:14-36.

**WSOU's Opening Argument for "Directly Connected":**

The Court should adopt the plain and ordinary meaning of "directly connected."  When claims 1 and 7 of the '653 patent recite "a decision circuit [which] is *directly connected* to an integrator," they mean that the decision circuit and integrator are connected such that the output of the decision circuit corresponds to the input of the integrator.  Ex. 13 (Polish Decl.) ¶¶ 59-65. According to the specification, the prior art system, as depicted in Fig. 1 (reproduced on right), contained an intermediary "EXOR circuit" (13) between the decision circuits (11, 12) and the integrator (14).  Ex. B ('653 patent) at 1:20-27, 1:57-67.  By contrast, the claimed system, as depicted in the exemplary embodiment of Fig. 3 (reproduced on right), "does not comprise the EXOR circuit." *Id*. at 2:30-21.  Instead, "the



Fig. 1



Fig. 3

second decision circuit **12** is directly connected to the integrator **14** so that the output signal Uincorr of the second decision circuit 12 is directly forwarded into the integrator **14**" without being interrupted by an EXOR circuit.  *Id*. at 2:61-64.  By omitting the EXOR, the decision circuit's output corresponds to the integrator's input.  In Fig. 3, "Uincorr" signifies both the output of the decision circuit (12) and input of the integrator (14).

4

The Court should reject Xilinx's proposed language, "connected with nothing in between," which is unsupported by the intrinsic record, confusing, and essentially meaningless. Clearly, different components in electrical systems need to be connected to each other by some means (*e.g.,* wire). Ex. 13 (Polish Decl.) ¶ 66. By requiring "nothing in between," Xilinx's would exclude any type of connection between the decision circuit and integrator other than having the decision circuit's output port physically touching the integrator's input port, which is unreasonable. *Id.*

### (b)   Xilinx's Answering Position

The '653 patent relates to a specific type of "eye monitor" circuit that recognizes the edges (i.e., boundaries) of a so-called "eye diagram." *See* Ex. B at Abstract, 1:7–10, Fig. 2 (eye diagram output). The '653 patent concedes that an "eye diagram" was known in the prior art, as were other eye monitor circuit designs. *Id.* at 1:13–27; Ex. 1 ¶¶ 16–17. Specifically, in the prior art design of Figure 1: an exclusive or "(EXOR) circuit 13" is between "second decision circuit 12" and "integrator [circuit] 14". *See* Ex. B at 1:57–67; Ex. 1 ¶¶ 17–18; Ex. 12 at 209.

The alleged invention is removing this EXOR circuit in order to allow responsiveness to input signals having bit rates greater than 10 gigabits per second. Ex. B at 2:14–21; *see also* Ex. 1 ¶¶ 22–23. This removal is shown by Figure 3's "eye monitor 30 according to the invention," in which "the *second decision circuit 12* is *directly connected* to the integrator". Ex. B at 2:61–62. This difference can easily be seen below.

   

**Prior art eye monitor circuit 10**    **Invention eye monitor circuit 30**

Xilinx's construction is the plain meaning of "directly connected" to a POSITA, while WSOU's "plain" meaning alternative demonstrates why this term must be construed. Starting with the claim language, the verb "connected" means to connect two circuits (here, the decision circuit to the integrator), and the adverb "directly" means this connection has no other circuit or component in between. *See* Ex. 1 ¶¶ 49–51. This meaning is supported by the specification, which explains that the invention is the removal of the EXOR gate from FIG. 1, and the resulting direct connection of FIG. 3:

> *The difference* between the eye monitor 30 of FIG. 3 and the eye monitor 10 of FIG. 1 *is the fact that* the eye mon[i]tor 30 of FIG. 3 does not comprise the EXOR circuit 13 of the eye monitor 10 of FIG. 1. Instead, *the second decision circuit 12 is directly connected to the integrator 14 so that the output signal* Uincorr of the second decision circuit 12 *is directly forwarded into the integrator 14*.

Ex. B at 2:57–64; *see also id.* at, e.g., 2:14–22, 2:30–36; Ex. 1 ¶¶ 45–48. Figure 3 shows an arrow "directly" from the decision circuit 12 to the integrator 14 with nothing else in between. A POSITA therefore would understand that "directly forwarding" by way of a direct connection expressly excludes intermediate components, such as logic gates. Ex. 1 ¶¶ 45-48.

WSOU's "no construction necessary" proposal must be rejected because it does not resolve the parties' dispute. *O2 Micro Int'l Ltd.*, 521 F.3d at 1362. The Court should reject WSOU's alternative construction as well because it is confusing and lacks evidentiary support. Both parties agree that "connected" means exactly that. But WSOU proposes that "directly" somehow means "such that the output of the decision circuit *corresponds to* the input of the integrator." The specification nowhere describes "directly" as an output "corresponding" to an input; instead, as discussed above, the specification says the output is "directly forwarded" as an input without any circuit (such as the EXOR) in between. Ex. B at 2:57–64, Fig. 3.

WSOU also fails to explain what it means by its "corresponds to" construction, which impermissibly allows any number of intervening circuits and components between the decision circuit and the integrator.  Ex. 1 ¶¶ 53–58.  This would vitiate the meaning of "directly" connected. *See, e.g.*, *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1582 (Fed. Cir. 1996) (rejecting attempt to read a limitation out of the claim because courts must give meaning to all the words in the claims).  As explained by Xilinx's expert Dr. Foty, WSOU's "corresponds to" proposal also would suffer from the stated disadvantages of the prior art, and even cover re-inserting an EXOR circuit back in between similar to prior art Figure 1, but for buffering the input of the integrator.  Ex. 1 ¶¶ 53–58.  The Court also should reject WSOU's strawman that Xilinx's construction would require "the decision circuit's output port physically touching the integrator's input port."  *Supra* § II.C.1.a.  To be clear, Xilinx's construction does not foreclose a wire or metal trace connection, consistent with Figure 3.  Ex. 1 ¶¶ 59–61.  Xilinx therefore does not object to further clarifying its construction to mean "connected [by a wire or metal trace] with nothing in between."

### (c)     WSOU's Reply Position

Xilinx concedes that its original proposed construction was confusing in requiring a connection "with nothing in between" the decision circuit and integrator.  As a fix, Xilinx now seeks to construe "directly connected" to mean "connected <u>by a wire or metal trace</u> with nothing in between," but Xilinx's modified proposal is still problematic.  As an initial matter, the phrasing of Xilinx's modified proposal could confuse jurors because it requires on the one hand that there be "*nothing*" in between the decision circuit and integrator, while simultaneously requiring *something* (*i.e.,* a wire or metal trace) in between those components.  Ex. 14 (Polish Reply Decl.) ¶ 8.  Moreover, the patent never limits the connection to "a wire or metal trace."  *Id.* at ¶ 7.

7

In any event, Xilinx's proposed construction, even as modified, is far too narrow.  Xilinx wrongly seeks to exclude eye monitors that have *any* additional components, regardless of whether those components meaningfully impact bit rate.  Contrary to Xilinx's suggestion, the distinguishing factor between the claimed invention and the prior art set forth in the '653 patent was *not* that the claimed eye monitor had "nothing in between" the decision circuit and integrator.  Rather, the patent emphasizes that, unlike the prior art embodiment, the eye monitor of the invention **lacks the EXOR circuit that was limiting the maximum bit rate** of prior art eye monitors.  Ex. 14 (Polish Reply Decl.) ¶¶ 9-12.  The '653 patent never excludes the use of any components other than the bit rate-limiting EXOR circuit of the prior art embodiment seen in Fig. 1.  *Id*.

In that regard, the '653 patent emphasizes that the eye monitor of the invention specifically lacks an EXOR circuit.  By including an EXOR circuit between the decision circuit and integrator, the prior art eye monitor had "the disadvantage that the EXOR circuit **13** [wa]s not able to follow bit rates above 10 Gbit/s" so that the prior art "eye monitor **10** cannot be used for a bit rate of e.g. 40 Gbit/s. Ex. B ('653 patent) at 2:14-17.  In light of that specific disadvantage in the prior art, the patent's express "object of the invention" was "to provide an eye monitor which allows to recognize and characterize the edges of the eye diagram at bit rates which are greater than 10 Gbit/s, e.g. at a bit rate of 40 Gbit/s."  *Id*. at 2:18-21.  The '653 patent "solve[s]" "this object" by doing away with the bit rate-limiting component—*i.e.*, the EXOR circuit. *Id*. at 2:22-36.  The specification discloses that the eye monitor of the invention has "a decision circuit which is directly connected to an integrator" in that "[t]he eye monitor of the invention **does not comprise an EXOR circuit**."  *Id*. at 2:22-31 (emphasis added).  By eliminating the prior art's EXOR circuit, "[a]ny **bit rate restriction due to the EXOR circuit** is therefore overcome."  *Id*. at 2:31-32 (emphasis added).

"As a result, the eye monitor of the invention has the advantage that it can be used for bit rates which are greater than 10 Gbit/s, e.g. at a bit rate of 40 Gbit/s." *Id*. at 2:32-35. Thus, the patent discloses and claims an eye monitor that lacks the disadvantageous EXOR circuit between the decision circuit and integrator. The claims do not expressly mention the lack of an EXOR circuit, but that is precisely what they mean by the decision circuit being "directly connected" to the integrator.

Unlike Xilinx's proposal, WSOU's proposed construction properly captures this expressly stated objective of the patent. That is, a decision circuit is "directly connected" to an integrator when they are connected, without an EXOR circuit, in a manner such that the integrator's input corresponds to the decision circuit's output. Xilinx argues that the patent's description of Fig. 3 supports its construction, but it does not. Rather, the patent explains that the eye monitor embodiment in Fig. 3 "does not comprise the EXOR circuit. Instead, … the decision circuit ... is directly connected to the integrator ... so that the output signal ... of the decision circuit ... is directly forwarded into the integrator," rather than into the disadvantageous bit rate-limiting EXOR circuit of the prior art embodiment of Fig. 1. Ex. B ('653 patent) at 2:49-67. Xilinx wrongly downplays the context and focus of this passage, which is to specifically exclude the bit rate-limiting EXOR circuit. Contrary to Xilinx's argument, an EXOR circuit is not merely *an example* of a component that the patent excludes; it is the only component the patent contemplates excluding.

With regard to Xilinx's contention that WSOU's proposal would permit the claimed eye monitor to include an EXOR circuit between the decision circuit and integrator, WSOU disagrees but, for clarity purposes, is willing to modify its proposed construction to the following: "connected <u>without an EXOR circuit</u> such that the output of the decision circuit corresponds to the input of the integrator." At bottom, Xilinx's interpretation of "directly connected" as permitting

"nothing in between" is unduly restrictive and not properly grounded in the patent. Xilinx does not (because it cannot) point to anything in the intrinsic record that reflects a clear intent in the patent to exclude any components other than an EXOR circuit.

### (d)  Xilinx's Sur-Reply Position

WSOU continues to rewrite the term "directly connected" contrary to its plain meaning. WSOU now proposes to construe this term as "connected <u>without an EXOR circuit</u> such that the output of the decision circuit corresponds to the input of the integrator." *Supra* § II.C.1.c (emphasis in original). To do so, WSOU relies on extrinsic expert evidence and argues the purpose of removing the EXOR circuit is to increase the transmission rate. *Id.* But there continues to be no lexicography, disclaimer or other intrinsic support to rewrite this term. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365–66 (Fed. Cir. 2012).

To be sure, the claimed "direct connection" is to achieve a higher data rate. Indirect connections—such as through an EXOR gate in the Figure 1 prior art embodiment—add unacceptable delay decreasing that rate. Ex. 1 ¶¶ 22–23. But so too, adding other intermediate connecting components adds delay, just as an EXOR gate does. Ex. 1 ¶¶ 53–58 (discussing delay added by components such as buffer circuits). In the claims, the inventor deliberately chose to require a "direct connection," not merely to exclude any delay caused by an EXOR gate as WSOU now proposes. Further, the mere "purpose" and "objective" of removing the EXOR gate in the specification embodiment does not rise to the level of lexicography or disclaimer required to redefine "directly connected". *See Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369–71 (Fed. Cir. 2012); *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016).

WSOU argues that Xilinx's construction excludes intermediary components "regardless of whether those components *meaningfully impact* bit rate." *Supra* § II.C.1.c. But the claims do not recite anything at all about the bit rate—much less permit indirect connections so long as there is

10

no "meaningful impact" on that rate.  Nor does the specification disclose any embodiments with indirect connections or intermediate components.  Instead, the specification explains that the invention is the direct connection itself.  *See supra* § II.C.1.b (citing Ex. B at 2:57–64).  WSOU also fails to explain what is a "meaningful impact" on the bit rate or its limits.  This is just another layer of confusion and indefiniteness introduced by WSOU's incorrect construction.

### 2.   "Decision circuit" (claims 1 and 7)

| WSOU's Construction | Xilinx's Construction |
|---|---|
| No construction necessary – plain and ordinary meaning. | "Circuit that decides whether an input signal is a binary '1' or '0' by comparing the input signal to the variable threshold." |

### (a)   WSOU's Opening Position

The term "decision circuit" has a well-understood plain and ordinary meaning that does not need further construction.  Ex. 13 (Polish Decl.) ¶¶ 67-70.  A POSA would understand that a decision circuit is a circuit capable of generating an output signal based on a comparison of an input signal against another criterion.  *Id.*

The Court should reject Xilinx's proposal, which wrongly seeks to restrict the term to circuits that make can decisions by comparing binary input signals to variable thresholds.  *Id.* ¶¶ 71-73.  Although a "decision circuit" *can* make a decision based on such a comparison, that is not what defines it as a "decision circuit."  *Id.*  The input signal for a "decision circuit" does not need to be binary (it could have any number of states), nor must it have a threshold.  *Id.*

### (b)   Xilinx's Answering Position

The term "decision circuit" means a circuit that compares the input signal to a threshold to determine whether the input signal is a binary '1' or '0.'  Ex. 1 ¶¶ 64–73.  This is consistent with and supported by the specification's descriptions of the two decision circuits:

> The first decision circuit 11 is therefore used to recover the received bits of the input signal Uin *by deciding whether a binary "1" or a binary "0" was received*. . . .
>
> [T]he input signal Uin is also forwarded to a second decision cir[c]uit 12 *which is provided with a variable threshold Uvar*.

Ex. B at 1:41–53. Figure 2 graphically illustrates the "decision" this decision circuit makes. If the input signal (Uin) is greater than the threshold voltage (Uthr), then the decision circuit decides that the input represents a binary '1' signal; but if the input signal voltage Uin is less than the threshold voltage Uthr, then it represents a binary '0' signal. Ex. 1 ¶¶ 16, 18, 66–69.

WSOU's "no construction necessary" proposal is not helpful and does not resolve the parties' dispute. *O2 Micro Int'l Ltd.*, 521 F.3d at 1362. Further, its description of a "decision circuit" as "a circuit capable of generating an output signal based on a comparison of an input signal against another criterion" is vague and does not cite specification support. *Supra* § II.C.2.a.

WSOU relies solely on testimony from its expert Dr. Polish, but he too does not cite any intrinsic support. "[T]he only meaning that matters in claim construction is the meaning in the context of the patent." *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). Dr. Polish opines (Ex. 13 at ¶ 72) that "[t]he input signal for a 'decision circuit' does not need to be binary (it could have any number of states), nor must it have a threshold." But the specification provides a more specific description of "a binary input signal" that is compared with a threshold value (e.g., Uopt, Uvar) to decide whether that signal is a binary '1' or '0'. Ex. B at 1:20–55, Fig. 1; Ex. 1 ¶¶ 71–73. The specification takes precedence over WSOU's extrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

**(c)     WSOU's Reply Position**

As discussed above, the plain and ordinary meaning of "decision circuit" would be readily apparent to a POSA and needs no further construction. Xilinx, however, is asking the Court to

redefine "decision circuit" to specify how the claimed "decision circuit" may work, even though claims 1 and 7 of the '653 patent do not specify this information.  Contrary to Xilinx's position, however, the '653 patent does not redefine "decision circuit" or otherwise "clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quotation marks and citation omitted).  At best, Xilinx is attempting to redefine "decision circuit" based on a single disclosed embodiment of a decision circuit, which is improper.

Notwithstanding Xilinx's accusations, it is not WSOU that is ignoring "the meaning [of 'decision circuit'] in the context of the patent." *Supra* § II.C.2.b.  Rather, and contrary to Xilinx's assertion, the patent is unequivocally clear that a "decision circuit" does not need to compare an input signal to a variable threshold.  For example, in Figs. 1 and 3 of the patent, decision circuit 12 in Fig. 2 makes a decision based on input signal Uin and variable threshold Uvar, but decision circuit 11 makes a decision circuit based on input signal Uin and optimum threshold Uopt, which is not explicitly disclosed as a variable threshold.  Thus, in the context of the patent, the meaning of "decision circuit" is plainly broader than Xilinx contends.  Ex. 14 (Polish Reply Decl.) ¶¶ 14-18.

### (d)   Xilinx's Sur-Reply Position

WSOU assumes its proposed construction is the plain meaning of this term to a POSITA. But it is not for the '653 patent, as shown by the intrinsic evidence, which must be considered. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314–17 (Fed. Cir. 2005).  The specification, which is usually dispositive of a claim term's meaning, *id.* at 1315, discloses that the decision circuit decides whether an input signal is a binary '1' or '0'.  Each reference throughout refers to the eye monitor as evaluating a binary input signal.  Ex. B at (57), 1:7–11, 23–27, 30–35, 40–45, 2:23–29, 3:5–9. And claims 1 and 7, which "define the invention," *Phillips*, 415 F.3d at 1312, expressly disclose

13

an "[e]ye monitor for evaluating a *binary* input signal . . . comprising a decision circuit . . . wherein the input signal *and a variable threshold* are provided to the decision circuit." *Id.* at 4:4–10, 30–36.   WSOU criticizes Xilinx's construction because decision circuit 11 relies on "optimum threshold Uopt, which is not *explicitly disclosed* as a variable threshold." *Supra* § II.C.2.c.   But WSOU cites no evidence indicating that an optimum threshold could never be varied.   Xilinx's construction therefore most closely aligns with the intrinsic evidence.

### D.    U.S. Patent No. 7,068,950 (Case No. 1:20-cv-01229-CFC-JLH)

**1.    "An analyzer configured (i) to analyze spectral power of an input signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding to a spectral null of the input signal, and (ii) to generate a control signal based on the analysis" (claim 1)**

| WSOU's Construction | Xilinx's Construction |
|---|---|
| Not governed by pre-AIA 35 U.S.C. § 112, ¶ 6, and not indefinite.  No construction necessary – plain and ordinary meaning.<br><br>To the extent the Court treats the term as means-plus-function:<br><br>Function: (i) to analyze spectral power of an input signal corresponding to the carrier and data signals, the spectral power being in a frequency band located near a spectral null of the input signal, and (ii) to generate a control signal based on the analysis.<br><br>Structure: A combination of one or more of integrated or discrete circuit elements, filters, analog-to-digital converter (ADC) circuitry, digital-to-analog converter (DAC) circuitry, processors, or equivalents thereof. | Governed by pre-AIA 35 U.S.C. § 112, ¶ 6.<br><br>Function: (i) to analyze spectral power of an input signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding to a spectral null of the input signal, and (ii) to generate a control signal based on the analysis;<br><br>Structure: *Indefinite*. |

(a)    **WSOU's Opening Position**

**WSOU's Introduction for the '950 Patent:**

14

The '950 patent claims an apparatus and method "for reducing misalignment between a carrier signal and a data signal" in a data transmission system. Ex. C ('950 patent) at claims 1, 17. Ideally, carrier and data signals are synchronized, but for various reasons can become misaligned, leading to data transmission errors. *Id.* at 1:47-67. The '950 patent teaches that such misalignment can be identified by observing a "spectral null" (power reduction) in a signal's radiofrequency (RF) spectrum. Fig. 3B, reproduced below, depicts two exemplary nulls, which appear as depressions (broad, negative peaks) relative to the flat background power level:



FIG. 3A                                        FIG. 3B

*Id.* at Figs. 3A-B, 3:19-41. As a solution, the patent discloses to reduce misalignment between carrier and data signals by analyzing the spectral power of an input signal in a spectral band corresponding to a spectral null, generating a control signal based on the analysis, and introducing a phase shift between the data signal and a clock signal upon which the carrier signal is based. Ex. 13 (Polish Decl.) ¶¶ 42-45.

**WSOU's Opening Argument for the "Analyzer Configured …" Claim Phrase:**

The Court does not need to separately construe the "analyzer configured …" claim phrase. The parties' dispute centers around whether this claim phrase invokes pre-AIA 35 U.S.C. § 112,

¶ 6 (it does not), and, if so, whether the term is indefinite (it is not).[1]  If the Court agrees that this phrase is not a means-plus-function term, Xilinx proposes no construction, and the plain and ordinary meaning should apply.

First, the "analyzer configured …" claim phrase is *not* governed by § 112, ¶ 6.  "When evaluating whether a claim limitation invokes § 112, ¶ 6, the essential inquiry remains whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *ZeroClick, LLC v. Apple Inc*., 891 F.3d 1003, 1007 (Fed. Cir. 2018).  Because this claim phrase does not use the word "means," a presumption that it is not a means-plus-function term applies.  *Id*.  Xilinx cannot rebut this presumption.  Rather, a POSA would understand claim 1 of the '950 patent to connote sufficient structure for the claimed analyzer.[2]  Thus, the "analyzer configured …" claim phrase does not invoke §112, ¶ 6.  *See Widevine Techs., Inc. v. Verimatrix, Inc.*, No. 2:07-CV-321, 2009 WL 3734106, at *16-17 (E.D. Tex. Nov. 4, 2009) (holding that the claim phrase "analyzer configured to analyze behavior … and terminate" activities based on the analysis was "not governed by 35 U.S.C. § 112(6)").

Second, even if § 112, ¶ 6 applied (and, again, it does not), Xilinx cannot meet its burden of establishing indefiniteness by clear and convincing evidence because the specification discloses sufficient structure corresponding to the claimed function.  Ex. 13 (Polish Decl.) ¶¶ 97-110.  For example, the patent informs a POSA that the analyzer can comprise one or more of integrated or discrete circuit elements, filters, analog-to-digital converter (ADC) circuitry, digital-to-analog

---

[1]  Xilinx waived this indefiniteness defense by never disclosing any basis for it in its invalidity contentions beyond a bare contention with no explanation or support.

[2]  Ex. 13 (Polish Decl.) ¶ 96 ("A POSA would understand from the claim that the analyzer would have an input port for receiving the input signal, a filtering component for isolating a particular frequency band of the input signal, a processor and circuitry for analyzing the spectral power within that band and generating the control signal, and an output port for transmitting the control signal.").

converter (DAC) circuitry, and processors. *Id.*; Ex. C ('950 patent) at Figs. 4-5, 3:42-65 (describing Fig. 4), 3:66-4:41 (describing Fig. 5), 6:32-57 (further describing "analyzer" structure).

    **(b)**    **Xilinx's Answering Position**

The '950 patent relates to optical transmitters used in fiber-optic networks for telecommunications. Ex. C at 1:12–22. Specifically, it attempts to address problems with synchronizing an optical carrier signal with a data stream. In the prior art, such as shown in Figure 1, "synchronizing [an] optical carrier signal 118 and electronic data stream 102" was "difficult to maintain due to … phase drifts in E/O [electro-optic] modulators." Ex. C at 1:47–53. "As a result of phase drift, carrier signal 118 and data stream 102 may become misaligned causing inaccuracies in [modulated output optical] signal 104." *Id.* at 1:51–53; *see also* Ex. 1 ¶¶ 31–35.

The '950 patent purports to improve synchronization by "analyz[ing] the radio frequency (RF) spectrum of the transmitter's output" and "adjust[ing] the phase of the clock signal driving an electro-optic (E/O) modulator in the transmitter." Ex. C at 2:6–7, 2:11–16. "When the carrier and data signals are misaligned," then "the spectral background is no longer flat, but rather, exhibits spectral nulls, e.g., nulls 304 and 306," as shown at § II.D.3.b *infra*, that are "indicative of misalignment and may be used to detect and correct the same." *Id.* at 3:29–35; *compare with* Fig. 3A; *see also* Ex. 1 ¶¶ 24–36. An embodiment of the alleged invention is shown in Figure 4.



FIG. 4

Transmission system 400 outputs "modulated optical signals" 104 having spectral nulls when there is misalignment.  Ex. C at 1:55–67, 3:15–41, and Fig. 2.  To reduce misalignment (and nulls), newly-added alignment device 402 attempts "to maintain carrier signal 118 in alignment with the input data signal (i.e., signal 102)."  *Id.* at 3:43–48; *compare with* prior art Fig. 1.  Alignment device 402 includes photodetector 404, an "analyzer circuit 406," and phase shifter 408.  *Id.* at 3:42–65; *see also* Ex. 1 ¶¶ 34–36.  Of particular importance is "[a]nalyzer 406," which "processes signal 414 [output by photodetector 404] and, based on the processing, generates a control signal 416 applied to phase shifter 408."  Ex. C at 3:57–59.  Analyzer 406 can include a general-purpose processor, and an analog to digital (ADC) and a digital to analog (DAC) converter.  *See id.* at 4:13–16, 4:34–41 5:8–11, 5:29–31, Figs. 5, 7.

The "analyzer" claim term is subject to 35 U.S.C. § 112, ¶ 6.  Even if a claim term does not use the word "means," § 112, ¶ 6 still applies if "the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'"  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)).  "The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."  *Id*.

Here, the word "analyzer" is a generic term, which has no common meaning in the art, followed by its function: "(i) to analyze spectral power of an input signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding to a spectral null of the input signal," and "(ii) to generate a control signal based on the analysis."  Ex. 1 ¶¶ 75–78.  A POSITA would *not* recognize the word "analyzer" or the subsequent functional language to connote any sufficiently definite structure, much less any specific structure that performs both

parts (i) and (ii) of the recited function.  *Id.*; *see also Vstream Techs., LLC v. PLR Holdings, LLC*, No. 6:15-cv-974-JRG-JDL, 2016 WL 6211550 (E.D. Tex. Sept. 27, 2016) (holding that "pipe analyzer" fails to connote sufficient structure and therefore is subject to § 112(f)).  Thus, this "analyzer" claim language does not connote structure or have a sufficiently definite structural meaning, and is written in means-plus-function language.  *Williamson*, 792 F.3d at 1349.

WSOU incorrectly argues § 112, ¶ 6 does not apply, citing only paragraph 96 in Dr. Polish's declaration.  *Supra* § II.D.1.a.  There, Dr. Polish briefly opines:

> A POSA would understand from the claim that the analyzer would have an input port for receiving the input signal, a filtering component for isolating a particular frequency band of the input signal, *a processor and circuitry for analyzing the spectral power within that band and generating the control signal*, and an output port for transmitting the control signal.  These are all structural components that *could allow* the claimed analyzer to perform the recited functions.

Ex. 13 ¶ 96.  The problem with Dr. Polish's opinion is the italicized language above, which does not recite specific structure, circuitry, or algorithms that perform parts (i) and (ii) of the recited function.  His *ipse dixit* testimony is unsupported by any evidence whatsoever.  And, his speculation that these components "could allow" the analyzer to perform the recited function is insufficient.

Because this is a means-plus function term, the specification must disclose and clearly link sufficient corresponding structure for performing the entire recited function.  It fails to do so, and thus, the term is indefinite.  The specification does disclose a "power analyzer 500" and a "spectrum analyzer 700", each including a general-purpose processor (processors 512 and 712, respectively) that must be programmed.  Ex. C at 3:66–4:1, 4:59–61, Figs. 5, 7; Ex. 1 ¶¶ 79–84.  But where the recited function is performed by a general-purpose computer or processor, the specification must disclose a special-purpose algorithm that performs the claimed function.  *WMS*

*Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). An algorithm is "a step-by-step procedure for accomplishing a given result." *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012). Like any other corresponding structure, any such algorithm must be "clearly linked" by the specification to the function, and sufficient to perform the function. *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997); *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318 (Fed. Cir. 2012). A general-purpose processor alone cannot be sufficient structure, and the specification's failure to disclose or clearly link a specific algorithm makes the claim indefinite. *See, e.g.*, *Net MoneyIn, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1366–67 (Fed. Cir. 2008); *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1336–38 (Fed. Cir. 2008).

Here, the specification fails to disclose or clearly link any special-purpose algorithm for performing parts (i) and (ii) of the recited function. No algorithm, software, or instructions are disclosed or clearly linked "to analyz[ing] spectral power of an input signal corresponding to the carrier and data signals, the spectral power being in a spectral band corresponding to a spectral null of the input signal." Ex. 1 ¶¶ 86–87. And, no algorithm, software, or instructions are disclosed or clearly linked to taking that analysis and then "to generate a control signal based on the analysis." *Id.* This term is thus indefinite.

WSOU disputes this, proposing in the alternative that the corresponding structure is:

> A combination of one or more of integrated or discrete circuit elements, filters, analog-to-digital converter (ADC) circuitry, digital-to-analog converter (DAC) circuitry, processors, or equivalents thereof.

*Supra* § II.D.1.a (citing Ex. 13 Decl. ¶¶ 97–110). Many problems exist with WSOU's proposal. *First*, it includes generic "processors" as structure, but not any specific algorithm. This alone renders the claim indefinite. *See WMS Gaming Inc.*, 184 F.3d at 1349; *Verisign*, 545 F.3d at 1366–67; *Aristocrat Techs. Austl. Pty Ltd.*, 521 F.3d at 1336–38. *Second,* other parts of WSOU's

proposed structure, such as "integrated or discrete circuit elements," are similarly generic and do not connote any particular structure.  *Third*, WSOU further expands its definition, arguing it covers a "combination of one or more of" the items listed and "equivalents thereof."  The end result is WSOU's proposal covers any and all conceivable structures—rather than just the structure disclosed and clearly linked by the specification, as § 112, ¶ 6 requires.  *Fourth*, there is no such clear linking of these components to the recited function by the specification.  Its failure to disclose and clearly link a specific algorithm, or any other structure, cannot be cured by expert testimony. *Noah*, 675 F.3d at 1312, 1318–19; *Function Media v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013).  And, it is irrelevant whether a POSITA could readily develop a program, or determine how to construct an algorithm, to perform the function.  *Noah*, 675 F.3d at 1317; *Function Media*, 708 F.3d at 1318; *Verisign*, 545 F.3d at 1366–67.

WSOU identifies portions of the specification as supporting its proposed structure.  But the passages WSOU identifies only describe the analyzer in functional language and disclose a programmable general-purpose processor without any specific software, algorithm, computer code, instructions, or steps, for either "analyz[ing] spectral power of an input signal …" or then "generat[ing] a control signal based on the analysis."  Ex. 1 ¶¶ 88–91.  For instance, WSOU cites:

> Analyzer 406 *processes* signal 414 and, *based on the processing*, generates a control signal 416 applied to phase shifter 408.  (Ex. C at 3:57–59.)

> Power analyzer 500 is configured to generate control signal 416 based on the amount of energy in a certain band located near a spectral null.  (*Id.* at 4:1–4.)

Nothing in this functional description describes or clearly links any specific processing algorithm for performing the recited function.  Ex. 1 ¶¶ 85, 87.  The same is true for the specification's other descriptions of the "analyzer" and its processors, such as:

> digital processors 512 and 712 may be specialized processors designed for their respective circuits 508 and 708 or be part of a different circuit or device connected to analyzer 406. Furthermore, said digital processors may be configured to use look-up tables for generating their respective digital control signals.

Ex. C at 6:50–55; *see also id.* at 4:38–41 (stating that, "[b]ased on the measured amplitude, processor 512 generates a digital control signal); Ex. 1 ¶¶ 84–92. There is no description here or elsewhere of any specific analyzer structure that "analyze[s] the spectral power …" and then "generate[s] a control signal based on the analysis." *See id.* at Ex. C at 2:19–27; 2:54–59; 3:49–51; 3:57–59; 3:66–4:58 (similarly vague, functional descriptions of the "analyzer"); Ex. 1 ¶ 92. For all of these reasons, this term lacks corresponding structure and is indefinite.

### (c)      WSOU's Reply Position

The "analyzer ..." claim phrase is not a means-plus-function term and requires no construction. Indeed, Xilinx's answering position concedes that the Court need not construe this phrase if it agrees that the phrase is not means-plus-function. Moreover, regardless of its means-plus-function status, the phrase is not indefinite.

Xilinx's answering position fails to rebut the presumption that the "analyzer ..." claim phrase is not means-plus-function. As discussed, the "analyzer" in claim 1 must be configured to analyze the spectral power in a spectral band of the recited input signal and to generate a control signal based on the analysis, which would inform a POSA that the "analyzer" is a spectral power analyzer that would have structures such as an input port for receiving the input signal; a spectral filtering component for isolating a particular frequency band of the input signal; a processor and circuitry for analyzing the spectral power within that band and generating the control signal; and an output port for transmitting the control signal to the phase shifter. *Supra* § II.D.1.a. Unlike the "pipe analyzer" in the *Vstream* case cited by Xilinx, spectrum analyzers were well-established in the prior art, and were known to be capable of measuring spectral power, for example, by Fourier

22

transform.  Ex. 14 (Polish Reply Decl.) ¶ 42 (citing Exhibit 5 thereto (P. HOROWITZ & W. HILL, THE ART OF ELECTRONICS (2ⁿᵈ ed., Cambridge University Press 1989)) at pp. 1024, 1035-38.)

Even if, *arguendo,* the Court were to find § 112, ¶ 6, applicable, Xilinx fails to establish that claim 1 is indefinite.  As discussed, the '950 patent discloses ample structure corresponding to the recited functions of the "analyzer" recited in claim 1, including one or more of integrated or discrete circuit elements, filters, analog-to-digital converter (ADC) circuitry, digital-to-analog converter (DAC) circuitry, and processors.  *Supra* § II.D.1.a.  For example, Fig. 4 provides a diagram of one embodiment of the claimed invention, including an exemplary spectral power analyzer that is further depicted in Fig. 5:



FIG. 4

FIG. 5

Ex. C ('950 patent) at Figs. 4 (highlighting added) & 5, 3:42-4:41 (describing Figs. 4 & 5).  Even so, the patent is clear that the claimed "analyzer" is not restricted to the precise components or arrangement depicted in these figures.  The patent explains, for instance, that the control signal generating circuit (508) may include analog and/or digital circuitry, and may contain analog-to-digital and/or digital-to-analog converters depending on the nature of its input.  *Id.* at 4:42-41.  A POSA would understand such converters not to be necessary, for example, if the input to the control signal generating circuit was already a digital signal.  Similarly, a POSA would understand how to implement one or more filters to isolate a spectral band.  Accordingly, the structure

proposed by WSOU (in the hypothetical event the Court finds § 112, ¶ 6 applicable) is not limited to Figs. 4 and 5, but includes a combination of one or more of integrated or discrete circuit elements, filters, analog-to-digital converter (ADC) circuitry, digital-to-analog converter (DAC) circuitry, processors, or equivalents thereof.

Xilinx's primary qualm with the "analyzer …" claim phrase seems to be with its structure including a "processor," which Xilinx contends necessarily renders the claim indefinite absent a disclosure of a specific algorithm. Xilinx is wrong. "[A]s . courts have noted, processor generally refers to a tangible object that can be purchased and that can perform certain functions even without specific instructions. Thus, unlike terms such as 'means,' 'element,' and 'device' that typically do not connote structure, 'processor' can on its own recite at least some structure to persons of ordinary skill in the art." *Fisher-Rosemount Sys., Inc. v. ABB Ltd.*, No. 4:18-cv-178, 2019 WL 6830806, at \*16 (S.D. Tex. Dec. 12, 2019) (citation omitted). "The term processor is 'not used as generic terms or black box recitations of structure or abstractions, but rather as a specific reference' to processors that are known in the art." *Id.* (quoting *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018)).[3]

Moreover, as explained by Dr. Polish, the patent provides sufficient description of the role and structure of the spectral power analyzer, including its processor. Ex. 14 (Polish Reply Decl.) ¶ 44. The spectral power analyzer is charged with the task of isolating a spectral band and

---

[3] Indeed, contrary to Xilinx's suggestion, courts regularly find the term "processor" not to invoke § 112, ¶ 6, and not indefinite. *See, e.g., Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*, No. 18-362-RGA, 2019 WL 7037656, at \*12-13 (D. Del. Dec. 20, 2019) (holding that claim terms containing the word "processor" did not invoke § 112, ¶ 6 and were not indefinite); *Fisher-Rosemount Sys., Inc. v. ABB Ltd.*, No. 4:18-cv-178, 2019 WL 6830806, at \*16 (S.D. Tex. Dec. 12, 2019) (similar); *Huawei Techs. Co. Ltd. v. T-Mobile US, Inc.*, No. 2:16-cv-57, 2017 WL 2691227, at \*25-27 (E.D. Tex. June 22, 2017) (similar); *SyncPoint Imaging, LLC v. Nintendo of Am. Inc.*, No. 2:15-cv-247, 2016 WL 55118, at \*19-20 (E.D. Tex. Jan. 5, 2016) (similar).

determining, based on an amplitude measurement, whether it includes a frequency of a spectral null, which would be indicative of misalignment. *Id*. (citing Ex. C ('950 patent) at 3:29-41, 3:66-4:12). To isolate the spectral band, the patent discloses the use of various filtering components. *Id*. (citing 4:13-31). Once the spectral band is isolated, the control signal generating circuit (508) takes a measurement of the signal's amplitude. *Id*. (citing 4:32-38). Based on the amplitude measurement, the processor within that circuit determines whether a spectral null is either present or absent, and generates a corresponding control signal. *Id*. (citing 4:1-4, 4:38-41). This control signal is then fed to the phase shifter, which will introduce a phase shift in the event the control signal indicates the presence of a spectral null (an indicator of misalignment). *Id*. (citing 3:57-65, 4:7-12, 4:38-41). Thus, the patent describes a straightforward approach for the spectral power analyzer, including its processor, to generate a control signal based on whether a spectral null is detected in the isolated spectral band. *Id*.

In light of the '950 patent's details about the processor's inputs, outputs, and processes within the disclosed spectral power analyzer, the Court should similarly find the inclusion of a processor as a structural component of the analyzer to be sufficiently definite.

### (d)     Xilinx's Sur-Reply Position

WSOU argues that the "analyzer" term is not subject to pre-AIA 35 U.S.C. § 112, ¶ 6 because "spectrum analyzers were well-established in the prior art." *Supra* II.D.1.c (citing Ex. 14 ¶ 42). But neither WSOU nor its expert identifies any such prior-art analyzer capable of performing the *entire function* recited in claim 1, or submits evidence showing this to be so. Notably, the specification does not do so either. This remains a § 112, ¶ 6 term.

As supposed structure for performing the recited function, WSOU largely repeats that the "analyzer" includes a "combination of *one or more* of integrated or discrete circuit elements, filters, analog-to-digital converter (ADC) circuitry, digital-to-analog converter (DAC) circuitry,

*processors*, or equivalents thereof." But these components (only *one* of which is new according to WSOU's construction) are not sufficient or clearly linked to perform the entire recited function, Ex. 1 ¶¶ 89–92, and WSOU and its expert have not shown otherwise. WSOU never addresses that the specification fails to disclose or clearly link a special-purpose processor algorithm that "analyze[s] spectral power …" and then "generate[s] a control signal based on the analysis."

WSOU instead mischaracterizes Xilinx's position, and argues that the specification's recitation of a "processor" does not "necessarily render[] the claim indefinite absent a disclosure of a specific algorithm." *Supra* § II.D.1.c (citing cases). But here, where the recited function is performed entirely by a *general-purpose* computer or processor, the specification must then disclose a special-purpose algorithm for it to perform the claimed function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). Because this black letter law requirement is not met, the specification fails to disclose corresponding structure for this § 112, ¶ 6 term.

WSOU is simply incorrect that the specification discloses sufficient, clearly-linked structure. *Supra* § II.D.1.c. In fact, WSOU's reply merely copies the declaration of its expert nearly verbatim, but neither identifies nor explains what specific algorithm is run by the general-purpose processor to make the requisite spectral measurement, or to then generate the corresponding control signal from that measurement to correct the phase misalignment. *Compare id. with* Ex. 14 ¶ 44. Instead, both repeat in conclusory, purely functional fashion that "[b]ased on the amplitude measurement, *the processor within that circuit* determines whether a spectral null is either present or absent, and *generates a corresponding control signal*." *Id.*

### 2. "An input signal …" / "data-modulated signal …" (claims 1 and 17)

| WSOU's Construction | Xilinx's Construction |
|---|---|
| No construction necessary – plain and ordinary meaning. | An [input] signal corresponding to a modulated optical signal. |

### (a) WSOU's Opening Position

The Court need not construe these claim phrases in the '950 patent, which have readily understandable plain and ordinary meanings. Indeed, Xilinx does not appear to dispute the plain and ordinary meanings of these terms. Instead, Xilinx proposes to import an "optical" limitation into claims 1 and 17, even though these claims do not use the word "optical." By contrast, other claims of the '950 patent expressly recite "optical" limitations. For example, claim 9 "further compris[es] a photodetector configured to (i) receive a data-modulated *optical* signal corresponding to the carrier and data signals and (ii) generate the input signal." Ex. C ('950 patent) at claim 9 (emphasis added). Dependent claims 10-14 similarly recite "optical" limitations. The fact that claims 9-14 recite "optical" limitations, whereas claims 1 and 17 do not, militates against importing "optical" as a limitation into claims 1 and 17. *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1333 (Fed. Cir. 2010) (declining to import a limitation that was recited in other claims but not the claim-at-issue). Accordingly, the Court should reject Xilinx's proposal.

### (b) Xilinx's Answering Position

WSOU asserts that these terms do not require construction. But these related terms can have different meanings in different contexts. Ex. 1 ¶¶ 93–94. Here, a POSITA would understand that they mean an "[input] signal corresponding to a modulated *optical* signal."

The '950 patent is directed to *optical* telecommunication systems. Ex. C at 1:9–16, 1:24–27, Fig. 1 (depicting a system for transmitting "optical signal 104"); Ex. 1 ¶¶ 25, 95–106. The "problem" the '950 patent purports to address is "reduc[ing] misalignment between the *optical*

carrier signal and the data resulting, e.g., from thermal effects in the E/O [electro-*optic*] modulator." Ex. C at 1:47–54, 2:3–18; Ex. 1 ¶¶ 99–103. This problem is unique to optical transmitters. Ex. C at 2:6–7, 2:11–16; Ex. 1 ¶ 100. The "*present invention*" is illustrated as "alignment device 402" in Figure 4. Ex. C at 3:42–45. Device 402 includes a *photo*detector 404 that "is configured to convert an *optical* tap signal 410 into an electrical signal 414 *corresponding to optical signal 104*." Ex. C at 3:55–57. Optical signal 104 is a *modulated optical signal*. Ex. C at 1:42–43. Xilinx's proposed construction is confirmed by WSOU's own citations to the specification, *all of which* address or refer to optical signals, photodetectors, optical transmitters, or E/O modulators. *See* Ex. 1 ¶¶ 95–106. "[W]hen the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment." *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009) (quoting *Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1379 (Fed. Cir. 2005)). The specification here describes "the present invention" depicted in Figure 4 as a "preferred embodiment" "for aligning an optical carrier signal" in an optical transmitter. Ex. C at 2:3–18, 3:42–48. And it does not disclose any other type of communication signal (e.g., wireless, electrical, acoustic). *See* Ex. 1 ¶¶ 105–06.

      (c)      **WSOU's Reply Position**

The Court should reject Xilinx's proposal to import the word "optical" into claims 1 and 17 of the '950 patent. As WSOU previously explained, whereas other claims of the patent recite "optical" limitations, claims 1 and 17 do not and, thus, should be so limited. *Supra* § II.D.2.a. Xilinx has failed to respond to this fact.

That the '950 patent focuses on "optical" embodiments, as Xilinx contends, is of no moment. Indeed, the Federal Circuit "has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to

that embodiment." *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371-72 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)); *see also Thorner*, 669 F.3d at 1366-67 ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that. To constitute disclaimer, there must be a clear and unmistakable disclaimer." (quotation marks and citation omitted)).

Moreover, Xilinx's characterization of the '950 patent as restricted solely to optical implementations is simply incorrect. For example, while Xilinx contends that "[t]he '950 patent is directed to *optical* telecommunication systems," Xilinx ignores that the patent specification states: "Although the invention is particularly suitable for use with communications equipment, ***those skilled in the art can appreciate that the invention can be equally applied to other types of electrical and/or optical equipment***." Ex. C ('950 patent) at 3:10-14 (emphasis added).

Xilinx's mischaracterization of the '950 patent's scope permeates its arguments regarding the system of Fig. 4 and the "alignment device **402**" depicted therein, as reproduced on the right. Ex. C ('950 patent) at Fig. 4 (highlighting added). Contrary to Xilinx's assertion, the '950 patent does not define the system of Fig. 4, or the "alignment device **402**" depicted therein, as "the present invention." Instead, and in contrast to the *Edwards Lifesciences*



FIG. 4

case on which Xilinx relies, the patent consistently refers to the system of Fig. 4 as "***one embodiment** of the present invention," as opposed to "the invention itself." See, e.g., id. at 2:52-*

65 (emphasis added), 3:42-43 (same); *see also id*. at 3:3-14 (discussing the patent's use of the phrase "one embodiment").[4]   And although Xilinx is correct that Fig. 4 depicts an "alignment device **402**" that includes "photodetector **404**," the patent also states that "***alignment device 402 may be configured for use with pure electronic circuits***, in which situation ***photodetector 404 may be excluded*.**"  *Id*. at 6:37-39 (emphases added).  Thus, the patent explicitly does not limit the alignment device to "optical" implementations; rather, it can also be used to phase shift and reduce misalignment of non-optical signals.  Ex. 14 (Polish Reply Decl.) ¶¶ 21-25.  Xilinx likewise is wrong that the patent limits itself solely to solving a single prior art "problem."  Rather, the patent describes the "require[ment of] synchronizing optical carrier signal **118** and electronic data stream **102**" as just "***one*** problem with [prior art] system **100**."  Ex. C ('950 patent) at 1:47-49 (emphasis added).

### (d)   Xilinx's Sur-Reply Position

The '950 patent "is directed to optical telecommunications systems" and addresses a problem "unique to optical transmitters," *i.e.*, thermal drift in the electro-*optic* modulator.  *Supra* § II.D.2.b; Ex. 1 ¶¶ 25, 95–106.  WSOU nonetheless argues that the '950 patent's invention (and hence the claims) is more than "optical" *embodiments*.[5]  But WSOU's citations to generic boilerplate sentences about other potential applications are insufficient to expand the claims

---

[4] *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1336-37 (Fed. Cir. 2011) ("[U]se of the phrase 'present invention' ... is not always so limiting, such as where the references to a certain limitation as being the 'invention' are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent.").

[5] WSOU is also mistaken that "Xilinx has failed to respond to" the fact that certain unasserted claims include the word "optical."  *See supra* § II.D.2.c.  Unlike the case WSOU cited, in this case the specification is clear that the invention is directed to optical telecommunications systems, which Xilinx and its expert Dr. Foty have explained, *see* Answering Br. at 11–12; Ex. 1 ¶¶ 24–36, 93–106; *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1334 (Fed. Cir. 2010) ("A person of ordinary skill would presume that a structure recited in a dependent claim will perform a function required of that structure in an independent claim.").

beyond optical systems, which the specification describes as "the present invention" depicted in Figure 4. *Supra* § II.D.2.b (citing Ex. C at 2:3–18, 3:42–48).  In fact, the patent "does not disclose any other type of communication signal" or any other type of communication system. *Id.* (citing Ex. 1 ¶¶ 105–06).  Xilinx's construction is therefore correct.

### 3. "Spectral null" (claims 1 and 17)

| WSOU's Construction | Xilinx's Construction |
| --- | --- |
| No construction necessary – plain and ordinary meaning.  Should the Court find construction necessary:<br><br>"loss or reduction of power indicative of misalignment" | A frequency at which the amount of energy transmitted is at a minimum. |

#### (a)  WSOU's Opening Position

The Court should construe "spectral null" to have its plain and ordinary meaning, which is a loss or reduction of power indicative of misalignment. Ex. 13 (Polish Decl.) ¶¶ 77.  The intrinsic record confirms WSOU's proposal.  According to the specification, a "spectral null" may occur in the "spectrum of a data-modulated signal when the carrier and data signals are misaligned."  Ex. C ('950 patent) at 3:29-33.  As depicted in Figs. 3A and 3B, when the signals are properly aligned, "[t]he spectrum exhibits a generally flat background with a sharp peak **302** corresponding to the modulation frequency"; however, when the signals are misaligned, "the spectral background is no longer flat, but rather, exhibits spectral nulls, e.g., nulls **304** and **306**[.]" *Id.* at 3:10-33, Figs. 3A-B.  As the figures clearly show, the "spectral nulls" are ranges of frequencies at which there is a loss or reduction of power as compared to the background power level. *Id.*  The nulls are depicted as broad, negative peaks centered around 6 and 17 GHz, respectively, whereas the modulation frequency 302 is depicted as a single sharp peaks at about 10 GHz.  The specification explains that "[t]he presence of one or more nulls in the spectrum is ***indicative of misalignment*** and may be

used to detect and correct the same." *Id.* at 3:33-35 (emphasis added).  WSOU's proposal properly embodies the patent's description of spectral nulls.

The Court should reject's Xilinx's overly narrow proposal that would limit a "spectral null" to "a frequency" at which the amount of energy transmitted is "at a minimum."  Xilinx's position is unsupported and confusing because the '950 patent is overtly clear that misaligned signals can lead to *multiple* nulls in a spectrum, that each null is a *broad*, negative peak that expands across a *range* of frequencies (not "a frequency"), and that each null can have *different minimum frequencies* (as opposed to "a minimum").  In Fig. 3B, for example, nulls 304 and 306 are not identical:  they have different peak shapes, heights, and widths (*i.e.*, different measured power reductions and different ranges of frequencies at which power is reduced).  Ex. 13 (Polish Decl.) ¶¶ 83-84.  Further, Xilinx's proposal would render "spectral null" meaningless, because essentially every spectrum contains a minimum, regardless of whether it contains a negative peak.  *Id.* ¶ 85.  For example, the Fig. 3A plainly does not contain a "spectral null," but it still contains a minimum.  *Id.*

### (b)   Xilinx's Answering Position

The '950 patent explains that a "spectral null" is the frequency (or set of frequencies) where the transmitted energy is at a minimum:

> As can be seen in FIG. 3B, the spectral background is no longer flat, but rather, exhibits spectral nulls, e.g., *nulls 304 and 306 at about 6 and 17 GHZ, respectively*.

Ex. C at 3:29–33, Fig. 3B.  This is consistent with the understanding of a POSITA.  Ex. 1 ¶¶ 108–136.  WSOU's competing construction is nonsensical.  If every "loss or reduction of power" could be a spectral null, then every frequency after the highest peak (shown by the annotation "X" below) would be a spectral null since every point to the right and below is a "loss or reduction of power."  *Id.* ¶ 120.



FIG. 3B

The nonsensical nature of WSOU's definition is further highlighted by its argument that a spectral null is a "broad, negative peak that expands across a range of frequencies." *Id.* ¶¶ 121–123. As shown in Figure 3B, there is a positive peak after every negative peak, so there can be no broad negative peak across a range of frequencies. *See id.*

**(c)   WSOU's Reply Position**

Nothing in Xilinx's answering position actually supports its proposed construction of "spectral null." Nor does Xilinx respond to the deficiencies in its construction that WSOU identified in its opening position. *See supra* § II.D.3.a. Instead, Xilinx devotes its position to asserting that WSOU's proposal is "nonsensical," but Xilinx's criticism falls flat. In making that assertion, Xilinx simply ignores that WSOU's proposal specifies that the loss or reduction of power must be "indicative of misalignment," which the patent explains how to assess. *See supra* § II.D.3.a. As indicated in WSOU's opening position, the "spectral nulls" in the '950 patent are ranges of frequencies at which there is a loss or reduction of power as compared to the background power level, and are visually depicted in Fig. 3B as the broad, negative peaks. *Supra* § II.D.1.a.,

3.a.  As the patent explains, such peaks are "indicative of misalignment."  *Supra* § II.D.3.a. (citing Ex. C ('950 patent) at 3:33-35).

Instead of attempting to support its own proposed construction, Xilinx tries (albeit unsuccessfully) to nitpick WSOU's proposal.  Xilinx points out that the "broad, negative peaks" seen in Fig. 3B are composed of a multitude of peaks that switch back and forth between positive and negative.  That changes nothing.  Contrary to Xilinx's assertion, WSOU's proposal does not in any way suggest that each "negative" data point is a spectral null.  Rather, each of the spectral nulls in Fig. 3B consists of a series of data points that collectively reflect a loss or reduction of power (as compared to the background power level) in a way that is indicative of misalignment.

Further, Xilinx's proposal would introduce a variety of ambiguities and lead to absurd results directly contradicting the express teachings of the patent.  Ex. 14 (Polish Reply Decl.) ¶¶ 31-34.  For example, applying Xilinx's proposal literally would cause the spectrum in Fig. 3A to contain a "spectral null" (because the spectrum contains a "minimum" power level), even though the patent is unequivocal that Fig. 3A does *not* contain a null.  *Id.* at ¶ 32.  In addition, Xilinx's proposed "at a minimum" language is vague because it does not specify whether it means an absolute or local minimum.  *Id.* at ¶ 33.  Depending on the interpretation, literally applying Xilinx's construction could deem spectral null 306 in Fig. 3B not to be "spectral null," because it does not contain the absolute minimum power level in the spectrum.  *Id.*  But even interpreting Xilinx's proposal to refer to a local minimum is problematic.  *Id.* at ¶ 34.  For example, the patent identifies the position of spectral null 306 as being at about 17 GHz, but the local minimum of spectral null 306 is actually at 19.5 GHz.  *Id.*  In sum, Xilinx's proposal does not comport with the patent.

### (d)   Xilinx's Sur-Reply Position

WSOU disputes that its proposed construction is "nonsensical," but fails to explain why every "loss or reduction of power" would not be a spectral null "indicative of misalignment" under

its proposal.  Accordingly, WSOU's proposal should be rejected, and Xilinx's proposal should be adopted for the reasons already discussed.  *See supra* § II.D.3.b.

### 4. "A spectral band corresponding to a spectral null" (claims 1 and 17)

| WSOU's Construction | Xilinx's Construction |
|---|---|
| Not indefinite. No construction necessary – plain and ordinary meaning.  Should the Court find construction necessary:<br><br>"a frequency band that includes at least a frequency of a spectral null" | *Indefinite.* |

### (a) WSOU's Opening Position

This term does not require construction.  Indeed, Xilinx does not even propose a construction for this term and asserts only that it is indefinite.  But Xilinx cannot satisfy its heavy burden of proving indefiniteness "by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).  Given that Xilinx bears the burden of proof but has never put its alleged basis for its indefiniteness position in writing,[6] WSOU should not be required to preemptively speculate as to Xilinx's precise arguments or reasoning, and accordingly reserves the right to respond fully to Xilinx's position once Xilinx actually discloses it.  From the parties' meet-and-confer discussions, WSOU generally understands Xilinx to be arguing that this term is indefinite because a POSA allegedly would not be able to determine the "metes and bounds" of what "a spectral band corresponding to a spectral null" is.  Xilinx is wrong.

The claims are not indefinite.  Rather, the intrinsic record informs a POSA "about the scope of the invention with reasonable certainty." *Sonix*, 844 F.3d at 1377.  For example, Fig. 3B depicts a spectral band encompassing a range of frequencies that includes frequencies of the modulation

---

[6] Xilinx waived this indefiniteness defense by never disclosing any basis for it in its invalidity contentions beyond a bare contention with no explanation or support.

frequency (302) and two spectral nulls (304 and 306).  Ex. C ('950 patent) at 3:29-41, Fig. 3B.

The patent indicates that preferably the "frequency band [is] located near a selected null of the RF

[radiofrequency] spectrum."  *Id*. at 2:3-10, 4:1-4.[7]  Based on the plain language of the claims and

the intrinsic record as a whole, a POSA would reasonably understand that a "spectral band" refers

to a frequency band that includes at least a frequency of a spectral null.  Ex. 13 (Polish Decl.)

¶¶ 86-93.

> **(b)     Xilinx's Answering Position**

This term is indefinite because the claimed "spectral band" is a range of frequencies that is

broader than a "spectral null."  Further, the word "band" and the phrase "corresponding to" are

terms of degree that require some objective guidelines for a POSITA to determine the range of

frequencies and relative location of the "band" that "corresponds to" a spectral null."  But there

are no such objective guidelines.  Ex. 1 ¶ 138.  Taking asserted claim 1 as an example, it recites:

> an analyzer configured (i) <u>to analyze spectral power</u> of an input
> signal corresponding to the carrier and data signals, <u>the spectral
> power being in</u> *a spectral band corresponding to a spectral null* of
> the input signal, and …

As shown by the underlined portion, the "analyzer" must analyze spectral power "being in" a

"spectral band," which "correspond[s] to a spectral null."  A POSITA must be able to objectively

answer the scope and limits of the spectral "band" that is "corresponding to" a spectral null—i.e.,

how wide is its bandwidth, and where is it relative to the spectral null?

---

[7] *See also* Ex. C ('950 patent) at 4:4-7 ("In one implementation, the band may be centered on null 304 (see FIG. 3B) and have a bandwidth of, e.g., 2 GHz.  In a different implementation, a different bandwidth and/or a different null or combination of nulls may be used."); 4:64-5:2 ("In one implementation, the frequency range may be centered on null 304 (see FIG. 3B) and be within, e.g., ±3 GHz from the position of said null.  In a different implementation, a different frequency range and/or a different null or combination of nulls may be used.")

The specification does not answer this question, but instead only adds confusion and vagueness, leaving a POSITA to arbitrarily guess the answer.  For example, it states:

> In one implementation, the *band* <u>may be centered on</u> null 304 (see FIG.3B) <u>and</u> *have a bandwidth* of, <u>e.g., 2 GHz.</u>  *[But i]n a different implementation, a different bandwidth and/or a different null or combination of nulls may be used.*

Ex. C at 4:4–7.  This example is just that—just one example.  It does not provide any objective guidance to a POSITA on the scope of the "spectral band" and how it "corresponds to" a spectral null in other situations or generally.  It only states that the spectral band can have other bandwidths; that it may (and presumably may not) be centered on a null; and that it may correspond to different nulls and combinations of nulls.  *Id.*  The specification's other disclosures are even more equivocal.  *Id.* at 2:7–11 (vaguely referring to evaluating the amount of energy "in a certain frequency band *located near* a selected null …"); 4:1–12 (similar vague reference to "a certain band *located near* a spectral null"); 4:43–46 ("*centered on*").  *See also* Ex. 1 ¶¶ 139–143.

The specification therefore does not provide clear, objective guidance about how to determine if a spectral "band" is "corresponding to" (or being "located near") a spectral null.  Definiteness requires more than the untethered subjective opinion of a POSITA about the boundaries of the claim.  *See, e.g.*, *Interval Licensing v. AOL, Inc.*, 766 F.3d 1364, 1370–74 (Fed. Cir. 2014) (holding claim term "unobtrusive manner" is a "purely subjective" claim phrase that lacking definition in the written description, and therefore indefinite); *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1246–56 (Fed. Cir. 2008) (affirming district court holding that the claim term "fragile gel" was a term of degree but indefinite because the upper bound of fragility could not be ascertained).  Absent any objective guidance here in the specification or otherwise, this term is purely subjective and indefinite.  Ex. 1 ¶¶ 137–143.

In *Halliburton*, the Federal Circuit explained some ways that the specification can resolve ambiguities when claim terms use functional term-of-degree language:

> For example, the ambiguity might be resolved by using a quantitative metric (e.g., numeric limitation as to a physical property) rather than a qualitative functional feature. The claim term might also be sufficiently definite if the specification provided a formula for calculating a property along with examples that meet the claim limitation and examples that do not.

514 F.3d at 1255–56. However, here the specification does not provide any such quantitative or qualitative solutions. Ex. 1 ¶¶ 146–47. Instead, the specification uses only optional, generic, subjective language ("located near" and "may be") and insufficient examples.

WSOU's "plain and ordinary meaning" construction ignores all of these issues. Its proposed alternative of "a frequency band that includes at least a frequency of a spectral null" fares no better because it imports limitations not found in the claims, and it still results in a subjective, arbitrary claim scope. Ex. 1 ¶¶ 144–145. Nothing in the "corresponding to" claim language or the specification's related "located near" description *requires* the spectral band to include a frequency of a spectral null, as WSOU proposes. *Id.* ¶ 145. "The fact that [the patentee] can articulate a definition supported by the specification, however, does not end the inquiry.… [T]he claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Halliburton*, 514 F.3d at 1251. Because there is no objective meaning or scope for this claim term, it is indefinite.

### (c)     WSOU's Reply Position

Xilinx fails to satisfy its heavy burden of proving its (previously undisclosed) indefiniteness defense by clear and convincing evidence. There is nothing indefinite about a "spectral band" being, as Xilinx states, "a range of frequencies that is broader than a 'spectral null.'" Nor is "spectral band" a term of degree.

With regard to the issue of how a POSA would determine whether a spectral band "corresponds to" a spectral null, the '950 patent provides sufficient objective guidance for a POSA to make such a determination.  Indeed, Xilinx and its expert acknowledge that the patent refers to spectral bands "located near" or "centered on" one or more spectral null, and even illustrates potential spectral bands containing spectral nulls.  *Supra* § II.D.4.b. (citing Ex. C ('950 patent) at 2:7-11, 4:1-12, 4:43-46).  The entire purpose of identifying "a spectral band" is to locate a frequency range that includes at least one spectral null (*i.e.*, an indication of misalignment), and to use that information to reduce misalignment.  For example, in connection with a different but related embodiment, the patent discusses assessing "the spectral shape of a signal … within a selected frequency range near a spectral null" to generate a control signal in order to "flatten the shape of the spectrum within the selected frequency range" (*i.e.*, minimize the spectral null).  Ex. C ('950 patent) at 4:595:7.  Thus, as reflected in WSOU's proposal, a POSA would understand from the patent that a spectral band "corresponds to" a spectral null in that it includes at least a frequency of a null.

Xilinx apparently takes issue with the fact that the '950 patent does not require a precise bandwidth or express a maximum possible bandwidth for a "spectral band corresponding to a spectral null," but that does not render the claim term indefinite.  As discussed, the patent indicates the spectral band should include at least a frequency of a spectral null, and provides examples of spectral bandwidths centered around or near one or more spectral nulls for purposes of practicing the claimed invention.  *Supra* § II.D.4.a.

By way of illustration, one disclosed example of a spectral band has a bandwidth of 2 GHz, centered on the spectral null (304) at about 6 GHz in Fig. 3B (*i.e.*, a band "from about 5 GHz to about 7 GHz"). Ex. C ('950 patent) at 3:66-4:22. This exemplary spectral band can be depicted as set forth to the right. *Id.* at Fig. 3B; *see* Ex. 14 (Polish Reply Decl.) ¶¶ 37-39. In this example, the spectral band clearly includes at least a frequency of spectral null 304 and could therefore be used purposes of analyzing the



spectral power of the null in accordance with the claimed invention. If the spectral band were wider or narrower than 2 GHz, it would still include at least a frequency of a spectral null that could be used in practicing the claimed invention. Given that spectral nulls can differ in "position, shape, and number…depend[ing] on certain characteristics of the system," it makes complete sense that the '950 patent allows that "a different bandwidth and/or a different null or combination of nulls may be used," instead of restricting spectral bands to specific bandwidths or positions. Ex. C ('950 patent) at 3:35-38, 4:6-7. As long as a spectral band includes at least a frequency of a spectral null, a POSA would not be concerned about precisely "how wide" the spectral band might be. Ex. 14 (Polish Reply Decl.) ¶ 40.

In sum, the intrinsic record provides sufficient guidance about the meaning and scope of "a spectral band corresponding to a spectral null," and Xilinx cannot prove otherwise by clear and convincing evidence. Given that the disputed claim term is supported by objective guidance in the intrinsic record and not ambiguous, the case law on which Xilinx relies is inapposite.

**(d)**     **Xilinx's Sur-Reply Position**

This claim phrase is indefinite because "the word 'band' and the linkage words 'corresponding to' are terms of degree requiring some objective guidelines for a POSITA to determine the range of frequencies and relative location of the 'band' that 'corresponds to' a spectral null." *Supra* § II.D.4.b.  WSOU once again fails to identify any such objective guidelines. *Supra* § II.D.4.c.  WSOU argues this term is definite by assuming that the spectral band "includes at least a frequency of a spectral null."  But as already explained by Xilinx and its expert, "[n]othing in the 'corresponding to' claim language or the specification's related 'located near' description requires the spectral band to include a frequency of a spectral null."  *Supra* § II.D.4.b; Ex. 1 ¶ 145. WSOU only imposes this unfound requirement to save the claim from its indefiniteness.

WSOU instead focuses on the word "band," mischaracterizing Xilinx's position as requiring the specification to disclose "a precise bandwidth or express a maximum possible bandwidth." *Supra* § II.D.4.c.  Certainly, for definiteness, the specification must provide *objective guidelines* to a POSITA about the width and position of the spectral band "corresponding to" the spectral null.  But WSOU concedes that the specification offers no such guidelines at all, and instead "allows that 'a different bandwidth and/or a different null or combination of nulls may be used.'"  *Id.* (quoting Ex. C at 4:6–7).  And here again, WSOU repeats its unsupported assumption that "*[a]s long as a spectral band includes at least a frequency of a spectral null*, a POSA would not be concerned about precisely 'how wide' the spectral band might be," relying on its conclusory extrinsic expert testimony, rather than any intrinsic evidence providing objective boundaries for the scope of this claim term.  *Id.* (citing Ex. 14 ¶ 40).

**E.      U.S. Patent No. 7,613,938 (Case No. 1:20-cv-01231-CFC-JLH)**

**1.      "Operable independent of the controller" (claim 13)**

| WSOU's Construction | Xilinx's Construction |
|---|---|
| No construction necessary – plain and ordinary meaning. | Operating separately from signals or commands of the controller. |

**(a)      WSOU's Opening Position**

<u>**WSOU's Introduction for the '938 Patent**</u>:

Communication network switches typically comprise a number of circuit cards that allow the system to function.  Ex. D ('938 patent) at 1:10-15.  Occasionally, circuit cards malfunction and need to have their power reset.  *Id.* at 1:15-36.  The '938 patent claims a circuit card comprising:  one or more devices, a controller, a switch responsive to the controller for decoupling the device(s) from electrical



FIG. 1

power for a predetermined time period, and an electrical power device, operable independent of the controller, that causes power restoration after the time period if the electrical power was also decoupled from the controller.  Ex. D ('938 patent) at claim 13.  An embodiment of such an apparatus is depicted in Fig. 1 of the patent, reproduced to the right.  *Id.* at Fig. 1 (red text added), 4:24-5:26.  The patent explains that by decoupling power for a predetermined time period and then restoring power, the circuit card of the invention avoids a costly, time-consuming drawback of prior art circuit cards that required personnel to physically visit the network element site to manually remove and reinsert a failing circuit card to reset its power.  *Id.* at 1:29-2:27; Ex. 13 (Polish Decl.) ¶¶ 46-49.

**WSOU's Opening Argument for "Operable Independent of the Controller":**

Claim 13 of the '938 patent recites "A circuit card comprising:  …. an electrical power device, ***operable independent of the controller***, that causes electrical power to the at least one device and the controller to be restored after the predetermined time period if the electrical power was also decoupled from the controller."  Ex. D ('938 patent) at claim 13 (emphasis added).  The claim phrase "operable independent of the controller" uses plain English words that would be readily understood by a POSA and do not require further construction.

Xilinx, by contrast, departs from the plain and ordinary meaning, and seeks to replace the actual claim language with unsupported, more restrictive language.  Xilinx would require the electrical power device to "***operat[e]*** separately from signals or commands of the controller."  The difference in meaningful.  Under Xilinx's proposal, the claimed electrical power device could ***never*** respond to an instruction from a controller, which is contrary to the claim's plain language that requires only that the electrical power device be "***operable*** independent of the controller" (*i.e.*, ***capable*** of being used independently from the controller).

      **(b)**      **Xilinx's Answering Position**

The '938 patent is directed to a circuit card, such as a "line card" in a telecommunications network, that is plugged into a backplane slot.  *See* Ex. D at 1:11–49, 2:12–14.  In the prior art, malfunctioning line cards could often be restored to operation by a "power cycle" of manually pulling out the card to power it off, and then reinserting the card to reconnect power.  *See id.* at 1:15–36.  Instead of manually pulling out and reinserting the card, the alleged invention provides for a "controller which controls operation of the apparatus" to switch off power to a device, and a separate "electrical power device" to restore power to the controller and the device on the card after a predetermined length of time.  *See, e.g.*, *id.* at 1:50–60, 3:15–20.

Claim 13 recites a "circuit card" comprising:

43

> an electrical power device, *operable independent of the controller*, that causes electrical power to the at least one device and the controller to be restored after the predetermined time period if the electrical power was also decoupled from the controller.

*Id.* at 10:8–12.  Remarkably, WSOU and its expert Dr. Polish make *no mention at all* of the prosecution history of the '938 patent, where the applicants relied on the disputed term to distinguish the prior art.

During prosecution, the inventors argued to the Examiner that the claimed "electrical power device" would operate separately from the controller—even when the controller was powered.  Specifically, they expressly distinguished their pending claims by arguing to the Examiner that prior art electrical power devices (referred to in other embodiments as a "switch controller") *did not* "operate independently" of the controller when *disconnecting* power:

> The [prior art] references do not disclose a switch controller *operating independently* of a controller *for controlling the switch to decouple*, as claimed in dependent claim 2.

Ex. 4, at 6.  In other words, the inventors argued that there was no "independent" operation if the controller signaled or commanded the "electrical power device" to power off when both were still powered on.  In this regard, the inventors further argued to the Examiner:

> Regarding claim 2, in [prior art] O'Meany, IA 23 *does not operate independently* of the MC 11 for controlling the power relay switch 22. In O'Meany paragraphs 21 and 22, the IA 23 is described as *directing the relay 22 to disconnect power in dependence on a shutdown signal generated by the MC computer 11*.

*Id.* at 4.  Relying on the inventors' arguments that the electrical power device could not respond to signals or commands from the controller, as in the prior art, the Examiner amended each independent claim to require an electrical power device or switch controller "operable independent of the controller."  *See* Ex. 5, at 2–3.  Xilinx's construction comes directly from the inventor's own

prosecution history patentability arguments and claim amendments, and also is consistent with the specification and plain meaning of "operable independent."  *See* Ex. D at 1:40–45, 1:55–65.

WSOU's argument that the electrical power device can still "respond to an instruction from a controller" when both are powered contradicts this very meaning and is foreclosed by the prosecution history.  Indeed, WSOU's proposal would read the claims on the file history prior art the inventors distinguished—both by argument and by amending their claims—which already disclosed electrical power devices that disconnect power from other card components in response to a signal (e.g., O'Meany's shutdown signal) or a command from the controller.  The law is well-settled that "claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent."  *Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966); *see Bd. Of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1369–70 (Fed. Cir. 2008) (rejecting a construction that would effect the "nonsensical result" of reading on prior art distinguished by claim amendment).  And, WSOU's proposal would render the word "independent" meaningless. *Ethicon Endo-Surgery, Inc.*, 93 F.3d at 1582.

### (c)      WSOU's Reply Position

Claim 13 of the '938 patent recites "an electrical power device, *operable independent of the controller* ..."  Ex. D ('938 patent) at claim 13 (emphasis added).  This phrase needs no construction.  As explained, the claim's plain language requires that the recited electrical power device be "operable" (*i.e.*, capable of being used) independently of the controller, and does not require, as Xilinx contend, that the device always and only be operated independently of the controller.  *Supra* § II.E.1.a.  That is, as long as an electrical power device is capable of operating independently of the controller, it is "operable independent of the controller," regardless of whether it sometimes is dependent on the controller.

45

The Court should reject Xilinx's unduly narrow proposed construction, which is divorced from the statements in the intrinsic record.  Xilinx wrongly criticizes WSOU (as well as Dr. Polish, even though he did not offer any opinions about this claim term) for not discussing the '938 patent's prosecution history in its opening position.  There was no reason, however, for WSOU to specifically call out the prosecution history before because it does not alter the meaning of the disputed claim term.  Indeed, nothing Xilinx relies on from the prosecution history supports its proposed construction, nor does the prosecution history clearly and unmistakably disavow the plain and ordinary meaning of the disputed claim phrase.

In its attempt to support its proposed construction, Xilinx mischaracterizes the statements from the prosecution history and ignores their context.  While Xilinx cites and quotes multiple prosecution statements, in each instance the applicants were characterizing the *prior art* electrical power devices as not operating independently of the controller (*i.e.*, they were not capable of operating independently), whereas the *claimed* electrical power device was "operable independent of the controller" (*i.e.*, it was capable of operating independently).  The prosecution statements are completely consistent with WSOU's proposal and contradict Xilinx's.  Moreover, Xilinx's proposal is overly narrow or, at best, vague.  Whereas Xilinx's arguments regarding the prosecution history are focused on whether the electrical power device is permitted to respond to a "power off" signal/command from the controller, Xilinx's proposed construction not only prohibits the electrical power device from responding to such a "power off" signal/command, but also seems to prohibit the exchange of any "signals or commands" (*i.e.*, any sort of communication) between the electrical power device and controller.

**(d)     Xilinx's Sur-Reply Position**

WSOU argues that "Xilinx mischaracterizes the statements from the prosecution history and ignores their context."  *Supra* § II.E.1.c.  To the contrary, it is WSOU that first ignored the

prosecution history, and now mischaracterizes it by arguing that "in each instance the applicants were characterizing the *prior art* electrical power devices as not operating independent of the controller (*i.e.*, they were not capable of operating independently)." *Id.* As Xilinx has explained, the inventors distinguished their invention from prior art devices that did not "operate independently" of the controller when disconnecting power. *Supra* § II.E.1.b.

According to the prosecution history, an electrical power device operating in response to a shutdown signal or command from a controller to disconnect power from other card components would read on prior art devices; this is why the Examiner amended each independent claim to require an electrical power device (or switch controller)[8] "operable independent of the controller." *See id.* Importantly, WSOU *never addresses* how its own construction supposedly comports with this prosecution history, nor explains how its construction has any meaning or limits the claim scope if the electrical power device could instead respond to controls and signaling from the controller. *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1582 (Fed. Cir. 1996) (rejecting attempt to read a limitation out of the claim because courts must give meaning to all the words in the claims). That is the antithesis of "operable independent of the controller"— including of the plain meaning that WSOU advocates—and would read the claims upon the very prior art devices that the inventors distinguished during prosecution.

---

[8] Independent claim 1 recites two separate controllers: the first is called the "controller," and the second is called the "switch controller" that is "operable independent of" that first controller. This can be confusing because both include the word "controller".

**F.      U.S. Patent No. 7,903,971 (Case No. 1:20-cv-01232-CFC-JLH)**

**1.      "Wherein the plurality of signal states and the number of bits in each sequence are increased" (claims 1, 15)**

| WSOU's Construction | Xilinx's Construction |
|---|---|
| No construction necessary – plain and ordinary meaning. | Wherein an increase in the plurality of signal states and the number of bits in each sequence is performed automatically by the optical line termination. |

**(a)      WSOU's Opening Position**

<u>WSOU's Introduction for the '971 Patent:</u>

The '971 patent claims an "optical line termination [OLT] being part of a passive optical network [PON]" and a method of operating such a network.  Ex. E ('971 patent) at claims 1, 15.

A PON is a fiber-optic telecommunications technology for delivering broadband network access to customers.  The patent provides a general schematic of a PON in Fig. 1, reproduced to the right.  *Id.* at Fig. 1 (red text added), 2:40-3:36.  The OLT serves as the



PON = Passive Optical Network
OLT = Optical Line Termination
S = Optical Splitter
NT = Network Termination

interface between the PON and the service provider's larger broadband network.  As depicted above and as claimed, the OLT is connected by a plurality of optical fibers to a plurality of network terminations ("NTs").  Data sent to a customer (*i.e.*, an NT) from outside the PON must go through the OLT, which sends the data "downstream" to reach the customer.  Similarly, data sent by a customer to outside the PON gets sent "upstream" through the OLT.  For various reasons, the quality of data transmissions an OLT may receive from different NTs can vary.  *Id.* at 1:29-37, 3:37-58.  To increase efficiency and reduce errors, the claimed invention adapts the data capacity of each transmission to the quality of the optical signal received by the OLT.  *Id.* at 1:41-2:27, 4:5-

5:6.  To that end, the claimed OLT is configured to generate an optical signal with a plurality of signal states, wherein each signal state corresponds to a different bit sequence, and the numbers of signal states and bits are increased based on a transmission quality of the optical signal of the relevant optical fiber.  *Id.* at claims 1, 15; Ex. 13 (Polish Decl.) ¶¶ 50-53.

**WSOU's Opening Argument for the "Wherein the Plurality …" Claim Phrase:**

Claim 1 of the '971 patent claims a method "comprising the step of generating an optical signal for transmission over one of the plurality of optical fibers, the optical signal including a plurality of signal states, each signal state corresponding to a different sequence of bits, ***wherein the plurality of signal states and the number of bits in each sequence are increased*** based on a transmission quality of the optical signal on the one of the plurality of optical fibers."  Ex. E ('971 patent) at claim 1 (emphasis added).  Claim 15 contains similar language, but is drawn to "[a]n optical line termination being part of a passive optical network," not a method.  *Id*. at claim 15.

The Court does not need to construe the disputed claim phrase, because a POSA would readily understand its plain and ordinary meaning without further construction.  The specification explains that to operate "a passive optical network that is capable to consider changes of the transmission quality of a link[,] …the invention solves this object by the step of changing the number of signal states."  *Id*. at 1:41-45.  For example, "if the transmission quality of the link proves to be better, it is possible to increase the number of signal states of the optical signal."  *Id*. at 1:46-48.  The specification also details how the number of signal states corresponds with the number of bits in each sequence.  *Id*. at 4:27-51.  In light of the intrinsic record, the Court should decline to further construe the disputed claim phrase.

49

The Court should reject Xilinx's proposal to require the claimed increase to be "performed automatically by the optical line termination."  The intrinsic record never uses that language, nor does it otherwise support importing such a limitation.

      **(b)**      **Xilinx's Answering Position**

The '971 patent "relates to a method of operating a passive optical network."  Ex. E at 1:8–11.  Telecommunication network providers use a passive optical network (PON), for example, to deliver high speed network access (e.g., Internet) to end users.  Ex. 2 ¶ 130.[9]  Consistent with this telecommunications application, the '971 patent depicts a PON having an optical line termination (OLT) connected via optical fibers to multiple network terminations (NT1, NT2, etc.).  *Id.*; Ex. E at 1:8–11, Fig. 1.  Different transmission rates can be used for communications to and from the NTs in the downstream and upstream directions, respectively.  *See* Ex. E at 1:17–28; Ex. 2 ¶ 131.  In the prior art, it already was known to use several different transmission rates in both directions.  *Id.*

According to the specification, "the transmission qualities of the links between the optical line termination and the network terminations may be different or may even change from time to time" and "known methods do not consider such changes of the transmission quality."  Ex. E at 1:29–37.  The '971 patent then discloses and claims adaptively "changing the number of signal states" and transmitted bits based upon changes in the transmission quality of the optical signal.  *See generally id.* at 1:41–2:37; Ex. 2 ¶¶ 133–34, 152–56.  For example, the number of transmission signal states and transmitted bits may be increased or decreased based upon measurements such as power of the link, bit error rates, or other metrics.  *Id.*  Importantly, however, the prosecution

---

[9] Alcatel Lucent, the original assignee of the '971 patent, was a supplier of telecommunications equipment to network providers.  Ex. 2 ¶ 130.

history and the prior art it discusses reveal that the '971 patent is limited to the claimed OLT and associated methodology *automatically* performing such adaptive changes—*not* a network operator manually making changes or doing so on a basis other than measurement of the transmission quality of the optical signal.

The parties' dispute for this claim term is whether the PON can be manually configured by a person to increase the plurality of signal states and the number of bits in each sequence, such as by a network operator (WSOU's position), or whether any such increase must be automatic by the OLT itself (Xilinx's proposal). The specification and the lengthy and extensive prosecution history are clear that Xilinx is correct.

The specification explains that the OLT itself defines the number of signal states:

> [T]he optical line termination *analyzes* the received optical signal of a specific frame with regard to its power and then *evaluates* a corresponding number of signal states. If the received power is high, the number of signal states may also be high. This is a simple but effective method *to define the number of signal states*.

Ex. E at 2:8–13. By defining the number of signal states, the OLT performs the claimed "increase" in the plurality of signal states and number of bits in each sequence. Ex. 2 ¶ 153. The specification is replete with similar disclosures. For example, the specification teaches that the OLT "defines a signaling mode," which is "a specific number of signal states," and that ultimately the "OLT assigns this signaling mode." Ex. E at 3:64–4:13; *see also id.* at 4:14–26 (explaining that the OLT "defines" different signaling modes based on whether the received power is high or low); 4:52–58 (discussing OLT communicating with respective NT about "the evaluated signaling mode" to carry out later transmissions using that mode and its signal states); 4:63–5:6 ("As a result, the transmission … in the upstream direction *is always adapted* to the *actual quality* of the optical signal received by the optical line termination OLT," with evaluation and adjustment as necessary so that "[t]he transmission rate … is thereby *permanently optimized*."); 5:7–21 (similar discussion

for downstream).  Indeed, the only way to ensure that these transmissions are "always adapted" and "permanently optimized" is for the claimed increase to be done automatically by the OLT. *Id.*; Ex. 2 ¶¶ 158.  The specification never discloses any other means (including by manual analysis, evaluation, calculation, definition, or adaption) to achieve the stated objectives.

The inventors' repeated patentability statements and disclaimers distinguishing the prior art further confirm this understanding.  Remarkably, *WSOU and Dr. Polish completely ignore* the prosecution history once again.   The prior art included different modulation modes, with corresponding different signal states and number of bits in each sequence.  Ex. 2 ¶¶ 155–58.  And, a network operator could manually switch between these different modes to increase these states and bits.  Ex. 2 ¶ 158.  During prosecution, the Examiner rejected the claims in view of this prior art.  For example, the Examiner cited Chand, which disclosed various modulation schemes such as basic QAM (2 states), 16 QAM (16 states), and 64 QAM (64 states) … with different signal states.  Ex. 6, at 3–5; Ex. 7 at 7.  The Examiner also rejected the claims as unpatentable subject matter under § 101.  *Id.* at 2.  In response, to overcome these rejections, the inventors argued that the recited operations were performed by the OLT itself:

> For example, the operation of "generating an optical signal," as recited in claim 1, is "at the optical line termination."  Similarly, the operation of *changing the number of signal states during operation* is performed *by "the optical line termination."*

Ex. 7, at 5 (explaining that the claimed operations "are tied to an apparatus").  Regarding the Chand prior art specifically, the inventors emphasized: "Chand's disclosure fails to disclose 'wherein the number of signal states is ***changed*** during operation by the optical line termination,' as recited in claim 1."  *Id.* at 6–7 (emphasis by inventors).  Later, when distinguishing prior art references Azadet and Asashiba, which similarly disclosed different signal states and the ability to change those states, the inventors again argued:

> For example, para. [0012] [of the patent application] recites "[a]n increase of the number of signal states, however, represents an increase of the transmission rate. **Therefore, the invention provides an adaptation of the transmission rate depending on the transmission quality of the link**."

Ex. 8, at 7 (emphasis by inventors).  A POSITA would understand these prosecution history statements and disclaimers to require the OLT itself to automatically perform the claimed "increase".  Ex. 2 ¶¶ 155–59.

WSOU argues that Xilinx's proposed construction is improper because the intrinsic record "never uses the language, nor does it otherwise support" the construction.  That simply is untrue, as explained above.  Further the proper construction of a claim term does not require an *in haec verba* recitation from the specification.  WSOU's contrary arguments seeking to avoid any construction at all is an improper hindsight attempt to read its claims on the very prior art the inventors distinguished and disclaimed, and the term must be construed to resolve the parties' dispute.  *See O2 Micro Int'l Ltd.*, 521 F.3d at 1351.

(c)     **WSOU's Reply Position**

The plain language of the claim term "wherein the plurality of signal states and the number of bits in each sequence are increased" is clear and requires no further construction.  The Court should reject Xilinx's attempt to rewrite the claim term to introduce an unsupported limitation that specifies how the recited signal states and number of bits must be increased:  According to Xilinx, they must be increased *automatically by the optical line termination*, but, as discussed, such a limitation is not supported.  *Supra* § II.F.1.a.

In its answering position, Xilinx attempts to couch the parties' dispute as whether the passive optical network (PON) can be manually configured, or must be automatically configured by the optical line termination (OLT), to increase the plurality of signal states and number of bits in each sequence.  *Supra* § II.F.1.b.  But the '971 patent itself never draws such a distinction

53

between manual and automatic configuration, and the Court should similarly not draw such a distinction.  Indeed, Xilinx fails to identify anything in the intrinsic record that discusses "manual configuration" or "automatic configuration."  Rather, Xilinx appears to be trying to concoct a potential non-infringement position out of thin air.

Xilinx mischaracterizes the prosecution, and fails to identify any clear and unmistakable disclaimer or anything concerning automatic versus manual configuration.  For example, in responding to the Examiner's § 101 rejection, the applicant argued that the claimed operations were tied to an apparatus and thus were directed to patent-eligible subject matter.  Ex. 7 (4/13/09 Amendment) at 5.  The response had nothing to do with manual versus automatic configuration.  *Id*.  The applicant's response to the rejection based on the Chand reference similarly did not distinguish between manual and automatic configurations.  *Id*. at 6-7.  Rather, the applicant pointed out that although Chand "discusses and compares various modulation schemes such as basic QAM (2 states), 16 QAM (16 states), and 64 QAM (64 states)" (*i.e.*, "different modulation schemes with different signal states"), "Chand's disclosure fails to disclose 'wherein the number of signal states is ***changed*** during operation by the optical line termination,' as recited in [pending application] claim 1."  *Id*. at 7 (emphasis in original).  Thus, the pending claim was not anticipated because "Chand merely compares different ***fixed*** QAM systems against each other," rather than having anything to do with manual or automatic configuration. *Id*. at 7 (emphasis added).

Bafflingly, Xilinx criticizes Dr. Polish for allegedly "completely ignor[ing] the prosecution history" (*supra* § II.F.1.b.), but Dr. Polish did not provide any opinions about this claim term.  Indeed, the Court need not consider the opinions of Xilinx's expert Dr. MacFarlane regarding this claim term.  The intrinsic record clearly does not distinguish between automatic and manual configuration, and Dr. MacFarlane's opinions do nothing meaningful beyond parroting what is

stated unambiguously in the intrinsic record and asserting that it supports Xilinx's proposed construction. *See Finjan, Inc. v. Cisco Sys., Inc.*, 837 F. App'x 799, 806 (Fed. Cir. 2020) ("Where, as here, 'an analysis of the intrinsic evidence alone will resolve any ambiguity in [the] disputed claim term,' it is 'improper to rely on extrinsic evidence,' such as expert testimony, to introduce ambiguity." (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996))).

### (d)     Xilinx's Sur-Reply Position

WSOU continues to advocate that the claim scope covers manual increases in the plurality of signal states and number of bits in each sequence.  Specifically, WSOU argues that "the '971 patent itself never draws such a distinction between manual and automatic configuration, and the Court should similarly not draw such a distinction."  *Supra* II.F.1.c.  That is simply untrue, as shown by both the specification and the extensive prosecution history Xilinx has discussed in detail—including the inventor's own emphatic statements to the Patent Office.  *Supra* II.F.1.b.

WSOU's reply never addresses Xilinx's specification citations, which plainly disclose that the OLT itself defines and increases the number of signal states; there is no mention of a user manually increasing those states.  *Id.* (citing, *e.g.*, Ex. E at 2:8–13).  WSOU's reply similarly ignores most of the inventor's extensive statements to the Patent Office, as well as the significance of the inventor's response to the Patent Office's § 101 rejection.  Even where WSOU does selectively discuss only two of the prosecution history statements, it ignores what the inventor said.  WSOU admits the inventor said that unlike his invention, the Chand prior art did not change the number of signal states "during operation *by 'the optical line termination.'*"  *Supra* II.F.1.c (emphasis added).  But WSOU then ignores this statement, and the many others like it during prosecution, stating that the OLT itself performs this increase, unlike the prior art.

55

### 2. "Based on a transmission quality of the optical signal" (claims 1, 15)

| WSOU's Construction | Xilinx's Construction |
|---|---|
| No construction necessary – plain and ordinary meaning. | Based on analysis and evaluation of a characteristic of the optical signal. |

### (a) WSOU's Opening Position

This claim phrase requires no further construction. The specification explains that the optical signals from different optical fibers may differ in power, and that signal states can be increased based on that quality. *See, e.g.*, Ex. E ('971 patent) at Figs. 2a & 2b, 1:29-35, 3:27-4:26, 4:63-5:6. Xilinx's proposal, which replaces the claim language "a transmission quality of the optical signal" with "analysis and evaluation of a characteristic of the optical signal," wrongly seeks to import an embodiment from the specification.[10] While the patent discusses "analysis" and "evaluation," it is always in the context of describing exemplary embodiments. *See, e.g., id.* at 2:6-14 ("*In an advantageous embodiment of the invention*, the number of signal states depends on the power of the received optical signal. *For example*, the optical line termination *analyzes* the received optical signal of a specific frame with regard to its power and then *evaluates* a corresponding number of signal states." (emphases added)), 2:19-24 ("In a further advantageous embodiment of the invention, ..."). The patent also discusses "analysis" and "evaluation" in connection with Fig. 2b (*id.* at 3:64-4:13), but is clearly talking about an exemplary embodiment. *See id.* at 2:40-43 ("FIG. 1 shows a schematic block diagram of *an embodiment* of a passive optical network according to the invention, and FIGS. 2a and 2b show schematic diagrams of signals

---

[10]  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012) ("We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that.")

within the passive optical network of FIG. 1." (emphasis added)).  The Court should not import

such embodiments as limitations.

> **(b)      Xilinx's Answering Position**

Xilinx's construction again comes straight from the specification and prosecution history.

As already explained, the intrinsic evidence discloses that the claimed "increase" of the plurality

of signal states and number of bits in each sequence is performed by the OLT following its analysis

and evaluation of the optical signal (e.g., the signal's power, bit error rate).  *See also* Ex. 2 ¶¶ 161–

64.  That same evidence, discussing this "analysis" and "evaluation" by the OLT, also supports

this construction that any increase must be "based on" that analysis and evaluation of an optical

signal characteristic.  *See also* Ex. E at 3:67–4:4 (evaluation may be based on "the error rate and/or

the error ratio and/or the eye opening or the like of the received optical signals").

Other portions of the prosecution history further support Xilinx's construction.  When

distinguishing and disclaiming the Azadet and Asashiba prior art, the inventors argued that neither

taught, suggested, or disclosed at least "the number of signal states is increased to a number of

signal states that is greater than two **based on a transmission quality of the one of the optical

fibers**," as recited in claim 1."  Ex. 9, at 7 (emphasis by inventors).  They went on to argue that

"the system disclosed by Azadet appears to generate the three level value (0,1,2) *regardless of* a

'transmission quality of the one of the optical fibers.'"  *Id.* at 8; *see also id.* at 10 (similar argument

that Azadet discloses "converting input bits into optical signals and voltages *regardless of*" the

optical signals' quality); Ex. 8, at 7 ("**Therefore, the invention provides an adaptation of the

transmission rate depending on the transmission quality of the link.**" (emphasis by inventors)),

9 (arguing that in Azadet, "the three level value is **always** three. … Thus, … the optical signal has

**no influence on the three level value** as disclosed by Azadet" (emphasis by inventors)).  From

these extensive inventor arguments, it is clear that this "based on" term does not permit the OLT

system to make arbitrary changes or ignore the characteristics of the optical signal, as a POSITA would understand.  Ex. 2 ¶¶ 163–64.

These repeated prosecution history statements—with the inventors' own emphasis to the Examiner—are conclusive.  Further, the Federal Circuit has "recognized that when a patent 'repeatedly and consistently' characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization."  *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016).  WSOU's contrary arguments must be rejected.

### (c)    WSOU's Reply Position

The Court need not further construe this term, and should reject Xilinx's proposal to import an "analysis and evaluation" limitation into the claims.  As discussed (*supra* § II.F.2.a.), some of the exemplary embodiments in the specification include an optical line termination that analyzes the power of an optical signal and then evaluates a number of signal states, but the claims do not include "analysis" or "evaluation" limitations.  *See Thorner*, 669 F.3d at 1366 ("We do not read limitations from the specification into claims; we do not redefine words.").

None of the prosecution statements relied on by Xilinx actually support its position.  *See supra* § II.F.2.b.  Rather, the cited portions of the prosecution history simply repeat the actual claim language, or point out that the Azadet prior art reference cited by the Examiner disclosed a system with a constant level value, rather than increasing the number of signal states based on a transmission quality of the optical signal, as claimed.  Xilinx's assertion that these statements conclusively support its proposed construction are no way tied to fact.  The applicant never redefined the claim phrase in the manner Xilinx asserts.

Furthermore, for same reasons discussed *supra*, the Court should not rely on Dr. MacFarlane's testimony to import Xilinx's proposed limitations into the claims.  *See Kara Tech.*

*Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) (declining to read limitations into the claims based on expert testimony, which "cannot overcome the plain language of the claims").

      **(d)**      **Xilinx's Sur-Reply Position**

WSOU incorrectly argues that Xilinx's construction comes from an exemplary embodiment. Foremost, Xilinx's construction comes from the claim language itself, which requires any increase in the plurality of signal states and the number of bits in each sequence to be "based on a transmission quality of the optical signal." In other words, this claimed increase cannot be arbitrary, and must be due to some analysis and evaluation by the OLT, contrary to WSOU's plain and ordinary meaning construction. *See supra* § II.F.2.b.

WSOU also incorrectly argues that Xilinx attempts to import specification embodiments. *Supra* § II.F.2.c. Instead, Xilinx is only looking to the specification to further understand the meaning of the claim language, as it must. *Phillips*, 415 F.3d at 1314–17. There, in the sole embodiment, the specification explains that "[t]he optical line termination *analyzes* the received optical signal of a specific frame with regard to its power and then *evaluates* a corresponding number of signal states." Ex. E at 2:8–11. Without analyzing and evaluating a characteristic of the optical signal, the OLT cannot perform the claimed increase "based on a transmission quality of the optical signal," as the claim requires.

WSOU's reply is largely dismissive of the extensive prosecution history. *Supra* § II.F.2.c. As Xilinx has explained, however, the inventor emphatically argued that the cited prior art was distinguishable where the increase in the number of signal states could be arbitrary, and also when there is no increase at all regardless of changes in the transmission quality. *Supra* § II.F.2.b. These statements are not merely redundant of the claim language as WSOU argues. Instead, they are central to properly limiting the claim scope to require analysis and evaluation of an optical line signal characteristic, to then perform the claimed increase in the number of signal states and bits.

G.    **U.S. Patent No. 9,312,838 (Case No. 1:20-cv-01233-CFC-JLH)**

1.    **"Dual clock generator configured to receive the first adjusted enable signal and the second enable signal, and in response operable to generate a reference clock signal and transmit the reference clock signal over a single conductor." (claim 1)**

| WSOU's Construction | Xilinx's Construction |
|---|---|
| Not governed by AIA 35 U.S.C. § 112(f), and not indefinite.  No construction necessary – plain and ordinary meaning.  Should the Court find construction necessary:  "a component/module capable of generating the reference clock signal"<br><br>To the extent the Court treats this term as means-plus-function:<br><br>Function: to receive the first adjusted enable signal and the second enable signal, and in response operable to generate a reference clock signal and transmit the reference clock signal over a single conductor.<br><br>Structure: Including, but not limited to, clocking resource, switch matrix/interconnection wires, configurable logic blocks, or equivalents thereof. | Governed by post-AIA 35 U.S.C. § 112(f).<br><br>Function: to receive the first adjusted enable signal and the second enable signal, and in response operable to generate a reference clock signal and transmit the reference clock signal over a single conductor.<br><br>Structure: *Indefinite*. |

(a)    **WSOU's Opening Position**

**WSOU's Introduction for the '838 Patent**:

"In microelectronics and telecommunication systems, two or more separate asynchronous clock signals are often required."  Ex. F ('838 patent) at 1:13-15.  The '838 patent generally claims an apparatus for sending two clock signals over a single conductor by using two clocks to generate two asynchronous input clock signals, an "edge



detector" to detect the edge of each input clock signal and generate corresponding "enable signals," a divider to generate an adjusted enable signal from one of the enable signals based on a predetermined factor, and a "dual clock generator" to receive the two enable signals and generate a "reference clock signal" to send over a single conductor. *Id.* at claim 1. The general components of an exemplary embodiment are depicted in Figs. 1 and 2, the latter of which is reproduced on the right (red text added). *Id.* at Figs. 1, 2; *see also id.* at 4:20-5:39; Ex. 13 (Polish Decl.) ¶¶ 54-55.

**WSOU's Opening Argument for the "Dual Clock Generator ..." Claim Phrase:**

The apparatus of claim 1 must contain "a ***dual clock generator*** configured to receive" the recited enable signals "and in response operable to generate a reference clock signal and transmit the reference clock signal over a single conductor." Ex. F ('838 patent) at claim 1 (emphasis added). To the extent a construction is necessary,[11] the Court should construe "dual clock generator" to have its plain and ordinary meaning, which in claim 1 a POSA would understand to refer an apparatus component/module capable of generating the recited reference clock signal. Ex. 13 (Polish Decl.) ¶ 114.

The Court should reject Xilinx's assertion that the "dual clock generator..." phrase is a means-plus-function term. Because the phrase lacks the word "means," the Court must initially presume that it is not a means-plus-function term. *ZeroClick*, 891 F.3d at 1007. Xilinx cannot overcome that presumption. Far from being a nonce term with no structural meaning, a "clock generator" is a well-known term of art with structural connotations. Ex. 13 (Polish Decl.) ¶¶ 115-116. But even if, *arguendo,* the Court concludes that it is means-plus-function, Xilinx cannot satisfy its burden of proving indefiniteness by clear and convincing evidence. Rather, the

---

[11] *See Semcon IP Inc. v. Amazon.com, Inc.*, No. 2:18-CV-00192-JRG, 2019 WL 2090006, at *20 (E.D. Tex. May 13, 2019) (construing "clock generator" to "have [its] plain and ordinary meaning without the need for construction").

specification discloses sufficient structure corresponding to the recited "dual clock generator," including as a structural element in the block diagram of Fig. 2. *Id.* ¶¶ 117-128. The patent is clear a "dual clock generator" is a clock generator capable of generating a reference clock signal based on dual input signals (*i.e.*, the recited enable signals). Ex. F ('838 patent) at 2:19-22, 2:41-44, 3:13-17, 5:32-38. The patent also states that the clock generator "can be implemented within a field programmable gate array (FPGA)" (*Id.* at 4:40-47), connoting structure such as a clocking resource, switch matrix/interconnection wires, and configurable logic blocks. Ex. 13 (Polish Decl.) ¶¶ 122, 127.

**(b)** **Xilinx's Answering Position**

The '838 patent teaches a "dual clock generator" that transfers two asynchronous clock signals over a single conductor (*e.g.*, a wire). Ex. F at 1:50–62, 2:23–44. This is done by generating a "reference clock signal" from the two asynchronous clock signals, and then transmitting that reference clock signal over the wire. *Id.* An embodiment is illustrated as Figure 1, shown below with the two asynchronous clock signals annotated in yellow, the dual "reference clock generator" in green, and the reference clock signal in red. Ex. 3 ¶ 50.



FIG. 1

Certain embodiments also include a clock recovery unit 122 in a second module 120 to recover the two clock signals based on the reference clock signal. *See, e.g.*, *id.* at 2:45–63.

This "dual clock generator" term is subject to 35 U.S.C.§ 112(f) because it recites a "function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1349. The term "dual clock generator" is a coined term, not a term of art, and is not a known structure for performing the claimed function. Ex. 3 ¶¶ 58–63. Thus, a POSITA would not recognize this term to connote sufficiently definite structure. *Id.* WSOU argues that a dual clock generator is "a component/module capable of generating the reference clock signal," but that only further confirms that the claimed "dual clock generator" is described only in functional terms and not recognized by a POSITA as a known structure.[12]

The Federal Circuit's analysis in *Advanced Ground Info. Sys., Inc. v. Life360, Inc.* is instructive. 830 F.3d 1341 (Fed. Cir. 2016). There, the Court upheld the district court's determination that the term "symbol generator" invoked means-plus-function claiming under § 112, ¶ 6 because it failed to describe a sufficiently definite structure. *Id.* at 1347. Just as here, the "symbol generator" there was not a term used in "common parlance or by persons of skill in the pertinent art to designate structure" in order to avoid the application of § 112, ¶ 6. *Id.* at 1348 (citations omitted). The term also was held indefinite because the specification failed to disclose "an algorithm or description as to how those symbols are actually generated." *Id.* at 1349. Here too, the term "dual clock generator" is indefinite. The specification fails to clearly link any particular structure, including hardware, software, algorithm, computer program code, instructions, or special purpose processor, that is sufficient to perform the recited function. Indeed, WSOU is unable to identify such corresponding structure.

---

[12] WSOU's expert Dr. Polish states that a "clock generator"—not a *"dual* clock generator"—would be understood to be a "structural component." Ex. 13 ¶ 116; *see also id.* at ¶ 127. His testimony about the structural components of a "clock generator" is therefore inapposite.

WSOU proposes that the corresponding structure is "[i]ncluding, but not limited to, clocking resource, switch matrix/interconnection wires, configurable logic blocks, or equivalents thereof" and identifies certain portions of the specification.  However, these portions make no mention of "clocking resource, switch matrix/interconnection wires, configurable logic blocks, or equivalents thereof," and do not clearly link WSOU's proposed structure to performing the specified function, nor is that structure sufficient to do so.  As a result, this term is indefinite.  *See Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008) ("[I]f a claim includes a means-plus-function limitation, failure to disclose adequate structure corresponding to the claimed function results in the claim being invalid for indefiniteness.").

The recited function here is very specific: "to receive the first adjusted enable signal and the second enable signal, *and in response operable to generate a reference clock signal* and transmit the reference clock signal over a single conductor."  *See* Ex. 3 ¶ 64.  Of the passages WSOU identifies, some describe the dual clock generator in purely function terms that are largely duplicative of the claim language.  *See* Ex. F at Abstract, 1:19–27, 2:15–22, 3:13–17, 5:32–39, 6:7–22; *see also* Ex. 3 ¶¶ 65–66.  Others are confusing or misleading by referring to a "dual reference clock generator 112," *see* Ex. F at, e.g., 4:40–5:11, when WSOU's own expert concedes that the claimed "dual clock generator" is instead referred to in the specification as "reference generator 218." *See* Ex. 13 ¶ 124.  But "dual reference clock generator 112" is *not* the "dual clock generator" recited by the claims.  Ex. 3 ¶ 67.

The claimed "dual clock generator" is depicted <u>as reference generator 218</u>, which the specification only succinctly describes as a generic, functional "black box":

> According to disclosed embodiments, first adjusted enable signal 216 and second enable signal 208 are received by reference generator 218. *Reference generator 218 generates reference clock signal 116 responsive to first adjusted enable signal 216 (forcing*

> *rising edges on reference clock) and second enable signal 208*
> *(forcing falling edges on reference clock)*.  Reference clock signal
> 116 is transmitted to module 120 over conductor 130.

Ex. F at 5:32–39; *see also id*. Fig. 2; Ex. 3 ¶ 68.  Nothing above or in Figure 2 clearly links or discloses any specific, corresponding structure to the recited function.  *Id.*  WSOU also points to the specification's statement that "[d]ual reference clock generator 112 may be implemented within a field programmable gate array (FPGA)," Ex. F at 4:46–47, arguing this "connot[es] structure such as a clocking resource, switch matrix/interconnection wires, and configurable logic blocks."  *Supra* § II.G.1.a (citing Ex. 13 ¶¶ 122, 127).  But as Xilinx's expert Dr. Baker explains, an FPGA is a programmable device.  Ex. 3 ¶ 69.  The specification fails to disclose the FPGA's program, and otherwise fails to clearly link or disclose any specific program or other structure of an FPGA to the lengthy recited function.  *Id.*

For all of these reasons, WSOU's proposed corresponding structure fails, and this means-plus-function term is indefinite.  *See id.* ¶¶ 55–71.

**(c)  WSOU's Reply Position**

Xilinx fails to overcome the presumption that the "dual clock generator ..." claim phrase is *not* a means-plus-function term and, regardless, cannot meet its heavy burden of establishing that this phrase is indefinite by clear and convincing evidence.  As previously discussed, claim 1 connotes sufficient structural information to a POSA to avoid means-plus-function treatment.  *Supra* § II.G.1.a.  Claim 1 indicates that the "dual clock generator" would have an input port to receive the recited enable signals, structural components to generate a reference clock signal from combining the input enable signals (such signal-generating structures were known in the art), and an output port over which to transmit the generated signal over a single conductor.

65

Furthermore, even to the extent the Court finds this claim phrase to invoke § 112(f), the '838 patent discloses sufficient structure corresponding to the dual clock generator's recited function. *See supra* § II.G.1.a.  In a step-by-step manner, the patent explains and illustrates how each of the recited signals are generated by the components of the claimed apparatus (as in Fig. 2, right), including by showing exemplary waveforms of such signals (in Fig. 4, right), and provides an algorithm for how the dual clock generator generates the reference clock signal



**Fig. 2: Block diagram of reference clock signal generator**



**Fig. 4: Exemplary waveforms of recited signals**

from the enable signals it receives and transmits it over a single conductor. Ex. 14 (Polish Reply Decl.) ¶¶ 50-51.

As described and illustrated in claim 1 and the patent's specification and figures, the two clocks (102 and 104) generate asynchronous first and second input clock signals (106 and 108, respectively), whose edges are then detected by first and second edge detectors (202 and 206, respectively).  Ex. F ('838 patent) at claim 1, 4:60-67, Figs. 1, 2, & 4; *see* Ex. 14 (Polish Reply Decl.) ¶ 52.  A counter/divider (212) then adjusts the first enable signal (204) based on a predetermined factor (such as suppressing the signal by introducing a guard time that effectively reduces the enable signal's frequency).  Ex. F ('838 patent) at claim 1, 5:1-31, Figs. 2 & 4; *see* Ex. 14 (Polish Reply Decl.) ¶ 53.  The "first adjusted enable signal 216 and second enable signal 208

are received by reference generator 218[,]" which then "generates reference clock signal 116 **responsive to first adjusted enable signal 216 (forcing rising edges on reference clock) and second enable signal 208 (forcing falling edges on reference clock)**." Ex. F ('838 patent) at 5:32-38 (emphasis added); *see* Ex. 14 (Polish Reply Decl.) ¶¶ 54-55.  Contrary to Xilinx's contention and unlike in the *Advanced Ground* case it cites, the '838 patent discloses an algorithm by which the dual clock generator generates a reference clock signal based on the enable signals, as observable in Fig 4.  Ex. 14 (Polish Reply Decl.) ¶¶ 54-55.  Thus, the patent discloses sufficient structure corresponding to the dual clock generator's claimed function.[13]

> (d)   **Xilinx's Sur-Reply Position**

WSOU argues this is not a § 112(f) term because "claim 1 connotes sufficient structural information to a POSA to avoid means-plus-function treatment" and because "such signal-generating structures were known in the art."  But neither WSOU nor its expert identifies any such "signal-generating structures" that were "known in the art," especially any that were configured to perform the entire function recited in claim 1.  In particular, WSOU continues to fail to point to any known *dual* clock generator structure in the art that performs the entire recited function, so this continues to be a § 112(f) term.  *See supra* § II.G.1.b.

As a § 112(f) term, WSOU mistakenly searches for corresponding structure in components that are not the reference generator 218 of Figure 2, which the parties agree is the *only* specification component corresponding to the claimed "dual clock generator" as recited in claim 1.  *Id.* (citing Ex. 13 ¶ 124).  WSOU also asserts that the specification discloses an algorithm for the operation of a dual clock generator.  *Supra* § II.G.1.c (quoting Ex. F at 5:32–38).  But the cited passage

---

[13] Xilinx has not disputed that the patent discloses sufficient structure for the "transmit" function.

merely functionally describes *what* the dual clock generator does—receive input "enable" signals and output a "reference clock signal"—not *how* the dual clock generator performs this function and its structure. *See, e.g.*, *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1316–17 (Fed. Cir. 2012) ("The portions of the specification that describe what occurs inside box 44, however, merely recite functional, not structural, language. This type of purely functional language, which simply restates the function associated with the means-plus-function limitation, is insufficient to provide the required corresponding structure." (internal citations omitted)). As Xilinx and its expert Dr. Baker have discussed, the specification does not disclose any algorithm for doing so or clearly link any structure of the reference generator 218 (*e.g.*, a circuit, transistors, code, etc.) to "forcing rising edges" "responsive to first adjusted enable signal 216" or "forcing falling edges" responsive to "second enable signal 208." *Supra* § II.G.1.b; Ex. 3 ¶¶ 65–71.

WSOU's expert, Dr. Polish, opines that a POSITA "would understand this portion of the specification to provide an algorithm for the generation of reference clock signal 116," but never identifies the supposed algorithm or explains how it performs the recited function. Ex. 14 ¶ 54 (citing Ex. F at 5:32–38). Further, failure to disclose and clearly link a specific algorithm, or any other structure, cannot be cured by expert testimony. *Noah*, 675 F.3d at 1318–19; *Function Media v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013). WSOU and Dr. Polish also fail to explain how the alleged algorithm supports its proposal that the corresponding structure is "[i]ncluding, but not limited to, clocking resource, switch matrix/interconnection wires, configurable logic blocks, or equivalents thereof," while ignoring Xilinx's prior arguments explaining why these are not corresponding structure. *See supra* § II.G.1.b.

### 2.   "Edge detector" (claim 1)

| WSOU's Construction | Xilinx's Construction |
|---|---|
| No construction necessary – plain and ordinary meaning. Should the Court find construction necessary:<br><br>"a component/module capable of detecting an edge of a signal" | A circuit that detects a rising or falling edge of an input signal and generates an output signal upon detection. |

### (a)   WSOU's Opening Position

Claim 1 of the '838 patent recites an apparatus comprising two "edge detectors," each configured to receive and detect the rising edge of an input clock signals and to generate an enable signal.  Ex. F ('838 patent) at claim 1.  The Court does not need to further construe the term "edge detector" beyond its plain and ordinary meaning—*i.e.*, a component/module capable of detecting an edge of a signal—which would be apparent to a POSA from the claim itself and the specification.  *See id*. at 2:30-37, 2:45-54, 3:3-10, 3:18-26, 4:60-67, 5:40-50, Figs. 2, 3.

The Court should reject Xilinx's proposed construction because it imports language from elsewhere in the claim, rendering those other portions of the claim superfluous.[14]  Also, the intrinsic record never limits an "edge detector" to "a circuit."

### (b)   Xilinx's Answering Position

Xilinx's proposal is the customary meaning of this claim term to a POSITA.  An edge detector must have an input signal, with its circuit then detecting a rising or falling edge of that signal.  Ex. 3 ¶¶ 73–74.  And, the edge detector also generates an output signal, but does so only when it detects the rising or falling edge.  *Id.*  This is consistent with the specification, where the

---

[14] *See In re Power Integrations, Inc.*, 884 F.3d 1370, 1376 (Fed. Cir. 2018) (rejecting construction that "renders claim language meaningless"); *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

disclosed edge detectors have all of these attributes.  *See* Ex. F at Fig. 2 (edge detectors 202 and 206); Fig. 3 (edge detectors 302 and 306); Fig. 6 (blocks 604, 608, 612, 616, 624, 628); and, *e.g.*, 4:62–64 ("Clock generator 112 includes edge detector 202 configured to detect a rising edge of clock signal 106, and in response edge detector 202 generates first enable signal 204.")  WSOU's "plain and ordinary meaning" contradicts these disclosures, and is problematic because the edge detector must also generate an output signal.  *See* Ex. 3 ¶¶ 74–76.

Indeed, WSOU's non-construction conspicuously omits the edge detector's function "to generate a[n] … enable signal."  *Id.*  This is readily apparent from claim 1:

> [1.b] a first *edge detector* configured to receive the first input clock signal, the first edge detector operable to detect a rising edge of the first input clock signal *and to generate a first enable signal*;

> [1.c] a second *edge detector* configured to receive the second input clock signal, the second edge detector operable to detect the rising edge of the second input clock signal *and to generate a second enable signal*;

The claim language thus identifies three functions each edge detector performs: (1) receiving an input clock signal; (2) detecting a rising edge of the input clock signal; and (3) generating an enable signal.  *Id.* ¶ 74.  Only Xilinx's proposal properly encapsulates all three functions.  Although WSOU argues that Xilinx's proposal "imports language from elsewhere in the claim," *supra* § II.G.2.a, Xilinx's proposal is the only one that properly reads the term in the context of the claim language, while reflecting the meaning of this term to a POSITA.  Ex. 3 ¶¶ 72–76.

> **(c)   WSOU's Reply Position**

Xilinx fails to articulate a reason why the term "edge detector" needs to be construed at all.  Xilinx's proposed construction—"a circuit that detects a rising or falling edge of an input signal and generates an output signal upon detection"—adds no further clarity than what is already apparent from the claim itself.  Claim 1 already states that each "edge detector" is (a) "configured

70

to receive [an] input clock signal"; (b) "operable to detect a rising edge of the ... input clock signal"; and (c) "operable ... to generate a[n] ... enable signal."  Ex. F ('838 patent) at claim 1.  Thus, the only aspect of Xilinx's proposed construction that is not specifically addressed in the other language of claim 1 is Xilinx's requirement that the "edge detector" be a "circuit."  Given that the '838 patent never uses the word "circuit," a more general term like "component" or "module" would be more appropriate, to the extent the Court is inclined to issue a construction for this claim term.  But, in short, there is no need for the Court to construe the term "edge detector."

Xilinx and its expert's accusation that WSOU's alternative proposed construction would improperly "cover devices that are not operable to generate an enable signal" is unfounded and legally incorrect.  *Supra* § II.G.2.b; Ex. 2 (MacFarlane Decl.) ¶ 76.[15]  Regardless of the construction of "edge detector," claim 1 expressly requires each recited "edge detector" to be "operable ... to generate a[n] ... enable signal."  Ex. F ('838 patent) at claim 1.  Xilinx's proposed construction would improperly render that subsequent claim language redundant and superfluous.[16]

### (d)    Xilinx's Sur-Reply Position

WSOU's reply does not dispute that Xilinx's construction is consistent with the claim language.  And while WSOU quibbles with Xilinx's use of the word "circuit" instead of "a more general term," WSOU does not dispute that the edge detector "detects a rising or falling edge of an input signal and generates an output signal upon detection."  *Supra* § II.G.2.c.  WSOU also fails

---

[15] Expert testimony is unnecessary for construing this term.  The intrinsic record is sufficient.

[16] Indeed, in the primary case on which Xilinx relies in its answering position for the next disputed claim term ("enable signal"), the district court expressly rejected a construction that would have "render[ed] the subsequent claim language redundant and superfluous."  *Freescale Semiconductor, Inc. v. Promos Techs., Inc.*, 561 F. Supp. 2d 732, 744-45 (E. D. Tex. 2008).

to explain how its construction comports with the "plain and ordinary meaning" of this term. Xilinx's proposal is the only one that properly construes this term according to its plain and ordinary meaning to a POSITA, in the context of the specification, and should be adopted.

### 3. "Enable signal" (claim 1)

| WSOU's Construction | Xilinx's Construction |
| --- | --- |
| No construction necessary – plain and ordinary meaning. Should the Court find construction necessary:<br><br>"a signal representative of the input clock signal" | A control signal that allows an electronic circuit to operate. |

#### (a)    WSOU's Opening Position

The Court does not need to construe "enable signal" beyond its plain and ordinary meaning. Claim 1 indicates that each of the two edge detectors is configured to receive an input clock signal, detect its rising edge, and then generate an "enable signal" (the first of which is then "adjusted" by a divider).  Ex. F ('838 patent) at claim 1; *see also id*. at Fig. 2, 3:44-45, 4:60-5:39.  In light of the intrinsic record, a POSA would understand an "enable signal" to refer to a signal representative of an input clock signal.  *Id.* at 1:48-62, 2:30-37, 4:60-5:4, 5:66-6:2 6:7-22.  The Court should reject Xilinx's proposal, because the intrinsic record does not support construing this term as "a control signal" or a signal "that allows an electronic circuit to operate."

#### (b)    Xilinx's Answering Position

A POSITA would understand that an "enable signal" allows an electronic circuit that receives the signal to operate.  Ex. 3 ¶¶ 77–78; *see also* Ex. 11 (Newton's Telecom Dictionary (18th ed. 2002) defining "enabl[e] signal" as "[a] signal that permits the occurrence of an event"); *Freescale Semiconductor, Inc. v. Promos Techs., Inc.*, 561 F. Supp. 2d 732, 744–45 (E.D. Tex. 2008) ("The court thus construes 'enable signal' to mean 'control signal that, when asserted, allows

an operation to occur.'"").  Further, an enable signal is a *control* signal.  Ex. 3 ¶ 78; *see also, e.g.*, *Freescale*, 561 F. Supp. 2d at 744–45.  This control purpose and function is distinct from, for example, a timing signal such as a clock signal.  Ex. 3 ¶ 78.  Xilinx's proposed construction is consistent with the specification, which explains that an enable signal is generated "*in response*" to detecting a rising or falling edge of an input clock signal.  *See, e.g.*, Ex. F at 4:60–67.  The enable signals thus act to control and enable the operation of the dual clock generator, which "generates reference clock signal 116 responsive to first adjusted enable signal 216 (forcing rising edges on reference clock) and second enable signal 208 (forcing falling edges on reference clock)." *Id.* at 5:34–38; Ex. 3 ¶¶ 79.

WSOU's "plain and ordinary meaning" is actually contrary to that very meaning to a POSITA.  *See* Ex. 3 ¶ 81.  Moreover, WSOU's proposed definition of "enable signal" as any signal "*representative of* the input clock signal" only adds further confusion contrary to a POSITA's understanding.  *Id.*  WSOU does not point to any lexicography in the specification, as it must, to contradict or broadly rewrite the usual meaning of "enable signal" to a POSITA.  *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365–66 (Fed. Cir. 2012).  And, WSOU's construction is particularly problematic in view of the embodiment of Figure 3, which generates third and fourth enable signals 304 and 308 in response to the rising and falling edges of reference clock signal 116, and generates fifth enable signal 316 from fourth enable signal 308.  Ex. 3 ¶¶ 80– 81; Ex. F at 5:40–50, 5:55–59.  To the extent that a "first enable signal" is "representative of," for instance, "the input clock signal"—if at all—the same cannot be said for all other enable signals in the specification.  Ex. 3 ¶¶ 80–81.  WSOU's own construction thus improperly excludes specification embodiments of the enable signals.

(c)    **WSOU's Reply Position**

As discussed, the Court need not construe "enable signal." *Supra* § II.G.3.a.  Through its answering position, Xilinx has revealed that it is relying heavily on the construction of "enable signal" from the *Freescale* case to support its construction in this case.  *Supra* § II.G.3.b.  There, the Court rejected the construction proposed by the plaintiff (who was represented by Xilinx's lead counsel of record from this case) and construed "enable signal" to mean "control signal that, when asserted, allows an operation to occur."  *Freescale,* 561 F. Supp. 2d at 744-45.  But that specific construction has no bearing on this completely unrelated case.  The '838 patent concerns a different technology and issued from an application filed 20 years later.  Moreover, the district court's claim construction in *Freescale* was based on the entirely different intrinsic record from that in this case.  Just as one example, whereas the patent at issue in *Freescale* (U.S. Pat. No. 5,467,455) used the term "control signal" over 30 times, the '838 patent does not use this term even once.  There is no basis *in the intrinsic record of the '838 patent* to redefine "enable signal" as a "control signal."[17]

The intrinsic record similarly does not support the functional language in Xilinx's proposed construction (*i.e.*, "that allows an electronic circuit to operate").  The '838 patent does not use this phrase, nor does it even use the word "circuit."  Rather, the '838 patent discusses the functionality of the "enable signal" in terms of its generation by an edge detector based on detecting a rising edge of an input clock signal, adjustment by a counter or divider, and use by a dual clock generator to generate a reference clock signal.  Ex. F ('838 patent) at claim 1, Fig. 2, 4:60-5:4, 5:12-38.

---

[17] Expert testimony is unnecessary for construing this term.  The intrinsic record is sufficient.

Xilinx attempts to rebut WSOU's alternative proposed construction (*i.e.*, "a signal representative of the input clock signal") by pointing to Fig. 3 (reproduced here), which concerns a different embodiment than that claimed in claim 1. But the patent indicates that the third (304) and fourth (308) enable signals are generated in a similar way as the enable signals in Fig. 2, based on edge detectors detecting the edges of an input clock signal—here,



FIG. 3

the reference clock signal (116). *Id*. at 5:40-54. The fifth enable signal (316) is just an "adapted" version of the fourth enable signal (308). *Id*. at 5:55-61. Thus, all the enable signals are representative of portions of their respective input clock signals.

### (d) Xilinx's Sur-Reply Position

WSOU mistakenly argues that Xilinx's proposed construction exclusively comes from *Freescale Semiconductor, Inc. v. Promos Technologies, Inc.*, 561 F. Supp. 2d 732 (E.D. Tex. 2008). It does not. Instead, "[a] POSITA would understand that an 'enable signal' allows an electronic circuit that receives the signal to operate," *supra* § II.D.3.b (citing Ex. 3 ¶¶ 77–78), and "is a control signal," *id.* (citing Ex. 3 ¶ 78). This is the plain and ordinary meaning of this term to a POSITA, as shown by the intrinsic and extrinsic evidence and also *Freescale Semiconductor*.

### 4.   "Reference clock signal" (claim 1)

| WSOU's Construction | Xilinx's Construction |
| --- | --- |
| No construction necessary – plain and ordinary meaning. Should the Court find construction necessary:<br><br>"a signal representative of the enable signals" | A periodic timing signal from which another timing signal is generated. |

### (a)   WSOU's Opening Position

Claim 1 calls for "a dual clock generator configured to receive the first adjusted enable signal and the second enable signal, and in response operable to generate a ***reference clock signal*** and transmit the reference clock signal over a single conductor."  Ex. F ('838 patent) at claim 1 (emphasis added).  The plain language of the claim is clear that a "reference clock signal" is a signal that is representative of the enable signals that dual clock generator receives.  Indeed, the patent discloses "generating . . . a reference clock signal responsive to the first and second enable signals," and states that "[t]he reference clock signal is representative of the first and second enable signals."  *Id*. at 1:59-61, 6:19-22; *see also id*. at 2:48-44, 3:13-17, 4:40-50, 5:32-38.  There is no reason to construe this term beyond its plain meaning.

The Court should reject Xilinx's proposal.  First, Xilinx's proposal would require the "reference clock signal" to be a "periodic timing signal," but those words are not found anywhere in the intrinsic record, nor do they clarify the disputed term.  Second, Xilinx would require the "reference clock signal" to be a source "from which another timing signal is generated," which is ambiguous as to what that other timing signal is and when or how it is generated from the reference clock signal.

### (b)   Xilinx's Answering Position

A POSITA would understand that a "reference clock signal" is a clock signal (as indicated by its name) and, like any clock signal, it is a periodic timing signal.  Ex. 3 ¶¶ 82–83.  WSOU's

76

proposal, however, does not identify the reference clock signal as a clock signal at all. *Id.* ¶¶ 82–83, 87. Indeed, WSOU even disputes that the reference clock signal is periodic. *See supra* § II.G.4.a. The specification also is clear that the reference clock is used to generate output clock signals—hence, the term's inclusion of the word "reference" that otherwise would be superfluous. Ex. F at 4:52–56 (module 120 receives reference clock signal 116 and "generates first and second output clock signals, 124, 126"); *id.* at 5:40–65 (clock recovery unit 122 is "configured to receive reference clock signal 116", and in response "generates first output clock signal 312" and "generates second output clock signal 320"); *see also* Ex. 3 ¶¶ 84–87.

WSOU conspicuously omits the specification's disclosure that the "reference clock signal" *is a clock signal*. *Id.* ¶¶ 82–83, 87. Moreover, WSOU's argument that this signal is any signal "*representative of* the enable signals" is confusing, vague, and inconsistent with the prevalent meaning of "clock signal" to a POSITA. Ex. 3 ¶ 87. For example, substituting WSOU's proposed construction above for "enable signal" into its proposed construction here for the term "reference clock signal" results in the following very confusing and circular definition of this term: "a signal representative of the 'signal[s] representative of the input clock signal.'" Once again, WSOU does not point to any lexicography, as it must, to contradict or broadly rewrite the ordinary meanings of a "clock signal" and a "reference" clock signal to a POSITA. *Thorner*, 669 F.3d at 1365–66.

WSOU's insertion of the phrase "representative of" is particularly problematic because, as discussed previously, the specification does not disclose any structure for the dual clock generator "to receive the first adjusted enable signal and the second enable signal, *and in response … generate a reference clock signal*." In other words, because the specification does not disclose to a POSITA how the dual clock generator generates a reference clock signal based on the received enable signals, WSOU's defining the reference clock signal as "representative of the enable

signals" is circular and adds even more confusion about its meaning. Ex. 3 ¶ 87. Conversely, Xilinx's construction properly captures that the reference clock signal is a periodic timing signal "from which another timing signal is generated," such as is discussed in the specification at 2:47–63 (quoted above) and further referenced throughout.

> (c)   **WSOU's Reply Position**

The Court should reject Xilinx's proposal and need not construe "reference clock signal." It is Xilinx—not WSOU—who is seeking to "broadly rewrite" this claim term. First, the patent does not require a "reference clock signal" to be a "periodic timing signal," and, indeed, refutes that notion. Ex. F at 4:20-50 (reference clock signal derived from two *asynchronous* clock signals); Ex. 14 (Polish Reply Decl.) ¶ 57 (reference clock signal in Fig. 4 does not appear to be periodic).

Second, Xilinx offers no justifiable basis for seeking to import a limitation requiring a "reference clock signal" to be a source "from which another timing signal is generated." Given that claim 1 of the '838 patent does not recite another timing signal that is generated from the "reference clock signal," it would be improper to import a limitation regarding a potential intended use of the "reference clock signal." In fact, even when a claim itself includes an express statement of intended use, such statements generally are found not to be claim limitations. *See, e.g., Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1355 (Fed. Cir. 2020) (finding a "statement of intended use" expressly recited in the claim to be "not limiting"). It would be even more so improper here to import an *unclaimed* intended use as a limitation into claim 1, as well as lead to ambiguities. *See* Ex. 14 (Polish Reply Decl.) ¶ 58.

> (d)   **Xilinx's Sur-Reply Position**

WSOU improperly redefines the plain and ordinary meaning of "reference clock signal" to a POSITA. *First*, WSOU contests the reference clock signal must be a periodic timing signal,

citing the specification's discussion of Figure 1 to argue that the "reference clock signal [is ] derived from two asynchronous clock signals." *Supra* § II.G.4.c (citing Ex. F. at 4:20–50); *see also* Ex. 14 ¶ 57 (opining that reference clock signal 116 of Fig. 4 "does not appear" to be periodic). But neither WSOU nor its expert definitively state that these are not periodic signals, and a POSITA understands that a clock signal is a periodic signal, as Xilinx has explained. *Second*, WSOU argues that Xilinx "import[s] a limitation" into claim 1 by its definition of the word "reference". But Xilinx's definition of a "reference" clock signal as "a source 'from which another timing signal is generated'" is, again, the plain and ordinary meaning of this term. *See supra* § II.G.4.b; Ex. 3 ¶¶ 83, 87. Accordingly, Xilinx's construction should be adopted.

DEVLIN LAW FIRM LLC

 /s/ *James M. Lennon*
James M. Lennon (No. 4570)
Peter Akawie Mazur (No. 6732)
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
jlennon@devlinlawfirm.com
pmazur@devlinlawfirm.com

OF COUNSEL:

Jonathan K. Waldrop
Darcy L. Jones
Marcus A. Barber
ThucMinh Nguyen
John W. Downing
Heather S. Kim
KASOWITZ BENSON TORRES LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065
(650) 453-5170

Hershy Stern
Howard L. Bressler
Joshua A. Whitehill
Shelley Ivan
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

Paul G. Williams
KASOWITZ BENSON TORRES LLP
1230 Peachtree Street, NE, Suite 2445
Atlanta, GA 30309

*Attorneys for Plaintiff WSOU Investments*
*LLC d/b/a Brazos Licensing and*
*Development*

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

 /s/ *Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

OF COUNSEL:

Hilda C. Galvan
Keith B. Davis
Christopher A. Buxton
JONES DAY
2727 North Harwood Street
Dallas, TX 75201-1515
(214) 220-3939
hcgalvan@jonesday.com
cbuxton@jonesday.com

David B. Cochran
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216) 586-7029
dcochran@jonesday.com

Thomas W. Ritchie
JONES DAY
77 West Wacker Dr.
Chicago, IL 60601-1692
(312) 269-4003
twritchie@jonesday.com

Jonathan McNeal Smith
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
(213) 243-2559
jonathansmith@jonesday.com

*Attorneys for Xilinx, Inc.*

Dated: April 5, 2022